1              UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF TEXAS

3    _____

4

     HEB GROCERY COMPANY, LP,

5          Plaintiff,

6    vs.                    Case No. 4:17-cv-02810

7    TODD MEAGHER, IRENE ALEXIS MEAGHER,

8    and MYSTORE, INC.,

9          Defendants.

10   _____

11

12

13                     CONFIDENTIAL

14              VIDEOTAPED DEPOSITION OF

15               MICHAEL J. LINDELL

16

17

                 Taken on January 15, 2019

18               Commencing at 9:07 a.m.

19

20

21

22

23

24

25   REPORTED BY:   PAULA K. RICHTER, RMR, CRR, CRC

```
 1              CONFIDENTIAL VIDEOTAPED DEPOSITION OF MICHAEL

 2    J. LINDELL, taken on January 15, 2019, commencing at

 3    9:07 a.m., at Oakridge Hotel and Conference Center,

 4    1 Oakridge Drive, Chaska, MN 55318, before Paula K.

 5    Richter, Registered Merit Reporter, Certified

 6    Realtime Reporter, and Notary Public of and for the

 7    State of Minnesota.

 8

 9                        **********

10

11                        APPEARANCES

12

13    ON BEHALF OF THE PLAINTIFF:

14          Mr. Jason M. Powers, Esq.

15          VINSON & ELKINS

16          2300 First City Tower

17          1001 Fannin Street

18          Houston, Texas 77002-6760

19          (713) 758-2522

20          jpowers@velaw.com

21

22    - and -

23

24

25    (APPEARANCES continued on next page)
```

```
 1    APPEARANCES (Continued)

 2    ON BEHALF OF THE PLAINTIFF:

 3          Mr. Tyson D. Smith, Esq.

 4          PIRKEY BARBER

 5          600 Congress Avenue

 6          Suite 2120

 7          Austin, Texas 78701

 8          (512) 482-5246

 9          tsmith@pirkeybarber.com

10

11

12    ON BEHALF OF THE DEFENDANTS:

13          Mr. Gary L. Pate, Esq.

14          THOMPSON COE

15          One Riverway

16          Suite 1400

17          Houston, Texas 77056

18          (713) 403-8210

19          gpate@thompsoncoe.com

20

21

22

23

24

25    (APPEARANCES continued on next page)
```

```
 1    APPEARANCES (Continued)

 2    ON BEHALF OF MIKE LINDELL PRODUCTS, LLC AND THE

 3    WITNESS:

 4          Mr. Joseph Springer, Esq.

 5          MY PILLOW, INC.

 6          343 East 82nd Street

 7          Suite 100

 8          Chaska, Minnesota 55318

 9          (952) 826-8603

10          jspringer@mypillow.com

11

12

13    ALSO PRESENT:   Ira Livingston, IV - Videographer

14

15

16

17

18

19

20

21

22

23          NOTE:   The original transcript will be

24    filed with VINSON & ELKINS, pursuant to the

25    applicable Rules of Civil Procedure.
```

```
 1                          INDEX

 2

 3   WITNESS:    MICHAEL J. LINDELL              PAGE:

 4      DIRECT EXAMINATION BY MR. POWERS........... 9

 5      CROSS-EXAMINATION BY MR. PATE.............. 111

 6      REDIRECT EXAMINATION BY MR. POWERS......... 127

 7      RECROSS-EXAMINATION BY MR. PATE............ 135

 8      FURTHER REDIRECT EXAMINATION BY MR. POWERS.. 145

 9

10   OBJECTIONS:

11         By Mr. Pate:      69, 70, 74, 81, 127, 148

12         By Mr. Powers:    124

13

14   LINDELL EXHIBITS MARKED:                     PAGE:

15   EXHIBIT 1   Deposition Subpoena for Michael

16               Lindell.......................... 10

17   EXHIBIT 2   Deposition Subpoena for Mike

18               Lindell Products................. 10

19   EXHIBIT 3   Documents Produced by Michael

20               Lindell, Bates MP001-38.......... 11

21   EXHIBIT 4   MyStore Website Pages............. 11

22   EXHIBIT 5   Responses to Plaintiff's

23               Interrogatories.................. 38

24   EXHIBIT 6   Trademark Application for

25               My Store......................... 84
```

1      (EXHIBITS continued)

2      EXHIBIT 7    Trademark Application for

3                   MyStore.com....................... 84

4      EXHIBIT 8    Trademark Application for

5                   Graphical Word Mark............... 84

6      EXHIBIT 9    Trademark Applicatio for

7                   Shopping Bag Logo................. 84

8

9      (Original exhibits attached to original transcript;

10     copies attached to transcript copies.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 P R O C E E D I N G S

2                 THE VIDEOGRAPHER:   We are on the

3    record to begin the video recorded deposition of

4    Michael Lindell in the matter of HEB Grocery

5    Company, LP versus Todd Meagher --

6                 MR. POWERS:   Meagher.

7                 THE VIDEOGRAPHER:   -- Meagher, et

8    al.

9                 Today's date is January 15th, 2019.

10   The time is 9:07 a.m.

11               This case is filed in the United

12   States District Court, the Southern District of

13   Texas, under civil action number 4:17-CV-02810.

14   This deposition was requested by Jason M. Powers

15   of Vinson & Elkins, LLP, counsel for the

16   plaintiff.

17               We are in Oakridge Hotel and

18   Conference Center located at 1 Oakridge Drive in

19   Chaska, Minnesota.

20               The court reporter is Paula Richter

21   with the offices of Lexitas.   And my name is Ira

22   Livingston, IV.   I am a representative of Lexitas

23   located at 13101 Northwest Freeway, Suite 210, in

24   Houston, Texas.

25               If all counsel present could

```
 1    identify themselves and whom they represent and

 2    the location of their offices.

 3              MR. POWERS:  Jason Powers for the

 4    Plaintiff, HEB Grocery, from Houston, Texas.

 5              MR. SMITH:  Tyson Smith, law firm of

 6    Pirkey Barber, also representing HEB, located in

 7    Austin, Texas.

 8              MR. PATE:  Gary Pate with Thompson,

 9    Coe in Houston representing

10    defendants/counter-plaintiffs Todd Meagher, Alexis

11    Meagher, and MyStore, Inc.

12              Jason, can we agree to designate

13    this deposition transcript as confidential?

14              MR. POWERS:  We can.

15              MR. PATE:  Thank you.

16              MR. SPRINGER:  Joe Springer, general

17    counsel of MyPillow, representing Mike Lindell

18    Products, LLC and Mike Lindell individually.

19              THE VIDEOGRAPHER:  If the court

20    reporter could please swear in the witness, we may

21    continue.

22              MICHAEL J. LINDELL,

23    duly sworn, was examined and testified as follows:

24

25                        (Next page, please.)
```

| | |
|---|---|
| 1 | DIRECT EXAMINATION |
| 2 | BY MR. POWERS: |
| 3 | Q.  Good morning, sir. |
| 4 | A.  Good morning. |
| 5 | Q.  Would you please state your name for the |
| 6 | record. |
| 7 | A.  Michael James Lindell. |
| 8 | Q.  Mr. Lindell, you understand that I represent |
| 9 | the plaintiff in this case, HEB Grocery? |
| 10 | A.  Uh-huh, yes. |
| 11 | Q.  Have you given depositions before, |
| 12 | Mr. Lindell? |
| 13 | A.  Yes. |
| 14 | Q.  About how many times would you say you've |
| 15 | done it? |
| 16 | A.  I don't know.  Five maybe. |
| 17 | Q.  Okay.  So you're familiar -- |
| 18 | A.  Aren't you going to ask me how I did? |
| 19 | Q.  But you're familiar with the procedure.  You |
| 20 | understand -- |
| 21 | A.  Yes. |
| 22 | Q.  -- the ground rules? |
| 23 | A.  Yes, yes. |
| 24 | Q.  Very good.  Just for the sake of formality, |
| 25 | let me present to you what I'll mark as Exhibits 1 |

1   and 2 to your deposition.

2               (Exhibit 1 and Exhibit 2 were marked

3   for identification.)

4   BY MR. POWER:

5   Q.  And just ask you to confirm that these are

6   the subpoenas pursuant to which we are taking your

7   deposition today.

8   A.  Yes.

9   Q.  The deposition that is directed to Mike

10  Lindell Products, LLC requests that that

11  organization designate a representative to appear

12  on its behalf.  Are you that representative today?

13  A.  Yes.

14  Q.  That request also seeks the production of

15  three categories of documents.  Before we begin,

16  your counsel, Mr. Springer, handed us a stack of

17  documents with the labels MP1 through MP38.  Are

18  these the documents that Mike Lindell Products,

19  LLC produces in response to the subpoena today?

20  A.  Yes.

21  Q.  I will mark your copy of that as Exhibit 3 to

22  the deposition, and we may refer to pages of that

23  as we go through --

24  A.  All right.

25  Q.  -- the day.

1    (Exhibit 3 was marked for

2  identification.)

3  BY MR. POWERS:

4  Q.  The jury, I suspect, will be familiar with

5  you and your business, so I think we can dispense

6  with some of the background questions, but let me

7  ask you this:  Your company is currently the owner

8  of an Internet domain name called MyStore.com; is

9  that right?

10  A.  Correct.

11  Q.  And which entity is it that owns that domain

12  name?

13  A.  Mike's Products, LLC.  Mike's --

14          MR. SPRINGER:  I think Mike Lindell

15  Products, LLC.

16          THE WITNESS:  Or Mike Lindell

17  Products, LLC.

18  BY MR. POWERS:

19  Q.  Mike Lindell Products, LLC.

20  A.  I've got a lot of LLCs.

21  Q.  Okay.  Have you seen the website that is

22  currently occupying that domain name, MyStore.com?

23  A.  Yes.  I built it the other day.

24          (Exhibit 4 was marked for

25  identification.)

1    BY MR. POWERS:

2    Q.    Does Exhibit 4 appear to be the website as it

3    currently exists today for --

4    A.    Yes.

5    Q.    -- MyStore.com?

6    A.    Yes.

7    Q.    Could you tell us what MyStore.com is going

8    to be, sir?

9    A.    It's going to be a platform for entrepreneurs

10   that are -- that in this country get lost where

11   they go on Amazon and they get corruptly copied by

12   people on Amazon, companies taking their ideas and

13   copy them overseas.

14            They -- it's basically a safe haven

15   for entrepreneurs that have brought me products

16   over the last two or three years to be able to

17   have a safe platform where millions of eyes are

18   going to come and purchase their products.

19   Q.    So this will be for people who are inventors

20   or they have business ideas?

21   A.    They'll be inventors.  It could be ideas.  It

22   could be inventions.  It could be -- I have

23   another company vetting them right now that's on

24   the website where they either have to help people

25   in -- mentally, physically in their faith or may

1  be the entrepreneur.  A lot of them will be Made

2  in the USA products.  And this is gonna be -- I

3  basically took all the problems that entrepreneurs

4  have and opened the gates where they can, you

5  know, have access to an amazing platform to sell

6  products, and I'll get the eyes there.

7  Q.  Gotcha.  So the concept is that these

8  products that are offered through the website will

9  all have some kind of faith or health component

10 associated with them?

11 A.  Faith, health, physically, mentally.  It's

12 got to -- it's got to be a purpose, not for them

13 just to make money.  But it could be just to help

14 the entrepreneur if it's a good product.  I mean,

15 it's very -- it's very much in my discretion what

16 I'm going to put up there.  This is my reputation

17 too.  I'm not going to put up any products where

18 corrupt people are behind it or things that don't

19 meet my criteria to let them up in the platform.

20          And it's going to be -- right now

21 entrepreneurs are blocked from box stores.

22 They're blocked everywhere.  They -- like, you

23 know, and they -- and patents are as good as the

24 paper they're printed on sometimes.  I mean,

25 it's -- so all the problems I've had as an

Michael J. Lindell                                                                      14

```
 1    entrepreneur, I took -- you know, I feel sorry for
 2    these entrepreneurs and -- getting these to idea.
 3            And then the revenue generated from
 4    MyStore, most of that or all of it's going to go
 5    to fund my recovery network and -- for addicts.
 6    Me being a former crack addict, they -- I've got
 7    an amazing platform for that that's going to help
 8    addicts across the country.  We'll have paid
 9    mentors.  And then also my foundation.
10    Q.  Do I understand that the inventors or other
11    sellers who are using the platform will be dealing
12    with a company called MS Product Development,
13    LLC --
14    A.  No.
15    Q.  -- is that right?
16    A.  No.  They'll be dealing with Mike -- Mike
17    Lindell, LLC, the management or whatever.  This
18    is -- this other company is a company that's
19    vetting them.  I mean, you know --
20    Q.  I see.
21    A.  -- they're vetting the products, screening
22    them.  You get -- you know, not every product
23    entered is going to make it.  There's -- you know,
24    there's a lot of crazies out there, you know.
25    Q.  Could you describe --
```

```
 1   A.  I invented a pillow.  You should invent this

 2   dog bed.  Really I've had it for four years, you

 3   know.

 4   Q.  And just very briefly, I don't need the

 5   details on this, but what will that vetting

 6   process entail in a general way?

 7   A.  You know, where they are is that you're not

 8   just vetting the product and -- and see how far

 9   they are along.  Imagine -- like you've seen Shark

10   Tank.  You've seen this -- other inventor sites.

11   You're vetting not just a -- the product to see,

12   you know, is it useful?  Where does it come from?

13   Is there a purpose behind it?  Who's the

14   entrepreneur?

15               I mean, it's not gonna -- I mean,

16   this isn't gonna be another platform for some --

17   for this entrepreneur that's got -- that's got it

18   made out there unless the product would actually

19   help people on this end.  It's got to have a

20   purpose, the whole thing.

21               And there's -- there's -- and, you

22   know, ideally the product would help people.  The

23   entrepreneur would be making them, you know, and

24   it may be in his garage and he doesn't have enough

25   money to go to the next level.  We'll be helping
```

1   on different levels with that.

2            You know, when an entrepreneur goes

3   on Shark Tank, they might need money, they might

4   need manufacturing, they might have a great idea

5   and they don't even know how to get it there.

6   They might have -- they might just need marketing.

7   They have great -- that's usually the case.  They

8   need marketing.

9            And you get up on corrupt Google or

10  corrupt Amazon or corrupt Facebook or corrupt

11  Twitter -- did I say that -- you get up on these

12  platforms and you get swallowed up by corruptness,

13  and that -- it's a bad space for an entrepreneur

14  to be in.

15           You can -- I had one just the other

16  day, a great product here in Minnesota.  He came

17  to me, a little entrepreneur.  He's got his life

18  savings, him and his wife.  It was their life

19  savings.  They're like, I don't know, 60, 70 years

20  old.  And a great product.  And he went up on

21  Google, didn't know what he was doing, and they

22  swallowed up all his money.  It was like 20 grand,

23  and he didn't even know what button he hit for --

24  to buy ads.  And here, of course, guess what?  You

25  don't get your money back.  If you don't pay us,

1   you don't get to be on Google.  Well, isn't that

2   something?

3   Q.  Okay.  So you would anticipate that some of

4   the inventors who will be featured on this

5   platform will be people who need help in the

6   manufacturing process?

7   A.  It could be anything.  It could be very

8   broad.  Manufacturing, money, marketing.

9   Basically a safe platform.

10          There's a difference.  You can go up

11  on a platform.  You can go up on Amazon and within

12  three days you're going to be copied something

13  made overseas right next to you.  They're

14  advertise -- they're going to sell ads above you

15  depending on how good your product is.  By the

16  time you see your product, you're going, what was

17  I googling anyway?

18  Q.  So you may be working with these inventors or

19  others and take their ideas and actually make them

20  into saleable products?  Is that --

21  A.  They're not just ideas.  Most of them have

22  products.  They -- you know, it's just -- it's

23  real broad.  You know, we've got from over here

24  just an idea, over here to where they've got --

25  they've been working out of their garage and they

1    can't -- it's a great idea but they get -- there's

2    no platform.

3              If you go do shows and fairs and

4    stuff, which is a great platform to learn about

5    your product in this country, you get copied by --

6    I won't even name the companies -- they'll copy

7    your product and they'll -- because they have

8    access to all the box stores, and they'll put them

9    in there and it's -- you're done.  You're going,

10   what, my product is already in Walmart?  Are you

11   kidding me?  This is crazy.

12             And those are the -- that's the

13   biggest group probably right there, that they've

14   got great ideas, great products.  Or they'll go on

15   a GoFundMe and they're -- and they're -- and then

16   they're copied there.  Before they even get their

17   funds, their product is out there.

18             Now, you can sit there and say,

19   well, you know -- well, I've got a patent.  Well,

20   whoop-de-do, you know.

21   Q.  Right.

22   A.  By the time these corrupt people then go to

23   the entrepreneur and they go -- you know, even if

24   it did go all the way to court, well, here's a

25   million dollars.  He might have made 100 million,

1    you know.  It's just -- it's all part of them

2    doing business, all the corruptness when it comes

3    to inventions in this country and Made in the USA.

4    Q.   Okay.  So using the MyStore.com platform,

5    some of these vendors will be able to market their

6    products; is that right?

7    A.   Yeah, absolutely.

8    Q.   And will they also be able to actually sell

9    the product on the website?

10   A.   That's what they're doing.

11   Q.   Okay.  And it's --

12   A.   This is a sales platform.

13   Q.   Right.  So it won't just be advertising.  It

14   will be -- you can actually make a purchase on the

15   website?

16   A.   Yeah, absolutely.  It's all -- this is all --

17   this is all -- you come on board.  We don't just

18   teach you -- you know, we're not a teaching

19   company, how to fish; this is where you fish in

20   this pond.  I'm going to bring all the eyes there

21   in this country to this platform --

22   Q.   Okay.

23   A.   -- you know.  I want to do what Amazon did in

24   15 years, do it in 2.

25   Q.   And you will be -- your company will be

```
1    providing services, actually helping to ship
2    product after it's --
3    A.  Yeah, yeah.  We made a big deal with a big
4    shipping company.  And I won't name their name.
5    It's FedEx.  Great company.  They -- yeah, I'm
6    going to have hubs around the U.S. where --
7    because we're going to be so big.  I know the -- I
8    know numbers.  I know scalable numbers and I
9    know -- I know all the advertising world and I
10   know the eyes that are going to come there, so I
11   had to go to them to say, here's how big we're
12   going to get and here's what we're going to need
13   for hubs, because I don't want to implode them
14   either, you know.
15   Q.  Right.
16   A.  I know that sounds -- you know, you're going
17   to implode FedEx?  Well, I want my people to get
18   the stuff on time, so we -- you know, if all of a
19   sudden this happens the way it's gonna happen, you
20   know, I cross all the T's and dot the I's, you
21   know.
22   Q.  And you'll be able to accept payments on
23   behalf of the manufacturers and the inventors and
24   the sellers and --
25   A.  Yeah.  There's -- you know, the way things
```

1  work on that, Amazon does it like in three ways.

2  You can sell product directly to Amazon.  You can

3  give them product directly to Amazon, where they

4  house it and sell your product.  You control

5  everything but the -- but they're shipping out of

6  the warehouse.  Or you can ship it yourself.

7           Now, they have -- the problem there

8  is obviously Amazon shows favoritism if they get

9  this and this and this.  It might be a little

10  twisted there.  So you're taking all the -- you're

11  tweaking all the good things of things that are

12  already out there, putting them on there -- you

13  know, it's like reverse-engineering anything.  You

14  take all the -- add all the good, keep the good,

15  get rid of the bad.  And this is what this lineup,

16  one of the beautiful sales -- and then all you

17  need is eyes.  I'll bring the eyes --

18  Q.  Okay.

19  A.  -- you know, so it's going to be --

20  Q.  But your website will actually be able to

21  help with distribution and fulfillment and --

22  A.  It does everything.  That's what -- yeah.

23  I'm going to be -- yeah, I'm going to be -- I'm

24  being that fulfillment.  I'm being that -- the

25  marketer.  I'm getting the eyes there.

1        I have -- we're building a studio,

2    getting a studio now where we're going to be

3    filming the entrepreneurs.  Every square is going

4    to have a story behind it.  It's not just, here's

5    a product.  Here's a coffee cup.  It's -- no.

6    It's going to be, this entrepreneur, what was your

7    passion behind it?  It's kind of like every square

8    of -- meaning MyPillow when it was back in the

9    day, this entrepreneur, he's got a story.

10            Incidentally, that's one of the

11   reasons I like the name MyStore.  I didn't want it

12   to be Mike's Products.  I wanted that entrepreneur

13   to take some pride in -- you know, hey, you can go

14   to MyStore.  It sounds kind of cool.  You go to

15   MyStore and you've got -- you know, you can see my

16   product there.

17            You don't say, go to Mike's store or

18   Mike Lindell, you know.  I don't want to take

19   their products.  I want them to have -- you know,

20   to be -- take some passion and -- you know, in

21   their invention, you know.

22   Q.  And the website will actually feature

23   demonstration videos that your company produces?

24   A.  Yeah, yeah.  It will be -- yeah, we'll be

25   producing anything that goes up there.  That's

1   representing me now too, this platform.  It's

2   going to be the most amazing platform where you

3   have -- you have a square with a product and

4   there's a story behind the entrepreneur.

5              You're not just saying, here's the

6   best coffee cup ever.  That's not how I market, as

7   you know.  You know, this is -- this is where --

8   you know, there's a story behind it.  Why am I

9   backing this guy?  Why do I care about this

10  entrepreneur?  And I'll tell you a story.  Hey,

11  this guy is a good guy.  He's from Burnsville,

12  Minnesota or whatever and he was working out of

13  his backyard and we found him.  This is the best

14  invention.  You know, this is the best thing since

15  sliced bread, you know, and stuff like that.

16             And then -- and then he might have a

17  website within the website maybe or to transfer

18  over or if they -- and if they want to leave, you

19  know, they can go out there with all the

20  corruptness.  They're welcome to do that.  And

21  they might not because of the way Google and

22  everything else works, the corrupt ad buying, that

23  if he does that, they might not be able to be on

24  here.  I'm checking those yet, because it becomes

25  too much for us to fight Google AdWords and fight

1  for all their products.

2            That's just -- you know, if they

3  want to stay safe, stay here.  If you want to go

4  out here, go ahead.  Good -- you know.  I'm not

5  saying it can't be done because I did it, but

6  it's -- you've got to -- better know where the --

7  what's behind that door.

8  Q.  It sounds like this project is very much

9  informed by your own experience starting a

10  business?

11  A.  Absolutely.

12  Q.  When did you first conceive of this idea of

13  providing a platform to --

14  A.  I would say at least two years ago.  It could

15  be three.

16  Q.  At the time when you had this idea, did you

17  know you wanted to call it MyStore?

18  A.  No, no.  In fact, one of the biggest drivers

19  to this is going to be my book when it comes out

20  because 30 million people are going to get my book

21  and I can send them all, so you have instant eyes.

22            And when I was -- and my book wasn't

23  ready yet back then, and I was -- you know, the --

24  we thought of different ideas.  We thought of --

25  and you can even look back.  We've got like Mike's

```
 1   Products and stuff.  And I would just sit and --
 2   sit and think about it, pray about it and go, no,
 3   that just -- I always look at everybody's end
 4   game.  Here's the entrepreneur, if I'm telling you
 5   on the street, I don't like that name, you know,
 6   Mike's products, you know.  Some people may not
 7   like me, you know.  I don't know where.  No, I'm
 8   just kidding.  That's my political ad there.
 9   Q.  Were there other names that you had
10   considered where you were actually looking at
11   domain names and trying to acquire domain names?
12   A.  Yeah.  Mike's Products I think was one.
13   Mike's -- Mike's Store, is just a couple that come
14   to mind.  We've got a whole -- and a lot of them
15   we -- you know, I had my -- my group -- I have
16   like two people I do all my stuff with.  My --
17   these two gals have been with me for a long -- and
18   we sat in a room and then actually this -- another
19   guy too.  And we just threw stuff around in the
20   room, and then you'd -- you know, another week
21   would go by and you'd look at them again and go,
22   no, that just don't sound right and -- just don't
23   sound right and -- yeah.
24            I wanted to tie in where people knew
25   it was me but -- putting all my credibility on it,
```

1    but -- but not necessarily being grandiose, saying

2    they're Mike's products.  And that's -- that's a

3    big thing because the entrepreneur, I just want

4    them to, you know, have what I've had with

5    MyPillow.  To have that sense, you know, what an

6    amazing thing to get through, to bust through all

7    this and be able to get this -- something you made

8    and produced to market.

9              And -- and I worked seven years in

10   the trenches, they call them, home shows and fairs

11   throughout the U.S. and Canada, and I watched so

12   many -- so many good products get copied, taken.

13   I watched -- I'm not going to name big companies,

14   but I'm -- I've seen it happen there too like you

15   wouldn't believe, on -- on all platforms.  And I

16   know these people.  I'm going, how could you do

17   this to people?

18   Q.  So did the idea of calling it MyStore come

19   out of one of these meetings --

20   A.  Uh-huh.

21   Q.  -- with you and your team?

22   A.  Yep, yep.

23   Q.  And at -- and once you identified that name

24   as being a name you liked, you sent someone to go

25   figure out --

1    A.  I moved --

2                THE COURT REPORTER:  I'm sorry.  Can

3    you try and wait until he's done with the

4    question?

5                THE WITNESS:  Okay, sure.

6                THE COURT REPORTER:  You're kind of

7    talking over each other.

8    BY MR. POWERS:

9    Q.  I'm sorry.  Go ahead.  The -- after you

10   identified this name, you sent someone to go see

11   if you could actually acquire that domain name?

12   A.  Yeah.  In about 30 seconds.  That's how I

13   move.  It was like, have you left the room yet to

14   call, you know?  That's how I do everything.  We

15   don't have big board meetings of -- with

16   PowerPoints.  It's not how my company works.

17               We'll sit like this.  If it's the

18   right and I know it's right, I might pray about it

19   and (descriptive sound) there it is.  Go get --

20   find this guy, you know.  We've done that with a

21   lot of different things.

22   Q.  Sure.  Now, is this --

23   A.  I went through a same -- similar thing with

24   my foundation and my recovery network.  Getting --

25   like trying to get Lindell.com or dot-org.  And,

```
 1    you know, there's another thing.  You want to talk
 2    about corruptness, you can't even get your own
 3    name, you know.  Mike Lindell.com I can't get, you
 4    know.
 5                 But they -- you know, so we went
 6    through that.  So yeah, we sent -- I sent them
 7    right away to get ahold of whoever, you know.
 8    First you look it up and then you've got to try
 9    and reach out to whoever it is.
10    Q.  And is this something that you assigned to
11    Todd Carter?
12    A.  Uh-huh.
13    Q.  And for the jury's information, who is Todd
14    Carter and what's his job title?
15    A.  He's my top -- what's his title?  It's IT --
16    I mean, he's my intelligence officer.  I don't
17    know what you'd call him.  He's --
18    Q.  Is he the chief technology officer?
19    A.  Yeah, the chief technology officer.  I don't
20    know --
21    Q.  Is there a --
22    A.  I just figured out what a CEO is a few years
23    ago.
24    Q.  And does he work for an entity called Lindell
25    Technologies, LLC?
```

1  A.  Yeah.  And Lindell Management, L -- and

2  Lindell Management.  I think -- I think Lindell

3  Technologies is under that.  He's got --

4  Q.  Okay.  Were there any other domain names that

5  he was investigating potentially acquiring at the

6  time?

7  A.  No.  That's the one I sent him, go get it

8  because I just knew it was right.  I just -- when

9  it got brought up, I went, wait a minute, that's

10  perfect.  Because I imagined the entrepreneur on

11  the other end, and that's all I could think of was

12  him telling his friend, go to MyStore, and it

13  would be like a branding like no other, you know.

14  Q.  Right.

15  A.  It was kind of like MyPillow.  You know,

16  where's MyPillow, you know?  Back then it sounded

17  weird.  Any my's sounded very weird.  I was one of

18  the first ones ever, and I'm going, that's kind of

19  corny, but --

20  Q.  But it worked.

21  A.  The my's exploded.

22  Q.  So do you have an understanding of how

23  Mr. Carter went about locating the owner of

24  MyStore.com, the domain name?

25  A.  I don't know what he does on his computer and

```
 1   tech.  I use everything on an iPhone, so I don't
 2   know what he -- if there's some search thing, but
 3   he found out, I guess -- this is my assumption and
 4   what he's told me.  He found out who had the
 5   domain.  And then I said -- I said, call him.
 6              And this -- you've got to realize,
 7   this isn't like, okay, I'll get back to you
 8   like -- and we're going to have a meeting next
 9   day, a board thing.  That's not how my company
10   rolls.  I don't even use an office.  I go
11   around -- I get them on the phone, you know.
12              I believe it might even been that
13   day he got ahold of him, probably within two
14   hours.  And then I not only said -- I think I --
15   he comes back I think after he had found him and I
16   said, well, get him up here, you know.  I think he
17   was up here like in a day or two.  It was pretty
18   fast.
19   Q.  Okay.  And Mr. Carter sent an e-mail to Nick
20   Meagher, who is the son of Todd Meagher; is that
21   right?
22   A.  Uh-huh.
23   Q.  And is that what this page 1 in Exhibit 3, is
24   that his e-mail inquiring about the --
25   A.  Yeah, right.
```

1    Q.  -- website?

2    A.  Yep, yep.

3    Q.  All right.  I notice Mr. Carter says here in

4    the postscript that, "I live in Southlake, Texas

5    too."

6             Does Mr. Carter permanently reside

7    in a different location, not Chaska, Minnesota?

8    A.  No.  He lives in Texas.  He is -- he flies up

9    here every week -- just about every week.

10   Q.  Do you know whether he has any prior

11   relationship with the Meaghers or their

12   businesses?

13   A.  Uh-uh, absolutely not.  We thought it was --

14   we looked for divine appointments.  We thought it

15   was a divine appointment that they were like

16   within blocks of each other.  That's what I look

17   at.  And I thought, well, this is meant to be.

18   That's a sign, you know.

19             And I literally said that to people.

20   I'd go, wow, this is it, you know.  Didn't I?

21   That's the way I -- so . . .

22   Q.  At the time that you sent Mr. Carter to see

23   if he could acquire this domain name, had anyone

24   at your company gone to look at what was currently

25   up at MyStore.com --

1   A.  No.

2   Q.  -- the current --

3   A.  I don't believe so.  I don't know -- I don't

4   know if -- that I don't know.  I'm sure Todd did,

5   and he probably said that, you know, his -- I

6   mean, he probably gave me some details.  I'm

7   not -- I can't answer that, what exactly he said

8   it was.

9           If there was details -- if we were

10  looking at something else, he'd say, this guy --

11  you know, let's say it was my recovery network.

12  He'd say, this guy owns this and they're using it

13  for X.  You know, he's doing treatment in south

14  Florida, you know.  I remember -- I remember a

15  conversation I had.

16          MyStore, there was nothing like -- I

17  believe it either wasn't being used or -- you

18  know, he probably gave me a brief history or

19  whatever, you know.  I don't think it was written

20  up there for sale, but I don't know that.  I

21  can't -- I have no idea on that.

22  Q.  Certainly at the time you didn't have an

23  understanding that there was a well-established

24  business that you needed to buy out?

25  A.  I had no idea.

1   Q.   Okay.  At the time --

2   A.   I liked the name so much, I was pretty

3   excited.   I just thought, if it's meant to be,

4   this will happen.   It's a divine appointment.   And

5   that's when he said it's two blocks away or

6   whatever, two miles away.   I thought, wow, this --

7   it's all coming together.

8   Q.   Now, at the time you assigned to Mr. Carter

9   this task of acquiring the domain name, was he

10   supposed to acquire anything else from the owner,

11   like a business, trademarks, anything like that?

12   A.   Well, this -- this -- he was supposed to

13   just -- you know, Todd doesn't get to make the

14   decision to go buy this.   You know, Todd did

15   the -- does the due diligence.   Everything comes

16   before me and my company.   Nobody gets to go out

17   there and make some kind of decision like this

18   without me, ever.   We run off blocks and

19   deviations.   They can't just make a change and not

20   tell me about it.   You know, it has to be --

21   that's how I run my company.

22           So he went and did what -- the due

23   diligence, said I could get the guy up here I

24   think -- I want to say this was maybe on a Monday.

25   It might have been Wednesday or Thursday.   It was

1   like real fast, you know.

2           And then when he came up here, then

3   everything was -- you know, was Todd and I

4   talking.  Todd Meagher, you know --

5   Q.  Right.

6   A.  -- I meant.

7   Q.  No, good point.  We have a pair of Todds

8   here.

9           Okay.  So did you do any kind of

10  background research on Mr. Meagher or his business

11  before making the acquisition?

12  A.  Todd would have done that too, you know.  He

13  would have said, you know, the -- but that would

14  have probably been done, you know, maybe --

15  because things happen so fast -- I don't know if

16  it was before he got here, when he got here, you

17  know.

18          I know for sure when he got here,

19  that that was -- you know, who are you?  Who are

20  you with?  Who are you?  You know, that type of

21  thing.

22          Basically, on a -- I've been -- you

23  know, for me, I've got to do stuff.  A lot of

24  betrayal, a lot of burns.  I've got to find out,

25  you know, okay, what's behind this.

1          And that's when I actually found out

2   that he was -- they had brought up some partner of

3   his.  It was John Lennon's kid or something like

4   that.  I remember hearing that.  There was some

5   due diligence done because I remember hearing

6   that, you know.

7   Q.  Were you ever concerned that the market was

8   already too familiar with the existing MyStore.com

9   business that it wouldn't be an effective vehicle

10  for you to use?

11  A.  Oh, no, that didn't come up at all.  That --

12  if it would have been established out there as

13  some kind of MyStore entity, you can't -- you

14  couldn't have -- it would have been too hard to

15  completely change a brand.

16          If it would have been -- it would

17  have been like this:  If I -- my recovery network,

18  there was a name we picked -- I'll give an

19  example -- and it was so established in the

20  secular market that -- in two states, that -- and

21  it's something I'm totally against.  I'm a -- I

22  follow faith-based, Jesus based, and I'm not

23  gonna -- I would never take that name and try to

24  rebrand it, even in that little space.

25  Q.  Right.

1   A.  So I know that there was nothing out there

2   that would have -- when it was checked on, that

3   would have hurt us, you know.  It was all --

4   everything would have had to be proactive, not

5   reactive.  Put it that way.  That's what I

6   thought.

7   Q.  Now, I think -- I think I understand what the

8   answer to this question will be, but you hadn't

9   authorized Mr. Carter to go with a budget and say,

10  you go acquire?

11  A.  Absolutely not.

12  Q.  His job was to bring the seller to you?

13  A.  Yeah.  You bring him to me.  I'll decide, you

14  know.  His -- his idea of a low budget might not

15  be mine or -- if I have a high budget, you know.

16  Q.  Okay.

17  A.  I've paid stuff for here if it's -- if it's

18  right in my space, you know, it's not necessarily

19  what this is.  It's -- I can see long-term what

20  it's going to be and it's -- sometimes the dream

21  is worth more than the market says, or less or --

22  you know.

23  Q.  Now, I don't want to know what your budget

24  was, but let me just ask the question.

25  A.  There was no budget for him.  He can't

```
 1   make -- he can't --

 2   Q.  No, I understand --

 3   A.  Right.

 4   Q.  I understand that.  What I mean to say is

 5   when Mr. Meagher came to meet you, did you already

 6   have a budget in mind for what you thought --

 7   A.  Absolutely not.

 8   Q.  Okay.

 9   A.  Absolutely not.

10            Is there an amount I wouldn't have

11   paid?  I don't even know that.  I can't even

12   answer that because it never -- you know, there

13   was nothing in my head.

14   Q.  Absolutely.

15   A.  I kept a very open mind, okay?

16   Q.  So Mr. Carter sends his e-mail to

17   Mr. Meagher, and then -- sends to Nick Meagher,

18   the son.  And then Todd Meagher, the father, calls

19   back.

20            Did Mr. Carter relay to you what

21   Todd Meagher said to him in that initial phone

22   call?

23   A.  You know, I don't recall and I'm going to say

24   I don't recall.  All I know is that I think he

25   was -- if I remember right, he was open to coming
```

1    up here.  And at first I said, well, why did --

2    why does -- this is what I said.  I remember

3    saying, why does it -- you know, do we really need

4    him to come up here?  Can't you see the -- and

5    then -- and then I just -- I get stuff like

6    instantly and I go, you know what?  Go ahead.

7    Because I'm just -- in my head, I'm going, if he

8    wants to comes up -- you know, if he can come up,

9    he's got a space.  Get him up here, you know.

10   Q.  Okay.  Just to see if it might help jog any

11   recollections, do you recall that you and Mike

12   Lindell Products, LLC responded to written

13   questions in the case?  I'll mark Exhibit 5 to

14   your deposition a copy of interrogatory responses

15   that you gave.

16             (Exhibit 5 was marked for

17   identification.)

18   BY MR. POWERS:

19   Q.  And I think if you turn to page 7, the final

20   page, is that your signature there?

21   A.  Yeah, okay.  Which -- where do you want me to

22   start reading here?

23   Q.  Okay.  So let's look at -- on page 3 -- no,

24   no, I'm sorry.  I take that back.

25             Page 4, you see this question:  "And

```
 1    please describe the sequence of offers and
 2    counter-offers" and it goes on?
 3              So the answer says --
 4    A.  I think -- this -- when it says here, over 1
 5    million, I remember -- I remember -- I do remember
 6    something about 1.7 million.  I've got like 1.7 or
 7    something that Todd came back.  I go -- and I'm
 8    going, what?  Well, what does it -- you know, what
 9    does it entail?
10    Q.  And that's -- that's kind of what I wanted to
11    find out about.
12    A.  I do remember that part, I mean, now that I
13    see this.
14              But when you say over 1 million,
15    I -- I just remember thinking, okay, this is --
16    this is serious now.  We've got to get him up
17    here, you know.
18              And at that point -- and I'll
19    just -- I'll interject here.  It was at that point
20    I'm going, you know, this is a lot -- this is a
21    lot of money.  How do you have this much money
22    into a domain, whatever, and all this.
23              And then I asked another guy in my
24    company, you know, the name "MyStore."  And he
25    says, oh, it's a short name; it's worth a lot, you
```

1    know.   I remember something like that he said, you

2    know.

3    Q.   Who did you ask --

4    A.   Ben Salden.

5    Q.   Ben Salden.   And --

6    A.   Yeah.

7    Q.   And what is Mr. Salden's job?

8    A.   He does -- that's the only question I asked

9    him.

10             He does all my Google corrupt

11   fighting AdWords and stuff like that.   He's my

12   nephew.   So it was just -- it wasn't like a formal

13   meeting.   I said, Ben, are ad -- you know, are

14   domains worth that much nowadays for -- you know?

15   Of course I knew that because like Lindell.com and

16   all these want millions and, you know, it's crazy.

17   Q.   So Mr. Salden, he's your nephew?

18   A.   Yeah.

19   Q.   And he did --

20   A.   He just said --

21   Q.   -- Google ad buying?

22   A.   You know, he didn't Google ad buys.   He just

23   said -- right to me, he said -- he says, yeah,

24   they're worth a lot; it's a short name.

25   Q.   Okay.

1    A.   That's all he said.

2    Q.   Is --

3    A.   End of quote.

4    Q.   Is Mr. Salden involved in the Internet

5    businesses in some way --

6    A.   That's all he does.

7    Q.   Okay.  What does he do?

8    A.   He buys -- he buys Google AdWords, fights

9    corrupt Google all day.  He fights corrupt Amazon

10   all day.  He buys ads in that space.  He -- this

11   is our domain fighting other domains when they buy

12   our ad words, you know.  He's a millennial.  They

13   know stuff about -- in that space, you know.  I

14   just ask him because he's, you know, techy like

15   that or kind of -- you know.

16   Q.   I see.

17   A.   He had no idea, but he -- I don't think, but

18   he goes, oh, yeah, it could be, you know.  He

19   knows what other things are worth out there, you

20   know, just by, you know, probably googling around.

21   I don't know.

22   Q.   Okay.  So Mr. Salden is not someone who's

23   done some kind of formal valuation process on --

24   A.   No, no, no.  I might have -- I might have

25   asked -- I don't think I did, though, but I asked

1  Todd -- I'm sure I asked Todd, well -- and Todd

2  basically kind of confirmed.  He said, Mike, it's

3  a good name; it's a short name, you know and --

4  Q.  And you asked Todd.  Todd Carter, right?

5  A.  Yeah, yeah.

6  Q.  And to make sure I understand --

7  A.  I was just -- I thought, when I heard like

8  1.7, I'm going, okay, this is serious.  We're

9  not -- I'm not going to go over the phone back and

10 forth.  We need to do a little more due diligence

11 here --

12 Q.  Right.

13 A.  -- you know.

14 Q.  And just to make sure I understand,

15 Mr. Salden when you say he fights these various

16 companies, he's not a lawyer, is he?

17 A.  No.  You fight -- you know, that's what

18 happens to entrepreneurs.  You don't need to be a

19 lawyer to fight that.

20 Q.  Right.

21 A.  We send that to our lawyers --

22 Q.  Right.

23 A.  -- when they really -- when they really kind

24 of screw us over.

25 Q.  But his -- his --

1   A.  He does the mini -- the mini fighting every

2   day.  If you're an entrepreneur in this country,

3   you have to every single day fight off Google

4   AdWords because they sell corruptness right above

5   you.  You've got to fight Yahoo!.  You've got to

6   fight Amazon.  It's a constant battle.  You need a

7   full-time team to sit there every day to watch

8   somebody coming up and attacking you.  They have

9   ways they can attack you that on their platforms

10  are legal.  It should be an antitrust law

11  violation.  That's a whole nother story.

12  Q.  Yeah.  And I think this is an excellent

13  point, and I'm not sure the jury would appreciate

14  the way you -- how this works, so why don't we

15  explain it to them.

16          Do we have a situation where people

17  are actually going to Google and buying the

18  opportunity to put their ads up when they search

19  for your name?

20  A.  Yeah, absolutely.  That's the corruptness of

21  Google and Amazon, all of them.

22          What you have is you have

23  MyPillow.com or MyPillow.  So now I do an ad on TV

24  and someone googles MyPillow, either one word or

25  two words.  It doesn't matter, or MyPillow.com.

1        Now here comes this person up here

2   selling some knockoff pillow from China, okay, or

3   someplace, and -- and now they're up there.  Now

4   this person comes, and they even use -- they'll

5   even try and use your name in there.

6        I have one right now, MyPillow

7   versus OurPillow.  I mean, and so you think -- or

8   MyPillow.  They'll try and use your name.  Then

9   you've got to fight them.  That's not me.  And --

10  but they'll go there and that customer now, you

11  might -- he might not buy there, but he'll lose

12  the impulse buy that -- or, you know, okay, I

13  can't find MyPillow.

14       Yahoo! sells like seven ad words.

15  You can't -- you've worked hard to be organically

16  the highest, and they'll sell all these spaces

17  above you.  So you have to buy your -- a lot of

18  time you have to buy your own ad word on a

19  defense, but you can only buy one spot.

20       Then, as long as we're talking,

21  Google came out with the Google Marketplace, the

22  most corrupt thing in the United States history,

23  in my opinion.  Here's Google Marketplace:  You

24  have to have a thousand SKUs to be up there.

25       So now in my MyPillow -- take

1   MyPillow.  I can't even buy my own ad word.  So in

2   other words, if you go back to the 1970s and '80s

3   and we had a town and I -- and I had a building

4   and I was the mayor and said, you know what?  The

5   three biggest guys in town get to advertise on

6   everybody's building, but they can't even

7   advertise on their own.

8           So now what happens is you've got in

9   Overstock.com, all the -- all the big dot-coms.

10  You know, Target.com.  You know, Amazon.com.  All

11  these people that have a thousand SKUs, they put

12  their ads up there, not even maybe having your

13  pillow, or your product, or if they do, they're

14  cannibalizing you.

15          I have the power in my business.

16  I'll just turn them off like a water spigot, like

17  I did Target.  They'll never sell a MyPillow in

18  history again.  They're buying my ad words and I'm

19  going, you're killing our advertising.  You're

20  killing this little company in Dubuque, Iowa that

21  has a newspaper that needs to make a sale.  They

22  get there and you've got your corrupt ad up there

23  on Google, you know.  And Google doesn't care, you

24  know.  They don't care.

25          But these guys, since I control

1   gold, I can turn off these guys within Google

2   Marketplace.  But if I didn't have that, then

3   someone else comes up there anyway that doesn't

4   even have the pillow.

5           So it's a very -- it's a -- it's no

6   man's land.  So these big tech companies, and the

7   same thing across the board.  I mean, I could sit

8   and tell you about Facebook, Twitter --

9   Q.  But you actually have people who are full

10  time every day trying to protect --

11  A.  Every day.

12  Q.  -- your name in the marketplace?

13  A.  You protect your name, your integrity.  To

14  protect your name.  To protect -- I just had one

15  yesterday that came from a -- it's an online site,

16  online whatever.  It's blah-blah-blah.com and

17  they're selling MyPillow with my picture holding a

18  pillow, and it's right out of China.  Right out of

19  China.  It's not -- it's not MyPillow.  You get it

20  home, you're going to open the box -- the box

21  looks like mine -- and it's not a MyPillow in

22  there.  Now, what do I do?  If I'm a little

23  entrepreneur, I can't do anything about it.

24          I can go there, though, and this

25  company, this platform, they have a little fear of

1    MyPillow that, you know, you're not going to do

2    this.  And if they're really selling MyPillow too,

3    they don't ever get to sell it again because we

4    just turn off the company if they're corrupt.

5    This company happens to be corrupt.  I wish I knew

6    their name, you know.

7            But -- so it's a constant battle

8    over ad words where people -- that's how they're

9    making -- I mean, they could do it so much

10   different but, you know, Google, Amazon, you know.

11           Bennzoil -- Bennzoil is getting

12   richer and richer.  He's going to be the first

13   trillionaire.  He doesn't just sell our -- he

14   sells corrupt ones.  And he'll put -- he'll put

15   four ads above you and -- four ads above your

16   product on Amazon.  When you have -- you have

17   worked on his platform, sold and advertised to get

18   people to his platform, and he sells your

19   billboards to somebody else, another product.

20   It's so rotten, you know.

21   Q.  But you think it's important for your company

22   to be able to defend itself against these people

23   who are --

24   A.  You have to be.  You'll be swallowed.

25               THE COURT REPORTER:  I'm sorry.  I'm

```
 1   not --
 2   BY MR. POWERS:
 3   Q.   Let me finish that question.
 4              It's important to you to be able to
 5   combat those others who are trying to confuse your
 6   customers?
 7   A.   It's not -- it's not just important.  It's
 8   critical.  It's crit -- even in my space.  I --
 9   you know, where I'm at now, I had another company
10   and they bought our ad words, and they went up
11   there -- an exact replica of my website so people
12   thought they were actually buying from me, and we
13   had to shut them down.
14              If we didn't know it -- a little
15   entrepreneur wouldn't have known what to do --
16   Q.   Right.
17   A.   -- and he would have been -- his integrity
18   would have been ruined.  His credibility would
19   have been destroyed, you know.  It was a company
20   out of Vietnam, actually, that put this
21   counterfeit website up and bought our ad words.
22              So you can find a couple corruptness
23   there and you really get a corruption onion.
24   Q.   Okay.  So Mr. Carter reaches out to
25   Mr. Meagher and --
```

1  A.  Right.

2  Q.  -- say it was just a matter of days before

3  Mr. Meagher came up to --

4  A.  I think it was probably three days, but I

5  mean, it was very fast, you know.

6  Q.  And it happened at your offices in Chaska?

7  A.  Uh-huh.

8  Q.  Is that right?

9  A.  Yes.

10  Q.  And who was present when you met with him?

11  A.  Myself.  I think Todd was in the room for a

12  little bit.  I --

13  Q.  Todd Carter?

14  A.  Todd Carter, yeah.  It was -- I didn't even

15  have my assistant in.  She was in my other office.

16  I have two offices.  I go back and forth when I

17  have people there.  And I left him a lot.  When I

18  had Todd -- Todd in the room kind of digging into

19  due diligence, I left him, went back to my other

20  office because it was kind of combining -- he was

21  there it seemed like the whole day.  But it was

22  like -- you know, there was bits and pieces,

23  meetings.  And then Todd would come back to me and

24  I said, I've got to get this done, and I went in

25  there and then I had a one-on-one.

1    Q.  And --
2    A.  And I'm very -- I want to add one thing too.
3    There might have been, in the beginning, maybe a
4    couple others in the room.  I don't remember that
5    part.
6            But when I -- when I go into
7    negotiations, it's a little different than you
8    would think other people.  I go back to where your
9    handshake is your word, and I'm very full
10   disclosure, you know.  Here's who I am.  Here's
11   what I am doing, okay?  Now if you want to try and
12   screw me, you know, it's in your court.  You know,
13   I'm very -- I'm very open.  Here's what I'm going
14   to do.  It's not like, okay, we're going to go --
15   you know, here -- we'll start here, have this
16   bidding thing and each person think who's -- you
17   know, that's not the way I roll.
18           It's either -- you know, either --
19   you know, this is the best thing for both of us,
20   you know.  That's it.  It's not going to be, get
21   back to me in a week and your lawyer will call me
22   up with a better offer and -- you know, we try and
23   cut the lawyers out of it.  No, I'm just kidding.
24   Q.  When Mr. Meagher was describing this meeting,
25   he said that he thought there was someone named

1   Steve there.  Do you know who that would be?

2   A.   Steve, Steve, Steve.

3   Q.   And he may have gotten the name wrong.

4   A.   Oh, I can't think of his last name.  I can

5   check my phone and find it.

6   Q.   Perhaps some description of who -- what kind

7   of person this is?

8   A.   I think it's the one from New York.

9                   MR. SPRINGER:  Was it -- I don't

10   know, Mike.  Was it Steve Vorneau?

11                   THE WITNESS:  Yeah, Vorneau, yeah.

12   I think he -- this was another guy who was going

13   to be -- at one time was going to be involved with

14   my recovery network, and he just -- he happened to

15   be in there.  And he actually -- he actually said

16   something in that room -- no, you're right.  He

17   was in there.

18                   He said that something in that room,

19   because he's from the traditional corporate world

20   in New York, and I took him out of there.  And

21   that was actually the beginning of the end for him

22   because the way he acted in front of him was like,

23   you know, trying to demean this product or

24   whatever and saying, you know, this -- you know

25   what I mean?  Like this MyStore, blah blah blah,

1    trying to discredit him and treat him like, quite

2    frankly, garbage.

3    BY MR. POWERS:

4    Q.  What did he say?

5    A.  I don't know, you know.  Something to --

6    something to the -- it wasn't like mean.  It was

7    some typical corporate negotiation thing.  Like

8    you know what?  I want to know more about this

9    guy, whatever.  We're not even to that point yet,

10   you know.  It's kind of like, here's this.  I

11   don't know.  It was something I didn't like

12   because it's not, you know -- and this guy was

13   going to be representing me out there in the big

14   world with big people, and that was -- I think

15   that was the last day he worked for me.

16   Q.  Was he an advisor to you in some way?

17   A.  No, no, no.  He hadn't even been hired yet.

18   Q.  Oh.

19   A.  And he just happened to be following me

20   around day and he -- in that room.  It's like,

21   it's none of your business.  You happen to be

22   sitting here, and you're saying this guy and now

23   you just might have shot down any chance we had of

24   making a deal.  Not off -- not off price.

25              This was like, you know -- I wanted

 1   to get -- I wanted to get him the passion -- you

 2   know, here's what I'm going to do with this for

 3   humanity, for -- you know, to get that thing.

 4   That's what I do.  I'm going, okay, what kind of

 5   person are you?  Don't gauge me.  This is what

 6   it's going to be used for good, that kind of

 7   thing.  And he's over here, you know, shooting his

 8   mouth off like -- I'm going, okay.

 9         I think that's when I left the room

10   and I came back and I got him out of there into

11   the other office, if I remember correctly.  And

12   Todd would even -- Todd Carter would remember

13   that.  In fact, I even remember kind of with Todd

14   Meagher kind of coming in and kind of bringing it

15   back, saying -- almost like an apology but, you

16   know, like saying, hey, that guy doesn't -- he

17   doesn't work for me; he's here for another thing;

18   sorry he was even in the room, you know.

19         And for -- you know, so -- and this

20   went on I think with the four, and then I said,

21   you know what?  You know, Todd, do some due

22   diligence.  I'm going to go do this.  Come back.

23   You know, get his, you know, input.  And then I

24   just -- I'm going to go in and just, you know,

25   talk to Todd directly.

1   Q.  Mr. Meagher said that he thought there was a

2   lawyer in the room for at least some of the

3   meeting.  Do you --

4   A.  That could have been Joe Springer.  He -- you

5   know, I think he was there for part of it, you

6   know.  I don't know.

7   Q.  So the jury might know, Mr. Springer is the

8   general counsel of your company?

9   A.  Yeah, yep.  He would have -- he would sit in

10  different things, not just because you needed a

11  lawyer.  It's because he's also, you know, our --

12  you know, one of our people.  We have like four

13  key people that do the day-to-day function, and

14  you've kind of got to know all the pieces if

15  you're ever -- if it ever comes to this, you know,

16  to write up the thing.  So I think he was in there

17  for part of it.  Not the negotiation or anything.

18  It was just kind of like, you know, here's this.

19              And he might have been in there when

20  that Steve guy was in there because I'm going,

21  this is crazy.  Because I think Todd Meagher made

22  a comment like, I walked into this hornet's nest.

23  I go, I'm sorry.  I didn't come with anybody.  I

24  thought I came to meet you, Mike Lindell, you

25  know, because he wanted to meet me, you know, and

1    stuff.  And I think that was part of it too.  He

2    wanted to see -- a lot of people want to see that,

3    you know, star TV thing, and I think that was --

4    he wanted some one-on-one and he was just kind of

5    blind-sided.

6              He didn't think I was that kind of

7    person that would have that.  This was so far away

8    from what I would normally do to someone who came

9    in.  I mean, my normal thing would be, hey, one on

10   one and it doesn't matter.  And a lot of times

11   I've done stuff where I haven't had the lawyer and

12   I'm going, okay, maybe I should have had him in

13   the room.  It happened once or twice because

14   sometimes the handshake isn't very good, you know.

15   Q.  So in this meeting, did Mr. Meagher describe

16   what he'd invested into MyStore or what his --

17   what his --

18   A.  Yeah.  He --

19   Q.  -- business project had been?

20   A.  Yeah.  He went into -- you know, some of the

21   stuff I didn't -- you know, I -- he started

22   getting all techy, you know, not talking -- not

23   techy words.  Words I could understand.  But it's

24   like, okay, that's great, that's great, you know.

25              It was basically kind of I think him

1   saying, you know, I have all this in.  And I think

2   I remember commenting, well, you know, I'm sorry,

3   you know, that you -- if you have 1.7 million or

4   whatever in, but I need to -- you know, I need to

5   know where I'm sitting now -- you know, where I'm

6   sitting now, that type of thing.  It's like -- you

7   know, it's great if -- if you have all this money

8   into it, I feel bad, but if it's only worth X, you

9   know, here's where I'm at.

10           So I'm basically telling, you know,

11   here's where I'm passionate, what I wanted to do

12   with it.  And I think he kind of seen I'm

13   unwilling -- I'm not going to pay 1.7 million.

14   And, you know, we were so far off at that time in

15   my head, and I'm going, you know, maybe this --

16   you know, something is not right here.

17           But it got off to a bad -- it got

18   off to a bad start in that thing so I kind of

19   felt, you know, I'm going to hear this out and

20   he's going to hear who I am.  And we actually

21   probably got side-tracked.  I have a little of

22   that going on.  So we probably talked about, you

23   know, addiction and my addiction, my crack.  I

24   mean, I'm very open with people and where -- you

25   know, probably talked a little politics.  The

1    ex-crackhead and got to meet the president and

2    where that went down.

3                I mean, I don't know.  We just kind

4    of got to know each other a little bit before you

5    start talking like, okay, how much are you going

6    to give me?  That wasn't the conversation, and

7    that's not how I do business.

8    Q.  So who put the first number on the table?

9    A.  I think he did.  You know, I think he did.  I

10   think it was like 800,000 or something like that

11   and --

12   Q.  And did he -- did he demonstrate any of the

13   technology that he was currently using --

14   A.  That was all with Todd.

15   Q.  Okay.

16   A.  No, I didn't -- and then Todd said -- you

17   know, Todd basically said, hey, he's got some good

18   stuff and --

19                MR. PATE:  Todd Carter said that?

20                THE WITNESS:  Yeah, Todd Carter,

21   yeah, said, he's got some good stuff.  And he

22   said -- you know, and then he had the Twitter and

23   Facebook handle, I believe, you know.

24   BY MR. POWERS:

25   Q.  And so that was happening over the course of

1  the same day?  Sometimes you would be in the room;

2  sometimes Mr. Carter --

3  A.  No, no, no.  This was -- when we got down to

4  this part, me and him one on one, I had already

5  heard from Todd that -- you know, that what this

6  is, kind of like, hey, this -- you know, it used

7  to be a store with a locator or something, you

8  know.

9              You know, like I say, I didn't sit

10  down with Todd for two hours by myself hearing

11  about this.  It was like, Todd, you think it's

12  okay?  Yeah.  That was basically it.  It's like,

13  yeah, he's got some good stuff and he's also got

14  this and this and -- you know, it was a very -- it

15  could have been five minutes; it could have been

16  ten.  It wasn't like an hour sit-down with Todd

17  Carter going, show me all this stuff.

18  Q.  Yeah, and that's one question I had.  You say

19  Mr. Meagher was probably in the office for most of

20  the day.  How much of the day did you actually

21  spend with him face to face, would you guess?

22  A.  At least an hour, hour and a half on the last

23  time -- on the last thing.  An hour to an hour and

24  a half because I'm sure I told stories.  And then

25  probably a half hour at the most with the whole

1   group because once that's -- once the -- once I

2   felt that he was very uncomfortable, I thought,

3   you know what?  Let's -- you know, I actually felt

4   too that he -- you know, I just felt and I get

5   stuff that, you know, I need to talk to him one on

6   one.  This isn't how -- this is wrong, you know,

7   especially having this guy that doesn't even work

8   for me in there shooting his, you know --

9   Q.  Right.

10  A.  -- saying something, trying to act important

11  to me like, look, I can negotiate that stuff.  It

12  was that type of thing, you know.  I'm like, okay,

13  you just showed me you couldn't.  You just showed

14  me -- that's not how I work, and you're -- and

15  you're gone.

16          So that was one -- actually, to be

17  honest with you, that was one of the benefits of

18  that day, how I felt.  Going, well, if something

19  else happens, he came up for -- you know, to

20  reveal this guy's true colors, and that -- and

21  that was a very good thing.

22  Q.  The -- so he asks for $800,000.  Did you ever

23  shake hands on $800,000?

24  A.  No, no, no.  It got -- I think we -- you

25  know, we talked about -- we hadn't agreed on 8.  I

```
1    said, well, I would have to think about that.  I
2    think it was that time.  We were basically going
3    to leave and I'm going, okay.
4              And then I asked -- you know, I
5    asked different things about, okay, what -- I
6    think this might be around the time where he did
7    bring up about the trademark, you know, because
8    I -- that's very important to me that you have an
9    R.  You know, is the R there?
10             And then that's where all the
11   conversation then transferred down to 300, then
12   back up to 4, you know, because with the -- you
13   know, for me, there was a -- it's a -- that was a
14   difference.  If there's some mud out there with an
15   R, I -- you know, I guess in my head, as we were
16   all talking, everything was clean-cut.  You know,
17   here's your thing (descriptive sound), you know,
18   because I know what it is to fight all these
19   things, you know.
20   Q.  So he told you that he did not have a
21   registered trademark?
22   A.  I don't know in them words.  He said that
23   there was -- there was some -- there were some --
24   could be some complications, I think is what he
25   said.  There could be some complications.
```

1          Because I don't know -- and this

2    is -- I don't know if Todd came back or something

3    or if Joe did at that time said, you know, there

4    could -- it's not in his name or it was in his

5    name.  I think he -- it gets very -- you know,

6    because this was -- there was nothing in the room

7    when him and I were talking about that.

8          And I said, if there's

9    complications, I said, you know, that's so

10   important because I gave him the ad word -- the

11   Google ad word thing, you know, and -- that's a

12   whole nother conversation, where if somebody has

13   your R and you don't have the -- and you have the

14   domain -- now, I can tell you -- I could sit and

15   tell you all day about how that can become hard

16   because now they're -- now they're -- you know,

17   you keep selling product, I think -- you go back

18   in the day, I think Nissan went through that, you

19   know, where the guy was selling birdhouses, you

20   know, or something like that, you know, and the

21   guy wouldn't give him the name.  And this goes

22   back, you know, where people can't even get -- I

23   can't get my name, Mike Lindell.com, you know.

24   Q.  So your -- your concern was that there might

25   be some other company that had a registration on

```
 1    the domain name that --

 2    A.   He --

 3    Q.   -- he wanted to buy?

 4    A.   He didn't say that, necessarily.  He said

 5    there's complications, but I can -- you know, I

 6    can -- don't worry about it, you know, that type

 7    of thing.  I -- you know, I -- you know, I've got

 8    it handled or whatever.

 9            And I said, well -- and it's not

10    worth that complication in my head.  I mean, it's

11    not worth -- you know, come to a different thing

12    here because if you've got that -- then I had to

13    weigh in my head, is it worth buying the domain.

14    And the Facebook and Twitter, having that, and the

15    domain.

16            And then I'm thinking about how much

17    of a fight is that going to be if I wanted to

18    get -- you always look at the worst scenario if he

19    says there's complications.  If I don't get it,

20    how bad is it going to be?  Is it even worth

21    anything then, the domain itself?

22            And I had to make a -- I made a fast

23    decision.  Yeah.  I said, 3, I think I went to 4

24    is what we ended up paying.  But I mean, he -- and

25    I think that going -- going up to 4, that was like
```

Michael J. Lindell                                                          63

1    the last -- last ten minutes and --

2    Q.  And was there anything that he did to push

3    you up that last 4?  Did he offer to give you

4    something that --

5    A.  No.  He just said, you know -- you know, this

6    is this.  You've got the Facebook, the Twitter,

7    you've got this.  And he's got this -- you know,

8    the platform he had up there, and nobody has used

9    it so it's wide open.  It's a short name.

10            I mean, he -- oh, he brought up the

11   short name thing at least -- Mike, I got this back

12   when it was my space.  I mean, he kept -- you

13   know, he was kind of a salesman at that point.  We

14   were down to the last few minutes and he knew it.

15            And he also knew that when I heard

16   this complication, the trademark kind of getting

17   thrown in the mix, I'm going, you know, I know --

18   you know, it might be worth 400 and then have --

19   but it ain't worth 8.  But that trademark, that R

20   is worth a lot more.  Probably in reverse, I would

21   rather have the R than the domain.  I know the

22   fights that go along with it when you're buying ad

23   words and stuff, you know.  It doesn't matter what

24   they're selling.

25            If I had -- if I had MyPillow out

Michael J. Lindell                                                    64

```
 1   there -- when MyPillow -- when I had MyPillow,
 2   someone else went and bought that out from under
 3   me back in the day, so I had to -- you know,
 4   corruptly.  And this was -- I can go into all
 5   kinds of corruption about people taking domain
 6   names and then putting them up there, and I had
 7   been through that with MyPillow back when I didn't
 8   have any money.  And I -- and if I didn't have
 9   that, it would be -- it's hard enough fighting
10   Google AdWords and stuff, but to not have an R,
11   people really prey on you then.  They'll come at
12   you from every direction, you know.
13   Q.  Did Mr. Meagher talk with you about the
14   litigation that he was in with HEB Grocery?
15   A.  He just said there's complications.  He
16   didn't get into -- you know, that might have
17   raised a big flag, but he said there's
18   complications.  And I would assume that he was --
19   he goes, yeah, I have -- I had the trademark
20   orig -- I think he got into little vague things,
21   and I'm going, okay.
22            Basically I thought to myself, I've
23   got to weigh this, pay him this, and then is it
24   worth it in the long shot that it -- you know, or
25   a short shot, whatever it is?  I didn't -- I
```

1   didn't really want to spend -- maybe I should have

2   now looking back -- spend, you know, weeks going,

3   okay, let's see.  What -- you know, what are the

4   complications, you know?

5           He did say that he had the -- he had

6   the original.  That he came up with it.  He got

7   the R, and -- way back.  I think it was -- I mean,

8   he went back years.  I think like three or four.

9   It was like early in the 2000s.

10  Q.  So he claims to you that he had been the

11  first person to use the name MyStore?

12  A.  That he got the R, yeah.

13  Q.  Okay.

14  A.  That he got the R.  I didn't -- he told me

15  that he -- his idea to use it.  I know we talked

16  about that, this app where grocery or some -- some

17  stores -- would be like a store locater.

18          And that's where Todd Carter said,

19  you know, you could also use it for that too, you

20  know, like -- to locate stores.  And I go, no, I'm

21  not using it to locate a store, you know.  I've

22  got my other dream.  I've got enough issues.

23  Q.  Did he -- did Mr. Meagher talk with you about

24  how he planned to approach the lawsuit with HEB --

25  A.  Uh-uh.

1   Q.  -- or ask you for any strategy advice?

2   A.  No, no, no.

3   Q.  Did he discuss whether -- if he could secure

4   a trademark, whether you would pay him additional

5   money?  Like if after you met, if he then went out

6   and secured a trademark, would you pay him for

7   that?

8   A.  No, we didn't talk about that part.

9   Q.  Was there anything that he offered you or

10  suggested that if he did it for you in the future,

11  you should pay him more?

12  A.  He did say -- he goes, this -- it was kind of

13  like, Mike, you know it's 800 here.  I said, but

14  it's not right now.  It was like, you know, here's

15  400.  It was kind of like I had gotten to the

16  point, because hearing that, because 400, yeah, I

17  mean, it's probably worth a million something with

18  that, but I'm not -- you know, you don't have that

19  right now.  You've got complications, you know.

20  So it wasn't like give me 4 now and 4 later.  It

21  wasn't like that, you know.

22  Q.  So that complication -- and I understand

23  Mr. Meagher is describing the HEB dispute as the

24  complication, right?

25  A.  Yeah, he didn't get into that dispute.  He

1   didn't give me the details --

2   Q.  Okay.

3   A.  -- at all on what the -- on what the -- who

4   had what or what -- who had what.

5           Was he confident that it was his

6   mark?  Yes.  And he portrayed that -- you know,

7   confidence that it would be -- you know, that

8   they'd be taken care of.  And it was basically,

9   well, that's great, you know.  You know, you're

10  here now.  I don't wait -- I'm not going to wait.

11  I -- you know, here's what I can give you.  That's

12  it, you know.

13  Q.  Let me ask you this:  If during that meeting,

14  while you were there with him at the day, if HEB

15  had been willing to immediately dismiss the

16  litigation and end that complication for

17  Mr. Meagher, would you have been willing to pay

18  Mr. Meagher more?

19  A.  Absolutely.

20  Q.  Do you have any idea how much more?

21  A.  I probably would have done -- because we had

22  went from 1.7 down to 8.  Probably 800, you know.

23  I don't know.  I can't sit and tell you that.  But

24  I will tell you this:  What I had to weigh in that

25  room was how much fighting I'm going to do.  The

Michael J. Lindell                                                                68

1    name -- the domain is so cool for what I wanted.

2    How much am I going to have to work now to fight

3    whatever he's talking about in case he doesn't get

4    it?  That's what I had to weigh.

5              And you know what?  I could always

6    make the decision, I'll flush this money, you

7    know, or maybe, you know -- flush it.  You've got

8    to look at your worst-case scenario in making that

9    teeter-totter decision, but it was such a -- it

10   fits my -- what I'm going to do so well, and I

11   believe it was divine intervention.  So that's --

12   you know, I made my decision on that, you know.

13             If he would have came in with this

14   neat bow, I could tell you it could have been

15   more.  It could have been less.  I don't know.  We

16   didn't get to that piece, you know.

17             I think we were close.  He had come

18   down to where his value I believe was 800, you

19   know, but then I heard these other little things.

20   I'm going, okay, I know what it takes to fight all

21   these things, you know.

22   Q.  Do you think Mr. Meagher understood that you

23   would have been willing to go as high as 800,000

24   if the lawsuit were not an issue?

25   A.  I think he -- I think he did.

1    Q.   Okay.

2    A.   I think he -- he knew my heart.  He knows how

3    I'm -- I'm not -- I'm not unfair.  I'm not

4    gonna -- you know, I'm gonna -- I had to make a

5    decision.  I risked that money, basically.  It's a

6    risk because I don't know -- wherever this --

7    wherever this all ends, I could flush probably the

8    greatest name for what -- my platform for

9    entrepreneurs ever.  I can't -- I don't know where

10   that -- where that ends up being, so -- but I had

11   to take a risk at that moment in time that, you

12   know, maybe I could -- maybe I could do this, but

13   how much would it take?  And I'm going -- you

14   know, the stuff going on now, I'm going, if I knew

15   now what I'd do then, it's like -- you know, it's

16   the opposite of Bob Seger's song, "I wish I didn't

17   know now what I didn't know then."  I wish I knew

18   now what I knew then -- or what -- I wish I knew

19   now what I didn't know then.  So reverse.

20   Q.   So did Mr. Meagher mention to you during this

21   day that he had an open settlement offer from HEB

22   on that day?

23   A.   Uh-uh, no.

24              MR. PATE:  Objection; form.

25   BY MR. POWERS:

1    Q.  Did he mention that HEB had told him they

2    would dismiss the lawsuit and let him keep

3    MyStore.com without any payment from him at all?

4                    MR. PATE:  Objection; form.

5                    THE WITNESS:  No, I -- no, I didn't

6    know that.

7    BY MR. POWERS:

8    Q.  He didn't mention that to you?

9                    MR. PATE:  Same objection.

10                   THE WITNESS:  Not that I remember,

11   no.  Not that I recall.

12   BY MR. POWERS:

13   Q.  Did he discuss with you whether your company

14   wanted him to settle the litigation or anything

15   like that?

16   A.  No.

17                   MR. PATE:  Objection; form.

18   BY MR. POWERS:

19   Q.  Did Mr. Meagher tell you why the Patent and

20   Trademark Office had canceled his trademark

21   registrations?

22   A.  That was later on I found out.  I don't know

23   if he told me or my lawyer.  He had let it

24   lapse -- lapse brain.  I mean -- I mean, that's

25   the only thing I can figure out is he let it

1    lapse.  And why, I don't know.

2            You know, I made a mistake back in

3    the day for a trademark I had where I didn't -- I

4    didn't have a lawyer to watch corrupt people, and

5    they went out and got a trademark similar to mine.

6    And, you know, because an entrepreneur, once

7    again, can't watch all that space and they went --

8    you know, they went out and got "I Heart

9    MyPillow."  You can look it up.  You know, it's

10   a -- it's a -- and they got it way after mine, but

11   I didn't contest it, you know, and I didn't know.

12   I was a little young entrepreneur and --

13   Q.  So once you --

14   A.  -- on crack, you know.

15   Q.  So once you had that experience of someone

16   trying to trademark a name like yours, you started

17   watching that kind of thing -- hiring people to

18   watch that kind of thing?

19   A.  Yeah, yeah.  I know -- I know what it can do.

20   I know what it can do.  I live in that space.  You

21   know, I live in that space.  It's hard enough when

22   they don't have a name out there.  That's why I

23   had to really make a decision with him going,

24   okay, you know, I'm sorry.  If you get it, great.

25   If you don't, that -- you know, I might have to

 1  flush this whole thing because I don't know -- I

 2  don't know who has it.  I didn't know who -- what

 3  the -- you know, what the situation was.

 4              So I had to make a business

 5  decision, just because it fit so well.  I would

 6  have never -- I'll tell you right now, with what

 7  he said there, I would have said, you know what,

 8  I'm sorry; come back.  But I move very fast in

 9  my -- it wasn't like, come back in a couple months

10  and we'll wait.  I'll give you 8 if you get

11  everything together, get your act together.  It's

12  -- the name is so cool and I'm already working on

13  this thing.  I've been working on it for two

14  years, so -- getting these entrepreneurs, getting

15  all these -- you know the -- from the idea -- from

16  the conception to the idea.

17              And my book is going to be coming

18  out, so this was all a timing thing.  It's a

19  timing thing right now.  You know, the book is

20  coming out in April and millions of eyes are

21  coming to this and, you know, I've got to make a

22  decision, do I call it -- you know, have

23  MyStore.com or completely scratch it up?  This is

24  our -- you know, you can't put up something and

25  then change the brand on it, you know.

1  Q.  Right.

2  A.  As you see where I've got coming soon, I have

3  to take a -- I had to take a risk right there

4  doing that to see what's going to come with

5  everything, you know.

6  Q.  Uh-huh.  So at the meeting he didn't describe

7  the fact that he had let these trademarks lapse?

8  A.  Uh-uh.

9  Q.  But you learned that subsequently?

10  A.  I learned that from my attorney, Joe

11  Springer.  You know, he -- he said there were

12  complications.  He goes, well, you know, he -- but

13  he -- he didn't say, hey, I let them lapse; I

14  don't have it.  He didn't come right out and --

15  you know, it was basically the complications.

16          And then, you know, Joe -- and then

17  Joe came to me.  I think Joe --

18          MR. SPRINGER:  Mike, I don't want

19  you to testify as to anything that I told you.  I

20  mean, you can testify to your understanding of

21  things, but you can't testify as to conversations

22  between you and me.

23          THE WITNESS:  Oh, okay.

24          MR. SPRINGER:  That's covered by the

25  attorney-client privilege.

```
 1                    THE WITNESS:  Okay.

 2    BY MR. POWERS:

 3    Q.  I take it Mr. Meagher never described to you

 4    the fact that he had other trademarks canceled for

 5    failing to file his papers?

 6                    MR. PATE:  Objection; form.

 7                    THE WITNESS:  No, never.  I never

 8    had this conversation with Mr. Meagher.  I had it

 9    with somebody else.

10    BY MR. POWERS:

11    Q.  Okay.

12    A.  How's that?

13                    MR. PATE:  That's a great way to do

14    it.

15    BY MR. POWERS:

16    Q.  You mentioned that Mr. Carter had looked into

17    some of these social media names, Twitter handles

18    and Facebook names and so forth?

19    A.  Uh-huh.

20    Q.  Did he talk about whether those social media

21    names had been actively used?

22    A.  No, he didn't tell me if they were used or

23    not.

24    Q.  Okay.

25    A.  I know how those work, believe me.  And that
```

1   was -- that was a thing to me where actually I'm

2   going, okay, you know, it's worth the gamble, you

3   know, because it's you -- I mean, he had things --

4   I can't -- he had ducks in a row, other than that

5   R, you know.

6   Q.  But Mr. Carter had never expressed any

7   concern to you that there was a large base of

8   social media followers who would be confused if

9   MyStore suddenly became --

10  A.  Oh, no, no, no.  He didn't say that at all.

11  He didn't say that.  And he -- and I'm surprised

12  if there is because I still wouldn't -- I would

13  have no idea if there's any.  I mean, I couldn't

14  tell you if there's any, if it's even active, you

15  know.

16  Q.  Did Mr. Meagher offer to include the domain

17  name Mitienda.com?

18  A.  No.

19  Q.  Have you ever discussed Mitienda.com with

20  him?

21  A.  Never.  Aren't you going to then ask me when

22  I heard that name?

23  Q.  When did you -- when did you hear the name

24  Mitienda.com?

25  A.  Yesterday.

1    Q.  Would you typically be in the habit of trying

2    to acquire the Spanish language equivalence of web

3    domain names --

4    A.  No.

5    Q.  -- you acquire?

6    A.  No, no.  I haven't even expanded MyPillow in

7    that space, you know.  No.

8    Q.  Did Mr. Meagher describe anything to you

9    about what he'd invested in, when he said that

10   he'd invested 1 million or 1.8 million --

11   A.  No.

12   Q.  -- or 1.7?

13   A.  He just said it was like 1.7.

14   Q.  Did he say what that was?

15   A.  You know, IT, I think -- you know, he went

16   all over.  I didn't -- he didn't say I purchased

17   this for this or did this.  He just -- he says, I

18   got a lot into it, you know.  It's like 1.7.  And

19   I'm going -- and he might have started telling me,

20   and I'm going, you know what?  That's a Todd thing

21   because I don't know what things are worth in that

22   thing.  Oh, I've got the -- you know, I've got the

23   IP thing on the back end of the hydrocollic (ph),

24   you know, whatever.  I don't know those big words.

25   Q.  Okay.  Would Mr. Carter already have been

1    working on what your technology platform would

2    have been for your plan for your inventor's

3    platform?

4    A.    No.   He -- what Todd told me, that -- Todd

5    Carter told me this:  He said it's -- it's a --

6    Meagher brought up.   He goes, and you might even

7    be able to use -- I have a platform you might even

8    be able to use, and Todd Carter looked at it.   He

9    said, we might be able to use some -- some of it

10   out of it and -- possibly, but that's all Todd

11   said, you know.   It's like any other platform, you

12   know.

13   Q.   Was there any particular features that

14   Mr. Carter mentioned as being of interest?

15   A.   There were videos -- there were -- I think

16   there were vid -- I can't even remember now.   We

17   were more -- I think we were more interested in

18   that a little bit in my recovery network because

19   there was going to be a lot of videos of people's

20   stories of hope.   I think that might have -- or I

21   mean my foundation, where each square is an

22   individual need and 100 percent of your money goes

23   to the need, so there's all these squares of need.

24   I think that was -- that got brought up.

25              But it was very -- once again, with

1    Todd and I, he goes -- and I'm going, yeah, yeah,

2    yeah.  You know, it was like, I've been down that

3    road and I've got about $2 million into my own

4    technology on it, so I'm going, I'm not gonna

5    change railroad tracks right now.  I don't care if

6    he's got -- you know, it would take an act of God

7    for me to switch it when I've already paid 2

8    million here, you know.

9    Q.   Yeah.  And I suppose in fairness, MyPillow

10   sells products over the Internet, right?

11   A.   Uh-huh.

12   Q.   And just so -- so that's a yes; is that

13   right?

14   A.   Yes.

15   Q.   So that if the jury doesn't know or hasn't

16   actually gone on to look at your website itself,

17   you sell probably, fair to say, millions of

18   dollars' worth of merchandise on an e-commerce

19   website that your company operates?

20   A.   43 million pillows.

21   Q.   Is your website the single largest channel

22   through which you sell?

23   A.   Absolutely.  A hundred percent, yeah.

24   Q.   And you do sell in retail stores, but --

25   A.   Yeah, I sell retail, but they turned me down

```
 1    back in the day so now they -- now we take them at

 2    our discretion, you know.

 3    Q.  Do you anticipate that the systems that you

 4    use to operate MyPillow.com, that a lot of those

 5    technologies will be used to support MyStore.com?

 6    A.  No.  The MyStore is gonna be -- when you say

 7    sys -- I would say the systems in the ad word

 8    space and all that that I've learned, absolutely.

 9    All the stuff we have that's the protected

10    platform.  Everything we've learned, everything

11    we've done, yes.

12              The actual back end is called

13    Magento on ours.  We're using a different

14    platform.  I think it's called something comm --

15    dot-commerce or something.  It's a different

16    platform that's suited to multiple -- massive

17    multiple products, and there's things in it -- and

18    other IT people can -- it's more interchangeable

19    than Magento.  Magento I'm relying on another

20    company here where I have to call them to fix, and

21    I don't like calling up the owner in the middle of

22    the night, so I don't know.

23              This is just a bigger -- bigger --

24    different -- just a little different back end

25    technology, but everything else on the front
```

1   end -- our advertising, our marketing, everything

2   that we've learned is going to come together to

3   make this an amazing --

4   Q.  And that's based on the learning and

5   experience of the Mike Lindell companies?

6   A.  Uh-huh.

7   Q.  Is that right?

8   A.  Yes.

9   Q.  So as you currently envision things, when

10  someone goes on to MyStore.com to make a purchase

11  of one of these inventions, they will not be

12  clicking and -- clicking on code that Todd Meagher

13  wrote?

14  A.  No, no.

15  Q.  And there was a written agreement reached

16  relating to the sale of the domain name; is that

17  right?

18  A.  Yes.  I believe -- I believe that -- I

19  don't --

20  Q.  If we look at page --

21  A.  I know I signed one.  I don't know if he

22  signed it.  And I think he signed one, and I don't

23  know if I signed.  I don't -- you know.

24  Q.  In your -- the documents that you brought

25  today, are pages 16 through 18, are those the

1   domain name purchase agreement that you signed?

2   A.   Let's see.   Yes.

3   Q.   And we don't have a copy here with

4   Mr. Meagher's signature on it, but as far as you

5   know, is this the agreement --

6   A.   Yes.

7   Q.   -- that you are --

8   A.   Yes.

9   Q.   -- that you consider to be in place?

10  A.   Yes.

11           MR. PATE:  Objection; form.   I'm

12  seeing one with Mr. Meagher's signature.

13           MR. POWERS:  Oh, I'm sorry.   Which

14  page is that?

15           MR. PATE:   24.

16           MR. POWERS:   Thank you.

17  BY MR. POWERS:

18  Q.   Page 24, is that a counter-signature by

19  Mr. Meagher?

20  A.   Yes.

21  Q.   Okay.

22  A.   So I guess it's the one he signed.   I don't

23  know.   I guess I really don't know the exact

24  difference between the two.

25  Q.   Okay.   But from the looks of it, does it

1   appear that the copy at pages 23 and 24 is --

2   well, no, it's a little different, isn't it?

3              So do you know for certain that you

4   and Mr. Meagher have signed the same draft?

5   A.  I don't believe so.  I don't know that for

6   sure.

7   Q.  Okay.  All right.  Well, we can look further

8   into that.

9   A.  I think Todd's -- I think this one might have

10  been after mine, but I don't know if they're both

11  on the same -- it might have been some two weeks.

12  I don't know.

13  Q.  And then payment was made in two pieces; is

14  that right?  What, two wire transfers?

15  A.  No idea on that.  That comes from --

16  Q.  And I'm just drawing that from the documents

17  in the back, but you wouldn't have any

18  disagreement with that if --

19  A.  No, I wouldn't have any disagreement.

20  Q.  Was any part of the payment conditional on

21  him -- on Mr. Meagher taking some action for you?

22  A.  No.

23  Q.  I don't see anything in this agreement that

24  would qualify, but are there any obligations that

25  Mr. Meagher still owes to you related to the

1    transaction for the sale of the domain name?

2    A.   No.

3    Q.   I'm sorry.   Is that a no?

4    A.   No, no, not that I'm aware.

5    Q.   And are there any -- any assets that he is

6    still offering to you or asking you to buy related

7    to this -- the MyStore name or domain name?

8    A.   No.

9    Q.   Okay.   All right.   We've gone quite a bit

10   over an hour.   Why don't we take a break for a

11   moment and just stretch our legs.

12   A.   Sure.

13                THE VIDEOGRAPHER:   This ends Media

14   Number 1.   We are going off the record at 10:20.

15                (A break was taken from 10:20 a.m.

16   until 10:45 a.m.)

17                THE VIDEOGRAPHER:   This begins Media

18   Number 2.   We are going back on the record at

19   10:45.

20   BY MR. POWERS:

21   Q.   Mr. Lindell, after you acquired the domain

22   name MyStore.com from Mr. Meagher, your company

23   filed trademark applications with the Patent and

24   Trademark Office for MyStore, MyStore.com and two

25   graphical elements; is that right?

1   A.  Yes.

2   Q.  All right.  I will -- in case you'd like to

3   refer to them, I'm going to hand you the

4   applications that I printed off from the Patent

5   and Trademark Office website this week.  Exhibit 6

6   is the application for My Store.

7                   (Exhibit 6 was marked for

8   identification.)

9   BY MR. POWERS:

10  Q.  Exhibit 7 is the application for MyStore.com.

11                  (Exhibit 7 was marked for

12  identification.)

13  BY MR. POWERS:

14  Q.  Exhibit 8 is the application for the

15  graphical word mark.

16                  (Exhibit 8 was marked for

17  identification.)

18  BY MR. POWERS:

19  Q.  And Exhibit 9 is the application for the

20  shopping bag logo.

21                  (Exhibit 9 was marked for

22  identification.)

23  BY MR. POWERS:

24  Q.  On the top of the first page of each of these

25  applications there's a filing date reflected of

1   July 26th, 2018.

2   A.   Uh-huh.

3   Q.   Do you see that?

4   A.   Yes.

5   Q.   And looking at the first page of the

6   documents you brought with you today, Mr. Carter's

7   e-mail to Mr. Meagher which is dated July 16th,

8   does it comport with your recollection that you

9   would have gone all the way from the initial

10  contact with Mr. Meagher to filing trademark

11  applications in ten days?  Was it that fast?

12  A.   Yes, absolutely.  I move fast.

13  Q.   All right.  Now, the applications that Mike

14  Lindell Products, LLC -- and while I'm thinking

15  about it, Mike Lindell Products, LLC, are you the

16  sole --

17  A.   Yes.

18  Q.   -- member of that?

19  A.   Yes.

20  Q.   Which means, for the jury's benefit, you're

21  the sole owner of that company?

22  A.   Yes.

23  Q.   The -- the applications that were filed by

24  Mike Lindell Products, LLC with the Patent and

25  Trademark Office, those were denied by the Patent

1    and Trademark Office; is that right?

2    A.   Yes.

3    Q.   And do you know what the reason was that was

4    given by the --

5    A.   I don't know.

6    Q.   Okay.  Was one of the reasons given that

7    there was a likelihood of confusion with existing

8    trademarks?

9    A.   Yeah, that was -- that's probably true.

10   That's what I recollect.

11   Q.   And was Mitienda one of the trademarks that

12   the PTO identified as being potentially --

13   A.   I don't know.

14   Q.   Okay.  Mike Lindell Products has not appealed

15   the Patent and Trademark Office's decision?

16   A.   No.

17   Q.   Instead you abandoned the application; is

18   that right?

19   A.   Correct.

20   Q.   Are you aware that before you abandoned the

21   application, Mr. Meagher filed trademark

22   applications for MyStore and MyStore.com?

23   A.   I don't know if -- I don't know the timing.

24   Q.   Well, are you aware that Mr. Meagher has

25   applied for trademarks on MyStore --

1    A.   Yes.

2    Q.   -- and MyStore.com?

3    A.   Yes.

4    Q.   Is there a reason why Mr. Meagher is applying

5    for trademarks on a domain name that you own?

6    A.   I -- what do you mean?  He's applied on what,

7    the domain name?

8    Q.   Mr. Meagher has applied for --

9    A.   He's applied on the name MyStore, right?

10   Yeah.  I don't think he's applied on the domain

11   name.

12   Q.   Yes.  He's applied for a trademark for the

13   name MyStore.

14   A.   Right, right.

15   Q.   Can you explain to us why Mr. Meagher is

16   applying to register a trademark that relates to a

17   domain name you own?

18   A.   I think -- I think -- with all the confusion,

19   I think he know -- this is just speculation, I

20   think he knows where my amazing platform is going

21   to go to help people.  And I think, you know,

22   he's -- he's stated to me on a gentleman's

23   handshake, if I get it -- you know, if I get it --

24   when I get it, I'll give it to you.  And I said,

25   well, otherwise I feel like I've flushed 400,000

1   down the drain.  You know, I took that gamble and

2   it's my -- my choice.  But I think he's -- I think

3   the guy -- he's got a little heart there, you

4   know.

5   Q.  So you feel you have a gentleman's agreement

6   with Mr. Meagher that if he acquires a

7   trademark --

8   A.  Right now, yes, absolutely.

9   Q.  And just to make sure I get my whole question

10  out --

11  A.  Okay.

12  Q.  -- before you begin answering, you have a

13  gentleman's agreement with Mr. Meagher that if he

14  acquires a trademark on MyStore, that he will

15  convey that to you?

16  A.  Yes.

17  Q.  At no additional cost?

18  A.  Right, correct.

19  Q.  Are there any other gentleman's agreements

20  that you have with Mr. Meagher?

21  A.  No.

22  Q.  Relating to the MyStore --

23  A.  No.

24  Q.  -- marks or name?

25  A.  No, no.

1    Q.  One of the e-mails that was produced this

2    morning, page number MP25, is a December 16th

3    e-mail from Mr. Meagher to you in which he conveys

4    a link to abandon the MyStore trademark apps.  Has

5    Mr. Meagher advised you to abandon the trademark

6    applications?

7    A.  Which page are you looking at?

8    Q.  Sorry.  It's page 25, sir.

9    A.  Yeah, yes.

10   Q.  And has he advised you that he thinks he'll

11   be more likely to obtain the trademark than --

12   than your company would be?

13   A.  Yes.

14   Q.  Has he explained his reasoning behind that?

15   A.  No.  I figure that it -- I was so far back, I

16   found out applying, there's all this mud, I was

17   okay, you know, go ahead.

18   Q.  And when you applied -- when your company

19   applied for a trademark, you applied for a

20   trademark on MyStore.com and you applied for a

21   trademark on the words "My Store" with a space in

22   between "my" and "store" --

23   A.  Uh-huh.

24   Q.  -- is that right?

25   A.  Yes.

1    Q.   And the -- you have a company called

2    MyPillow, Incorporated, right?

3    A.   That's correct.

4    Q.   And that has a space between the "my" and the

5    "pillow"?

6    A.   In the corporation -- in the actual trademark

7    name MyPillow, it's one word, but I've learned,

8    obviously from way back when, get -- get it all

9    covered, every angle.   That goes back to the

10   Google corruption.

11   Q.   Has Mr. Meagher informed you that he's asking

12   the court in Texas for permission to argue that

13   the name -- you couldn't trademark a phrase "my"

14   followed by a noun, like "my store" or "my

15   hammer"?   Has he told you about that --

16   A.   No.

17   Q.   -- argument he's making?

18   A.   No.

19   Q.   Do you have any understanding about whether

20   the Patent and Trademark Office will register

21   trademarks for phrases like MyStore and MyPillow?

22   A.   Well, they did MyPillow, but that -- not as

23   one word -- it was just one word.   I did that -- I

24   did that back in 2005, I believe.

25   Q.   But your company applied for a trademark on

1   My Store with a space between the two words?

2   A.   No.   Together.

3   Q.   And if the trademark application --

4   A.   And that was me.  I did it together, one

5   word.

6   Q.   And if the trademark application in the

7   Patent and Trademark Office on July 26 has a space

8   between "my" and "store," that doesn't comport

9   with your recollection?

10  A.   There's two -- there's two ways, right?

11  Correct?  I thought I told him -- my instructions

12  were get everything applied for in every shape or

13  form, even the dot-com, which I -- I don't even

14  know if they -- if they do that dot-com.  I don't

15  think he did ours on dot-com, but I don't know.

16  Q.   Well, if -- if you have a trademark on

17  MyStore as one word or My Store as two words,

18  would you be comfortable with the Patent and

19  Trademark Office issuing trademarks to other

20  people that was the opposite way?  Like if you

21  have it with a space, would you be okay with the

22  PTO --

23  A.   No, they don't do that.  It creates confusion

24  in the marketplace.  That's my understanding.

25  That's -- you know.

1   Q.  And you wouldn't be comfortable --

2   A.  I think that's the trademark -- that's the

3   patent -- the U.S. patents business there.  If

4   they do it -- I don't know if they do it.

5                 Would I be uncomfortable in my -- at

6   MyPillow if somebody got My space Pillow, yeah,

7   I'd be uncomfortable.

8   Q.  And if somebody were to --

9   A.  They got I Heart MyPillow.  There's a good

10  example.

11  Q.  Right.  And if somebody were to start running

12  advertisements with -- they were selling MyPillow

13  but it was My with a space between My and Pillow,

14  that would seem to you to be confusing to

15  consumers?

16  A.  Well, no.  The confusion would be if you had

17  My Pillow with two words and they were selling a

18  pillow that wasn't MyPillow.  Like I Heart

19  MyPillow is doing.

20  Q.  Right.  Okay.  So Mr. Meagher has asked you

21  to abandon the applications that Mike Lindell

22  Products, LLC has filed and is now filing

23  applications with the intention of conveying those

24  trademarks to you?

25  A.  To my understanding, yes.  Nothing written,

1  and like I say, and no more money and it's like --

2  I think it's just like, you know, I've got a great

3  thing going here, Todd, and, you know, I think

4  it -- I think he is hard for what he, you know,

5  felt that -- I think he just feels it's a great

6  platform and there's no -- there's no money that's

7  going to be exchanged.

8  Q.  In the time since the domain name sale

9  occurred, has Mr. Meagher been working with your

10  team to transfer social media accounts and e-mail

11  addresses and things of that nature to your

12  company?

13  A.  As far as I know.  My social media gal, I

14  know of a couple instances there where -- where I

15  got a call and there was passwords or something.

16  I think that was with either Pinterest or corrupt

17  Twitter, one of the two.

18  Q.  Now, Mr. Meagher has a domain named called

19  YourStore.com.  Are you aware of that?

20  A.  No.

21  Q.  Okay.  Have you seen Mr. Meagher's -- the

22  website that he has up at YourStore.com?

23  A.  No.

24  Q.  Do you have any understanding of why he'd

25  have a website up at YourStore.com that has a

1  MyStore logo on it?

2  A.   I have no idea.

3  Q.   That's not something he's talked about with

4  you?

5  A.   No.

6  Q.   Has Mr. Meagher, since the time of the domain

7  name sale, undertaken to demonstrate technologies

8  to you or tried to sell additional web interface

9  information to you in any way?

10  A.   He's -- there's been three conversations.

11  One -- one was he's offered me this in circle,

12  it's like a Facebook thing that was in -- it's

13  just talk.  He's offered me I think 5 percent if I

14  come on board.  I haven't seen the -- his

15  platform.  I haven't had time.

16           And Todd Carter might have looked at

17  the technology that he's had.  And like I'd said

18  before, we're not -- that's not the platform we're

19  going to be using for the MyStore.  We're using

20  our own.  It's like I think called Not Commerce or

21  something commerce, so . . .

22  Q.   And you said three.  Is there a third one

23  that you're referring to?

24  A.   The third one was just a referral to his son.

25  His son does front page design work.  So I, with

 1   his son, had done some work with recovery network.

 2   I don't know.  I think -- I'm not sure.  Front

 3   page photo stuff.  Nothing -- nothing techy.  His

 4   son -- I met him, he's like a designer guy.

 5   Q.  So just to make sure I have clarity on all

 6   three of those, the -- there's some web design

 7   work that Mr. Meagher's son, Nick, has been

 8   invited to participate in?

 9   A.  Uh-huh.

10   Q.  The social media item you mentioned, is that

11   the OpenCircle.com program that Mr. Meagher is

12   working on?

13   A.  No.  That's just an idea in his head.

14   Q.  Okay.

15   A.  As far as I know.

16   Q.  Okay.  That's not something that you actually

17   signed up to participate in?

18   A.  No, no.

19   Q.  In his deposition he mentioned that he had

20   invited you to participate on an advisory board --

21   A.  Uh-huh.

22   Q.  -- related to OpenCircle?

23   A.  Yeah.

24   Q.  Have you done anything like that yet?

25   A.  No, but we've talked about it and I've said,

1   you know, I've got -- I haven't seen -- I said if

2   it looks good, I need to see it and I would do it,

3   and I thought 5 percent was fair, but I'm not --

4   once again, when I do due diligence, I have to

5   look so much because I -- my credibility platform.

6   I want to know what this is, who this is, what's

7   it gonna do, where's the end result, why is it

8   being done.  I mean, there's just so many things.

9          There's -- I get approached all over

10  the country where people want me to get involved.

11  Todd is just another one of hundreds and hundreds

12  and hundreds of -- people want me to put my

13  credibility onto their thing and -- because it's

14  going to get other names brought in, you know.  So

15  I haven't -- that's as far as we've gotten.

16  Q.  Okay.  Mr. Meagher had mentioned he thought

17  you had made some introductions for him related to

18  this Open Circle --

19  A.  Yes, I did.

20  Q.  -- project.

21  A.  Yeah.

22  Q.  I think he even mentioned the White House.

23  Have you made introductions for Mr. Meagher on

24  him?

25  A.  Not at the White House.  I made it to

Michael J. Lindell                                                    97

1    people that -- I don't know what he means by White

2    House.  There's Washington, D.C., I think one guy,

3    I can't even remember his name.  I made a

4    couple -- the introduction I made, the guy worked

5    for a super PAC.  I actually told Todd not to --

6    you know what, because I was doing a parallel due

7    diligence, and this guy here turned out to be --

8    he said he had ties to the White -- and he didn't,

9    okay?  His credibility went way down, and I'm not

10   going to go down that route.  And so I said, Todd,

11   forget him, okay?

12            But yes, I did do that introduction.

13   And they talked on the phone, and then I -- it was

14   like within days I found out that this guy was

15   very much wanting to get involved in something

16   else of mine so he's trying to -- I mean, it was

17   just a -- you know, he revealed himself.  Kind of

18   like -- Todd has been involved with two guys

19   revealing themselves.  You just can't -- you open

20   up an onion and you go, what?  You know.

21            So there was one introduction to

22   that guy, and I know who he's talking about now.

23   I just had to think there.  And this guy said he

24   had very much ties, and he doesn't.  And I know

25   that firsthand from some people I help, so . . .

1    Q.   Now, the interrogatories that HEB served on

2    your company, we asked what valuations, if any,

3    are you aware of relating to the MyStore domain

4    name, trademark, or business.  And the answer was:

5    Respondents are not aware of any valuations

6    relating to the MyStore domain name, trademark or

7    business.

8              Is that still the case today?

9    A.   For -- for me, it would be all speculative.

10   I mean, it would be speculative.  I -- if I had my

11   head where it's going to get to, you know, it

12   would be so speculative.

13             But I'm never going to -- public,

14   and I'm not going to go get other people to tell

15   me what to do, so it's -- it will stay that way.

16   Everybody speculates what MyPillow is worth, and

17   they'll never know.

18   Q.   But your view is that if Mr. Meagher had

19   filed his declaration of continued use and not let

20   his trademarks lapse, you would have been willing

21   to pay more --

22   A.   Absolutely.

23   Q.   -- for his domain?

24   A.   And it would have been -- my sense of it, it

25   probably would have been that 800, you know,

Michael J. Lindell                                                99

```
 1   because it was such a unique package.  Here it is.
 2   But you need the bow, and we're missing the bow,
 3   you know.  You've got all these things.  It ain't
 4   any good without the bow, and that -- you know,
 5   that's . . .
 6   Q.  Has Mr. Meagher ever talked to you about
 7   whether he would like to get money in this
 8   litigation from HEB and then seek more money from
 9   you as well?
10   A.  Uh-uh.  No, absolutely not.
11   Q.  Okay.
12   A.  He will not get any more money from me on
13   anything on that.
14   Q.  You've mentioned a couple of times your
15   experience in this environment with people trying
16   to acquire domain names that look similar to your
17   names.
18              How many websites have you bought or
19   sold?
20   A.  MyPillow.  You mean domain names?
21   Q.  That's right.
22   A.  Domain names, I don't know.  It could be, I
23   don't know, 50, 100.  I don't know.  You just buy
24   names.  Some of them you can get -- if they're
25   there, you get them or you may never use them.
```

1    Those are the ones that don't mean anything.

2            TheLindellFoundation.org, you're not

3    going to use that.  It's LindellFoundation.org.

4    But you get that out of defense, and -- if nobody

5    has got you.  But you get so much out of defense,

6    you know, so so many of mine, we'll just not use

7    it, or you get ones that are -- you might buy a

8    dot-com that's similar.  These are just the

9    dot-coms now, not the Rs.  The dot-coms are a

10   different world.  You go get the dot-coms so that

11   even my own name, MichaelJLindell.com, we probably

12   have MikeJLindell because otherwise somebody else

13   will go out there, get the corrupt domain, start

14   saying bad things and put my picture up and say

15   they're me.  They do it all the time for things.

16           But, you know, it's the same space

17   as when you get into Twitter and all these other

18   things.  You get people that attack, and that's

19   how they do it for identity theft or copying or

20   trying to show that they're you, especially when

21   you're as high profile as I am right now.  They're

22   -- they come at you every angle, and they try and

23   feed off the -- you know, their greed.  Some will

24   be for greed.  Some will be just to destroy.  Some

25   will be just for -- you know, like the cross I

1  wear on TV.  I don't know.

2  Q.  Some of these websites, as you say, they're

3  available and you can just get them by going to a

4  domain name or registrar and paying 40 bucks or

5  something like that, right?

6  A.  Yeah.  And I don't buy them.  I mean, my --

7  my gal buys them all.  They go -- they range, I

8  guess.  They'll range from -- you know, I'm sure

9  you could pay Amazon.com probably billions, you

10  know.  I mean, I'm -- there's a range there.  I

11  don't know what they range.

12           If nobody -- typically, the ones you

13  could get for $40 would be something like, "I love

14  this room really -- really good dot-com."  Nobody

15  is going to buy it, you know.  I mean, you get --

16  as you get more to the -- anyone out there,

17  they -- all the domains were bought up, every

18  combination you could think of, by another corrupt

19  group, and they will come in and then you -- and

20  then you have to pay for -- even for your, like I

21  say, my own name, Lindell.com, you know.  They're

22  using last names, a company out in Canada.  I

23  mean, it's just crazy.  And they want to rent me

24  my own name.  You know, really?

25  Q.  When you or your company have had to go

1   through that process of trying to negotiate a

2   purchase of a domain name, is there a standard

3   market or some kind of, you know, published index

4   that you look at to get a sense of what these

5   things are worth?

6   A.   No.   Nobody knows.   It's all supply and

7   demand.   If they -- let me tell you something on

8   that.   If you Google your name that you want too

9   much -- this is a little clue for any

10  entrepreneurs out there -- be careful to search

11  that name because people at the government office

12  and people in the State if you register -- don't

13  ever register your state name first, your LLC.   I

14  would get the domain first because there's crooks

15  down at the State that will sit there and see, oh,

16  MyPillow, LLC, and then they'll go get

17  MyPillow.com.   That's what they do.   And then

18  they're going to turn around -- they bought it the

19  day before for whatever, and they're going to up

20  the charge to you and sell it.   That's -- you

21  know, that's the name of the game.

22          Nowadays they're all taken anyway,

23  so it's all supply and demand.   So if you google

24  that name enough -- you could look the day before

25  on, I don't know, pick a site or whatever that

1   sells them, whoever has like, you know, all these

2   domains, and a lot of them are overseas that are

3   corrupt that grab our domains.  So then you'll

4   have the domain name and the day before it was

5   $200 and now it's 5 grand, you know.  Don't you

6   think that they look in to see how bad you want

7   that?  That's what they do, you know.

8              And they do it -- they do it with

9   all this stuff you don't see in hyperspace.  You

10  know, that guy's IP address, he just googled it

11  six times.  Let's see who's googling it.  Oh, it's

12  Mike.  I paid a lot for Mike -- I think it was

13  Mike66.com.  I mean, it was crazy.  I'm going, how

14  would anybody even care about that, you know?  And

15  they do.  They -- you know, these guys -- the tech

16  world out there and somebody got richer in Silicon

17  Valley.  There's your answer.

18  Q.  So -- but you in your office, you're not

19  aware of there being some type of standard

20  valuation --

21  A.  There's no standard.  There's no standards

22  for selling domains.  It's supply and demand.  And

23  they've got -- whatever algorithms they use --

24  obviously shorter names, key names, are worth

25  more.

1          Established names, if you're going

2     to sell something that's with it -- if you have --

3     you know, if I was going to sell MyPillow.com and

4     still sell MyPillows to somebody, that name

5     MyPillow has got a lot of branding out there, you

6     know, so the domain is worth there.  It's all

7     about eyes.  It's what -- eyes getting it to that.

8     You know, how much is behind it and how easy it is

9     for the consumer on that domain name.  It's

10    what -- it's what you're going to use it for and

11    how -- how important it is.

12    Q.  So the -- the value may be tied to the amount

13    of consumer awareness there is of that name

14    already?

15    A.  Not -- not necessarily.  That's just the --

16    they know what a -- the values of domain names

17    have changed.  The shorter the name, the easier.

18    I mean, that's worth more.  I mean, it's like --

19    you know, if you don't think CoffeeCup.com is

20    worth a lot more than Coffee Cups in this Room at

21    This Thing, you know.  I mean, people -- people

22    have had -- and that goes with anything.  You go

23    to Twitter, you go to Facebook, all that.  I can't

24    even have my name on one of them.  I have to have

25    MyPillow USA, you know.  You know.  And I can't

1   get a blue check in my own name, you know.   I

2   mean, there's just a lot of stuff that goes with

3   that.

4   Q.   And just to make sure, when you say that if

5   it's shorter, it's worth more, I assume that the

6   letter T.com isn't like the most valuable web

7   domain in the world, right?

8   A.   It -- actually, that would probably add value

9   because it's easy.   I mean, it's easy.   When I

10   do -- put it this way, when I went -- I got my --

11   My Lindell Foundation -- or my

12   MyLindellManagement.com, I tried to find every way

13   in the world to shorten that so if I give you my

14   business card, I'm a -- I don't like typing all

15   that crap in.   I went like, you know, MT.com or

16   ML.com.   You ain't gonna get that.   You pay

17   through the nose.

18             So you're -- you're a little wrong

19   on that.

20   Q.   Sure.

21   A.   I think it's easy -- there's so many factors,

22   but one of them is the easiness if they'll

23   remember that.   Remembering is a big thing.

24   Remembrance of that is a big thing.

25             There's other factors.   Like I said,

1   supply and demand.  If this guy is over here

2   selling it in hyperspace and you googled it ten

3   times, you're going to pay more, I'm sorry.  You

4   should keep it quiet.  If you want to go see how

5   much it is, buy it.  You know, you go to bid on

6   it, and, oh, give us a bid.  Really?  I'm going to

7   give you a bid?  You already have a number in your

8   head.  As soon as I give you a bid, you know, oh,

9   the price of rice just went up, you know.

10  Q.  Well, just to make sure I understand when

11  you're talking about that balance of factors, the

12  other factors --

13  A.  There's so many factors.

14  Q.  Yeah.  You would agree that MyPill.com is not

15  worth more than MyPillow.com even though it is

16  shorter?

17  A.  Because that -- because that's another

18  factor.  That's like an established business.

19  Then you're adding in value that has nothing to do

20  with that other than when you sell your business,

21  if you didn't have that, you wouldn't get that

22  much for your business.

23  Q.  Right.

24  A.  It's an indirect value, you know.

25  Q.  So consumer awareness would be one of the

1  factors that would influence the domain name

2  value?

3  A.  Well, it would make your business price go up

4  because of that domain.  If you didn't have that

5  domain -- if I was branding -- if I was sending

6  everybody to Mike.com and that MyPillow name is

7  out there, number one, I'd leave so much on the

8  table.  But number two, that Mike.com, if I had

9  MyPillow.com, any businessman would say, obviously

10  that's better, you know, because they match.  You

11  know, they match the name of your product.

12            People have done it all the time

13  with a product and have it established -- that's

14  why this MyStore would be so cool.  Easy to

15  remember and it fits what I'm doing.

16            People try and fit -- the problem

17  nowadays is you try and -- you try and fit the

18  name with what you're doing, that has more value

19  to the person that it doesn't fit and they're just

20  buying it for, oh, that sounds cool.  Like

21  CoffeeCup.com.  Or in the case of the Nissan

22  thing, he sold birdhouses.  He thought it -- and

23  his last name was Nissan.  Nissan had a different

24  reason, you know.

25  Q.  So things like whether it matches what you're

1  trying to accomplish, consumer awareness, is it

2  short, is it easy to remember, these are all

3  things that would influence the value of a domain

4  name?

5  A.   It worked for me personally.  For -- I mean,

6  other people, you know.  And I have to -- I

7  go over -- you know, I've overpaid back in the day

8  when MyPillow had no value to anybody, but these

9  guys -- I did my -- I used to own bars and

10  restaurants.  I applied for my LLC down at the

11  State first, and the corrupt guy entered it that

12  day.  They're spies down there.  He put in

13  MyPillow.com.  I ended up having to pay $10,000

14  for that back 12 years ago or 13 -- or 11 years

15  ago.  I told him, you know -- it was -- at that

16  time it was just an idea.  I said, my kid is doing

17  it for a school project.  You know, you're going

18  to really clip me this, you know?

19  Q.   It sounds like extortion.

20  A.   Absolutely.  Well, it's corruptness because

21  they're grabbing.  They're grabbing.  It's just

22  like any product.  They're not even going to use

23  it, but they have it, you know.  That's a bad

24  thing, you know, if you get something for -- but

25  that's -- it's a commodity now.  It's like -- you

1    know.

2    Q.  Are you aware of there being any place where

3    the prices at which domain names change hand or

4    publicly reported or index of some kind?

5    A.  I think GoDaddy.  I think that's one maybe, I

6    don't know, where they -- you can get -- you go to

7    GoDaddy.  I don't know.  It's just what I -- I've

8    never been there, but that's -- I think I've seen

9    my IT person -- that's the first place she'd look

10   because they're not as -- you know, those are the

11   weird generic ones that -- you know, that nobody

12   has grabbed from GoDaddy yet, you know.  I mean,

13   there should be -- there should be a law you have

14   to use it, but that's just me.

15   Q.  Have you been asked to come to Houston for

16   the trial of this case?

17   A.  No.

18   Q.  Do you have any intention to appear at trial

19   if asked?

20   A.  I go -- I go to Lubbock a lot.  That's where

21   my gal lives.  So Houston is only an hour away.

22   I'm not ruling it out, but my time is very, very,

23   very, very busy and it's -- you know.

24   Q.  And I don't want to use any more of it than

25   we have to, so let me just ask a couple more

Michael J. Lindell                                                                 110

```
 1   questions to follow up.
 2               What did you do to prepare for
 3   today's deposition?
 4   A.  What did I do to prepare?  I came in a half
 5   hour early today.
 6   Q.  Okay.  Have you been --
 7   A.  At my corporate, and these -- I met the --
 8   I'm not even sure the name here.
 9               MR. PATE:  Mr. Pate.
10   BY MR. POWERS:
11   Q.  Mr. Pate?
12   A.  Yeah.  And he said, you know, Mike -- my
13   lawyer, Joe Springer, said, Mike, you've been to
14   depositions before.  And I said, well, I'm very
15   busy; I don't want to spend eight hours.  He
16   says -- he says, well, you know, they can go how
17   they can go, and I'm going, okay.  And so I said a
18   prayer that it would be shorter than eight hours
19   and here we are.  There's a lot of truth to that,
20   isn't there?
21   Q.  So you met with your lawyer and Mr. Meagher's
22   lawyer?
23   A.  Uh-huh.
24   Q.  Okay.  All right.  And --
25   A.  And it was -- and they basically showed me
```

1    the sheet.  Here's -- you know, here's what

2    you're -- here's what we got.  The sheet you were

3    handed, you know.

4    Q.  And did Mr. Meagher explain to you why he

5    thought it was important that he file a trademark

6    application on MyStore?

7    A.  Uh-uh.

8    Q.  Okay.

9    A.  Not me.

10   Q.  He didn't say anything about it being

11   something that he needed for his lawsuit against

12   HEB?

13   A.  No.

14              MR. POWERS:  All right.  I'll pass

15   the witness.

16              MR. PATE:  Thank you.

17                 CROSS-EXAMINATION

18   BY MR. PATE:

19   Q.  Mr. Lindell, thank you for your time.  You

20   understand I represent Todd Meagher, MyStore,

21   Inc., and Alexis Meagher?

22   A.  Okay.  Yes, I do.

23   Q.  And I just have a few questions for you, sir.

24              Do you consider the trade name

25   MyPillow to be a valuable company asset?  I think

1    I already know the answer --

2    A.   Yeah.

3    Q.   -- to this question?

4    A.   Absolutely.

5    Q.   Do you consider the domain name --

6    A.   I'm sorry.  One second.

7    Q.   Oh, no problem.

8    A.   Do I what?

9    Q.   Do you consider your domain name,

10   MyPillow.com, a valuable company asset?

11   A.   The two you just named is our biggest asset.

12   Q.   And do you consider the registered trademark

13   for MyPillow a valuable company asset?

14   A.   One of our top three assets, yes.

15   Q.   Okay.  So you take those three things, the

16   trade name, the domain name, and the trademark,

17   and all three form three valuable assets that

18   bring value to your brand, true?

19   A.   Huge, yeah.  Yes.

20   Q.   Okay.  Would your company be damaged if you

21   were to lose the trademark MyPillow?

22   A.   Beyond repair.

23   Q.   Would your company be damaged if you were to

24   lose the domain name MyPillow.com?

25   A.   We wouldn't be here.

1    Q.   Would your company be damaged if you were to

2    lose the --

3    A.   So -- so just think --

4    Q.   Yes, sir?

5    A.   -- if Google took a platform down on their

6    site.   That would be bad.

7    Q.   That's true.

8    A.   I just had to throw that in there.

9    Q.   That's true.

10           Would your company be damaged if you

11   were to lose the trade name MyPillow?

12   A.   Yes.

13   Q.   If I were to offer you 1 million for the

14   MyPillow trade name, would you accept it?

15   A.   I wouldn't take a billion.

16   Q.   If I were to offer you a -- 1 million for the

17   domain name MyPillow, would you accept it?

18   A.   No.

19   Q.   If I were to offer you a million for the

20   MyPillow trademark, would you accept it?

21   A.   No.

22   Q.   You've stated that if Mr. Meagher had a

23   registered trademark for MyStore.com, you would

24   have considered the domain name more valuable and

25   paid more for it.   Is that because you decided to

```
 1    use the domain name as a trade name in the future,

 2    it would be protected?  That wasn't a very good

 3    question.

 4    A.   No.  I -- it's really kind of polluted.

 5    Q.   That wasn't good.

 6    A.   Rephrase the question.

 7    Q.   Let me do it a different way.

 8              Earlier in your deposition you

 9    referred to -- and I apologize.  I'm a little bit

10    hard of hearing.

11    A.   Yeah, yeah, yeah.

12    Q.   Somebody --

13    A.   I'm with you.  Hold on.

14    Q.   Okay.  Somebody by the name of -- is it

15    Mr. Sullivan?

16    A.   Okay.  Hold on.  What did you say?

17              Salden, S-A-L-D-E-N.

18    Q.   Salden?

19    A.   Salden.

20    Q.   Salden, okay.  And what's his position?

21    A.   He runs my Google AdWords, Amazon, all the --

22    we do ad buys on those platforms.

23    Q.   Okay.  So --

24    A.   I don't know what you'd call that.

25    Q.   Very good.  So he's kind of --
```

1   A.   E-commerce.  He's basically e-commerce.  I

2   guess that's the --

3   Q.   Director of e-commerce?

4   A.   Yes.

5   Q.   Okay.

6   A.   That's correct.

7   Q.   Very good.  And he -- I think I have your

8   testimony.  He said that MyStore.com is a short

9   name and, therefore, it's worth a lot more?

10  A.   Right, right.

11  Q.   Okay.

12  A.   And he's -- and just to be clear, he's

13  talking the domain names.  He knows -- the domain,

14  dot-com.

15  Q.   Right.

16  A.   He's got a different view -- and that would

17  be worth X, okay?  But without that -- if you

18  don't have the registered trademark, you

19  basically -- what do you have?  I mean, I know

20  what it takes to fight in that space, so it's

21  really -- that was a calculated gamble I took, so

22  it's basically (descriptive sound), without that.

23  Q.   You want all three components to come

24  together.  You want the domain name --

25  A.   You can't -- yeah.  I don't believe that you

1   can make it in that space, anybody, without those

2   three components together.  That's what I -- I

3   believe that.

4   Q.  And let's take the domain name that you have,

5   MyPillow.com, and the issue of shortness and that

6   that's more valuable.  MyPillow.com, in your

7   thinking, in your evaluation, would be more

8   valuable than MyPillowTX.com, true?

9   A.  Absolutely.  But back when those corrupt guys

10   took MyPillow, I had MyPillowShop.com.  It wasn't

11   close to the -- I know how it went.  (Descriptive

12   sound), you know.  I had to make a decision there.

13   All the money I had in the world -- in fact, I had

14   to borrow money to give these guys, I think it was

15   10,000 or $11,000, back when I had nothing to get

16   them because I knew the value of having -- hearing

17   MyPillow.com rather than MyPillowShop.com.  That

18   was totally about length of name and matching the

19   product I'm selling.

20   Q.  Right.

21   A.  You know, the -- if you're -- if whatever

22   you're branding at, if your trademark, you don't

23   have that R -- the domain -- the domain -- you

24   could change the domain, have the domain.  That's

25   your store there.

1    Q.   Right.

2    A.   But I -- you're -- for the consumer,

3    you're -- matching all three is amazing.

4    Q.   Yeah.

5    A.   The product name, ding ding.   Unheard of.

6    That's your home run.

7                Now, can you function with your

8    product and your R matching?   Yes.   And the domain

9    could be, you know, Mike's -- MikeLindells.com,

10   because you're branding these two things and

11   you're sending them there.   It's just -- you're

12   going to lose some and -- you're going to lose

13   some of your filter.

14   Q.   Right.   And you like MyPillow.com because if

15   a consumer is wanting to buy a pillow, it kind of

16   suggests what you would type into the Internet to

17   go find your pillow, right?

18   A.   Because it's -- there's a lot of reasons for

19   that name.

20   Q.   Yeah.

21   A.   It's -- it matches everything.

22   Q.   Right.

23   A.   MyPillow -- and it's called MyPillow.   I

24   didn't get the name originally to go, oh, people

25   will Google "pillow" and they'll go to MyPillow.

1   No.   I named MyPillow MyPillow back before my's

2   were even, you know, nothing, a figment of

3   people's imaginations, so I thought it was weird.

4   Where's MyPillow?   MyPillow.

5                   Now people have become to know that

6   as -- that is a brand.   To get that to change to,

7   you know, a brand, it was even weird for people,

8   but they -- but to have that domain that matches

9   that, you're searching for MyPillow --

10  Q.   Right.

11  A.   -- you know, which brings us back to corrupt

12  Google.   So you have these ad words there and

13  they're googling my brand name and selling ads up

14  there, you know.

15  Q.   Right.

16  A.   That's crazy.

17  Q.   And if you were to be offered the domain name

18  such as MyPillowTX.com, you wouldn't have a high

19  interest in that because it's geographically kind

20  of limiting suggesting Texas, isn't it?

21  A.   I've never bought any -- I've never bought

22  any other -- you -- when you brand your name, you

23  don't need to get all the dot-coms.   You need to

24  worry about your trademark, your Rs.   That's where

25  you need to protect, your R.

1    You -- if you start -- if you get

2    every combination of MyPillow, blah blah blah --

3    now, do other countries?  You get the MyPillow CA,

4    like Canada, that's different.  But you --

5    absolutely.  That's another mistake that

6    entrepreneurs make, by the way, is they'll go get

7    MyPillow.net, MyPillow.org, MyPillow.tv, you know,

8    all these things, thinking other people are going

9    to come.  That's not the way they go after you.

10   Q.  Right.

11   A.  And you don't need it.  It's a joke.  You're

12   sending people to different things.

13             If you did get a name -- I've gotten

14   a couple, like that -- when I had that

15   MyPillowShop.com, I have to redirect that.  I

16   don't leave it up there on Google as a site.  You

17   weaken your engine.  You weaken your engine.

18   Q.  Right.

19   A.  All these things would weaken yourself.

20             So if you did have one so somebody

21   else didn't get it, like, you know, then you take

22   that and you redirect it to your -- to your

23   website, so if they did click on that, you would

24   come here.

25             Google is a machine that you've got

1    to know their back algorithems.  Otherwise you're

2    almost gonna cannibalize yourself --

3    Q.  Right.

4    A.  -- or weaken yourself, weaken your links.

5    And this is another person I'm going to count --

6    that checks out.  Links that can be -- if this

7    thing is linked, you might make this one strong

8    and you know -- and your website isn't even as

9    strong as it should be, you know.

10   Q.  Another thing I wanted to get clarification

11   on, I think you testified earlier that Todd Carter

12   said that Todd Meagher had some good stuff.  And

13   was he referring to Todd -- Todd Meagher's

14   computer coding and technology platform?  Is that

15   what he was referring to?

16   A.  I think it was the -- you know, I don't think

17   it was that so much.  It was the good stuff,

18   meaning that he had all these platforms, which is

19   strange that you got -- to have a name that short

20   and have Twitter, Pinterest, Google -- or I mean,

21   Suck a Buck or Facebook -- I mean, you have a --

22   you have all these -- did I say Suck a Buck?

23   Okay.  Suck -- what is it?  He has all these

24   handles in that corrupt Silicon Valley world,

25   so --

Michael J. Lindell                                                    121

1    Q.  Right.

2    A.  -- because it's -- for me, that was very

3    important because I don't have to fight in that

4    space.  You know, I looked at -- you know, the

5    gamble -- the calculated gamble I took was, okay,

6    these spaces -- he says there's some confusion or

7    some problems over here, but these were all lined

8    up like (descriptive sound), perfect.  And I'm

9    going, well, it's worth this --

10   Q.  Yes.

11   A.  -- if -- you know, and if I get this -- you

12   know, it was worth the calculated gamble

13   because --

14   Q.  Sure.

15   A.  -- because there was -- these were -- this

16   was good stuff.  You had these on those platforms.

17   That's pretty much unheard of.  If you would have

18   had the R for it, this would have been sort of

19   like oh, you know.

20   Q.  Much more valuable?

21   A.  Oh, absolutely, because it just -- without

22   that, these amazing things don't really mean

23   anything.

24   Q.  Absolutely.  Now, you mentioned that -- and

25   you saw some documents from your company's filing

```
1    with the United States Patent and Trademark

2    Office --

3    A.   Right.

4    Q.   -- there were some glitches in the

5    application, one -- one of which may be the space

6    between "My" and "Store."  And were you also aware

7    that there were some glitches in the

8    identification, you know, that's in red how --

9    A.   You know, I wasn't aware of this, and let me

10   tell you about this.

11   Q.   Yes.

12   A.   I normally -- back with MyPillow, I even did

13   it myself, you know, without a lawyer.

14            With this, I've had -- I've had the

15   same patent attorney.  We have him doing stuff all

16   the time.  I basically said, get everything you

17   can without direction of them to get -- you know,

18   you guys, the name could -- here, I could have

19   probably corrected it with -- I haven't even read

20   this.

21   Q.   Sure.

22   A.   I would have had that corrected, whatever it

23   was.  But I didn't -- to be honest with you, I

24   said, just get the -- get everything you can that

25   would tie into this so somehow we would have --
```

```
 1   you know, maybe something -- if I could use
 2   this -- we never got this.  I didn't know, you
 3   know.
 4   Q.  Okay.
 5   A.  So they did this without my -- I did -- I did
 6   make the logo.  My daughter put that together.
 7   Q.  Oh, okay.  And then is it your understanding
 8   that your company abandoned this application so
 9   Mr. Meagher could fetch it and acquire it and then
10   give it to your company?
11   A.  Correct.
12   Q.  And you went into quite a length earlier in
13   your testimony about -- it seems like you evaluate
14   and vet the businessmen and women that you do
15   business with.
16   A.  Uh-huh.
17   Q.  You're concerned about character.
18   A.  Absolutely.
19   Q.  Okay.
20   A.  That's why I'm -- in fact, I'm full
21   disclosure.  I walk in a room and here's who I am
22   and you better show me who you are.  If you want
23   to screw me over, you know, it's over because this
24   could have been a great thing in the long run.
25   Q.  Right.
```

1    A.  And that's where that's at.

2    Q.  And did you vet Mr. Meagher and find him to

3    be a man of -- from what you can tell, a man of

4    character?

5    A.  Yes.

6              MR. POWERS:  Object to the form.

7              THE WITNESS:  I mean, they -- yes.

8    Did I dig into the past?  I vetted him one on

9    one --

10   BY MR. PATE:

11   Q.  Right.

12   A.  -- in that room.

13   Q.  Sure.  And you also, I think, remarked that

14   it was part of Todd Meagher's heart or part of his

15   character that he's going and trying to chase down

16   this trademark --

17   A.  Yes.

18   Q.  -- for your company?

19   A.  I really believe that part of the -- you

20   know, the picture that was painted in that office

21   was, you know, he really appreciated -- or cared,

22   and a lot of times people disguise that for this

23   stardom thing, okay?  It was -- I know, you

24   know -- at first I thought, he wants to come up

25   here to meet me, blah -- you know, whatever.  And

1   then he got in the room and then he heard about

2   what I was going to do with it.  Now, I don't know

3   if Todd had told him that over the phone or what

4   we planned to do.  I was full disclosure.  Here's

5   what I'm gonna do.  This money is going to help

6   these addicts in this country.  It's going to help

7   inner cities.  It's going to help everything.

8           And I really believe that his -- you

9   know, I think to this day he would have stood --

10  it would have stood firm on a much higher price

11  even for that maybe, and then he felt bad he

12  didn't have that R.  And I'm going, well -- you

13  know, I'm going, well, this is not worth that.  I

14  mean, what are we talking here, you know?

15          And him coming back, he didn't have

16  to come back.  I took the gamble and say, I want

17  to help you get the R.  He didn't have to do that.

18  I believe that was because I showed him who my

19  heart was.  I don't think he has another agenda.

20  I haven't made any promises to him.

21          You could talk about this Facebook

22  thing.  There's been no promise there that I'm --

23  absolutely not.  I said, Todd, I have to look and

24  see what it is.  I don't -- it's part of the thing

25  he already said I don't believe in, or part of it.

1   I'm just -- I'm still skeptical.  I've got another

2   thing.  You know, what if he did this?  That's why

3   I sent him to the other guy that -- you know, go

4   to this guy and see what he's -- you know, he's

5   got some big ideas.  And it turned out that -- I

6   feel bad I sent him to that guy, you know.

7   Q.  I just have one or two more questions for

8   you.

9               Counsel brought up kind of a

10  hypothetical about shortening of names and he

11  said, well, how about shortening MyPillow to

12  MyPill.com.  That would not be attractive to you

13  at all because "My Pill" suggests maybe a

14  pharmaceutical drug, correct?

15  A.  Right.  I mean, the more descriptive in your

16  name you can get of your product, obviously the

17  better -- of the domain name, you know.  The

18  registered trademark, you know, the way I -- I'll

19  tell you, the way I do business, you want to get

20  all three.  You want to get your best -- your best

21  opportunity for success there.  And if I would

22  have sent -- all this time if I would have sent

23  MyPillow to MyPillowShop.com, I'm telling you, you

24  would have lost by the power of multiplication.

25  Somebody that's just even too lazy to type in

1   MyPillowShop, they'll go what was it, MyPillow,

2   you know.

3           I don't know if we would have got

4   the way we branded because my branding -- I don't

5   brand.  Every spot you see breaks even or makes

6   money.  So it's like you need everything -- you

7   need every advantage you can get to get that -- to

8   get that --

9   Q.  Oh, absolutely.

10  A.  -- to get that money.

11  Q.  Let me just check my notes.

12          MR. PATE:  I'm going to pass the

13  witness.

14               REDIRECT EXAMINATION

15  BY MR. POWERS:

16  Q.  Just a little bit of follow-up, Mr. Lindell.

17  I want to make sure there's not any lack of

18  clarity about this discussion of vetting Mr.

19  Meagher.

20          Had there been any kind of

21  background check done on Mr. Meagher by you or

22  your company?

23  A.  I --

24          MR. PATE:  Objection to form.

25          THE WITNESS:  What's that?

Michael J. Lindell                                                      128

 1              MR. PATE:  You can answer.

 2              THE WITNESS:  I think Todd Carter,

 3   you know, because we checked out -- I think that's

 4   when I found out, he said he was partners with

 5   Julian Lennon, I guess, or -- which, you know --

 6   he was pretty -- what I liked about him, he was

 7   pretty open and that after it was him and I one on

 8   one, after he got past this -- what had been said

 9   to him by this Steve guy, and I'm going, this

10   isn't who I am, you know.  Let's just talk and

11   see, you know.  Who are you, you know?  You know,

12   I'm -- I could say something now about some other

13   people, but I won't.

14   BY MR. POWERS:

15   Q.  But -- but --

16   A.  But he -- he -- so when he said that, I had

17   Todd -- you know, Todd kind of does my due

18   diligence on that.  And Todd said, yeah, he's

19   legit; this is his partner, blah blah blah.

20              So it's a couple things he said in

21   that, and that could have been -- and then

22   before -- you know, then I, you know, went to Todd

23   and say, check this out; he says this.  You know,

24   just, you know, cross-check.  But you -- and you

25   get him in that one on one.

1    And have I been fooled before?

2    Absolutely.  I've had more betrayal in my life

3    than you could ever, you know -- but you've got to

4    go with -- you know, I look at things and I just

5    felt there was many things that pointed to it.

6    This was a divine appointment, the right thing to

7    do, and it matched so good.

8    I mean, if we would have been some

9    shyster, whatever, some crook, would I have still

10   bought it?  I don't know.  I probably would

11   have -- I probably would have because it matches

12   so good, but -- yeah.

13   But would I -- with all the -- I

14   will say this:  If I hadn't talked to him and, you

15   know, took the calculated gamble on that, now

16   you're adding another factor into his character

17   that down the road he isn't even try to -- now

18   whatever he's talking about, and normal

19   businessmen would not have done that.

20   I did -- I based that on the guy I

21   seen there, that he would -- that he would do this

22   for me on a handshake.  And that's why I kept --

23   took that calculated gamble of $400,000 and which

24   at the time, that -- and anytime it's a lot of

25   money, but at the time it's like -- I'm looking

1   down the future.  Had he been a shyster, whatever,

2   like I -- that I could see through this whatever

3   sheep in wolf clothing or whatever, or the

4   opposite or whatever, I would have not -- I would

5   have not took that gamble.  You know, I would have

6   said -- you know, it would have been a

7   different -- it would have been a different thing.

8   Q.  And I just want to make sure it's clear for

9   the jury.  When you say that you -- you vetted

10  him, it's in that in-person interaction where

11  you --

12  A.  Yeah.

13  Q.  -- feel --

14  A.  Yeah, absolutely.  To me, that's worth it,

15  you know.  And to check out some of the things he

16  said.

17  Q.  Right.

18  A.  You know, if someone says they're a partner

19  with John Lennon's kid, I go, you know, okay, that

20  would be a pretty big fabrication.

21  Q.  But you had not looked into his litigation

22  background?

23  A.  No, none of that.

24  Q.  You had not discovered the tax liens on his

25  home?

1   A.   No, none of that.  I have no idea.  This is

2   the first I've heard of that right there.

3   Q.   Okay.  It was your sense, though, when you

4   met him that he appreciated or cared about the

5   mission that you had?

6   A.   Absolutely.  That was -- and if he wouldn't

7   have, I don't think I would have trusted him.

8   Q.   Right.

9   A.   You know, there was -- it was both.  I really

10  believe he -- he sincerely cared about what I was

11  doing.

12  Q.   Yeah.  And that mission would help

13  entrepreneurs and help the beneficiaries of your

14  charitable mission?

15  A.   Right.  With his addicts and to help the

16  addiction in this country and to help inner

17  cities.

18  Q.   But Mr. Meagher never offered to donate the

19  domain name to you?

20  A.   No.

21  Q.   The --

22  A.   That would have been a good thing.  I should

23  have -- let's rewind the tapes.

24           To be honest with you, though, it

25  was kind of like -- you know, we had steered it to

1    that as kind of like, okay -- I do think this,

2    that had I not told him all that, it would have

3    been 1.7 million stuck on, you know.  I mean, it

4    could have been in millions.  He wasn't going to

5    budge on that.

6              I don't -- you know, I don't know

7    how far down -- that would have been typical

8    corporate negotiations.  I don't know you.  I

9    don't care, but I don't trust you and I don't

10   trust you.  That's typical in corporate world

11   America.  That's my opinion.

12   Q.  Yeah.  But as you described to Mr. Pate, it

13   was -- it's really important to you that you

14   protect your trade name, your domain name, and

15   your trademark, all three of those?

16   A.  Absolutely.

17   Q.  It's so important that you hire people to

18   defend you in the technology space and you hire

19   lawyers like Mr. Simonelli to defend you in the

20   legal space?

21   A.  Being proactive in the -- in the trademark

22   and getting the -- getting the -- now I can do

23   stuff proactively that I didn't -- that I didn't

24   know then.

25   Q.  Yeah.  And I think you said that

1  entrepreneurs make a mistake of thinking they need

2  to register every domain name when they should be

3  protecting the trademark?

4  A.   They should be getting the registered

5  trademark and getting -- you get that, and it's

6  the domain names where they get into, oh, I'm

7  going to go out and get -- gee, does anybody have

8  this dot-com?  Well, it doesn't matter if you

9  don't have the R.  What are you going to do, sit

10 and fish in an empty pot, you know?

11 Q.   So you were trying to develop a brand and

12 develop a business, letting your trademarks lapse

13 would be a pretty serious mistake?

14 A.   Absolutely.  It happened to my father when

15 he -- quite a while ago, and he let his -- not

16 only his trademark but his patent lapse.  He had

17 cancer and he didn't -- and nobody attended to

18 that and it lapsed, you know.

19 Q.   And I think as you described it with respect

20 to MyPillow, losing any piece of that trademark,

21 trade name, domain name, triad, losing any part of

22 it --

23 A.   Yeah, once it's established, yeah.

24 Q.   -- could be irreparable?

25 A.   Right.  You can -- you can lose it -- you can

1   lose the other two and save with the R because it

2   protects your product, but you can't do the other

3   way around.  You lose the R, you're dead, you

4   know, because they can stop you.

5           It's like this -- it's kind of like

6   patents.  When I got my patent, I was told once,

7   are you going to get a patent on this pillow?  And

8   the guy says -- and this guy sat -- or no, the guy

9   came up to me at the Minnesota State Fair and he

10  said, are you the guy that invented this?  I said,

11  yeah.  This was in 2006.

12          He said -- he said, well, you know

13  this stuff lasts ten years.  He said, this will

14  never see big retail.  And he goes, you ever hear

15  of the cars that got 200 miles to the gallon?  He

16  says, you'd better go get a patent or -- and he

17  said, the average person buys 40 pillows in a

18  ten-year period.  You'd better go get -- go get a

19  patent because the big companies -- I'm not going

20  to name them; we all know what they start with, a

21  lot of S's -- they're going to go around you, get

22  that patent, and never make this pillow, so --

23  just like they did with the cars that got 200

24  miles to the gallon.

25          So it's like with a patent, it

1   protects you in your own space.  A lot of that's,

2   you know, for defensive protection that -- as much

3   as off -- you know, to be here I am, and that's

4   what they're, you know --

5   Q.  So you think it's important, get the R and

6   defend the R?

7   A.  Get -- absolutely.

8   Q.  Okay.

9   A.  That's -- to me that's -- you get that, and

10  the R -- that R gets more and more valuable as

11  your product -- or if it's a product or

12  whatever -- as you get the money you spend on

13  branding that R.  That's -- you know.

14                  MR. POWERS:  Pass.

15                  RECROSS-EXAMINATION

16  BY MR. PATE:

17  Q.  Just a couple more questions.

18          You talked about -- you used the

19  interesting phrase a minute ago, "in your own

20  space."  Tell us what you mean by that.  You're

21  protecting --

22  A.  Yeah, you're protecting -- in this world we

23  live in, not only if you don't get copied at the

24  ground level, it's all about -- they all want a

25  piece of whatever you've done.  Obviously MyPillow

1    is probably one of the biggest targets in the

2    United States because I've seen the most.  I've

3    been on TV over 2.5 million times.  So they --

4    everybody wants to grab on to that.  It's

5    (descriptive sound).

6               An entrepreneur over here, you're

7    not going to hear about that guy who gets

8    swallowed up by the -- you know, you're not going

9    to have a lawyer to fight that, to protect it.

10   And if he doesn't know this other -- these

11   platforms that we live in, then you -- you could

12   be dead.

13              Like I told the guy that got, you

14   know, $9,000 he spent on Google AdWords and all he

15   did was get in there himself.  He didn't know

16   anything about what goes on there, and he was

17   charged so much a click.  And he -- you know, he

18   sold a hundred and some dollars worth of product.

19   It put him in -- they had saved his whole life for

20   this.  He's got all this product.  I felt so bad

21   for him.  I'm going -- and Google is not -- they

22   don't care.  They're not going to give that back.

23   And you know what?  They don't need a bill

24   collector.  You know what they do?  You can't

25   advertise in here anymore.

1   Q.  Right.

2   A.  It's that simple.  So in your own space, it's

3   what -- it's what stuff is worth --

4   Q.  Right.

5   A.  -- you know, depending where your footprint

6   is too, you know.

7   Q.  Are you meaning in pillows, in selling

8   pillows, that's your space?

9   A.  Yeah.  In my -- in my -- whatever my brand

10  name, whatever my brand is, to protect that space,

11  that's -- you know, you need to protect that.  And

12  if you -- but -- from ad words, from copycats,

13  from, you know, corruption.  From -- I mean,

14  that's your -- that's your -- protect patents is

15  supposed to do that too, but everybody knows they

16  tweak one thing and you ain't gonna, you know --

17  to me, your trademark is even more important than

18  your patent.

19  Q.  Right.  Now, let's talk about that for a

20  second.  If somebody goes out and gets a trademark

21  that's somewhat similar to your trademark but

22  they're in a whole different space.  They're

23  selling cars.  They're not trying to trade off of

24  your goodwill and sell pillows.  They're just

25  selling cars.  You're not too concerned about

1   them, like you are with somebody that's trying to

2   sell pillows, correct?

3   A.   Well, that depends.   I'm in a different

4   space because --

5   Q.   Right.

6   A.   -- because right now -- I'm in an anomaly

7   right now with MyPillow.   You could -- if I had

8   somebody selling cars and putting MyPillow on it,

9   they're using -- or my face.   They use my face all

10  over -- I just had one yesterday.   They used my

11  face all over the place, which I've got

12  trademarked now, you know.   And they -- you have

13  to -- you know, it depends on, like I say, the

14  footprint you're in, if you -- what was the

15  question again?

16  Q.   Yeah.   If somebody gets a similar trademark,

17  somewhat similar, maybe calls it MyCarPillow.com

18  or something --

19  A.   We went and --

20  Q.   -- like that, and they're selling cars?

21  A.   In my thing, we've had to go after that

22  because in this world, and it's kind of shifted

23  because of Google AdWords.   You know, if Google

24  AdWords all of a sudden -- I'll give you an

25  example.

1          I mean, it doesn't -- it doesn't --

2    it depends what space you're in.  When I came out,

3    there was a thing called My Pillow Pets, if

4    everybody remembers them.  Well, they were up

5    there, number one, organically.  And I thought,

6    you know what?  It's in a different space.  It's a

7    little stuffed animal.  And I thought, you know

8    what, they're gonna -- I talked to them.  I said,

9    you're not gonna -- if you ever do an infomercial,

10   I said -- because I thought it might have been

11   infringing on this trademark I had, and I said, if

12   you ever do an infomercial, you can't do it.

13   You've got to rebrand yourself as Pillow Pets,

14   which they did, and we came to an agreeable.

15          But in that space, in that moment in

16   time, neither one interfered, but they shifted

17   their brand named to Pillow Pets, trusting me that

18   I was gonna be huge some day.  I did that in 2006

19   or '07, seeing the future.  Not many people would

20   have been proactive like that and went to that

21   company to say, you need to take the "My" off

22   that.  I'm not gonna sit and fight this.

23          Now, and we're both going to benefit

24   from it because as I start branding -- moving --

25   you know, you're taking spaces in Google.  See,

1   there's a different factor nobody realizes that

2   comes in.  You're blocking each other out and

3   you're having -- if you would have -- let's say

4   you have Coffee Cup and then you had -- I don't

5   know how to -- the example, but I guess that

6   Pillow Pets is the best example.

7               So you're -- you're kind of taking

8   these spaces and if someone is looking for a

9   Pillow Pet, they'll -- well, I might buy a

10  MyPillow and vice-versa.  But when you get to

11  another sphere, that's where I had to have them --

12  you guys got to agree over time to take out that

13  "My" because I could see the future.  Not many

14  people see that --

15  Q.  Right.

16  A.  -- where you could -- it just really depends

17  on the space you're in.

18  Q.  Right.

19  A.  Would I allow a -- would I allow, in my space

20  I'm in right now, someone to have MyPillow --

21  MyPillowCars.com?  Absolutely not, because there

22  would be bleeding off the public my name

23  recognition in this United States, which I'm the

24  most recognized brand in the country, and they

25  would be going, oh, Mike Lindell gave this car

1    place credibility in this.

2              So I'm in a different space like

3    that.  So other entrepreneurs wouldn't worry me at

4    times.  It didn't at Pillow Pets, but it did, you

5    know -- I mean, I think everything is different

6    when you come to that.

7    Q.  Let me tweak that just a little bit.  How

8    about if they're -- they get a trademark for

9    MyCar.com and their space is they're selling

10   automobiles?

11   A.  Yeah.  That's --

12   Q.  You're not going to police that?

13   A.  No, absolutely not.  Totally different.

14   Q.  Same thing with like MyCoffeeCup.com?

15   A.  Right, absolutely.  That's where the my's --

16   the my's -- I believe one of the places, the my's

17   thing, I did a commercial in Eden Prairie,

18   Minnesota and the Twins were there and they seen

19   that -- the Minnesota Twins.  And right away you

20   had, My 29, MyTwins.com.  And it was -- it just

21   kind of -- and I think at the same time you had

22   other my's starting up at the same time back in

23   the early 2000s, and they were all different.  It

24   was like putting a prefix.  It was like Apple to

25   an iPhone, and if they came out with an "I" coffee

1   cup, you know, same type of thing.

2   Q.  I think I have one more question for you.

3           Going back to the vetting of

4   Mr. Meagher, you had Todd Carter vet him to line

5   up some of his claims to make sure they were

6   accurate, like --

7   A.  Just to fact check.  Basically, fact check,

8   you know, because I'm -- I've been burned so many

9   times by people, and I think they have a good

10  heart and they come in and they -- you know,

11  they'll deceive me and I turn around and I'm

12  going, wait a minute; are you kidding me?

13          And I can -- you can read my book.

14  I mean, it's one after another.  But you've got

15  to -- you've got to trust.  You can't just not

16  make deals or not talk to people.  I feel

17  getting -- you know, if nine -- if that happens to

18  me one out of ten times, I want to give that

19  person the here's who I am; who are you.  And his

20  fact checks came out.  It wasn't a big vetting.

21  It was certain things I pulled out of the

22  conversation to fact check.  If you're going to

23  lie about a little thing, you're going to lie

24  about a big thing, you know.

25  Q.  Plus when you meet Mr. Meagher in office --

1  you're a pretty good judge of character, aren't

2  you?  You've had your mistakes over the years, but

3  you're --

4  A.  Oh, yeah, I've seen -- but like, it can still

5  happen.  I mean --

6  Q.  Sure, absolutely.

7  A.  -- I'm not saying -- you know, nobody is

8  perfect because when greed is involved, they can

9  be very deceiving, you know.

10          But yeah, I think I am.  I think I

11  am.  And if I'm not, I'll pray about my things.  I

12  mean, I'll pray about stuff.  You know, is this

13  the right thing?  Or I look for divine connections

14  or divine appointments that happen.

15  Q.  Spiritual discernment as well.

16  A.  Yeah.  This is my discernment.  And when --

17  one of the things was that it was so close to

18  Dallas.  That was just -- of all the places in all

19  the world, in all the times, he's right next to

20  the guy that I would have check him out.  So he

21  got to drive -- you know, basically, go check his

22  office.  His office is, it's crazy, two miles

23  away.

24          So now I look at -- people could

25  say, well, how can you connect that?  I can tell

Michael J. Lindell                                                          144

1   you stories over and over again of where -- and

2   everyone in my company could -- when I get these

3   divine appointments, that -- it's something means

4   something.

5   Q.   Right.  Plus when you get to have the

6   notoriety and the publicity and the fame that you

7   have, you can see through people pretty quickly to

8   see if they're just after your money or riding off

9   of your popularity?

10  A.   Yeah, I usually can.  And, you know, you're

11  talking to a guy, I've had guns to my head, swords

12  to my throat.  I have been in -- God has given

13  me -- being able to be put in a situation and get

14  out of that situation by his protection.

15              So do I see it right away?  I

16  usually -- I used to err on the side of -- I give

17  the benefit of the doubt and forgive them.  Okay,

18  I'm going to forgive this part.  But now it's

19  become, my boundaries are a little more, you know.

20  Q.   Yeah.

21  A.   Maybe a lot more, you know.

22  Q.   Absolutely.

23  A.   You know, even though the guy could just

24  knife me in the head, I would, you know, forgive

25  him.  Okay, I guess we'll still do the deal.  No.

1   I've gotten a little better.

2                   MR. PATE:   I pass the witness.

3             FURTHER REDIRECT EXAMINATION

4   BY MR. POWERS:

5   Q.  All right.  Sorry.  One more.  I have to

6   follow up on a --

7   A.  Yeah.

8   Q.  -- question he raised.

9                   So he's talking about this notion of

10  names that are similar but they're in different

11  spaces.  And so let's imagine that you've got

12  MyPillow.com.  Someone comes along and registers

13  MyPill.com and it's a pharmaceutical company and

14  they really want to sell medicine.  Does that

15  cause you any heartburn for them to have that?

16  A.  You know, it wouldn't have, but now it would

17  have, what you just said exactly, because we have

18  a corrupt company.  They're called Snuggle-Pedia

19  [sic].  They're buying our ad words since they

20  started out, buying MyPillow -- or MyPillow --

21  using our name in their trickery, so your -- the

22  consumer sees the name MyPillow on our ad words

23  and buys it, but they don't have MyPillow, okay?

24  It's a company in California.

25                  Then they went to -- we got ahold of

1    Google, got ahold of a trademark, sent a shot

2    across their bow, you can't do this.  It's our

3    registered trademark.

4              Then they went to MyPill.  They put

5    MyPill up there.  Not dot-com, but MyPill.  And

6    then we shot across the bow, and they took -- now

7    it just says "My" versus "Our Pillow."  They still

8    got by with it.  Very corrupt company.  Very --

9    they found an angle.

10             And I just -- in my mind, I've had

11   to just be, you know, okay with that.  But before

12   if it was them selling pills and they -- and I

13   didn't -- wasn't aware of that, probably would

14   have.

15             The problem is -- you look at is

16   what are they gonna do if MyPill.com -- and if I

17   look, wow, they've been around, they're selling

18   pills, no problem.  But if it's -- but now you'd

19   have to worry -- you still have to get lengths to

20   get to the MyPill.com.

21             But the -- these guys using -- it's

22   all good Google AdWords that's come into play,

23   which people don't realize of how -- what can they

24   do with that?

25             Now, you know, what they could do

Michael J. Lindell                                                    147

```
 1    with that, they could buy my ad words and if you

 2    as a consumer see MyPill.com up there, it doesn't

 3    matter what they're selling.  I'm in a different

 4    space than a lot of people are because of the

 5    power of my brand right now.

 6              Get this.  Let's just say -- let's

 7    say that -- I'll give you an example.  Delta.  You

 8    brought up Delta before.

 9    Q.  I believe he did, but go ahead.

10    A.  Somebody did.

11              So you have two Deltas selling two

12    different things, right?  And one of them -- one

13    of them doesn't have the R and the other one does.

14    Let's say the planes do.  Well, now this Delta

15    over here at the time, that's okay, they're

16    selling luggage or whatever.

17              Well, now what happens to Delta's

18    competition?  Let's say it's United Airlines,

19    okay?  They go get that -- the Delta.com or

20    DeltaPlus.com -- or Delta with a -- it's little

21    add-on, and now they buy Delta's ad words to get

22    people to fly in their airplanes, and you think

23    it's Delta.  But they're going to pull X amount.

24    That's what's going on in our country.

25    Q.  Well, and --
```

1    A.  And it starts with corrupt Google.

2              MR. PATE:  Objection; nonresponsive.

3    BY MR. POWERS:

4    Q.  And so if -- you know, if MyPill.com pops up

5    and they actually are selling, you know, some

6    medication or something like that, but then they

7    started taking banner ads from Tempur-Pedic and,

8    well, I'm going to set up pillowcases --

9    A.  Absolutely.

10   Q.  -- would you object to that?

11   A.  Yeah, absolutely.  This is exactly what I'm

12   talking about.  It depends -- you know, if I -- if

13   somebody came to me and said, I have -- you know,

14   I went and got MyPill.com and it's this

15   pharmaceutical company or whatever it is and they

16   had -- for all I know, they do.

17             Now -- now, if I would -- if he

18   stayed in his space, that would be okay.  I'd be

19   absolutely fine.  But all of a sudden if it kept

20   coming up and he's buying MyPill.com, buying our

21   ad words against that, now I could go -- because

22   of my R, I can go to the trademark office and take

23   him to court.  But that's customer confusion

24   because of my brand of MyPillow because he invaded

25   my space, and that gives me protection within my

1   own space.  You follow me?

2   Q.  I do.

3   A.  That's a big thing because it's very complex

4   right now, is -- depends what they're using it.

5                Well even at MyPillow, if they had

6   MyPill.com out there and they're selling pills or

7   whatever, as long as it's not illegally, you know,

8   they -- and then -- but if they came up and

9   took -- and tried to steal from us in my space.

10               But on the other hand too, they've

11  got to be very -- I've learned you have to be very

12  proactive.  Like I Heart MyPillow got out there

13  and -- you know, and using it against me, you

14  know.

15  Q.  I understand.

16               MR. POWERS:  I pass the witness.

17  I'm done.

18               MR. PATE:  I'm done.

19               MR. POWERS:  Thank you very much.

20               THE WITNESS:  You guys good?

21  Awesome.

22               MR. PATE:  Got you out of here

23  before eight hours.

24               THE WITNESS:  You guys know I don't

25  like Silicon Valley very well?

1              THE VIDEOGRAPHER:   This concludes

2    today's deposition.   We are going off the record

3    at 11:48.

4              (The deposition was concluded at

5    11:48 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 151

1                    REPORTER'S CERTIFICATE
2

STATE OF MINNESOTA      )
3                          ) ss.
COUNTY OF RAMSEY        )

4
5          I hereby certify that I reported the
VIDEOTAPED DEPOSITION OF MICHAEL J. LINDELL, on
6    January 15, 2019, in Chaska, Minnesota, and that the
witness was by me first duly sworn to tell the whole
7    truth;
8          That the testimony was transcribed by me and
is a true record of the testimony of the witness;
9
          That the cost of the original has been
10   charged to the party who noticed the deposition, and
that all parties who ordered copies have been
11   charged at the same rate for such copies;
12         That I am not a relative or employee or
attorney or counsel of any of the parties, or a
13   relative or employee of such attorney or counsel;
14         That I am not financially interested in the
action and have no contract with the parties,
15   attorneys, or persons with an interest in the action
that affects or has a substantial tendency to affect
16   my impartiality;
17         That the right to read and sign the
deposition by the witness was reserved.
18
19         WITNESS MY HAND AND SEAL this 18th day of
January, 2019.
20
21
22
23         *Paula Richter*
           Paula K. Richter, RMR, CRR
24         Notary Public, Ramsey County, Minnesota
           My Commission Expires January 31, 2021
25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| HEB GROCERY COMPANY, LP, §<br>Plaintiff, §<br>§<br>v. §<br>§<br>TODD MEAGHER, IRENE ALEXIS §<br>MEAGHER and MYSTORE, INC., §<br>Respondents. § | CIVIL ACTION NO.: 4:17-CV-02810 |

## MICHAEL LINDELL AND MIKE LINDELL PRODUCTS, LLC'S
## RESPONSES TO PLAINTIFF'S INTERROGATORIES

To:    Plaintiff, HEB Grocery Company, LP, by and through its attorneys of record, Louis T. Pirkey
and Tyson D. Smith, Pirkey Barber PLLC, 600 Congress Avenue, Ste. 2120, Austin, TX
78701; and

Jason M. Powers, Stephanie Miller Noble, Vinson & Elkins, LLP, 1001 Fannin St., Ste. 2500
Houston, TX 77002

Michael Lindell and Mike Lindell Products, LLC (collectively, "Respondents") serves the

following Responses to Plaintiff HEB Grocery Company, LP's Interrogatories.

## GENERAL OBJECTIONS

1.   Respondents object to all individual requests to the extent they call for information protected

by the attorney-client privilege, the attorney work product doctrine, joint defense privilege, or

any other applicable privilege or protection ("Applicable Privilege"). To the extent that the

Interrogatories call for information protected by an Applicable Privilege, Respondents hereby

claim such Applicable Privilege and invoke such protection. The fact that Respondents do

not specifically object to an individual request on the ground that it seeks such privileged or

protected information shall not be deemed a waiver of the protection afforded by the

Applicable Privilege.

1



EXHIBIT
Lindell
5
1-15-19    PR

2.  Respondents object to the Interrogatories to the extent that they seek the discovery of

sensitive and confidential business, financial and/or proprietary information of Respondents

or any third party.

3.  Respondents have exercised due and reasonable diligence in responding to the

Interrogatories and Respondents reserve the right to supplement or amend any and all

parts of the responses provided herein should new information be discovered.


Subject to the foregoing General Objections, Respondents answer the Interrogatories as

follows:

## ANSWERS TO INTERROGATORIES

1.      Please describe the complete terms of the transaction to acquire the MyStore.com domain
name or related marks (e.g., what was sold, by whom, to whom, and in exchange for
what).

ANSWER:      Mike Lindell Products, LLC purchased the domain name mystore.com for

$400,000 from Todd Meagher.


2.      Please identify each written agreement or written conveyance relating to your acquisition
of any interest in the MyStore.com domain name or related marks.

ANSWER:      There was no written agreement between the parties to purchase the domain name.

Upon information and belief, Todd Meagher submitted documents to the registrar

of the MyStore.COM domain name to transfer the domain name to Respondent

Mike Lindell Products, but Respondents do not have such document.


3.      Please describe the role of each individual who participated in negotiating or carrying out
the acquisition of the MyStore.com domain name.

2

ANSWER:    <u>Michael J. Lindell</u>:  Michael Lindell negotiated the purchase of the domain name
face-to-face with Todd Meagher.

<u>Todd Meagher</u>:  Todd Meagher negotiated the purchase of the domain name face-
to-face with Michael Lindell.

<u>Todd Carter</u>:  Todd Carter is Chief Technology Officer for Lindell Technologies,
LLC, who provides shared technology services to various entities related to
Michael Lindell, including Mike Lindell Products, LLC.  He sent the initial email
inquiring about purchasing the domain name mystore.com.  After the business deal
had been struck between Michael Lindell and Todd Meagher, Carter reviewed the
source code and a demo of the web application developed for mystore.com with
Todd Meager and his son, Nick Meagher. The web application showcased brick
and mortar retail stores and their owners and relied heavily on videos, usually
recorded by the store owner, to feature products and what made the store/vendor
special. In addition to the web application a mobile application existed which
allowed users to locate stores based on their current location. Ultimately, after
reviewing the web, database, and mobile applications, Carter decided not to use the
coding created by the Meagers and instead use an established e-Commerce platform
with which Carter was more familiar.

<u>Nick Meager</u>:  Upon information and belief, Nick Meager received the initial email
from Respondents inquiring about the purchase of the MyStore.COM domain.  He
also was involved in the demo of the source code described above.

3

4.    Please describe the sequence of offers and counter-offers leading to the transaction, including what each offer or counter-offer was, who made it, and when.

ANSWER:    Todd Carter sent an email to Nick Meagher, the contact person listed on Whois for

the MyStore.COM domain, inquiring about the purchase of the domain.    Todd

Meagher responded to him by telephone. Todd Meagher represented that he had

over $1 million invested in MyStore.COM and its associated technology, but would

be willing to sell for $800,000.   We setup a meeting and Todd Meagher came to

our offices in Chaska Minnesota.    Michael Lindell and Meagher negotiated the

price of the sale face-to-face.   Meagher again stated that he had over $1 million

invested in MyStore.COM and its associated technology. Lindell offered $300,000

for the domain name.    Todd Meagher demonstrated Beta versions of the

programming and technology that he had in place for the MyStore.COM website

and mobile platforms. Meagher agreed to reduce his price to $400,000 and include

the MyStore social media user names and source codes that Meagher had developed

for MyStore.com and its associated IOS and Android mobile applications.

Respondents agreed.   Respondents subsequently decided to not use the source

codes developed by Meagher and instead are using an established e-commerce

platform with which their CIO, Todd Carter, is more familiar.

5.    Please describe all discussions with Todd Meagher concerning HEB and its lawsuit against Todd Meagher, including who participated in those discussions, when they occurred, and what was said.

ANSWER:    Todd Meagher disclosed the existence of the lawsuit. He stated that his use of the

MyStore trademark was prior to any use by HEB and that he was confident that he

4

would prevail.  These representations were made on or about July 19, 2018 and

August 29, 2018 to Michael Lindell and Joseph Springer, counsel to Respondents.

6.   Please describe all discussions with Todd Meagher concerning his ownership of trademarks related to MyStore, MyStore.com, MiTienda, or MiTienda.com.

ANSWER:   Meagher represented that he was the owner of the domain name MyStore.com.

Meagher also stated that he his use of the MyStore and MyStore.COM trademarks

was prior to any other use.   Upon information and belief, Meager mentioned his

ownership in Mi Tienda or Mi Tienda.com, but Respondents had no interest in those

trademarks or URLs.

7.   How do you intend to use the MyStore.com domain name?

ANSWER:   Respondents object to this request as seeking information that is confidential and

proprietary.  Without waiving those objections, Respondents answer as follows:

Respondents intend to use the domain as a business-to-consumer marketplace for

new-to-market products that help consumers with their health or faith, and to also

help inventors and new entrepreneurs bring their products directly to consumers.

8.   What discussions have you had with Mr. Meagher regarding your acquiring any additional assets or services from Mr. Meagher, such as trademarks, business entities, domain names, software, website coding, or others?

ANSWER:   Respondents discussed having Meagher's team modify the MyStore.COM software

code to meet the needs of our business model. Respondents subsequently decided

to use an established e-commerce platform with which their CIO, Todd Carter, is

more familiar.

9.   If there have been discussions as described in Interrogatory #8, describe the terms on which the parties have discussed, offered, or requested any additional assets or services.

5

ANSWER:    No.

10.    What ongoing or prospective business relationships do you have with Mr. Meagher or any of his companies?

ANSWER:    At the end of September, Meager offered to have Michael Lindell join the advisory

board of his OpenCircle.com venture in exchange for 5% equity in the entity.

OpenCircle.COM is a social network that requires an invitation from an existing

member and that is governed by members. It is unrelated to Respondents' plans

for MyStore.COM.    No documents have been exchanged to effectuate this

transaction.

11.    On what terms, if any, have you offered or agreed to pay any litigation costs or liability arising out of HEB's lawsuit against Todd Meagher?

ANSWER:    Respondents have not offered or agreed to pay any litigation costs or liability

arising out of HEB's lawsuit against Todd Meagher.

12.    What valuations, if any, are you aware of relating to the MyStore domain name, trademark, or business?

ANSWER:    Respondents are not aware of any valuations relating to the MyStore domain name,

trademark, or business.

6

<u>As to the Answers:</u>

STATE OF MINNESOTA    )
                      )SS
COUNTY OF CARVER      )

Dated: 11/9/18

Mike Lindell Products, LLC

By _____
Michael J. Lindell, President

_____
Michael J. Lindell

TRACI RAE ELIZABETH SCHREMPP
NOTARY PUBLIC - MINNESOTA
My Comm. Exp. Jan. 31, 2021

_____
Notary Public

My commission expires Jan. 31. 2021

<u>As to the objections:</u>

1/9/18

_____
Joseph Springer
General Counsel | My Pillow, Inc.
343 East 82nd Street, Suite 100 |
Chaska, MN | 55318
(952) 826-8603
jspringer@mypillow.com
**ATTORNEY FOR MICHAEL LINDELL
AND MIKE LINDELL PRODUCTS, LLC**

7

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been served on all counsel of record on this 9ᵗʰ day of November, 2018, as follows:

*Via Email*
Louis T. Pirkey
Tyson D. Smith
Pirkey Barber PLLC
600 Congress Avenue, Ste. 2120
Austin, TX 78701

*Via Email*
Jason M. Powers
Stephanie Miller Noble
Vinson & Elkins, LLP
1001 Fannin St., Ste. 2500
Houston, TX 77002

*Via Email*
Gary L. Pate
Thompson Coe Cousins & Irons, LLP
One Riverway, Suite 1400
Houston, Texas 77056

Joseph Springer

8