VINSON & ELKINS LLP
Jason M. Powers (SB# 24007867)
Allison L. Fuller (SB# 24087547)
1001 Fannin Street, Suite 2500
Houston, TX 77002
Telephone: (713) 758-2522
Facsimile: (713) 615-5809
Email: jpowers@velaw.com
Email: afuller@velaw.com

Rebecca L. Petereit (SB# 24062776)
Matthew D. Struble (SB# 24102544)
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Telephone: (214) 220-7700
Facsimile: (214) 220-7716
Email: rpetereit@velaw.com
Email: mstruble@velaw.com

PIRKEY BARBER PLLC
Louis T. Pirkey (SB# 16033000)
Travis R. Wimberly (SB# 24075292)
Tyson D. Smith (SB# 24079362)
1801 East 6th Street, Suite 300
Austin, TX 78702
Telephone: (512) 322-5200
Facsimile: (512) 322-5201
Email: lpirkey@pirkeybarber.com
Email: twimberly@pirkeybarber.com
Email: tsmith@pirkeybarber.com

ATTORNEYS FOR HEB GROCERY COMPANY, LP

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | § | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| TODD MEAGHER | § | Case No. 20-40208-mxm11 |
| | § | |
| Debtor. | § | |

**HEB GROCERY COMPANY, LP'S REPLY IN SUPPORT OF ITS
MOTION FOR RELIEF FROM THE AUTOMATIC STAY
TO PROCEED WITH PRE-PETITION CLAIMS FOR INJUNCTIVE RELIEF**

HEB seeks relief from the automatic stay to complete the Southern District Litigation against the Debtor for trademark infringement of HEB's incontestable registrations for its MI TIENDA Marks.[1] Debtor's response ignores the real issue before this Court. The most efficient and least costly way to resolve the long-pending but nearly-complete Southern District Litigation is to block Debtor's forum-shopping strategy and let Judge Hughes issue his ruling on the pending summary judgment motion or, if necessary, take the case to the trial he is ready to hold. It will be far costlier and more time consuming to restart the litigation process in this Court, in part because Debtor admits he wants to use this proceeding to reboot his defense with expensive new expert witnesses, new discovery, and new claims. Allowing Judge Hughes to finish his case does not threaten the orderly distribution of the Debtor's assets or undermine the purpose of the automatic stay, because HEB is not even seeking monetary damages from the Debtor in the Southern District Litigation. Debtor's only argument for this Court's involvement in this matter is that it must protect a critical asset—a supposed common-law trademark right—but the evidence submitted shows this supposed right in fact has no value, if it exists at all. The stay should therefore be lifted so that the Southern District Litigation can reach its hard-earned and long-awaited conclusion.

**I.   The relevant factors dictate that the Southern District should be allowed to proceed.**

  **A.   Contrary to Debtor's claim, the Southern District case is on the verge of completion.**

  1.   In his Response to HEB's Motion for Relief from the Automatic Stay (Dkt. 31, the "Response"), the Debtor describes the procedural posture of the Southern District Litigation in misleading fashion, claiming it "is not close to trial," that "[d]iscovery is incomplete," and that the Debtor "anticipates taking at least one more deposition." Resp. ¶ 21. Not so.

---

[1] Capitalized terms not defined herein are used as defined in HEB's motion for relief from the automatic stay (Dkt. 22, the "Motion").

1

2. First, the discovery period in the Southern District Litigation closed *over a year ago*, on February 1, 2019,[2] so any additional discovery would be barred by the Southern District's scheduling and management orders. Moreover, the Debtor identifies none of the supposed discovery that needs to be done. On the contrary, the Debtor himself has admitted in the Southern District Litigation he can proceed to trial immediately with little or no discovery at all. *See, e.g.*, S.D. Litig. Dkt. 158 at 1 (arguing that HEB's "trademark case should be simple and could be tried largely on the public record" and that trying HEB's claims separately from the counterclaims would "economize and streamline" the case).[3]

3. Second, this bankruptcy was filed because the conclusion of the Southern District Litigation was imminent. Judge Hughes had already granted summary judgment against Debtor on Debtor's counterclaims, and was ready to decide HEB's fully-briefed summary judgment motion on HEB's affirmative claims.[4] From the bench, Judge Hughes described summary judgment findings he had made that supported HEB's claim for trademark infringement,[5] which if granted would avoid the need for a trial. Judge Hughes' completion of his rulings was interrupted by the Debtor's motion to recuse Judge Hughes, and after that recusal motion was denied, the Debtor filed this bankruptcy action. In the unlikely event that a trial is necessary, it will occasion no delay, as Judge Hughes has informed the parties that if a trial is to occur, he anticipates it will

---

[2] *See* S.D. Litig. Dkts. 83 & 119.

[3] *See also* Exhibit 1 (S.D. Litig. Feb. 15, 2019 Hrg. Tr.) at 13:23–14:7 [App. 14–15] (Mr. Pate: "Your Honor, I think I have a way we can narrow all the issues very cleanly, and get this resolved. We are willing to just have a trial, trial only on the trademark issues. … And if HEB wins, I think that probably does away with all of our counterclaims and there is no need for a separate trial on that."); *id* at 48:19–20 [App. 49] (Mr. Meagher: "I just want to get to trial, and see if I found – if I infringed or not.").

[4] HEB's Motion (Dkt. 22) ¶¶ 11–13.

[5] *See* S.D. Litig. Dkt. 275 (Opinion on Partial Summary Judgment) at 2 ("A claim for trademark infringement requires (a) that the person seeking to stop another's use has a mark and (b) that the mark is likely to cause confusion with its mark. HEB has supported its claim. … It has shown a multitude of ways that Meagher has used the mark in a way that is likely to confuse consumers …. Allowing Meagher to use his mark in a way that competed with its mark would dilute HEB's mark.").

2

take no more than two days.[6] The case would very likely be complete by now absent Debtor's attempts to recuse and now oust Judge Hughes. Under such circumstances, lifting the stay is appropriate. *See In re Young*, No. 06-80397 G3-7, 2006 WL 3088225, at *3 (Bankr. S.D. Tex. Oct. 20, 2006) (finding cause to lift the stay to allow the movant to proceed with the prosecution and resolution of pending dispositive motions in state court).

> **B. As has happened repeatedly already, it is Debtor's forum-shopping strategy, not resolution in the Southern District, that will drive litigation costs up.**

4. The Debtor also argues that lifting the stay will cause him financial hardship because he cannot afford to keep paying his Houston litigation counsel, so it would be better to litigate this dispute in Fort Worth. Debtor's argument makes no sense.

5. First, while Debtor claims he cannot pay his Houston litigation counsel to litigate the claims in the Southern District case, he has successfully moved to keep the *very same* litigation counsel to litigate the *very same* claims in this Court. The only explanation Debtor even attempts to offer for how litigating here would be cheaper is that he cannot afford to travel to Houston. But it is not clear there is any travel required (since the case is likely to be resolved on a summary judgment motion that is already submitted for ruling), and even if there were, the cost of Debtor's Houston-based litigation counsel traveling to Fort Worth for hearings and trial is undoubtedly greater than the cost of what little travel Debtor could ever have to make to Houston.

6. Second, the Debtor is hiding the ball when it comes to litigation costs. If the Debtor forces this dispute into the bankruptcy, he intends to take new discovery and present a new expert witness—as evidenced by the Response itself. The Debtor filed in this Court a "likelihood of confusion" survey prepared by Debtor as Exhibit A-2 to the Response. This survey was prepared

---

[6] *See* Exhibit 2 (S.D. Litig. Nov. 5, 2018 Hrg. Tr.) at 14:24–25 [App. 69] (Ms. Cayce: "We think it [trial] could be done in two days max." The Court: "That's the longest trial I have.").

3

long after the Southern District deadline for designating experts, producing reports in discovery, or submitting summary judgment evidence, purportedly as part of another Northern District lawsuit seeking to oust Judge Hughes.[7] HEB, naturally, objected to the use of this evidence in the Southern District as being untimely and not relevant to the issues in dispute in any event.[8] But Debtor's intent to rely on that evidence in this Court gives away the game—he is not in this Court to streamline the litigation or reduce litigation costs. He is in this Court to restart the litigation with new theories, at least one new expert witness, and new evidence, because he believes the Southern District Litigation is going poorly for him, as Judge Hughes observed in connection with the Debtor's recusal motion.[9]

7. Third, even if there were some reason to expect litigation costs in the Southern District Litigation, that is no answer to HEB's motion. While litigation costs to the Debtor are a factor in determining whether to lift the automatic stay, this factor alone does not constitute sufficient grounds to deny a motion for relief from the stay. *See, e.g.*, *Matter of McGraw*, 18 B.R. 140, 142 (Bankr. W.D. Wis. 1982) ("The cost of defending in a civil suit has been given serious consideration by bankruptcy courts, but no case has been found in which the high cost of defending is by itself 'great prejudice' which will bar modification of the stay."). This is especially so when discovery has already been concluded in the other matter in question. *See In re Fowler*, 259 B.R. 856, 861 (Bankr. E.D. Tex. 2001) (lifting stay because "Movants advised the Court that discovery has been concluded. This fact indicates that the Debtors will not be forced to bear substantial additional costs in order to defend the lawsuit."). Here, where discovery in the Southern District

---

[7] *See* S.D. Litig. Dkt. 257.
[8] *See* S.D. Litig. Dkt. 258.
[9] *See* S.D. Litig. Dkt. 281 (Order Denying Recusal) ¶ 2 ("[T]he Defendants are creating an issue because they feel like the case is not going their way.").

is concluded and summary judgment is on the horizon, an unexplained fear of additional costs does not justify keeping the stay in place and delaying resolution further.

### C. The Southern District is well-suited to conclude this case.

8. As noted in HEB's motion, the Southern District is the most appropriate and efficient forum to determine the trademark infringement claims because (1) the claims concern "the application of federal and state intellectual property law," (2) Judge Hughes is already "well-versed with the facts, issues and parties in that action after two years of litigation," (3) discovery has been completed in the district court action, and (4) the Southern District Court is prepared to conduct a jury trial. *See In re Consol. Distributors, Inc.*, No. 13-40350 (NHL), 2013 WL 3929851, at *11 (Bankr. E.D.N.Y. July 23, 2013) (granting the movant's motion to lift the stay to allow pending trademark dispute to proceed where the case had been pending for over two years).

9. Debtor's only response to these arguments is to say that the Southern District Litigation is not a "niche subject matter" involving a specialized tribunal like the USPTO or TTAB. Resp. ¶ 26. While *Consolidated Distributors* shows that a trial court need not be a "specialized tribunal" to warrant the lifting of a stay in a trademark matter, it is worth observing that the subject matter of this dispute *actually is pending* in the USPTO's Trademark Trial and Appeals Board. As explained in HEB's motion, the Debtor and his spouse have opened separate fronts in this dispute in the TTAB in another attempt to get around Judge Hughes, and the TTAB has stayed proceedings awaiting a determination of liability by the Southern District Court.[10] Therefore, the specialized tribunal has already recognized the value of Judge Hughes' longer-standing involvement in the case. This Court can do the same.

---

[10] *See* HEB's Motion (Dkt. 22) ¶¶ 6–7.

5

### D. Courts routinely exempt proceedings for injunctive relief from the stay.

10. As shown in HEB's motion, the automatic stay was not intended to apply to judicial proceedings to enjoin unlawful conduct by the Debtor. *See, e.g.*, *Dominic's Restaurant of Daytona, Inc. v. Mantia*, 683 F.3d 757 (6th Cir. 2012). The Debtor suggests in response that this well-established exception to the automatic stay applies only where there has been a temporary restraining order or a preliminary injunction issued against the Debtor in the pre-petition suit in which the injunctive relief is sought. Resp. ¶¶ 12–15.

11. Debtor cites no authority for the theory that preliminary injunctive relief must be in place to warrant lifting the stay in an injunctive relief case. On the contrary, courts routinely exempt claims for injunctive relief from the automatic stay—regardless of whether any preliminary relief has previously issued. *See, e.g.*, *In re Hillenbrand*, Case No. 09-75574-R, at *3 (E.D. Mich. Bankr. Feb. 2, 2010) (lifting stay to allow pursuit of injunction enforcing covenant not to compete, finding it was for the state court to determine "whether an injunction should be issued"); *In re Hughes*, 166 B.R. 103, 106 (Bankr. S.D. Ohio 1994) (lifting stay to allow movant to pursue claims in state court, noting state court should determine whether movant is "entitled to enjoin [Debtor] from any further breaches or whether [Movant] may be adequately compensated by monetary damages"); *Amplifier Research Corp. v. Hart*, 144 B.R. 693, 695 (E.D. Pa. 1992) (allowing defamation suit seeking injunctive relief to proceed, noting "if [Movant's] allegations are true, [Debtor] has no property right in distributing the [allegedly defamatory] report in the first place" and if "the allegations are false, the injunction will not issue"); *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 917 (E.D.N.Y. 1988) (declining to stay action for trademark infringement, noting "plaintiff should be permitted to secure against [Debtor] the limited relief sought on this motion—that is, summary judgment as to liability as a predicate to obtaining equitable relief"). Debtor's argument appears to have been invented out of whole cloth.

6

**II.  Lifting the stay would not prejudice Debtor, because there is no valuable "common law trademark" right to protect.**

    **A.  The Debtor has no registered trademark rights in "MyStore."**

12. The Debtor suggests that he originally registered the MyStore trademark with the USPTO in 2009, Resp. ¶ 5, and "register[ed] the mark again" in 2015. Resp. ¶ 8. The latter claim is simply untrue, as is the Debtor's claim that HEB "unsuccessfully" contested Meagher's trademark application for MYSTORE at the TTAB (Resp. ¶ 10). The Debtor's trademark registration lapsed in 2015 because the Debtor did not file proof that he had continued to use the trademark.[11] Since his trademark registration lapsed, the Debtor has never obtained a federal trademark registration for MyStore. He applied for a registration, but did not get it. The MyStore application serial number cited in the response was abandoned by the Debtor in 2018, after which the TTAB sustained HEB's opposition to that application and entered judgment against the Debtor.[12] The Debtor has no federal registration rights to protect.

    **B.  There is no evidence that there is any common law trademark of value.**

13. Debtor claims this Court must keep this case to protect the "MyStore trademark," which Debtor claims is a "critical and necessary component" of the Debtor's reorganization plan because it will bring up to $800,000 in sale. Stunningly, the evidence Debtor attaches shows exactly the opposite. According to the Debtor's own evidence, this supposed asset is *worthless*.

14. The Debtor claims that he has "common law trademark rights" in the MyStore name, and Mike Lindell, the current owner of the mystore.com domain name, "wants to purchase the MyStore trademark from Meagher and has stated that he would be willing to pay as much as

---

[11] *See* HEB's Motion (Dkt. 22) ¶ 4 n.7.

[12] *See* Resp. at 3 n.2 and accompanying text (citing Serial No. 86763399); HEB's Motion at Exhibit 2 (TSDR record for Serial No. 86763399); *see also* HEB's Motion ¶¶ 5, 8 (noting that a subsequent trademark application for the MyStore mark was filed by the Debtor in 2019, which is the subject of a dispute at the TTAB that has been stayed pending resolution of the Southern District Litigation).

$800,000.00 for it." Resp. ¶¶ 5, 7. But Debtor references a deposition transcript that says nothing of the kind. In the deposition, Mr. Lindell denied any interest in paying anything to acquire any common-law trademark rights for any additional monies.[13] Instead, Mr. Lindell said that at the time he purchased the mystore.com domain name from the Debtor, Mr. Lindell was interested in purchasing a federally-registered MyStore trademark from him—but the Debtor did not own a federally-registered mark at that time, and still does not.[14] Mr. Lindell also testified that if the Debtor were ever to obtain a federally-registered mark, the Debtor has already orally promised to convey that federally-registered MyStore trademark to Mr. Lindell for *no additional money* beyond what Mr. Lindell already paid for the mystore.com domain name.[15]

15. In other words, there is no evidence whatsoever that this bankruptcy is protecting a valuable asset in the form of trademark rights. Mr. Lindell has expressed interest in acquiring a

---

[13] *See* Lindell Dep. Tr. at 66:3–21 (Q. Did [Mr. Meagher] discuss whether – if he could secure a trademark, whether you would pay him additional money? Like if after you met, if he then went out and secured a trademark, would you pay him for that? A. No, we didn't talk about that part. Q. Was there anything that [Mr. Meagher] offered you or suggested that if he did it for you in the future, you should pay him more? A. He did say … you know it's [worth $800,000.00] here. I said but it's not right now. … So it wasn't like give me 4 now and 4 later. It wasn't like that, you know."); *see id.* at 83:5–8 (Q. And are there any – any assets that [Mr. Meagher] is still offering to you or asking you to buy related to this – the MyStore name or domain name? A. No.).

[14] *See* Lindell Dep. Tr. at pp. 60–63 (trademark registration was "very important" to him, and the lack of it caused him to counter Mr. Meagher's $800,000.00 offer at half the asking price); *id.* at pp. 98–99 (testifying that he would have been willing to pay Mr. Meagher $800,000.00, instead of the $400,000.00 agreed price, if Mr. Meagher "had filed his declaration of continued use and not let his trademarks lapse" but that "you need the bow [the trademark registration], and we're missing the bow"); *see also* Exhibit 3 (Mr. Lindell's Responses to Mr. Meagher's Cross-Interrogatories) at nos. 3 & 5 [App. 87] (testifying that Mr. Meagher agreed to reduce his asking price "[b]ecause he did not have a registered trademark" and that in the course of negotiations, Mr. Lindell "demanded a lower price" because "the domain name was no longer protected by a registered trademark").

[15] *See* Lindell Dep. Tr. at 88:12–18 (Q. [Y]ou have a gentleman's agreement with Mr. Meagher that if he acquires a trademark on MyStore, that he will convey that to you? A. Yes. Q. At no additional cost? A. Right, correct.); *id.* at 92–93 (testifying that Mr. Meagher applied for the MyStore and MyStore.com trademarks with the intention of conveying them to Mr. Lindell and Mr. Lindell reiterating that "there's no money that's going to be exchanged"); *id.* at 123 (testifying that he abandoned his own trademark application for MyStore at the PTO because it was his understanding that Mr. Meagher was going to "fetch it and acquire it and then give it to [Mr. Lindell's] company"); *see also* Exhibit 4 (S.D. Litig. Dec. 4, 2019 Hrg. Tr). at 89:12–23 [App. 179] (Mr. Pate: "Mr. Meagher said, I'll get this [MyStore trademark] right for you, Mr. Lindell. Let me apply using my original language that the United States Patent and Trademark Office has already approved before. … Basically, Mr. Meagher's assisting Mr. Lindell to get it published correctly." The Court: "But he got it in his name." Mr. Pate: "Yes. And then he will transfer the rights over to Mr. Lindell.").

8

federally-registered trademark, but this bankruptcy court has no power to grant the Debtor such a mark (only the USPTO can do that), and Mr. Lindell would apparently already own it even if it existed. And the Debtor submits no evidence that the common-law rights he claims to have in the name "MyStore" actually exist now that the Debtor has stopped doing business at the domain name "MyStore.com" and sold the domain name "MyStore.com" to someone else.

### C. The Southern District Litigation is not interfering with any estate asset or any reorganization or distribution.

16. As shown in HEB's motion, because HEB is not seeking monetary damages from the Debtor in the Southern District Litigation, allowing the action to proceed will not deplete the Debtor's estate or interfere with the orderly distribution of the Debtor's assets. As courts recognize, compliance with an injunction does not require any expenditure of money from the Debtor, only that the Debtor refrain from engaging in the tortious use of his property. *See, e.g.*, *In re Hillenbrand*, at *3 ("Here, compliance with the injunction does not require any expenditure of money. It only requires that the debtor cease violating the terms of the covenant not to compete."); *see also Dominic's Rest. of Dayton, Inc. v. Mantia*, No. 3:09-CV-131, 2010 WL 1258111, at *3 (S.D. Ohio Mar. 25, 2010), *aff'd*, 683 F.3d 757 (6th Cir. 2012) ("While an assessment of monetary damages against [Debtor] may be prevented by application of the automatic bankruptcy stay, injunctive relief regarding the use of the property in the commission of a tort is not.").

17. Arguing that the MyStore trademark is a critical asset for his reorganization, the Debtor relies on *In re Chestnut*, 422 F.3d at 306, for the proposition that the stay is meant to prevent "a single creditor from seizing debtor's 'most significant assets' and thereby 'hinder[ing] the ability of other creditors to obtain equitable distributions of the estate's resources.'" *Id.* at ¶ 20. Again, the Debtor misunderstands the governing standards and the relief sought by HEB.

18. Contrary to the Debtor's suggestions, HEB does not seek to seize the Debtor's common law rights to the MyStore trademark, nor has HEB made any attempt to take the mark for its own business plan. *See* Resp. ¶¶ 1, 9 n.3. Rather, HEB is only attempting to enjoin the Debtor from further unlawful infringement of HEB's incontestable trademark registrations. *See Larami Ltd. v. Yes! Entm't Corp.*, 244 B.R. 56, 59 (D.N.J. 2000) ("At its core, plaintiff's suit is an attempt to prevent allegedly unlawful conduct, not an attempt to directly exercise control over the property of the bankruptcy estate. Larami seeks to prevent Yes! from infringing on its patented water gun design. Larami does not seek to seize control of any of Yes!'s inventory or equipment.").

### III. The Debtor misrepresents HEB's attempts to confer prior to filing its motion for relief from the stay.

19. Although the Debtor does not claim that HEB's motion should be denied based on a conference requirement, the Debtor nevertheless claims that HEB failed make a good faith effort to confer prior to filing. Resp. ¶ 11. In fact, well before the February 12 filing of HEB's motion, HEB counsel had been in conference with Mr. Pate (special litigation counsel for the Debtor) at least twice by telephone and at least ten times by email between January 25th and January 31st. In those communications, HEB counsel consistently expressed the view that the stay needed to be lifted, and Mr. Pate consistently expressed the view that the parties should hold a mediation in the Southern District Litigation without lifting the stay or involving an appointed estate trustee. Mr. Pate further indicated by email and telephone that he was in contact with the Debtor's bankruptcy counsel on this issue. The position of Debtor counsel was clear well before HEB's final and unanswered attempts to directly contact the Debtor's bankruptcy counsel with respect to the filing of the motion.

20. HEB prays that the Court grant its motion and lift the automatic stay so that HEB may pursue injunctive remedies against the Debtor for violations of the federal Lanham Act.

Respectfully submitted,

| | |
|---|---|
| */s/ Rebecca L. Petereit* | /s/ *Louis T. Pirkey* |
| VINSON & ELKINS LLP | PIRKEY BARBER PLLC |
| Jason M. Powers | Louis T. Pirkey |
| State Bar No. 24007867 | State Bar No. 16033000 |
| Allison L. Fuller | Travis R. Wimberly |
| State Bar No. 24087547 | State Bar No. 24075292 |
| 1001 Fannin Street, Suite 2500 | Tyson D. Smith |
| Houston, TX 77002 | State Bar No. 24079362 |
| Telephone: (713) 758-2522 | 1801 East 6th Street, Suite 300 |
| Facsimile: (713) 615-5809 | Austin, TX 78702 |
| jpowers@velaw.com | Telephone: (512) 322-5200 |
| afuller@velaw.com | Facsimile: (512) 322-5201 |
| | lpirkey@pirkeybarber.com |
| Rebecca L. Petereit | twimberly@pirkeybarber.com |
| State Bar No. 24062776 | tsmith@pirkeybarber.com |
| Matthew D. Struble | |
| State Bar No. 24102544 | |
| Trammell Crow Center | |
| 2001 Ross Avenue, Suite 3700 | |
| Dallas, Texas 75201 | |
| Telephone: (214) 220-7700 | |
| Facsimile: (214) 220-7716 | |
| rpetereit@velaw.com | |
| mstruble@velaw.com | |

***Attorneys for HEB Grocery Company, LP***

11

## **CERTIFICATE OF SERVICE**

   I hereby certify that on March 3, 2020, a true and correct copy of the foregoing was served on all parties entitled to service via this Court's Electronic Filing System, or otherwise by first class mail.

                 */s/ Matthew D. Struble*
                 Matthew D. Struble