IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| IN RE: | § § § | Chapter 11 |
| TODD MEAGHER | § § | Case No. 20-40208-mxm11 |
| Debtor. | § § § | |

## DECLARATION OF JASON M. POWERS IN SUPPORT OF
## HEB'S REPLY TO ITS MOTION FOR RELIEF FROM THE AUTOMATIC STAY
## <u>TO PROCEED WITH PRE-PETITION CLAIMS FOR INJUNCTIVE RELIEF</u>

I, JASON M. POWERS, do hereby declare:

1.     My name is Jason M. Powers.  I am over the age of 18 years old, of sound mind, capable of making this declaration, and personally acquainted with the facts stated in this declaration.  The facts herein are true and correct.

2.     I am an attorney and a partner in the law firm of Vinson & Elkins LLP, acting as counsel for HEB Grocery Company, LP n/k/a H-E-B, LP ("HEB") in the civil action currently pending in the United States District Court for the Southern District of Texas, captioned *HEB Grocery Company, LP v. Todd Meagher et al.*, Case No. 4:17-cv-02810 (the "Southern District Litigation"), between HEB and the Debtor in the above-captioned case, Todd Meagher.  I am a member in good standing of the State Bar of Texas.  As a result of my representation of HEB in the Southern District Litigation, I have become and am familiar with the papers served on the parties in the course of the litigation and the relevant documents in the public record, as may be further described herein.

3.     Attached hereto as **Exhibit 1** [App. 01–54] is a true and correct copy of the transcript for the February 15, 2019 pretrial conference before Judge Hughes in the Southern District Litigation.

4.       Attached hereto as **Exhibit 2** [App. 55–83] is a true and correct copy of the transcript for the November 5, 2018 hearing before Judge Hughes in the Southern District Litigation.

5.       Attached hereto as **Exhibit 3** [App. 84–89] is a true and correct copy of interrogatory responses served by third parties Michael Lindell and Mike Lindell Products, LLC in the Southern District Litigation on December 14, 2018.

6.       Attached hereto as **Exhibit 4** [App. 90–230] is a true and correct copy of the transcript for the December 4, 2019 hearing before Judge Hughes in the Southern District Litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 3, 2020.

Jason M. Powers
Attorney for HEB Grocery Company, LP
n/k/a H-E-B, LP

# EXHIBIT 1

1                 **IN THE UNITED STATES DISTRICT COURT**
                  **FOR THE SOUTHERN DISTRICT OF TEXAS**
2                          **HOUSTON DIVISION**

3   HEB GROCERY COMPANY, LP        )         CAUSE NO.
                                   )         4:17-cv-2810
4                                  )
    VS.                            )         Houston, Texas
5                                  )           2:43 p.m.
                                   )
6   TODD MEAGHER, ET AL            )         February 15, 2019

7

8
        *********************************************************
9
                         **PRETRIAL CONFERENCE**
10
                **BEFORE THE HONORABLE LYNN N. HUGHES**
11
                   **UNITED STATES DISTRICT JUDGE**
12

13      *********************************************************

14  APPEARANCES:

15  FOR THE PLAINTIFF:

16  **Jason Michael Powers**
    **Tyson David Smith**
17  **Stephanie Lynn Noble**
    Vinson Elkins LLP
18  1001 Fannin
    Suite 2500
19  Houston, TX 77002-6760
    Tel:  713-758-2522
20  Email: Jpowers@velaw.com

21  FOR THE DEFENDANTS:

22  **Gary Leonard Pate**
    **Maria Sanchez**
23  Thompson Coe Cousins & Irons LLP
    One Riverway
24  Suite 1400
    Houston, TX 77056
25  713-403-8210
    Email: Gpate@thompsoncoe.com

1 | COURT REPORTER:

2 |     Ms. Kathleen K. Miller, CSR, RMR, CRR
        515 Rusk, Room 8004
3 |     Houston, Texas  77002
        Tel:  713-250-5087
4 |
  | Proceedings recorded by mechanical stenography.
5 | Transcript produced by computer-assisted transcription.

6 |

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                      P R O C E E D I N G S

2                THE COURT:  Thank you.  Be seated.  Good

3  afternoon.

4                MR. POWERS:  Good afternoon.

02:43:06   5                MR. PATE:  Good afternoon, Your Honor.

6                THE COURT:  I hope everybody's favorite

7  activity is Friday afternoon in court.  Sometimes people

8  get to go even better and have Friday night in court.

9                All right.  First, clearly, in a short

02:43:54  10  note about Mr. Meahger's claim that HEB has said it has no

11  damages; there is a difference between damages sought in

12  court monetarily to compensate for something.  That's one

13  kind of damages.

14                The difference here is, HEB is suing about

02:44:32  15  its injury, and its entreat does not, in its judgment,

16  cover in this suit.  Regardless of what the facts may be,

17  they may have a half a million dollars worth of damages in

18  the legal sense.  They are seeking here simply to clear up

19  the title through some intellectual property; and their

02:44:57  20  title is being injured, and that issue is gone.

21                Mr. Pate, do you know how many times you

22  have interrupted Mr. -- or Doctor, whatever he is, Andriene

23  in the deposition?

24                MR. PATE:  I do not know, but I hope I did not

02:46:11  25  interrupt the gentleman.  I found him to be very pleasant.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1              THE COURT:  There are lots of interruptions.

2              MR. PATE:  Well, I --

3              THE COURT:  I didn't count them either.  I know

4    y'all don't think I have a life, but I have got a life

02:46:24  5    above that.

6              But I read it.  What he said, I believe,

7    was misconstrued and he was asked questions about what he

8    didn't say.  He was not given some of the papers

9    beforehand, and was asked to look at something and opine.

02:47:04  10             I have forgotten the name of your guy, but

11   both of them said essentially the same thing.  The question

12   sometimes reflected an economic deficiency, which is common

13   among lawyers, even more common than layman, and I clearly

14   thought I could find it without putting a Post-It on it,

02:47:34  15   and I apparently was wrong, and that was the amount of

16   money spent for something is not the determinate of its

17   value.

18             The portrait of Abraham Lincoln, while

19   beautiful and inspiring, is actually a copy of one that's

02:47:57  20   owned by The University of Texas.  They wouldn't lend me

21   the original, but they did let me have a good negative of

22   it, so I could go have it printed on canvas.  Yes, I deal

23   in fake art.

24             So, if I sold it to you -- we have known

02:48:24  25   each other for some time -- I will make you a good deal.

1  It is only $2700.  While what I got was worth $2700, what

2  you got was worth $500.  They're reasonably expensive to do

3  that.  Like most art today, the frame costs more than the

4  art.

02:48:47   5           And so the investment is valued not on

6  what went in but what it produced.  For instance, I have

7  over my lifetime invested in small part on something over

8  21 dry holes, and my investment right quickly turned into

9  worth nothing, and so expenditure does not equal value.

02:49:31   10          I was just up in western Colorado for a

11  funeral, and I don't ski, and don't like snow, and I was

12  near Rifle.  Exxon built a shale oil extraction there back

13  in the late '80s, I guess, and they spent an enormous

14  amount of money, and it was not practical.  They spent a

02:50:06   15  smaller, but still enormous, amount of money disassembling

16  everything, and selling it, scrapping it, moving it

17  somewhere else and cleaning up the mess.

18          Exxon wishes that that billion or two

19  dollars were viewed by people trading its shares as worth

02:50:31   20  two billion dollars; but, no, they value the investment at

21  zero, even though the investment was real.

22          And I believe the -- that the essence of

23  what the other guy said, your guy, they both said the same

24  thing:  Does it work?  By "work" meaning, is it profitable?

02:51:07   25          MR. PATE:  Your Honor, when we were taking

1  Mr. Andrien's deposition -- and he is a very nice

2  gentlemen.  I enjoyed asking him questions.  But we came to

3  determine that Mr. Andrien did not, just like our expert,

4  Richard Claywell, who we have dedesignated, did not

02:51:26  5  understand or appreciate eCommerce and the value of domain

6  names.

7            THE COURT:  No.  Mr. -- is it Mr. Andrien?

8            MR. PATE:  Andrien.

9            MR. POWERS:  Yes, it is, Your Honor,

02:51:37  10  Mr. Andrien.

11            THE COURT:  He is not a doctor?

12            MR. POWERS:  He does not hold a Ph.D., Your

13  Honor.  He holds an M.B.A. in finance.

14            THE COURT:  He can go to Harwin and pick one

02:51:48  15  up.  You can get your citizenship papers, Ph.D., whatever

16  you want.

17            Okay.  So Mr. Andrien, he had not done a

18  couple of little pieces, but he said, I thought fairly

19  clearly, that he could evaluate anything if he had the

02:52:12  20  data.  He frequently would say, I don't have any data on

21  that so I don't know.

22            MR. PATE:  But we have produced that data, and

23  I attached --

24            THE COURT:  Whatever you produced he read and

02:52:24  25  said it has no value.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          MR. PATE:  But he also said he didn't have any

2    experience in valuing eCommerce and domain names.  That's

3    why we attached Michael Lindell's deposition.  Michael

4    Lindell was asked about, is MyStore and MyStore.com

02:52:42   5    valuable?  He said, extremely value because, he said, in

6    his words, It's a short name, meaning it is right on point

7    for the value of that eCommerce life.

8          THE COURT:  There is more to a domain name than

9    really short.  Twenty years ago I would have said, you

02:53:03   10   could put a crude word like "shit," that's four letters,

11   too, and it would be completely useless.  It would probably

12   be a very profitable domain name in this world.

13         MR. PATE:  It -- Mr. Lindell testified that he

14   bought from Mr. Meagher MyStore.com because it's such a

02:53:36   15   good and valuable domain name, and he is planning to roll

16   out a new eCommerce business called MyStore.com where he is

17   featuring new entrepreneurs and marketing them and their

18   products to give them an entree into eCommerce in the

19   business world.

02:53:55   20         THE COURT:  Ebay will do that.  Etsy, is that

21   the other one?

22         MR. PATE:  Etsy.

23         THE COURT:  Well, there are a lot of them,

24   apparently.

02:54:04   25         MR. PATE:  Yes.

1                    THE COURT:  My law clerk is on Ebay.

2                    MR. PATE:  And then Michael Birch, who founded

3 Bebo and sold it for, I think, 850 million --

4                    THE COURT:  Counsel, you do this all the time.

02:54:28    5 Stop.  Mr. Andrien said that it would all depend.  Your

6 client does have Bevo, is that --

7                    MR. PATE:  Bebo, yes.

8                    THE COURT:  Bebo?

9                    MR. PATE:  Yes, B-E-B-O.

02:54:47   10                    THE COURT:  Because if you made it Bevo, U.T.

11 would sue you 900 times in a minute.

12                    MR. PATE:  That is true.  That is true.

13                    THE COURT:  They are very possessive.

14                    MR. PATE:  Yes.

02:55:01   15                    THE COURT:  It may.  The question before this

16 gentleman was, did this one?  And the fact that Mr. Meagher

17 may have had good ideas and sold them for $400,000, or

18 somebody else entirely had a good idea -- you wouldn't have

19 paid much for Amazon in 1992.  I mean, the name has been

02:55:27   20 around forever.  I'm not sure why Mr. Bezos chose Amazon,

21 but it's not the word "Amazon."  It's the genius of Bezos.

22 Kind of neat to have an entire world try to imitate you

23 every day.

24                       And so his comment was that it has no

02:55:55   25 value under the circumstances presented there.  That

1   doesn't take anybody who can code or can do any other

2   things that eleven-year-olds can do.  They don't have to be

3   able to do that.  You don't have to have done it.  It's an

4   underlying economic proposition.  And I thought Mr. Lindell

02:56:25   5   had turned away from MyStore.

6             MR. PATE:  No.  What actually happened there is

7   Mr. Lindell, when he purchased MyStore.com from

8   Mr. Meagher, his trademark attorney filed an application

9   for the MyStore and the MyStore.com trademark; and in the

02:56:47   10   description of use, which is probably the most important

11   thing in filing a trademark application, he used the words

12   "retail" and "store" in there, which flagged eleven

13   different things including MyStore Pharmacy, and MyStore

14   Cosmetics, anything, because of that overly broad

02:57:06   15   description of use.

16             And so finally, Mr. Lindell contacted us

17   and said, Will you please reapply to the United States

18   Patent and Trademark Office and get it right?  And so

19   Mr. Meagher calls out --

02:57:22   20             THE COURT:  Or get it different.  I mean, the

21   one that was -- what did Lindell buy since his trademark is

22   dead?

23             MR. PATE:  He bought the brand, the trade name,

24   and the domain name.  And so we --

02:57:39   25             THE COURT:  But neither of those have

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  protection now.

2            MR. PATE:  They have common law protections.

3  What we need are -- we need the registered protections.

4  And so Mr. Meagher has contacted the commissioner for the

02:57:53  5  United States Patent and Trademark Office and said, If I

6  reapply for MyStore and MyStore.com, and use my original

7  formula, so to speak, of use of goods and services that I

8  originally applied for the trademark and had a registered

9  trademark for all these years, would you fast track it?

02:58:11  10           And they -- they gave him -- made special

11  status.  They have approved it, and they found no

12  likelihood of confusion.  And Monday is a critical day,

13  Your Honor.  Monday, this trademark application goes up for

14  publication, and so that means within the next 30-day

02:58:31  15  window anybody can oppose it that is going to oppose it.

16  And, Your Honor --

17           THE COURT:  And get sued by Mr. Meagher.  Yes.

18  He sues people who file --

19           MR. MEAGHER:  Not me.

02:58:46  20           THE COURT:  There is a bullying claim in here.

21           MR. PATE:  I don't think Mr. Meagher has a

22  history of litigious conduct of suing people over his

23  marks.

24           THE COURT:  He has a bullying claim for

02:58:57  25  somebody asserting their own interest.

1          MR. PATE:  Over -- bullying as defined by the

2  United States Patent and Trademark Office is overreaching

3  the legitimate protection of the law.

4          THE COURT:  I didn't ask you that.  I said

02:59:08  5  that's what he has been doing.

6          MR. PATE:  He has not been bullying.  HEB has

7  been bullying.

8          THE COURT:  He has been suing people for

9  bullying when they assert their interest.  There is a

02:59:18  10  bullying claim in here.

11          MR. PATE:  Our bullying claim against HEB?

12          THE COURT:  Yes.  That's him claiming against

13  somebody trying to get their trademark.

14          MR. PATE:  Yes.

02:59:28  15          THE COURT:  And he calls it bullying.

16          MR. PATE:  The United States Patent and

17  Trademark Office calls it bullying.  Trademark bullying.

18          THE COURT:  No.  They didn't.  You hope they

19  will.  The trouble is the suit is here now.

02:59:40  20          MR. PATE:  Your Honor, can I tell you what

21  happens Monday?

22          THE COURT:  No.  Because the trademark office

23  has its work to do.  It will do.  I have a lawsuit

24  asserting all kinds of things, and there is a challenge to

03:00:05  25  that already.  Is that not right?

1              MR. PATE:  That is correct.

2              THE COURT:  Mr. Powers?

3              MR. POWERS:  I'm sorry, to what, Your Honor?

4              THE COURT:  To whatever Meagher is doing now in

03:00:15   5  Washington.

6              MR. POWERS:  Mr. Meagher's trademark

7  application will be -- will be set up for publication -- I

8  forget the word, published for opposition -- published for

9  opposition, and at that point it will be proper for people

03:00:31  10  to file objections.

11              THE COURT:  So what have they done that's

12  bullying?  That is hard to say.

13              MR. PATE:  They --

14              THE COURT:  What are they being thuggy about?

03:00:40  15              MR. PATE:  For six years, they never objected

16  or opposed our registered trademark.

17              THE COURT:  No.  No.  Stop.

18              MR. PATE:  I am explaining, Your Honor.

19              THE COURT:  I don't -- that trademark is gone.

03:00:55  20              MR. PATE:  Right.

21              THE COURT:  And you can't use anything -- this

22  is a ruling.  You can't use anything connected with the one

23  that he abandoned by his behavior.

24                  This is a new one, and it has to stand or

03:01:15  25  fall on its merits.  And HEB, and Amazon, and anybody else

1 who wants to contest it is free to contest it without being

2 called an Internet thug.

3          MR. PATE:  Your Honor, maybe I could answer the

4 question even more directly.  Here's a more direct answer.

03:01:33  5          Their trademark registration says their

6 use for goods and services is retail grocery store

7 services.

8          We have never had a description of use

9 that even looks or smells anything like that.  And so they

03:01:48  10 have no business opposing us in any way, shape, or form.

11          THE COURT:  You know --

12          MR. PATE:  We are not in retail business.

13          THE COURT:  HEB does not have to rely on your

14 judgment of what your client's mark does and how it affects

03:02:04  15 things.

16          I got to spend an inordinate part of my

17 life discussing what Tiffany's trademark covered.  And

18 women's accessories is a very, very broad category.

19          MR. PATE:  Sure.

03:02:37  20          THE COURT:  So you can't put Tiffany's on your

21 shoes, lady's shoes.  If you want to put them on hunting

22 boots, I don't know about that.

23          MR. PATE:  Your Honor, I think I have a way we

24 can narrow all the issues very cleanly, and get this

03:02:50  25 resolved.

1          We are willing to just have a trial, trial

2 only on the trademark issues.  Let the jury decide if there

3 is anything confusing about MyStore and their goods and

4 services, and HEB and their goods and services.  And if HEB

03:03:08  5 wins, I think that probably does away with all of our

6 counterclaims and there is no need for a separate trial on

7 that.

8          THE COURT:  I read that.  But I don't think the

9 counterclaims have any merit anyway.

03:03:18  10          MR. PATE:  Well, we are willing to stipulate to

11 the dismissal of those without prejudice if the Court will

12 keep us on track for March 5th, trying just a pure

13 straight-up trademark case against HEB.  We will stipulate

14 without prejudice.

03:03:38  15          THE COURT:  What trademark does that apply to?

16          MR. PATE:  Even when our trademark cancelled,

17 that did not cancel our common law trademark rights to

18 MyStore and MyStore.com.

19          Our common law trademark rights continued

03:03:53  20 because of our continuous use in commerce.

21          THE COURT:  The testimony thus far has been it

22 hasn't been used in commerce, much less continuously.

23 Mr. Meagher testified they never had a customer, isn't that

24 right, Mr. Powers?

03:04:14  25          MR. PATE:  That is true.  And I may have

1  misspoke when I said continuous use in commerce.  But

2  our -- what I should have said is our trademark rights

3  continued, continuously, as common law trademark rights.

4  And then they sued us, even when we didn't have --

03:04:30  5          THE COURT:  Why do you -- isn't he squatting,

6  as --

7          MR. PATE:  No.  He's not a trademark squatter,

8  by any means.

9          THE COURT:  Well, he is not using it and he

03:04:38  10  thinks it covers a bunch of stuff other people can't do.

11          MR. PATE:  We don't -- we are not in their

12  lane, so to speak.  We are not in the lane of retail

13  grocery stores.

14          THE COURT:  You are not in any lane.

03:04:50  15          MR. PATE:  We are in the lane of eCommerce.

16          THE COURT:  They're in eCommerce.

17          MR. PATE:  They do not sell on their Internet

18  sites, Your Honor.  Their Internet sites just advertise

19  their groceries for products.  You have to go to the

03:05:05  20  grocery store products or their Curbside.

21          THE COURT:  That is commerce.  Having an

22  Internet site that convinces, say, a deputy marshal to go

23  get some tacos from MiTienda, the whole package is

24  commerce.

03:05:29  25          The problem I am having is Mr. Meagher has

1 done nothing with his site.  It has never been operational.

2           Quit gesturing, Mr. Meagher.  May I have a

3 "yes, sir" on that?

4           MR. MEAGHER:  Yes, sir.

03:05:51 5           THE COURT:  If you don't like what I say,

6 that's fine --

7           MR. MEAGHER:  It's incorrect.

8           THE COURT:  -- but don't make faces and don't

9 gesture.

03:06:07 10          MR. PATE:  I think the big difference, Your

11 Honor, is we're in -- our website was set up and designed

12 for social networking in eCommerce.  Meaning that if --

13          THE COURT:  I know what his is supposed to do.

14          MR. PATE:  Right.

03:06:18 15          THE COURT:  But right now it's some words that

16 he intends to use for that.  You can disagree he has not

17 sold anybody's grandmother's portrait.

18          MR. PATE:  I agree.

19          THE COURT:  Or he has not furnished space for

03:06:37 20 somebody else to sell their grandmother's portrait.

21           Mr. Powers --

22          MR. POWERS:  Yes, Your Honor.

23          THE COURT:  -- give me the HEB view of the

24 common law copyright.

03:06:53 25          MR. POWERS:  Your Honor, I believe, that if Mr.

1    Meagher, or HEB, or anyone else is using a mark in commerce

2    and then attains an identity in the marketplace, the

3    customers tend to associate that name with its producer,

4    and that is something that is -- has been lined up with the

03:07:13    5    common law of trademark law.

6            THE COURT:  So it requires use that then would

7    be encroached upon by a current copyright holder, common

8    law or statutory?

9            MR. POWERS:  Yes.  That's right, Your Honor.

03:07:34    10    It does require use, and as a matter of fact when one

11    applies to the patent and trademark office for a trademark,

12    one has to demonstrate that they are engaged in use.

13            MR. PATE:  Your Honor, may I?  Judge Gray

14    Miller says in an opinion about trademark infringement that

03:07:57    15    the standard is that defendant's use of its mark creates a

16    likelihood of confusion as to the source, affiliation, and

17    sponsorship, and citing the Elvis Presley case.

18            So the issue --

19            THE COURT:  He is not only a fine judge, he's

03:08:15    20    better looking than I am.

21            MR. PATE:  The issue is, this -- does Todd

22    Meagher's use --

23            THE COURT:  No.  Wait.  I have been talking to

24    you for a while.

03:08:26    25            MR. PATE:  Yes, Your Honor.

1          THE COURT:  And then I asked to talk to

2    Mr. Powers.

3          MR. PATE:  Yes, Your Honor.

4          THE COURT:  And I know you are not going to

03:08:31   5    like what he says.  Frequently, I don't.  But I am going to

6    listen to him, and we will come back to you.

7               So coming up with a concept, talking about

8    starting it, looking for investors, getting some money,

9    spending some money.  It's not the use of it, in this case,

03:09:04   10   among consumers.

11         MR. POWERS:  That is quite right, Your Honor.

12   The preparation to make use of a mark does not confer

13   rights of priority.  It does not constitute use of a mark.

14   And frequently when you have debates in trademark cases,

03:09:19   15   people are trying to establish who had the earliest use and

16   the Courts have been fairly clear.

17         THE COURT:  Earliest inspiration?

18         MR. POWERS:  The Courts have been clear that

19   the earliest use -- just the thought of the idea, the

03:09:30   20   preparation, that does not constitute use.  It is priority.

21         THE COURT:  And wouldn't that be the essence of

22   this case?

23         MR. POWERS:  I think it is, Your Honor.  I

24   think one of our real concerns here is the burgeoning use

03:09:47   25   that Mr. Meagher was engaged in.  While it is true that he

1   did not himself plan to sell tortillas, the fact was that

2   he was making space available on his website for exactly

3   that purpose.  And we think that our consumers looking for

4   our products would be likely to go to his site and find

03:10:07   5   people willing to sell exactly the same kinds of products

6   that we sell.

7          THE COURT:  So in the absence of use, there is

8   no fact of actual confusion, or whether there was

9   confusion?

03:10:43   10          MR. POWERS:  If Mr. Meagher has shut down all

11   of his websites, and stopped seeking trademarks, then, I

12   think that would be no use.  At this moment Mr. Meagher has

13   an active trademark application.  He is in --

14          THE COURT:  An application?

03:10:59   15          MR. POWERS:  That's correct.

16          THE COURT:  But again, back to the real

17   world --

18          MR. POWERS:  Right.

19          THE COURT:  -- no use means no case.

03:11:09   20          MR. POWERS:  I think that's -- if he

21   established there was, in fact, no use we would have no

22   cause of action against him.

23          THE COURT:  They have told me that several

24   ways.  He directly told me that.  The investment, the

03:11:22   25   conception, design, all that stuff does not establish a

 1 | common law copyright.

 2 |             Did anybody want me to read Mr. Lidell --

 3 | or Lindell's deposition?

 4 |             MR. PATE:  I submitted it to the Court because

03:12:09   5 | I think it's valuable.

 6 |             THE COURT:  We would be happy -- oh, I'm

 7 | just --

 8 |             MR. PATE:  Yeah.  I have submitted it for you.

 9 |             THE COURT:  I deal with a lot of paper.

03:12:19   10 |             MR. PATE:  Yes.

 11 |             THE COURT:  And a lot of electronic things.

 12 |             MR. PATE:  Would you like me to have another

 13 | copy sent to chambers?

 14 |             THE COURT:  How long is it?

03:12:26   15 |             MR. PATE:  It's not long at all.  It's maybe

 16 | 140 pages long.

 17 |             MR. POWERS:  That sounds about right, Your

 18 | Honor.  It was less than three hours.

 19 |             THE COURT:  Please send us --

03:12:36   20 |             MR. PATE:  We will send you a copy.

 21 |             THE COURT:  -- a copy.

 22 |             MR. PATE:  Your Honor, would you like Michael

 23 | Burgess as well?  He is along the same vein as Mike

 24 | Lindell.

03:12:45   25 |             THE COURT:  Whoever you want to offer.

1          MR. PATE:  Okay.

2          THE COURT:  Yeah.

3          MR. PATE:  We will be glad to do that, Your

4  Honor.

03:12:50   5          THE COURT:  Because I want to read them.  And I

6  don't think Ms. Noble has a social life, so she probably

7  would like to prepare a motion for summary judgment based

8  on the missing of a couple of key elements.  And he will be

9  off on Monday.  He will be celebrating our presidents, and

03:13:24  10  he won't interfere with your work, so you will get a lot

11  more done.

12              Don't worry, I know who does the work.

13              Because I have been studying this

14  yesterday and today, and I am at a loss to see how you get

03:13:44  15  past the no use; and then on some of the details of the

16  other things, the idea that HEB does not have a legitimate

17  interest in protecting its mark.  You can't wait until

18  somebody gets one, like Mr. Meagher's, and then start

19  applying to expand the definition.

03:14:08  20              Tiffany's has adjusted its copyright

21  definition over the -- I don't know at this point, 130

22  years.

23              A prompt defense is probably a good thing.

24  It's certainly not bullying.  Recently filed was a bunch of

03:14:41  25  stuff that talked about settlement negotiations before

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 litigation, and I did not see the relevance of that or the

2 admissibility of it.

3                    Did you do it?

4                    MR. POWERS:  Your Honor, we did file objections

03:14:55  5 to the use of testimony, and I think we will be preparing

6 exhibits, objections that are due on Monday, on that issue

7 as well.  But all of these settlement negotiations ought

8 not be --

9                    THE COURT:  Well, they are due on Tuesday if

03:15:09  10 you want it because Monday is a holiday.

11                    MR. POWERS:  Thank you.  Appreciate that, Your

12 Honor.

13                    THE COURT:  She appreciates that.

14                    I personally object to President's Day.

03:15:20  15 The idea that we celebrate George Washington and James

16 Buchanan equally, Andrew Johnson and Dwight Eisenhower

17 equally, is a little bazaar.  I'll be celebrating

18 Mr. Washington's birthday on Monday here, because

19 Mr. Lincoln would think that the best way to celebrate

03:15:46  20 America is work hard to make it stronger.

21                    All right.  Let's take a 15-minute recess,

22 and I will consult with my Ms. Noble.

23                    THE CLERK:  All rise.

24 (Proceedings recessed from 3:16 to 3:38.)

03:38:48  25                    THE COURT:  Thank you.  Please be seated.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          MR. PATE:  Your Honor, may I --

2          THE COURT:  Yes, sir.

3          MR. PATE:  May I clarify something for the

4  record, please?

03:38:56   5          THE COURT:  You may try.

6          MR. PATE:  Thank you.  My client, if he was

7  making some facial expressions, he was actually frustrated

8  with his lawyer.

9          THE COURT:  Well, that makes a bunch of us.

03:39:08   10          MR. PATE:  And he wanted me to clarify, because

11  I may have misspoke on this.

12          THE COURT:  All right.  Wait a minute.  I am

13  not mad at him.

14          MR. PATE:  Okay.

03:39:16   15          THE COURT:  It's just this is a different

16  context for most normal people.

17          MR. PATE:  Sure.  Sure.

18          THE COURT:  And they forget that it's a

19  sterner, more rigorous place.

03:39:28   20          MR. PATE:  Right.  So here are the three things

21  I want to correct that I may have misspoken on the record.

22              When Mr. Meagher sold the domain name

23  MyStore to Mike Lindell, he did not sell the trade name.

24  He only sold the domain name.  Mr. Meagher has continuously

03:39:46   25  used the trademark in commerce since as early as 2005 and

1 MyStore has not just been a concept.  He is not a concept

2 man.

3            THE COURT:  Wait a minute.

4            MR. PATE:  Yes, Your Honor.

03:40:02  5            THE COURT:  Lindell bought the domain name.

6            MR. PATE:  Just the domain name, not the

7 trademark.  Todd Meagher has continuously since 2005 owned

8 the trade name.

9            THE COURT:  Doing what?

03:40:12 10            MR. PATE:  I will give you an example now what

11 he is doing now with it.

12            THE COURT:  No.  I want to know what he has

13 done historically.

14            MR. PATE:  Could I have Mr. Meagher speak to

03:40:22 15 that?  Because he best knows what he has done with that

16 domain name historically, with the trade name.  Would the

17 Court, please, permit it?

18            THE COURT:  If he will stick to the point.

19            MR. PATE:  Yes, Your Honor.

03:40:34 20            THE COURT:  And wanting to talk about all of it

21 is not a bad thing, Mr. Meagher.

22            MR. MEAGHER:  I understand.

23            THE COURT:  But we can't, you know, so if you

24 would come up and tell us exactly what you have done with

03:40:51 25 the tradename in commerce.

1        MR. MEAGHER:  Since 2005 I have had several

2  websites that use the MyStore brand for a platform like

3  Etsy, which you identified with early in this case.  That

4  has been the same business model since 2005.

03:41:14    5        Currently, that is still running but not

6  running on the MyStore domain name because I sold it.  It

7  is running on another domain now.  It could be MyStore.co,

8  MyStore.net, MyStore.org.  The domain name doesn't matter.

9  The business --

03:41:31   10        THE COURT:  When did you sell to Lindell?  It's

11  in there somewhere.

12        MR. MEAGHER:  Yeah.  I am not really sure.

13        THE COURT:  And so these other operations --

14        MR. MEAGHER:  It is all one operation, Your

03:41:50   15  Honor.

16        THE COURT:  All right.  Well, this other

17  operation, when did you start doing that?

18        MR. MEAGHER:  2005.

19        THE COURT:  And what were the gross sales in

03:42:06   20  2006?

21        MR. MEAGHER:  It's a prerevenue start-up.  In

22  other words, it generates data, but it doesn't generate

23  revenue.  The data is the value.

24        THE COURT:  All right.  Tell me, what sort of

03:42:18   25  data does it generate?

1          MR. MEAGHER:  The best way I can liken it is

2    like Twitter.  Twitter is a multi --

3          THE COURT:  I know what Twitter is.

4          MR. MEAGHER:  They generated no revenue until

03:42:30    5    they went public.

6          THE COURT:  Neither did Amazon but Amazon was

7    selling books.  Now it sells used cars and --

8          MR. MEAGHER:  They generated revenue, Amazon

9    did, but Twitter did not because they got data.  And that

03:42:43   10    is what we did for our first year of our business, we

11    collected data.  And that would be data on sellers, data on

12    buyers.  And the type of -- go ahead.

13          THE COURT:  Where did a normal person -- that

14    means somebody over 30 who is not in the computer

03:43:05   15    business -- how did they use this site?

16          MR. MEAGHER:  There's two sides to the site.

17    It's called the two-sided marketplace.  So if Your Honor

18    wanted to sell one of those flags behind him, he could post

19    it on the platform.

03:43:20   20          THE COURT:  Only this one.  This one is mine.

21    That's America's.

22          MR. MEAGHER:  You could sell that flag, and you

23    would be a seller.  But you could also be a buyer, and then

24    a buyer would come on and they would look for flags and

03:43:33   25    then they would find your flag and then they would

1  communicate with you.  They would watch a video of a

2  presentation of your flag, or whatever else you were

3  selling, and they would communicate directly with you and

4  do a transaction with you.

03:43:43    5              Currently, there are five other companies

6  doing this exact same model.

7              THE COURT:  When you say "directly," do they

8  call you on the phone?

9              MR. MEAGHER:  E-mail, text you, call you on the

03:43:52   10  phone.  Absolutely.  It's like an electronic classified ad

11  site.  And when we first met with you, Your Honor, you got

12  it.

13              THE COURT:  Classified ads charge.

14              MR. MEAGHER:  No.  So the biggest classified ad

03:44:05   15  site on the Internet is called Craigslist.  They charge

16  zero for the classified ads.  They make their money from

17  the retailer, retailers, who then offer services to the

18  viewers that are looking at the classified ads.

19              THE COURT:  If you own a newspaper, you sell

03:44:25   20  ads.

21              MR. MEAGHER:  Yes, sir.

22              THE COURT:  And including classified ones.

23              MR. MEAGHER:  Yes, sir.

24              THE COURT:  As a very small boy, I was certain

03:44:35   25  that my parents were not really reading that, really small,

1 and little chunks, and pages of them.

2          So I demanded that I am going to read

3 this.  And, of course, she would -- said something and I

4 realized I didn't know whether that was right or wrong

03:44:58  5 because I didn't read it.  I just was obnoxious.

6          How would the MyStore as a broker work?

7 The same way as -- it can't work where you get no revenue

8 forever.

9          MR. MEAGHER:  Correct.  MyStore wasn't a

03:45:31  10 broker.  It wasn't a part of the transaction.  It was a

11 platform.  It just gave you space on the Internet.

12          THE COURT:  In the post 2005, or post 2010?

13          MR. MEAGHER:  It has always been the same.

14          THE COURT:  So in the operation how many

03:45:59  15 transactions were conducted from people who found each

16 other on your site?

17          MR. MEAGHER:  Because we're not part of the

18 transaction, we don't know the close of the transaction

19 rate.

03:46:18  20          THE COURT:  How many people advertised, or --

21 on your site?

22          MR. HYMAN:  Tens of thousands.

23          THE COURT:  Come on, this is your -- your

24 market numbers.  You know better than that.  How many

03:46:32  25 people placed their classified ad in 2010?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          MR. MEAGHER:  If you were to ask me that

2    question maybe two years ago, I think, when I still had the

3    data, I could give you the exact numbers; but because of

4    our terms and conditions and privacy, when I sold

03:46:49   5    MyStore.com domain name, I was obligated to delete the

6    data.

7          I could not use that data for privacy

8    reasons, so it's been deleted.  So I can't give you the

9    number.

03:46:57   10         THE COURT:  You could count the number of

11   things that you deleted.  That is not privacy.

12         MR. MEAGHER:  We deleted the whole database,

13   Your Honor.

14         THE COURT:  I know.  But the number of people

03:47:11   15   whom you delete is not classified.

16         MR. MEAGHER:  Okay.

17         THE COURT:  So if you had 17 people, you can

18   delete them all, and burn the computer, but you still know

19   17.

03:47:22   20         MR. MEAGHER:  The last check I did that I can

21   recall was a little over -- a little over 6,000 sellers,

22   and about -- and this was realtime.  So sellers come and

23   go.  So if you were to set up and say, I want to sell --

24   created a MyStore and you were selling things, you may take

03:47:40   25   down your MyStore a month from now.  So the number is

1  constantly churning.  It is not the same.

2            THE COURT:  I know.  If you got on a subway in

3  New York, you go through the turnstile and it keeps track

4  of how many people -- in fact, they keep track by the

03:47:57   5  number of dollar bills, or whatever you put in it these

6  days.  And probably 80 percent of the people are the same

7  most days.  Twenty percent of the people turn over, but you

8  don't know that.

9            MR. MEAGHER:  Are you asking me?

03:48:20   10            THE COURT:  Yes.

11            MR. MEAGHER:  I think the number that you're

12  asking for is called visitors.  How many people actually

13  went to the site either as a buyer or a seller and visited

14  the site.  Actually, we don't know if they transacted or

03:48:32   15  not, but we know they were there.  If you are asking me

16  that number, that is hundreds of thousands.  And if you

17  asked me to try and --

18            THE COURT:  If you put a dead frog on a site on

19  the Internet you will get 100,000 people.  It is a huge

03:48:44   20  country.

21            MR. MEAGHER:  It is global.

22            THE COURT:  That is true, too.

23            MR. MEAGHER:  Our people were from the U.K.

24  They were from Japan.  They were from Australia.  They were

03:48:52   25  from all over the world.  Our website catered to the whole

1 world.  It wasn't just United States.

2            THE COURT:  Nobody from Kazakhstan?

3            MR. MEAGHER:  I would have to check.

4            THE COURT:  I have a young friend who is a

03:49:09  5 missionary in the other Georgia...

6            MR. MEAGHER:  Your Honor, if I could say one

7 other thing that I hope might help --

8            THE COURT:  Sure.

9            MR. MEAGHER:  -- and that is, I have heard a

03:49:19  10 lot of -- a lot about valuing a company; and in the

11 traditional sense, you're absolutely right.

12            People come in and they look at things and

13 they go, Well, how much revenue?  What are your assets?

14 What is your constant turnover.  That all makes perfect

03:49:36  15 business sense.

16            I am in a business that doesn't look at

17 things the same way as a traditional business.  The value

18 of the business is not based on revenue.  It is based on

19 data.  How many users do you have?  How deep is the data?

03:49:48  20 What is the value of that data profile?  How much

21 information do you have on Judge Lynn Hughes?

22            THE COURT:  You just told me you deleted them.

23            MR. MEAGHER:  At the time.  Before I --

24            THE COURT:  How valuable are they?

03:49:59  25            MR. MEAGHER:  It depends how deep --

1              THE COURT:  You have 100,000 visitors, so you

2    can't segregate it between --

3              MR. MEAGHER:  You can.

4              THE COURT:  -- between transactions.

03:50:08   5              MR. MEAGHER:  No.  You can segregate it to

6    state.

7              THE COURT:  No, I understand that.  You can do

8    that with an old fashioned telephone book.  Look up what

9    street they live on and --

03:50:22   10              MR. MEAGHER:  So when you go to sell a business

11   like mine, and if I were to sell it, I would -- somebody

12   would look at me and go, What do you have?

13                   Well, I have intellectual property.

14                   What is that?

03:50:30   15                   Well, I have got these great domain names.

16                   What else?

17                   I have got these trademarks.

18              THE COURT:  You told us earlier domain

19   namers -- domain names don't count.  It's the trademark.

03:50:41   20              MR. MEAGHER:  Domain names do count and so

21   does --

22              THE COURT:  I know that.  I'm just saying you

23   told me something different a minute ago.

24              MR. MEAGHER:  If I did, I misspoke.  They

03:50:50   25   absolutely matter.  Here is a perfect analogy.  If I own

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 the domain name "hotels.com," it has a value.  But if I own

2 the domain name "hotels.com" and it has a trademark, now it

3 is a protected domain name.  It has a lot more value

4 because it is protected.

03:51:05  5                    And I had that with MyStore.  I had

6 MyStore and MyStore.com, and I had it trademark protected.

7 And when I lost my trademark and tried to refile to regain

8 it, because of an error, that's when HEB came in and tried

9 to block me from regaining my trademark.  That is what this

03:51:19 10 is all about.

11                    THE COURT:  I know that.

12                    MR. MEAGHER:  Yes, sir.

13                    THE COURT:  You goofed up.

14                    MR. MEAGHER:  Yes, sir.

03:51:23 15                    THE COURT:  Somebody took advantage of it.

16                    MR. MEAGHER:  They are trying, yes, sir.

17                    THE COURT:  Well, no.  You say they did take

18 advantage of it.

19                    MR. MEAGHER:  Well, they got me here in front

03:51:30 20 of you, Your Honor.  Yes.

21                    THE COURT:  Well, there are two of us who

22 regret that.

23                    MR. MEAGHER:  And Mr. -- my attorney referenced

24 earlier, I have actually spoken directly with the

03:51:42 25 Commissioner of Trademarks at the USPTO, who has looked at

1  my case and has made a special ruling for my case, for my

2  trademark to be rereviewed because the second error I made,

3  Your Honor, was after I lost my trademark.  I could have

4  recovered it quickly by filing a document called a "Make

03:51:59   5  Special Application."  I didn't know that.

6                    THE COURT:  I can't help that.

7                    MR. MEAGHER:  I know.  I know.  But I can still

8  do it.

9                    THE COURT:  My recollection it's like a

03:52:08   10  seven-month period before --

11                    MR. MEAGHER:  No.  There is no timeline on

12  that.  So, I have refiled it per her request, and it was

13  approved, and it's been examined again.

14                    THE COURT:  No.  You don't have it?

03:52:21   15                    MR. MEAGHER:  No.

16                    THE COURT:  Mr. Meagher --

17                    MR. MEAGHER:  I don't.

18                    THE COURT:  -- you had it.

19                    MR. MEAGHER:  It is pending.

03:52:25   20                    THE COURT:  That means you don't have it.

21                    MR. MEAGHER:  Correct, sir.  I do not have it.

22                    THE COURT:  That is like having a constructive

23  girlfriend.  I am fixing to have one doesn't --

24                    MR. MEAGHER:  But the one thing he wanted to

03:52:39   25  correct was, even though I don't have the mark, I have been

1  using it in commerce continuously and I have refiled for

2  the mark, and that is where we are today.

3              THE COURT:  Thank you.  And what you did with

4  it is helpful but you had a registration.

03:52:56  5              MR. MEAGHER:  Yes, sir.

6              THE COURT:  And you, with no participation of

7  H.E. Butt, lost it?

8              MR. MEAGHER:  Yes, sir.

9              THE COURT:  And then -- and they took advantage

03:53:08  10  of their legitimate opportunity to contest the new one.

11              MR. MEAGHER:  That is exactly correct.

12              THE COURT:  I made a ruling earlier that none

13  of the history of the old one counts because it's dead.

14  It's dead.

03:53:29  15              MR. MEAGHER:  But use in commerce counts, Your

16  Honor, and the old one played --

17              THE COURT:  The old one is dead.

18              MR. MEAGHER:  Okay.

19              THE COURT:  Excuse me.

03:53:41  20              MR. MEAGHER:  And that happened in 2015, Your

21  Honor, when I lost it.  So then I filed a new one, and they

22  opposed it.  And we spent two years at the USPTO's trial

23  and appeals board, two years.  Then I withdrew it.  I gave

24  up.

03:53:58  25              THE COURT:  You gave it up.  So none of that

1 history counts.

2          MR. MEAGHER:  Okay.  I'm just trying to bring

3 you to where we are, but you seem to already know.

4          THE COURT:  You can't string together six

03:54:08    5 rebuffed proposals into it.  The next time you ask, you

6 have to get accepted.  And so you had things and you lost

7 them.  You had them and you lost them.  You had it and

8 abandoned it.  So what we have to work with is you have an

9 application.

03:54:30   10          MR. MEAGHER:  Yes, sir.

11          THE COURT:  And they have opposed it.

12          MR. MEAGHER:  They have not yet.

13          THE COURT:  Well --

14          MR. MEAGHER:  It publishes Monday.

03:54:36   15          THE COURT:  The time hasn't come.  But I am

16 willing to take opposition and give you ten points.

17          MR. MEAGHER:  Thank you, sir.

18          THE COURT:  I'm just -- I am guessing there.

19          MR. MEAGHER:  I got you.  I got you.

03:54:48   20          THE COURT:  I don't even know whether I said

21 the bet right, because I am -- I don't, unless I fixed it.

22 In which case, I'll bet heavily, or I'll be the house.

23          MR. MEAGHER:  Your Honor, what we were hoping

24 for today, and the reason why I came down, was I was hoping

03:55:22   25 that you would make this simpler.  They wanted to push the

1  trial.  I really wanted to get on with my life.  So I

2  was -- asked my attorney to ask the Court if the Court will

3  just listen to the case of infringement.

4            If there is infringement and you believe

03:55:35  5  that I have infringed, then, there are no damages.  There

6  is no other things.  We don't have to bring the experts up.

7  We don't have to do any of that.  We're done.

8            If I have infringed and you believe -- the

9  Court believes that, the jury believes I have infringed,

03:55:49  10  then nothing else matters.  So, I'm trying --

11            THE COURT:  It is not that you infringed but

12  that you will impinge if you get your new registration.

13            MR. MEAGHER:  Well --

14            THE COURT:  Mr. Powers, isn't that a statement

03:56:05  15  of your case?

16            MR. POWERS:  That's right, Your Honor.

17            MR. MEAGHER:  And if I could just one more

18  time --

19            THE COURT:  Write that down.  That's a sting of

03:56:12  20  one.

21            MR. POWERS:  If he was to use the mark in

22  commerce, then that report -- if he were to use the mark or

23  threaten to use the mark, he is infringing on our --

24            THE COURT:  The essence of the claim is the

03:56:30  25  mark such as it would --

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1              MR. MEAGHER:  Infringe.

2              THE COURT:  What?  Commercial consequences

3    would be confusion.

4              MR. MEAGHER:  That is exactly right, Your

03:56:44   5    Honor.  Exactly right.

6              MR. PATE:  That's exactly right.

7              MR. MEAGHER:  And what this comes down to is

8    one simple question, one question to the jury and actually

9    one question to Your Honor.  Have I used the mark in a way

03:56:56   10   that when a consumer looks at it, they would think that I

11   was a retail grocery store service, or I was in some way

12   supported by or affiliated with HEB?

13              That answer is going to be real simple to

14   prove, and really easy, and by the record, and by some

03:57:12   15   very --

16              THE COURT:  Not as long as your site is blank.

17              MR. MEAGHER:  My site is not blank, Your Honor.

18   That's -- my attorney was incorrect.  That's why I had the

19   face on.  I'm sorry, Your Honor, but he made a misstatement

03:57:24   20   there.  This has been a contiguous use and is currently in

21   use or I couldn't have a pending application, Your Honor.

22   I had to submit to the USPTO use and commerce.

23              THE COURT:  Okay.

24              MR. MEAGHER:  Yes, sir.

03:57:35   25              THE COURT:  And I have pointed out I have some

1  reservations about that.

2          MR. MEAGHER:  So if we were just to hear --

3  just listen to the argument of infringement, that answers

4  all the questions.  All this other stuff -- and I think --

03:57:55  5  I think the Court got upset with me when I filed my

6  counterclaim and asked for $10 million.  I think everybody

7  got upset with me.  So I am willing to step --

8          THE COURT:  I didn't get upset.  I am a Judge.

9          MR. MEAGHER:  Yes.

03:58:11  10          THE COURT:  I don't react.  I thoughtfully

11  consider.  I don't deliberate because I am not

12  schizophrenic, but I carefully think about both sides, and

13  I -- when Mr. Pate objects, I try rather quickly to make a

14  decision, because one thing you do in this business is make

03:58:41  15  an infinitude of decisions.

16          The final judgment is one out of 400 in

17  the average case.  There are all those little ones that

18  mean a lot, as the 1940s song had it.  You ought to look it

19  up.

03:58:59  20          MR. MEAGHER:  When we first met with you in

21  chambers, Your Honor, we were pretty -- pretty excited, my

22  wife and I, because you said this is a simple case.  It

23  could be argued on the record.  We believed that then.  We

24  believe it now.  We don't need experts.  We don't need

03:59:12  25  witnesses.  We think that --

1          THE COURT:  You have them whether I need them

2  or not.

3          MR. MEAGHER:  Well, if we were to get the Court

4  to allow us to split and just focus on the trademark issue

03:59:23  5  first on the 5th of March, that answers all the questions,

6  because nothing else is necessary.  If I lose on

7  infringement, damages don't matter.  How many -- how much

8  business I had, how much money I raised, what they think it

9  is worth, what I think it is worth, it doesn't matter.

03:59:40  10          We have to get past the one simple

11  question.  Did Todd Meagher infringe on HEB's MiTienda

12  mark?  Did I do something to imply to consumers that I was

13  HEB or I provided retail grocery store services?  It is

14  really that simple, Your Honor.

03:59:57  15          THE COURT:  Mr. Powers, was it correct that the

16  history is not relevant, or does HEB think that the past

17  practice, however discontinuous as it may be, is

18  illustrative of what might happen with the new

19  registration?

04:00:27  20          MR. POWERS:  Your Honor, we don't know of any

21  better source of evidence to know what he plans to do with

22  the MyStore mark other than what he has done with the

23  MyStore mark.  And so to that extent, the fact that he had

24  a website on which he was hosting vendors who were selling

04:00:45  25  food products, that is pertinent and it suggests what he

1   intends to do with his mark.

2                   Now, a lot of this history, and I'm sorry

3   to have to bring this up, but a lot of this history

4   Mr. Meagher has just described is quite different from what

04:00:59   5   he deposed to.

6                   When I took his deposition, he said that

7   he didn't know when the first user was.  He said that he --

8   that it absolutely mattered what domain name MyStore was

9   under; and that if he called his business by any other

04:01:12   10   name, it decimated the business.

11                   He said he didn't have any idea how many

12   sellers or buyers had been on the site, didn't have any

13   idea how many visitors had been to the site.  He didn't

14   know what regions they had come from.  And now he has put

04:01:25   15   in -- well, I guess his testimony on all of these subjects.

16   I don't know how we can go to trial in three weeks when the

17   story keeps changing.

18                       I apologize, Your Honor.  I am frustrated.

19                       The real -- sorry.  Go ahead.

04:01:41   20           THE COURT:  All right.  You're going to move on

21   the known data we have here, including, yes, testimony.

22   You're not lying to me, are you?

23               MR. MEAGHER:  Absolutely not, Your Honor.

24               THE COURT:  You're taking care of that.  I am

04:02:00   25   not going to ask you.

                    KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1                      When can you move on the issue of

2  commerce?

3                      MR. POWERS:  Your Honor, I think we -- of -- I

4  think we can probably do that in two weeks, Your Honor.

04:02:23  5             THE COURT:  By Wednesday?

6                      MR. POWERS:  Your Honor, if I can get some help

7  from my co-counsel.

8                      MR. SMITH:  Monday is a holiday, Your Honor.

9                      THE COURT:  Only for the weak.

04:02:38  10            MR. POWERS:  Your Honor, we will -- if I can

11  get one week, Your Honor, we will --

12                     THE COURT:  Friday at 3:42.

13                     MR. POWERS:  Thank you, Your Honor.

14                     THE COURT:  When can you respond?

04:02:48  15            MR. PATE:  Fifteen days, Your Honor, after

16  that.

17                     THE COURT:  I am not giving you 15 days to

18  respond to their thing that they are getting five days to

19  do.

04:03:00  20            MR. PATE:  Could I have ten days to respond

21  under the Federal Rules of Civil Procedure?

22                     THE COURT:  You're forgetting the line in the

23  rule that says "unless modified by the Court."  The Court

24  will give, you know, until the following Friday.

04:03:12  25            MR. PATE:  Yes, Your Honor.

1          THE COURT:  We have been in this for somewhere

2   between summer of '17 -- is that about when it was filed?

3          MR. POWERS:  I believe that's right, Your

4   Honor.

04:03:43    5          MR. MEAGHER:  Yes, sir.

6          THE COURT:  Though, I think we have heard much

7   of the same thing, I would like if y'all -- if neither of

8   you wants it, that's fine, but Mr. Meagher's deposition,

9   whatever else.  So we have two business valuation

04:04:11   10   depositions and Mr. Meagher's.

11          MR. POWERS:  Mr. Andrien gave a deposition,

12   that's right, in terms of what new would come in.  Yes, I

13   suppose Mr. Birch and Mr. Lindell was what Mr. Pate was

14   talking about earlier.  Mr. Meagher's deposition, and I

04:04:28   15   suppose we will probably offer you Ms. Richard's deposition

16   as well.

17          THE COURT:  Well, you have got them.

18          MR. PATE:  Sure.

19          MR. MEAGHER:  Your Honor, none of that is

04:04:38   20   necessary if we answer the one question if I infringed or

21   not.

22          THE COURT:  I need to have all the background.

23          MR. MEAGHER:  Okay, Your Honor.

24          THE COURT:  And --

04:04:50   25          MR. MEAGHER:  What's -- I'm trying my best

1  here, Your Honor, to do everything right.  I have asked

2  these -- I don't know the procedures that well, but I have

3  asked my attorney, I have asked these guys to answer the

4  one simple question through interrogatories, through

04:05:02   5  request for admissions, when did I infringe?  How did I

6  infringe?

7          Your Honor, they haven't even told me that

8  since 2017, we have been here.  They haven't presented the

9  Court with any evidence I have infringed and they haven't

04:05:13   10  told me how.

11          THE COURT:  But you just don't -- told me what

12  you were doing and when you were doing it.

13          MR. MEAGHER:  Yes.

14          THE COURT:  We have other evidence about what

04:05:22   15  was on the site.

16          MR. MEAGHER:  They are not the same thing.

17  They are different businesses.

18          THE COURT:  It's illustrative.  You just

19  conceded the only data available other than your

04:05:39   20  self-pronounced goal is what has happened.  But they spent

21  three years and a couple of hundred thousand dollars to

22  learn a whole lot about how to focus things there now.

23          And things that would apply to normal

24  people don't apply to law.  You know, if you don't pay your

04:06:08   25  mortgage, and your mother-in-law is sick, you still have to

1  pay your mortgage.  You got laid off; you still have to pay

2  your mortgage.

3              MR. MEAGHER:  All I --

4              THE COURT:  So the context within which human

04:06:23  5  decisions are made are not how it is done here.

6              MR. MEAGHER:  Understood, sir.  All I was

7  asking, Your Honor, was that -- and all I was trying to

8  point out was all that you're asking for them to present to

9  you, all the time that you're going to spend reading about

04:06:39  10  all of these confusing things, the value of the company,

11  the business, how many users we had, none of that is

12  relevant to the core case which is:  Did I infringe on

13  their mark?

14              If I did -- if I am doing a different

04:06:53  15  business, it doesn't matter how much business I am doing,

16  and how much it is worth.

17              THE COURT:  It doesn't matter how much you're

18  doing because it's the doing that entitles you to the mark.

19              MR. MEAGHER:  Correct, Your Honor.  And if you

04:07:05  20  were to -- I am telling Your Honor, if you were to look at

21  what I do and what they do on a screenshot, you would not

22  be confused.  So, again, I ask the Court, and the reason

23  why we came was a motion to continue on the 5th, but

24  continue on the question of, is there infringement?

04:07:21  25              THE COURT:  That's what we are going to do.

1          MR. MEAGHER:  Thank you, Your Honor.  That is

2 all I ask.

3          THE COURT:  And we will not have the trial on

4 the 5th until we get this cleared up, and there are other

04:07:32   5 pending motions.

6          MR. POWERS:  That is right, Your Honor.  We do

7 have the pending motions to dismiss, and strike the

8 affirmative defenses.  Getting those issues hammered out, I

9 think, would make -- make for a much cleaner trial

04:07:48  10 preparation.

11          MR. PATE:  And, Your Honor, we have long before

12 that filed multiple motions for summary judgment that have

13 not been ruled upon.

14          THE COURT:  I know.

04:07:59  15          MR. PATE:  And request for judicial notice of

16 certain adjudicative facts we would like the Court to take

17 judicial notice of.

18          THE COURT:  Did you read that?

19          MR. POWERS:  We have, Your Honor, and we would

04:08:10  20 like to respond to it because we think it materially

21 misrepresents what it is the Patent and Trademark Office

22 does.  I think they are trying to afford preclusive effect

23 to the very first paths that the first examining attorney

24 at the patent and trademark office makes.

04:08:26  25          THE COURT:  All right.  But I am not going to

1 take judicial notice of that.  I know the law.  That's a

2 theoretical concept.  So if you want to brief something

3 like that, that is fine; but I am not taking judicial

4 notice that if one bureaucrat said, we will fast track it,

04:08:49  5 that doesn't mean anything and they're either issued by the

6 institution or they're not.

7             MR. MEAGHER:  Your Honor --

8             MR. PATE:  But it --

9             THE COURT:  I am very fond of patents and

04:08:59  10 trademark.  My father-in-law was an inventor, and my son

11 got tired of sending rockets up into space and decided he

12 would become an inventor.

13             MR. MEAGHER:  Your Honor, all we're asking the

14 Court to take judicial notice of is the record, the actual

04:09:18  15 dates, the filing, the cancellation.

16             THE COURT:  Well, as long as they will give it

17 to me, that is a public record.

18             MR. MEAGHER:  Right.  We printed it out and we

19 have given it to the Court.  We would like the Court to

04:09:28  20 take judicial notice of that, not of any conversations just

21 of the public record, is all we ask.

22             MR. POWERS:  To be clear, the public records,

23 the documents that he is referring to, are even on our

24 exhibit list.  What I don't -- what I objected to is this

04:09:39  25 concept of judicial notice and trying to afford preclusive

1 effects to these steps that are just midway through the

2 process.

3          MR. PATE:  But the entire process that the

4 examining attorney goes by is the standard of likelihood of

04:09:54  5 confusion.  It is the exact standard they have sued us

6 under.

7          THE COURT:  Intermediate bureaucratic decisions

8 are wonderful, I am sure.  They are simply not binding

9 until they're final decisions.  Just like all of

04:10:09  10 my preliminary decisions, they are not real until the final

11 gavel comes down.

12               I don't use that one.  It scares the jury.

13          MR. MEAGHER:  Your Honor, did you say earlier

14 that we are moving the trial, that we went -- we won't be

04:10:28  15 on the 5th?

16          THE COURT:  I am not smart enough to read all

17 the confusing things they are going to write me.

18          MR. MEAGHER:  I am afraid of it actually, Your

19 Honor.  I just want to get to trial, and see if I found --

04:10:39  20 if I infringed or not.

21          THE COURT:  Well, it's my conclusion we are not

22 quite ready.

23          MR. MEAGHER:  Thank you, sir.

24          THE COURT:  But we have got somewhere under 20

04:10:48  25 pending motions, including the anticipated two.

1            MR. PATE:  Your Honor, could I recommend that

2    we take our counterclaims and we enter a stipulation of

3    dismissal without prejudice so that we narrow the

4    battlefield dramatically?  Then we're all focused on what I

04:11:10    5    think we have been focused on this last hour, trademark

6    infringement or no infringement.  We would be willing to do

7    that.

8            THE COURT:  It is my recollection that you

9    offered that at the first pretrial conference.

04:11:25   10            MR. PATE:  Last pretrial conference --

11            THE COURT:  No.  The first.

12            MR. PATE:  What I was saying in the last

13    pretrial conference we took off the table, in all candor,

14    before the Court the business disparagement claim and the

04:11:41   15    Court recognized that.  And what we're willing to also do,

16    because we want to proceed with utmost candor before this

17    tribunal, to take that off the table, too, without this --

18    without prejudice, so that we can narrow the battlefield,

19    and it makes for a whole lot less rulings that are pending,

04:11:58   20    and it keeps us all laser focused on what the real issue is

21    about.

22            THE COURT:  Business disparagement is gone

23    forever.

24            MR. PATE:  Understood.

04:12:09   25            THE COURT:  And if you will without condition

1  stipulate to the abandonment of the others, the

2  bullying -- the thuggy --

3              MR. MEAGHER:  Thug goes, Internet thugs.

4              THE COURT:  Internet thugs, that malicious

04:12:33  5  prosecution.

6              MR. MEAGHER:  Your Honor --

7              THE COURT:  Misuse.

8              MR. PATE:  Cancellation.

9              MR. MEAGHER:  Cancellation.

04:12:47  10              THE COURT:  Well, the cancellation is a

11  counterclaim.  Unclean hands, mitigation, laches,

12  unenforceability issue, misuse, there are a lot of them.  I

13  think he has already addressed them.

14              MR. PATE:  Those were our affirmative defenses.

04:13:11  15              MR. MEAGHER:  That is right.

16              MR. PATE:  But we are willing to take the

17  counterclaims themselves off without prejudice and remove

18  those off the table.

19              THE COURT:  We are going to try the case.

04:13:22  20              MR. PATE:  Okay.  Understood.

21              THE COURT:  I mean, I can't divide them up like

22  that.

23              MR. PATE:  Understood, Your Honor.

24              THE COURT:  I mean, normally, you divide it up

04:13:32  25  when Todd Meagher and MyStore are going to fight in front

1 of the jury, and they are on the same side, and then it

2 gets complicated.

3          MR. MEAGHER:  So, Your Honor, does it makes

4 sense to -- and I am asking a question.

04:13:45   5          THE COURT:  Sure.

6          MR. MEAGHER:  It doesn't make sense to first

7 answer the question of if there is infringement or not; and

8 then if there is, deal with all this damages stuff?

9          And if there isn't, damages stuff goes

04:13:56  10 away because I would think your job is a lot easier.

11          The cost for all of us is greatly reduced

12 if we come here on the 5th and only argue over the

13 infringement because if there is no infringement, then

14 there is no likelihood of confusion.  The case is pretty

04:14:15  15 much done.  If there is no infringement, there is no

16 damages.  And on the 5th, we don't need experts.  We don't

17 need for you to read all this paper.

18          THE COURT:  I am going to read it, or I am

19 going to do it by paper.

04:14:27  20          MR. MEAGHER:  Okay.

21          THE COURT:  It, including the record.

22          MR. MEAGHER:  Better man than I.  That is a lot

23 of reading.

24          THE COURT:  Well, I'm not sure about that.  I

04:14:36  25 don't recall ever having had in a patent case to decide the

1  damages, because they all know what it is really worth.

2  They just fight like high I.Q. boxers, or something.  Once

3  they know the answer, they -- now, sometimes they plea for,

4  you know, 30, or 40, 100 million dollars or some extra for

04:15:07    5  punishment, but that -- they think that is unrealistic.

6          MR. MEAGHER:  Do I hear the Court correctly

7  that the Court will not allow me to withdraw the

8  counterclaims?

9          THE COURT:  You may withdraw anything you want,

04:15:21   10  but if it is withdrawn it is gone now and forever.  Hold

11  your peace.  Like that thing they say at weddings, which

12  nobody takes advantage of.

13          MR. MEAGHER:  Well, my -- my idea, Your Honor,

14  quite candidly, was take it off the table.  If I win on

04:15:39   15  infringement, then bring it up.  Then it is ripe.

16          THE COURT:  There is a rule.

17          MR. MEAGHER:  Yes, sir.

18          THE COURT:  You have to bring everything you

19  have about one train wreck in one case.

04:15:49   20          MR. MEAGHER:  Got you.

21          THE COURT:  Sometimes we get lawyers who are

22  not aware of that, and they lose the breach-of-contract

23  claim so they file another lawsuit on fraud or something.

24  No.

04:16:00   25          MR. MEAGHER:  So we are not --

1            THE COURT:  One train wreck, one case.

2            MR. MEAGHER:  So we are not -- we are moving

3  the trial then from the 5th?

4            THE COURT:  We have to if we are going to get

04:16:08   5  all this underbrush cleared out.

6            MR. MEAGHER:  Understood.

7            THE COURT:  All right.

8            MR. MEAGHER:  Got you.

9            THE COURT:  Ms. Sanchez, anything I left out?

04:16:28   10            MS. SANCHEZ:  No, Your Honor, I think that is

11  thorough.

12            THE COURT:  Ms. Noble?

13            MS. NOBLE:  No, Your Honor.

14            THE COURT:  Okay.  Thank you for your help.

04:16:37   15  All right.  We're adjourned.

16            THE LAW CLERK:  All rise.

17  (Recessed at 4:16 p.m.)

18                COURT REPORTER'S CERTIFICATE

19

20      I, Kathleen K. Miller, certify that the foregoing is a

21  correct transcript from the record of proceedings in the

22  above-entitled matter.

23

24                          /s/ _____
   DATE: March 2, 2019    Kathleen K. Miller, RPR, RMR, CRR
25

           KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

_____
                                    )
HEB GROCERY COMPANY, LP,            )
          Plaintiff,                )
                                    ) CIVIL ACTION NO.
VS.                                 ) 4:17-CV-2810
                                    )
TODD MEAGHER, IRENE ALEXIS          )
MEAGHER AND MYSTORE, INC.,          ) 4:39 P.M.
          Defendants.               )
_____)

HEARING
BEFORE THE HONORABLE LYNN N. HUGHES
NOVEMBER 5, 2018

APPEARANCES:

**FOR PLAINTIFF:**
MR. JASON M. POWERS
MS. ALLISON L. FULLER
Vinson & Elkins LLP
1001 Fannin Street, Suite 2500
Houston, Texas  77002
(713)758-2522

**FOR DEFENDANTS:**
MS. MARILYN CAYCE
Thompson, Coe, Cousins & Irons, LLP
One Riverway, Suite 1400
Houston, Texas  77056
(713)358-6779

**ALSO PRESENT:**
MR. TODD MEAGHER

**COURT REPORTER:**
Heather Alcaraz, CSR, FCRR, RMR
Official Court Reporter
515 Rusk, Suite 8004
Houston, Texas  77002
(713)250-5584

Proceedings recorded by mechanical stenography, transcript
produced by computer.

15:55:36   1          **THE COURT:**  Thank you.  Please be seated.

16:40:04   2          You're very fortunate.  This morning, we had a

           3   blizzard in here, and I see it's finally getting to marginally

           4   normal.  It throws the Russians off when we have the air

           5   conditioning on when it's cold and the heat on when it's hot.

16:40:32   6          All right.  Well -- Ms. Fuller, where are we?

16:40:52   7          **MS. FULLER:**  I will defer to my esteemed colleague,

           8   Jason Powers, for the summary update, Your Honor.

16:40:59   9          **THE COURT:**  Esteemed?

16:41:03  10          **MS. FULLER:**  In my --

16:41:04  11          **THE COURT:**  It's just Powers.  I mean -- if you think

          12   he can handle it, all right.

16:41:08  13          **MS. FULLER:**  We'll take our chances today.

16:41:11  14          **MR. POWERS:**  Thank you, Your Honor.  I think that it's

          15   fair to say that we have exhausted our efforts at settlement

          16   discussions, and what remains before trial -- as the Court

          17   knows, there are three motions that are pending right now.

16:41:25  18          HEB has a motion to dismiss the counterclaims that

          19   were added eight weeks ago.  There's also a motion to strike the

          20   affirmative defenses that were added at that time.

16:41:34  21          **THE COURT:**  Speak up a little bit.

16:41:34  22          **MR. POWERS:**  Sure.

16:41:35  23          **THE COURT:**  The court reporters are fragile people.

16:41:38  24          **MR. POWERS:**  In addition to the motion to dismiss the

          25   counterclaims and to strike the affirmative defenses, the other

1    remaining item is defendants' motion for summary judgment

2    against HEB on actual damages, although we did not plead actual

3    damages in the case.  So that's a pending item.

16:41:56  4         The remainder of the discovery that needs to be taken

5    before trial all relates to defendants' counterclaims, the

6    $20 million damages claim that was added eight weeks ago, and

7    there are a few remaining documents to be produced, at least on

8    our side.  Sorry, not from us, but that we are seeking from the

9    defendants.

16:42:20  10        The documents that we are still seeking concern the

11   sale of the domain name MyStore.com to Mike Lindell Products.

12   We have not received documentation establishing what that

13   transaction was, but we do have interrogatories that have been

14   propounded to the company.  Those were served, I think, a week

15   ago Friday.  We asked for those responses to come in at the end

16   of this week.

16:42:49  17        I have not been advised by counsel for Mr. Lindell or

18   his company when we should expect those responses, but we asked

19   for them this week.

16:42:57  20        **THE COURT:**  Friday.

16:42:58  21        **MR. POWERS:**  Pardon?

16:42:59  22        **THE COURT:**  Friday.

16:42:59  23        **MR. POWERS:**  Yes.  That's right, Your Honor, Friday.

16:43:01  24        **THE COURT:**  That's when you'll get them.

16:43:02  25        **MR. POWERS:**  Well, I hope so.

16:43:04  1          And then, beyond that, we have requested depositions.

2      We've tried to keep it narrowly focused.  We have left the

3      majority of the investors off the list.  We have tried not to

4      ask for any of the employees or contractors of MyStore.

16:43:20  5          We are seeking four depositions.  One is one of the

6      defendants, Mrs. Irene Alexis Meagher.  She was the president of

7      MyStore.com in 2017.

16:43:33  8          We are advised that it was her decision to shut down

9      the business, allegedly because of the HEB litigation, but we

10     have not heard that from her yet, and, allegedly, she is the

11     only person who was aware of the business disparagement, which

12     supports one of the counterclaims here.

16:43:52 13          Mr. Meagher claims that HEB is -- having brought the

14     lawsuit, has brought him into disrepute.  Mrs. Meagher is the

15     only person who has spoken to someone who was aware of the

16     litigation existing, apparently, according to him.

16:44:05 17          **THE COURT:**  She can ask me.

16:44:06 18          **MR. POWERS:**  I suppose that's true, Your Honor.

16:44:09 19          So we've asked for her deposition.  She's also an

20     individual who applied for the MiTienda and MiTienda.com

21     trademarks, herself, and signed the declaration indicating that

22     those trademarks were in use by Mr. Meagher.  So it relates to

23     the intellectual property claims as well, but my interest is

24     primarily on the damages claims.

16:44:28 25          There are two investors that we've sought depositions

1    from, Mr. Birch and Mr. Schupak.  These are individuals who, in

2    2008, allegedly agreed to make investments in MyStore, and their

3    investments are the foundation of the valuation opinion given by

4    Mr. Meagher's expert.

16:44:50  5              THE COURT:  Physically, where are those gentlemen?

16:44:53  6              MR. POWERS:  I understand they're in New York, but I'm

7    not certain of that, Your Honor.

16:44:57  8              THE COURT:  Ms. Cayce?

16:44:58  9              MS. CAYCE:  One is in San Francisco, Your Honor.

16:45:00 10              THE COURT:  Pardon?

16:45:01 11              MS. CAYCE:  One gentleman is in New York, and another

12   gentleman is in San Francisco, and they weren't investors.  They

13   made loans to the company --

16:45:08 14              THE COURT:  We discussed that, and he was --

16:45:11 15              MS. CAYCE:  Yes.  Okay.

16:45:11 16              THE COURT:  -- he was not at all clear about what the

17   relationship was.  That's why I'm going to let them do it.

16:45:19 18              MR. POWERS:  So we have those two individuals, and the

19   only remaining deposition beyond that would be the deposition of

20   defendants' valuation expert, a gentlemen named Richard

21   Claywell, who maintains that the value of the MyStore business

22   was $20 million.  It appears, to me, that he is relying on

23   Mr. Schupak and Mr. Birch, although it's not clear that either

24   Mr. Schupak or Mr. Birch had done a valuation.

16:45:43 25              In any event, I'd like to find out more about the

1    basis for Mr. Claywell's opinion.  His report does not give a

2    great deal of detail on those issues.

16:45:52  3        We do have other pretrial work that we're working on.

4    We do have an agreed schedule with the defendants to exchange

5    things like exhibit lists, witness lists and the like.

16:46:01  6        **THE COURT:**  I assume that for the people in New York

7    and San Francisco, you'll want them to bring all valuations that

8    they've had done or did themselves about the company before or

9    after investing in it, or whatever they did.

16:46:21 10        **MR. POWERS:**  That's right, Your Honor.  If they had

11    such material, we would be absolutely interested in looking at

12    that.

16:46:27 13        **THE COURT:**  Did -- do it so that they produce it two

14    weeks before their deposition so that you can read it and won't

15    have to read it while everybody watches.

16:46:36 16        **MR. POWERS:**  I think that makes sense.

16:46:38 17        **THE COURT:**  All right.  There was a person that was

18    discussed last time who was a computer programmer relative or --

16:46:48 19        **MR. POWERS:**  Your Honor, there was discussion of a

20    gentleman named Peter Atkins (phonetic).  I have told the

21    defendant -- I understand he lives in San Francisco and that he

22    was a programmer, and he was supposedly involved in helping to

23    attract potential investors in the early days of the program.

16:47:03 24        I've told the defendants that if he's not going to

25    come to trial, I don't need to take his deposition.  And so if

1    that's the case, and I think it is, we're not going to take time

2    on that.

16:47:13   3          THE COURT:  Thank you.

16:47:14   4          Ms. Cayce?

16:47:16   5          MS. CAYCE:  Your Honor, first of all, we have no plans

6    to have Irene Meagher here or testifying at trial.  Her

7    involvement was administrative and filing with the patent

8    office, which is just, frankly, a matter of public record.  I

9    mean, they don't need to ask her how she physically filed --

16:47:36   10         THE COURT:  No, but that's what she says she did, and

11   so --

16:47:42   12         MS. CAYCE:  And then I don't think -- I'm just told

13   she knows nothing about our business disparagement claim.

14   That's all going to be Mr. Meagher.

16:47:49   15         THE COURT:  But she knows all about the books and

16   records of the company.

16:47:53   17         MR. MEAGHER:  No, sir.

16:47:54   18         MS. CAYCE:  No.  She was just simply doing a clerical

19   act, basically, when she filled out the paperwork or signed it

20   because she was, at the time, the president of the company.  But

21   that's --

16:48:05   22         THE COURT:  Well, but there's a Texas law that says

23   that if you take the title of president, you can't disclaim the

24   responsibilities.

16:48:16   25         MS. CAYCE:  Mr. Meagher can address that, if you would

1    like.  He's still sort of technically pro se, but -- but we --

16:48:25 2         **THE COURT:**  So what are you doing here?

16:48:26 3         **MS. CAYCE:**  -- he has this wealth of knowledge.  He's

4    a lot more informed of the facts.

16:48:30 5         **THE COURT:**  No.  I mean, pro- -- if he's still

6    pro se --

16:48:32 7         **MS. CAYCE:**  Well, you're in a -- what you said you

8    were.  Whatever.

16:48:35 9         I don't know.  Last time, apparently, he talked a lot,

10   but -- maybe that was a problem, but he does have --

16:48:39 11        **THE COURT:**  No.  We found out a lot, I think.  I don't

12   make a practice of that, normally.  In fact, I don't let -- like

13   to let lawyers talk.

16:48:53 14        **MS. CAYCE:**  Yeah.  I know.  This is just -- you know,

15   he's got the law and history of this.

16:48:56 16        **THE COURT:**  But this says --

16:48:58 17        **MS. CAYCE:**  Sorry?

16:48:58 18        **THE COURT:**  -- you represent him, the docket sheet.

16:49:00 19        **MS. CAYCE:**  Yes.  That's true.  Mr. Pate and I do.

20   Mr. Pate would have been here, but he has a conflict,

21   unfortunately, he couldn't get out of.

16:49:08 22        **THE COURT:**  You're fine.

16:49:09 23        **MS. CAYCE:**  Okay.

16:49:10 24        **THE COURT:**  My rule is whoever shows up is attorney in

25   charge, and if two people show up, we do it in declining order

1   of IQ.  So we got Fuller leading one side, and she's got --

2   brought her associate.

16:49:33  3        All right.  You heard that.  Where is she?

16:49:37  4        **MS. CAYCE:**  She's in the greater Dallas/Fort Worth

5   area.

16:49:40  6        **THE COURT:**  Well, she can come on down.

16:49:44  7        **MS. CAYCE:**  Yeah.  I think we just -- you know, it's

8   another -- it's another cost.  That's more manageable --

16:49:49  9        **THE COURT:**  I know, but --

16:49:49 10        **MS. CAYCE:**  -- than New York and California, but --

11   which when we get to that point, we would be more than willing

12   to provide affidavits from these people because what one of them

13   is going to say is -- or they both will say they don't have any

14   documents that --

16:50:02 15        **THE COURT:**  Well, but no, I want them to say that,

16   and, you know, I respect and like you, but I'd just as soon to

17   hear it in their words and not an affidavit.  So --

16:50:15 18        **MS. CAYCE:**  Right.

16:50:16 19        **THE COURT:**  But at our last meeting, there was much

20   talk about the investors, lenders, whatever, and I think it's

21   only fair to HEB that they find out what is the nature of the

22   structure of this company.  And so he'll do it quick and

23   politely for everybody, but I think -- she had -- she had the

24   title of president.  She's got to answer for it.

16:50:57 25      *(Sotto voce discussion between Mr. Cayce and Mr. Meagher.)*

16:51:05 1    **MS. CAYCE:** Yeah.  He's just telling me it's an

2    Internet filing.  So she had no -- but, you know, it was a title

3    of the company that I think doesn't even exist anymore.

16:51:13 4    **THE COURT:** I have no reason to doubt his assertions

5    except he wasn't clear about a lot of details.

16:51:20 6    **MS. CAYCE:** We do this -- is it possible to do it

7    telephonically?

16:51:25 8    **MR. POWERS:** Your Honor, I'm happy to go to Dallas for

9    the deposition, where the witness is.

16:51:29 10    **THE COURT:** Why don't we all meet in -- what,

11    Buffalo's about halfway?  I guess Centerville's supposed to be

12    halfway.

16:51:38 13    **MR. POWERS:** I think Centerville is.

16:51:38 14    **THE COURT:** Theoretically.

16:51:41 15    **MS. CAYCE:** Yeah.  It's -- to our point, you know,

16    we're -- the more they run up the cost, the more pejorative this

17    whole litigation is financially, too.

16:51:49 18    **THE COURT:** I understand that, but he's made a lot of

19    accusations.

16:51:55 20    **MS. CAYCE:** Yeah, since this has developed.

16:51:57 21    **THE COURT:** They just want to be left alone with what

22    they have, yet he wants 1.6 million last time we were together,

23    and now it's 20 million.  So I'm losing ground.

16:52:20 24    Anything that the defendants need that we haven't

25    covered already?

16:52:29  1          **MS. CAYCE:**  We were -- we haven't gotten to the

2    Claywell -- the expert's -- I guess, if they're going to be

3    allowed to depose our technician, then we should be allowed to

4    depose their technician.

16:52:40  5          **THE COURT:**  Do you have one?

16:52:42  6          **MR. POWERS:**  Your Honor, we have three experts we've

7    designated:  Ms. Richard, who is an intellectual property

8    attorney, Mr. Andrien --

16:52:50  9          **THE COURT:**  Wait a minute.  Why do I want to listen to

10   a lawyer?  I got three, four -- five of us in here because I

11   talk to myself, sometimes.

16:53:00 12          **MR. POWERS:**  Your Honor, Mr. Meagher's claim is that

13   this lawsuit was brought vexatiously or had no legitimate

14   ground, and so Ms. Richard's long experience in the intellectual

15   property practice, I think, would be helpful for the jury to

16   understand why a -- an owner of trademarks has to enforce its

17   marks and the way in which they carry it out.

16:53:21 18          **THE COURT:**  That's the law, and I will instruct my

19   jury.  Leave my juries alone.

16:53:28 20          So were you doing this back when everybody would bring

21   in three or four patent lawyers to testify about what the law

22   was?  I put a stop to that long before the Supreme Court got

23   around to saying no.  So we don't -- I don't think we need her.

16:53:46 24          **MR. POWERS:**  Your Honor --

16:53:46 25          **THE COURT:**  You need to draft a perfectly lucid, brief

1   explanation of that.  Talk to Ms. Cayce about it, come up -- if

2   y'all can come up with an agreed instruction, I'll -- after I

3   clean up your English, I will then probably let them do it, but

4   that is -- you're going to pay $900 an hour to somebody to tell

5   what the patent office does.  There are times when I don't think

6   they know what they're doing.

7         **MR. POWERS:**  And, Your Honor, I completely agree that

8   this issue of what the law requires and what the law allows of a

9   litigant is an issue of law for the Court.  The problem is that

10  this has been made into a damages claim to be presented to the

11  jury, and it's our contention, as expressed in our motion to

12  dismiss, those claims do not state a valid claim and that, in

13  fact, he has no claim to present to a jury on that issue.

14        But if he is to be allowed to present to the jury an

15  argument that this damages claim is wrongful by its nature, a

16  lawyer explaining why damages claims -- or, rather, why

17  trademark claims like this are something that is customary, not

18  vexatious, within the range of reasonable actions would seem to

19  be appropriate; otherwise, I don't know how the jury will be

20  informed as to how they're to evaluate Mr. Meagher's claims.

21        **THE COURT:**  Well, we'll get together, and we'll

22  discuss that, but that's still, I think, a question of law.  I

23  mean, the ultimate answer, did this cross the line into pure

24  meanness, is for me, but what we need -- jurors need background.

25  I prefer to give it to them unless it's, you know, construction

1    or something where they're actually talking about, "Here's what

2    we were doing," because you have a wreck on a derrick, most

3    people, strangely enough, have never worked on a derrick.

4    They've missed an exciting part of life.  The key thing there is

5    to survive.

16:56:00   6         All right.  So we're going to hold that one.  Who's

7    your next technician?

16:56:06   8         **MR. POWERS:**  Mr. Andrien is our valuation expert.

9    He's evaluated Mr. Claywell's report and is prepared to testify

10   on standards for business valuation and whether there is a

11   legitimate damages model here.

16:56:19  12         **THE COURT:**  Well, after you depose Mr. Claywell,

13   you'll have the opportunity to move to strike it before we ever

14   get to a nice jury.

16:56:28  15         **MR. POWERS:**  Agreed, Your Honor.  And --

16:56:30  16         **THE COURT:**  So I think we'll worry about that after we

17   see what survives.

16:56:35  18         **MR. POWERS:**  That would make sense to me, Your Honor.

16:56:36  19         **THE COURT:**  And then third one?

16:56:37  20         **MR. POWERS:**  The third one is Patrick Walther.  He is

21   the director of eCommerce at HEB.  He has reviewed the code for

22   the MyStore.com website and for the applications for the Android

23   system and the IOS system, and he has reviewed that and has

24   opinions about whether Mr. Meagher's claims that the code is now

25   useless are, in fact, true.

16:57:00   1          He's had years of experience --

16:57:03   2          **THE COURT:**  Okay.  No, that -- finally, he gets to one

3    that makes sense.

16:57:07   4          **MR. POWERS:**  He is -- we've disclosed his opinions,

5    and certainly, if they want to take depositions of him or any of

6    the other experts, we have no objection to that.

16:57:14   7          **THE COURT:**  All right.  Let's hope -- we're going to

8    wait on the first two, and you can do him now or after we do

9    some more, but I'd like you to give me a week to look at the

10   pending motions again because I just -- I spent my time since I

11   saw you last praying that you would settle, and so now I have to

12   go back to the details.

16:57:48  13          Who else do you have as witnesses?

16:57:51  14          **MR. POWERS:**  Those are the only experts we've

15   designated, Your Honor.

16:57:53  16          **THE COURT:**  All right.  How about real people?

16:57:55  17          **MR. POWERS:**  They've already taken the deposition of

18   Juan Alonso, who is the vice president of the southern region

19   here and oversees the Mi Tienda stores.  I anticipate that he

20   will be testifying at trial for us in addition to whatever

21   experts we're allowed to present.

16:58:11  22          **THE COURT:**  All right.  So this -- this trial will

23   work out fine.

16:58:16  24          **MS. CAYCE:**  We think it could be done in two days max.

16:58:19  25          **THE COURT:**  That's the longest trial I have.

16:58:21  1        **MS. CAYCE:**  I'd like to --

16:58:22  2        **THE COURT:**  I have three-day trial, one-day, two-day,

3  and you can't have three days.

16:58:28  4        But I disclosed last time that I'm friends with

5  Charles Butt.  I must disclose to them about our relationship.

16:58:36  6        **MS. CAYCE:**  Okay.

16:58:38  7        **THE COURT:**  Some time ago, she kindly bought my wife's

8  father's bay house, and she has said nice things about it in

9  the -- what, 10, 12 years?

16:58:50 10        **MS. CAYCE:**  It's been 16 years.

16:58:52 11        **THE COURT:**  Sixteen years?

16:58:53 12        **MS. CAYCE:**  I know.  Uh-huh.

16:58:56 13        We're still loving it.

16:58:59 14        **THE COURT:**  I'm glad.

16:59:00 15        **MS. CAYCE:**  Next time, I'll bring you a picture of the

16  big house that went up next door, but...

16:59:10 17        **THE COURT:**  Do because, you know --

16:59:10 18        **MS. CAYCE:**  I know.

16:59:10 19        **THE COURT:**  -- I used to pay attention to that when we

20  owned it, but --

16:59:12 21        **MS. CAYCE:**  You need to take it home.

16:59:14 22        **THE COURT:**  At the time, my wife and I -- going to the

23  bay in a lovely house with a pool and the pool table and all

24  manner of nifty stuff didn't fit what we were doing, and so this

25  was a boon to our children and their friends is how it turned

1   out to be.

16:59:38  2          **MS. CAYCE:**  I know how that works.

16:59:40  3          **THE COURT:**  So we finally decided that -- see if the

4   kids could get use of it from Ms. Cayce.

16:59:48  5          **MS. CAYCE:**  Yeah.  Our boys have enjoyed it.

16:59:51  6          **THE COURT:**  All right.  What was worse is my son, at

7   the time, worked at NASA, and so we could impose on him to go

8   check on it, but he -- he could do whatever he wanted, as far as

9   we were concerned, because he was helping us.

17:00:11  10          What else do you need?

17:00:14  11     *(Sotto voce discussion between Ms. Cayce and Mr. Meagher.)*

17:00:18  12          **MS. CAYCE:**  Mr. Meagher really wants to speak to you,

13   Your Honor.  You should...

17:00:21  14          It might narrow the issues because...

17:00:24  15          **MR. MEAGHER:**  I think it will.

17:00:29  16          **THE COURT:**  Is it okay?

17:00:30  17          **MR. POWERS:**  Your Honor, I have no objection if

18   Mr. Meagher would like to address the Court.

17:00:34  19          **THE COURT:**  All right.  Would you step up to the

20   lectern, please, sir, and talk slowly so that the court reporter

21   can record it.

17:00:42  22          **MR. MEAGHER:**  I apologize that --

17:00:44  23          **THE COURT:**  Bend that down a little bit.

17:00:45  24          **MR. MEAGHER:**  I apologize that last time I was here,

25   I -- it seems like I didn't -- I wasn't clear on --

17:00:50  1          **THE COURT:**  All right.  You're not being loud, now.

17:00:53  2          **MR. MEAGHER:**  How about that?  Is that better?

17:00:55  3          **THE COURT:**  Slide the base down a little bit.

17:00:57  4          **MR. MEAGHER:**  Okay.  Oh, there we go.

17:00:58  5          **THE COURT:**  Johnny Cash doesn't sing like this

       6  (indicating), does he?  He gets right up here (indicating).

17:01:03  7          **MR. MEAGHER:**  Okay.

17:01:05  8          My wife did not file for the trademark after this

       9  litigation started.  I set up MyStore, Inc.  The company never

      10  formulated.  It never did any business.  It never really took

      11  ownership of any assets.

17:01:23 12          So it's kind of -- was just a shell.  I did that so

      13  she had the company in her name so that when this was resolved,

      14  she could move forward with it.  That was the plan.

17:01:32 15          As far as filing the trademark application, I filed

      16  that online in her name.  She did not file it.  I filed it

      17  online --

17:01:40 18          **THE COURT:**  She let you do it.  She --

17:01:42 19          **MR. MEAGHER:**  Absolutely.  At my direction.

17:01:44 20          She doesn't have any knowledge of any of this, and

      21  she's just -- you know, she's nervous about courts and being

      22  involved and my -- but she will, if we need to have her

      23  involved.  But she's going to tell this Court that she

      24  doesn't -- she doesn't know anything because she doesn't.

17:02:00 25          But if that's what we have to do, then I would rather

1  it be done in the court and not through a deposition because

2  that costs us more money.  So we're just trying to avoid the

3  cost.

17:02:10  4          **THE COURT:**  No.  Doing it in court costs money, too.

17:02:13  5          **MR. MEAGHER:**  Yeah.  True.  True.  So it's --

17:02:15  6          **THE COURT:**  Among other places, to the taxpayers.

17:02:19  7          **MR. MEAGHER:**  Some of the things that --

17:02:20  8          **THE COURT:**  I don't look like much, but I'm really

9  expensive.

17:02:25 10          **MR. MEAGHER:**  You know, the other -- the other people

11  that they're talking about, my nephew, he wasn't involved in

12  raising any money.  He was just a coder.  He knows nothing about

13  this and won't be --

17:02:36 14          **THE COURT:**  Might talk about the code.

17:02:39 15          **MR. MEAGHER:**  No.  He -- he was one of many, and it

16  was ten years ago.  He has no -- I mean, it would be a waste of

17  money.

17:02:45 18          **THE COURT:**  Mr. Meagher --

17:02:46 19          **MR. MEAGHER:**  Yes, sir.

17:02:46 20          **THE COURT:**  -- I understand --

17:02:49 21          **MR. MEAGHER:**  Okay.

17:02:50 22          **THE COURT:**  -- you believe that to be true --

17:02:52 23          **MR. MEAGHER:**  Okay.

17:02:52 24          **THE COURT:**  -- and you're well informed, but the nice

25  lawyer for HEB has been through lots of cases -- he dyes his

1    hair -- lots of cases, and he likes to talk to the people

2    themselves.  And you talked a lot about your -- nephew?

17:03:16  3         **MR. MEAGHER:**  He is my nephew, yes.

17:03:18  4         **THE COURT:**  -- nephew last time, and so he's -- he

5    won't take any longer than absolutely necessary.  He'll just ask

6    his nice direct questions and move on.

17:03:29  7         **MR. MEAGHER:**  When we were here last time, I didn't

8    talk about my nephew, at all.  In fact, you, at the beginning of

9    the -- the hearing, said that you took him off the table right

10   away, that he was my nephew, that you weren't going to allow him

11   to be deposed in California.  So I didn't talk about my --

17:03:44  12        **THE COURT:**  Is he still in California?

17:03:46  13        **MR. MEAGHER:**  Yeah.  He lives in Napa.

17:03:47  14        But I didn't talk about him last time I was here.  I

15   only talked about my two investors, slash, lenders, and I know

16   that -- I guess I didn't good -- do a good job of clarifying

17   that, but I will right now.  It's --

17:03:59  18        **THE COURT:**  No.  He's going to want to get that under

19   oath with the questions he asks.

17:04:05  20        **MR. MEAGHER:**  And an affidavit -- sworn affidavit

21   wouldn't do that?  We have to fly to California to --

17:04:10  22        **THE COURT:**  Well, no, you -- he's going to depose you

23   somewhere -- presumably, here -- and --

17:04:17  24        **MR. MEAGHER:**  Just trying to avoid going to California

25   and spending the money.

17:04:21  1          **THE COURT:**  Well, I have a California daughter.  It's

2   so much cheaper to fly her here than pay one night's hotel bill

3   and eat, too.  So he could fly here.

17:04:39  4          **MR. MEAGHER:**  Wow.  He's going to fly -- okay.  I

5   don't know --

17:04:43  6          **THE COURT:**  That makes sense for three people to fly

7   to California instead of one here?

17:04:48  8          **MR. MEAGHER:**  Well, not --

17:04:49  9          **THE COURT:**  But if he refuses, that -- he'll have to

10   appear out there.

17:04:54 11          **MR. MEAGHER:**  Right.  When we were here last time, the

12   last thing I explained, this -- this, really, is about my

13   reputation, and that's what I spent most time talking to you

14   about last time.

17:05:03 15          These people, ten years ago, wrote me hundreds of

16   thousands of dollars based on my model and my -- my ability.

17   They had nothing to do with the operations.  They didn't do

18   evaluations like he's indicating.

17:05:16 19          They, basically, invested in me and the companies and

20   the assets of the companies.  That's what they're going to say,

21   and I got them all to send me an e-mail to confirm that.

22   They're all on the same affidavit.  If we have to force them to

23   fly here to say the same thing again, I guess that's how it

24   works.

17:05:33 25          But it will damage my reputation with them because

1    I've already put them in a position where they've had to deal

2    with this when they didn't think they would have to deal with

3    this.  So I was just trying to avoid that, but I'll do whatever

4    you think is -- is right.

17:05:46   5         THE COURT:  You sued HEB for $20 million; is that

6    true?

17:05:51   7         MR. MEAGHER:  I countersued them.  Yes.

17:05:54   8         THE COURT:  Which side of the "versus" you're on

9    doesn't matter much.  It's what you ask for.

17:05:59  10         MR. MEAGHER:  You're right.  I have.  I've lost my

11   company.  Yep.

17:06:02  12         THE COURT:  And so --

17:06:03  13         MR. MEAGHER:  And I owe these people money, and they

14   can attest to that.  I guess --

17:06:06  15         THE COURT:  It's kind of hard to say we need to save

16   one airfare to California and one from New York, which is

17   actually a cheaper airfare than flying from here to Laredo, in

18   case you ever -- it's --

17:06:21  19         MR. MEAGHER:  When I -- when I spoke to Mr. Schupak in

20   New York, he said:  Todd, this -- this deal was ten years ago.

21   I don't have any papers on it.  I don't remember hardly

22   anything.  The numbers look close to my value than what we were

23   going to pay for, but we didn't do any evaluation.

17:06:37  24         THE COURT:  Then --

17:06:37  25         MR. MEAGHER:  So I --

17:06:37 1         **THE COURT:**  -- is it true that your technician relied

2    on them?

17:06:43 3         **MR. MEAGHER:**  We're not going to call our expert to --

4    we're not going to use -- I'm going to be the only witness in

5    this case and rely on the public record.

17:06:50 6         **THE COURT:**  Well, HEB may want to call your expert.

17:06:54 7         **MR. MEAGHER:**  He's going to say what they said to him,

8    what I just said to you, "We didn't have anything" -- "we don't

9    know anything about the company operations.  We gave Todd

10   Meagher $500,000 based on a $20 million evaluation, expect to

11   get our money back."

17:07:08 12        One guy's going to say, "I lent him the money, and now

13   he owes me the money," and that's all there is.

17:07:13 14        **THE COURT:**  So -- now, when was this company valuation

15   done?

17:07:25 16        **MR. MEAGHER:**  It was 2008.  Mr. -- Mr. -- Mr. Birch

17   gave me $75,000 for less than 1 percent of the company.  He did

18   that because we were negotiating with Mr. Schupak in New York,

19   who was going to put $2 million in based on a $20 million

20   evaluation.

17:07:43 21        Mr. Schupak, unfortunately, became victim of

22   Bernie Madoff and couldn't write his check.  So the deal never

23   closed.  Instead, Mr. Birch came back and gave me a loan of

24   $500,000 to keep the company going until we could do another

25   raise.

17:07:57   1       We didn't have to do another raise, and we stayed

2   building it and got ready to do our raise in 2015, and that's

3   when --

17:08:06   4       **THE COURT:**  Where is the $20 million valuation?

17:08:09   5       **MR. MEAGHER:**  Two million dollars for 5 percent of the

6   company is $20 million valuation.

17:08:16   7       **THE COURT:**  All right.

17:08:20   8       **MR. MEAGHER:**  That's how it's done in my business.

17:08:30   9       **THE COURT:**  That measurement -- or to be cool like

10   kids now days, metric -- is an approximation.

17:08:44   11       **MR. MEAGHER:**  Correct.

17:08:45   12       **THE COURT:**  If you look at whatever Chevron's selling

13   for, and you multiply that times the number of outstanding

14   shares, you get a market valuation.  Your shares never traded.

17:09:00   15       **MR. MEAGHER:**  There were no shares.

17:09:02   16       **THE COURT:**  Well, then the market valuation approach

17   does not apply to a single- or two-person transaction.

17:09:16   18       All right.  What else?

17:09:23   19       **MR. MEAGHER:**  I just ask the Court, again, that these

20   people have limited information.  They're far away.  It's going

21   to cost tens of thousands of dollars to get pretty much nothing.

22   But if that's what we have to do, I guess it's what we have to

23   do.

17:09:36   24       If there's any way this Court could find a way of

25   doing it without lawyers flying out to California and

1    New York City or flying people down here and paying for their

2    hotels and their flights and their time, which would all be on

3    me, I would hope the Court might be able to help us.  They did

4    last time by letting Mr. Lindell -- them give Mr. Lindell 12

5    questions, and he's filling them out right -- with his lawyer.

17:09:59 6        He has more to say than the other two parties.  I

7    would think that that might be, also, a solution we could do

8    with Mr. Schupak and Mr. Birch, where they would answer any

9    questions they have and maybe not even limit the questions.

17:10:13 10       **THE COURT:**  Well, Ms. Fuller cannot make decisions

11   based on a statement that she hasn't seen.  If the statement is

12   thorough and rigorous and complete, she may say, "We don't need

13   him," but you got to produce something.

17:10:37 14       **MR. MEAGHER:**  We have produced e-mails --

17:10:38 15       **THE COURT:**  No.  She will want to go, thoroughly,

16   through all the assumptions that are in answers he would have

17   put in an affidavit -- that he will put in an affidavit.  This

18   is not Charlie says it's okay --

17:10:59 19       **MR. MEAGHER:**  Understood.

17:11:00 20       **THE COURT:**  -- and -- anything else?

17:11:17 21       **MR. MEAGHER:**  Just appeal to you, again, to try and

22   limit the cost for us on this one.

17:11:20 23       **THE COURT:**  Well, I don't want HEB to have more cost

24   than is absolutely necessary.

17:11:27 25       **MR. MEAGHER:**  Then this makes no sense because these

1   people don't have anything to offer this case at all.

17:11:33  2        THE COURT:  Mr. Meagher, I'll -- I'm afraid that I'll

3   make the decision about whether it's sensible or not.

17:11:40  4        MR. MEAGHER:  I won't trouble you with anything else.

5   That's all I had to say.

17:11:43  6        THE COURT:  I, generally, don't like depositions or

7   interrogatories or requests for production.  So you have to earn

8   them around here.

17:12:00  9        Yes, ma'am?

17:12:00 10        MS. CAYCE:  Your Honor, I believe that Mr. Pate's on

11  top of the -- has communicated with Mr. Lindell.  They will have

12  the answers this week early -- I will try to get it before

13  Friday.  He's tied up.  Tomorrow's a big day for him, and --

14  that election thing we have, the midterms.

17:12:17 15        THE COURT:  The big day for all of us.

17:12:19 16        MS. CAYCE:  For all of us, yeah.

17:12:21 17        So maybe -- maybe there's a little ray of hope that we

18  can work out from his answers and maybe try to negotiate on the

19  other two or give it a shot at an affidavit --

17:12:30 20        THE COURT:  He's got to do it.

17:12:32 21        MS. CAYCE:  No, he is.  No.  I mean, we'll get the

22  answers to them.  He is doing it.  I mean, we've sent them --

17:12:38 23        THE COURT:  Tomorrow's Tuesday.  That still leaves a

24  bunch of --

17:12:41 25        MS. CAYCE:  Right.  No, it will be done.  It will be

1    done as soon this week as possible.  We're not intentionally

2    sitting on it till Friday.

17:12:47  3        But maybe we can have -- you know, we didn't do so

4    well at trying to settle the case.  Maybe we can negotiate on

5    the discovery given the parameters that we've just laid out --

17:12:57  6        **THE COURT:**  Well, no, if he asks for something --

7    remember, he has no free will in this -- and you think it's more

8    than what's reasonably useful, talk to him about it, but he gets

9    to decide, and if he really gets outlandish, then you can move

10   to quash the request.

17:13:24  11       The trouble is I never know what witnesses are going

12   to say.  I practiced long enough to have several clients whose

13   testimony in court was nothing like they told me it was.  So if

14   I were in charge of the state bar, first, I would make a rule

15   that you can double your fee to any client who lies to you, and

16   then I'd abolish the rest of it.

17:14:00  17       *(Sotto voce discussion between the Court and law clerk.)*

17:14:05  18       **THE COURT:**  So I think that exhausts what we can do

19   this afternoon.

17:14:10  20       **MR. POWERS:**  Your Honor, may I just confirm:  You

21   asked us to wait a week so you can look at the pending motions

22   before we begin scheduling discovery?  Is that --

17:14:19  23       **THE COURT:**  Right.  To -- or wait till you hear, but

24   if we say a week, it puts the pressure on me.

17:14:30  25       Did -- and by then you may have seen all this other

1    stuff, and so be reasonably prepared, and send me -- what's the

2    man's name, Cladell [sic]?

17:14:45  3              **MS. CAYCE:**  Lindell.

17:14:46  4              **THE COURT:**  Lindell.

17:14:47  5              I'm -- it's her person.  So I'm going to let her send

6    it to me.

17:14:51  7              And don't file it.  Just send it to Glenda.

17:14:55  8              **MS. CAYCE:**  Okay.

17:14:57  9              **THE COURT:**  Put a note in there, "The judge said to do

10    this" --

17:14:59 11              **MS. CAYCE:**  Okay.

17:14:59 12              **THE COURT:**  -- otherwise, she'll make you eat it.

17:15:14 13              I'll get to that.  If I have questions, I'll holler at

14    you again.

17:15:21 15              Now, your wife's in Dallas?

17:15:23 16              **MS. CAYCE:**  Yeah.  We -- I live -- we live in Dallas.

17:15:25 17              **THE COURT:**  You live in Dallas.

17:15:31 18              And the expert lives in Dallas?

17:15:34 19              **MS. CAYCE:**  No.  You met my wife, Judge, in chambers

20    the first day we came to meet with you.

17:15:39 21              **THE COURT:**  No.  I mean --

17:15:41 22              **MR. MEAGHER:**  We came together.

17:15:42 23              **THE COURT:**  -- the technician that --

17:15:42 24              **MS. CAYCE:**  The expert.

17:15:44 25              **MR. MEAGHER:**  Oh, the expert.

17:15:45   1          **MR. POWERS:**  Mr. Claywell, as I understand it, lives

2      in the League City area.

17:15:48   3          **MR. MEAGHER:**  Yeah.  He lives around here.

17:15:51   4          We're -- we don't intend on calling Mr. Claywell as a

5      witness.

17:15:55   6          **THE COURT:**  In fact, she'll have you over to the

7      house, and y'all can go swimming and ask some questions and just

8      jump back in the pool.

17:16:02   9          **MS. CAYCE:**  Yeah.  And we may resolve it, if we're not

10     going to call -- but we'll give it a try to work it out.  How

11     about that?

17:16:08  12          **THE COURT:**  All right.  So I'll work on the pending

13     stuff.  You-all do your best interpretation of what I just said.

14     We'll do it with the order, but if you remember something I told

15     you to do that's not in the order, do it.

17:16:23  16          **MS. CAYCE:**  Okay.

17:16:23  17          **THE COURT:**  Anything else, sir?

17:16:25  18          **MR. MEAGHER:**  No, sir.

17:16:26  19          **THE COURT:**  All right.  Thank you, Counsel.

17:16:28  20          **MR. POWERS:**  Thank you, Your Honor.

17:16:28  21          *(Proceedings concluded at 5:16 p.m.)*

22                              -o0o-

23          I certify that the foregoing is a correct transcript

24     from the record of proceedings in the above matter.

25     Date:  November 13, 2018     */s/ Heather Alcaraz*
                                     Signature of Court Reporter

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HEB GROCERY COMPANY, LP, | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO.: 4:17-CV-02810 |
| TODD MEAGHER, IRENE ALEXIS | § | |
| MEAGHER and MYSTORE, INC., | § | |
| Defendant. | § | |

**MICHAEL LINDELL AND MIKE LINDELL PRODUCTS, LLC'S**
**RESPONSES TO DEFENDANTS' CROSS INTERROGATORIES**

To:   Plaintiff, HEB Grocery Company, LP, by and through its counsel, Louis T. Pirkey and Tyson
D. Smith, Pirkey Barber PLLC, 600 Congress Avenue, Ste. 2120, Austin, TX 78701; and
Jason M. Powers, Stephanie Miller Noble, Vinson & Elkins, LLP, 1001 Fannin St., Ste. 2500
Houston, TX 77002; and

Defendants Todd Meagher, Irene Alexis Meagher And Mystore, Inc., Gary L. Pate,
Thompson, Coe, Cousins & Irons, LLP, One Riverway, Suite 1400, Houston, Texas 77056

Michael Lindell and Mike Lindell Products, LLC (collectively, "Respondents") serves the

following Responses to Defendants' Cross Interrogatories.

**GENERAL OBJECTIONS**

1.   Respondents object to all individual requests to the extent they call for information protected

by the attorney-client privilege, the attorney work product doctrine, joint defense privilege, or

any other applicable privilege or protection ("Applicable Privilege"). To the extent that the

Interrogatories call for information protected by an Applicable Privilege, Respondents hereby

claim such Applicable Privilege and invoke such protection. The fact that Respondents do

not specifically object to an individual request on the ground that it seeks such privileged or

protected information shall not be deemed a waiver of the protection afforded by the

Applicable Privilege.

2. Respondents object to the Interrogatories to the extent that they seek the discovery of sensitive and confidential business, financial and/or proprietary information of Respondents or any third party.

3. Respondents have exercised due and reasonable diligence in responding to the Interrogatories and Respondents reserve the right to supplement or amend any and all parts of the responses provided herein should new information be discovered.

Subject to the foregoing General Objections, Respondents answer the Interrogatories as follows:

## CROSS-INTERROGATORIES

**INTERROGATORY NO. 1:**
In your response to HEB's Interrogatory No. 3 you stated, "Nick Meagher received the initial email from Respondents inquiring about the purchase of the MyStore.Com domain." Did Nick Meagher respond to that email? Was Nick Meagher part of the negotiations or involved in sale of the mystore.com domain name?

**ANSWER:**

In response to HEB's Interrogatory No. 3 Respondents stated "Upon information and belief, Nick Meager received the initial email from Respondents inquiring about the purchase of the MyStore.COM domain." (Emphasis added).   Nick Meager did not respond to that email.   Todd Meagher responded to that email as stated in our response to Interrogatory No. 4.   Nick Meagher was never involved in the negotiations for or involved in sale of the mystore.com domain name.   All such matters were between Respondents and Todd Meagher.

**INTERROGATORY NO. 2:**

In your response to HEB's Interrogatory No. 4 you stated, "Todd Meagher represented that he had over $1 million invested in MyStore.com and its associated technology, but would be willing to sell for $800,000." What do you contend Meagher would be willing to sell for $800,000?

**ANSWER:**

The MyStore.com domain name.

**INTERROGATORY NO. 3:**
In your response to HEB's Interrogatory No. 4 you stated, "Meagher agreed to reduce his price to $400,000." What is your understanding of why Todd Meagher agreed to reduce his price?

**ANSWER:**

Because he did not have a registered trademark on MyStore.COM.

**INTERROGATORY NO. 4:**
In your response to HEB's Interrogatory No. 4 you stated, "Meagher agreed to reduce his price to $400,000 and include the MyStore social media user names and source codes that Meagher had developed for MyStore.com and its associated IOS and Android mobile applications." Do you contend that Meagher included the social media user names, the source codes that Meagher developed for MyStore.com and its associated IOS and Android mobile applications as part of the $400,000 sale price for the domain name MyStore.com?
**ANSWER:**

No. He agreed to throw in the social usernames and non-exclusive use of his source code after we

agreed on the $400,000 price for the domain name www.mystore.com.

**INTERROGATORY NO. 5:**
During the negotiations for the sale of the domain name MyStore.com, who raised the question about whether Meagher had a trademark for MyStore and how did it impact the price for the domain name sale?

**ANSWER:**

Respondents did. Because the domain name was no longer protected by a registered trademark and

involved in pending litigation, we demanded a lower price.

**INTERROGATORY NO. 6:**
Were you aware that Todd Meagher previously had a registered trademark for the words MyStore and MyStore.com?

**ANSWER:**

Yes.

**INTERROGATORY NO. 7:**
If Todd Meagher had the trademark MyStore or MyStore.com, would you have agreed to the original price of $800,000?

**ANSWER:**

Yes.  With the registered trademark MyStore or MyStore.COM, I believe the domain would be worth between $800,000 and $1,600,000.

## VERIFICATION

As to the Answers:

STATE OF MINNESOTA       )
                                              )SS
COUNTY OF CARVER       )

Mike Lindell Products, LLC

Dated: 12/14/18

By _____
Michael J. Lindell, President

_____
Michael J. Lindell

_____
Notary Public

My commission expires  Jan 31, 2021

As to the objections:

_____
Joseph Springer
General Counsel | My Pillow, Inc.
343 East 82nd Street, Suite 100 |
Chaska, MN | 55318
(952) 826-8603
jspringer@mypillow.com
**ATTORNEY FOR MICHAEL LINDELL
AND MIKE LINDELL PRODUCTS, LLC**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been served on all counsel of record on this 1st day of December, 2018, as follows:

*Via Email*
Louis T. Pirkey
Tyson D. Smith
Pirkey Barber PLLC
600 Congress Avenue, Ste. 2120
Austin, TX 78701

*Via Email*
Jason M. Powers
Stephanie Miller Noble
Vinson & Elkins, LLP
1001 Fannin St., Ste. 2500
Houston, TX 77002

*Via Email*
Gary L. Pate
Thompson Coe Cousins & Irons, LLP
One Riverway, Suite 1400
Houston, Texas 77056

Joseph G. Springer

# EXHIBIT 4

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3  HEB GROCERY COMPANY, LP       )      NO. 4:17-CV-2810
                                  )
 4                                )
    VS.                           )      Houston, Texas
 5                                )      10:35 a.m.
                                  )
 6  TODD MEAGHER, ET AL           )      December 4, 2019

 7

 8      *********************************************************

 9                           HEARING

10           BEFORE THE HONORABLE LYNN N. HUGHES

11              UNITED STATES DISTRICT JUDGE

12                       VOLUME 1 OF 1

13
        *********************************************************
14
    APPEARANCES:
15
    FOR THE PLAINTIFF:
16
         Mr. Jason Michael Powers
17       Ms. Allison Lee Fuller
         Vinson Elkins LLP
18       1001 Fannin
         Suite 2500
19       Houston, TX 77002-6760
         Tel:  713-758-2522
20       Email: Jpowers@velaw.com
                Afuller@velaw.com
21
         Mr. Travis Wimberly
22       Mr. Tyson David Smith
         Pirkey Barber PLLC
23       1801 East 6th Street
         Suite 300
24       Austin, TX 78702
         Tel:  512-334-8497
25       Email: Twimberly@pirkeybarber.com
                Tsmith@Pirkeybarber.Com
```

```
 1  FOR THE DEFENDANTS:

 2       Mr. Gary Leonard Pate
         Thompson Coe Cousins & Irons LLP
 3       One Riverway
         Suite 1400
 4       Houston, TX 77056
         Tel:  713-403-8210
 5       Email: Gpate@thompsoncoe.com

 6       Ms. Karen Bryant Tripp
         Attorney at Law
 7       PO Box 1301
         Houston, TX 77251-1301
 8       Tel:  713-658-9323
         Email: Ktripp@tripplaw.com
 9
    COURT REPORTER:
10
         Ms. Kathleen K. Miller, CSR, RMR, CRR
11       515 Rusk, Room 8004
         Houston, Texas  77002
12       Tel:  713-250-5087

13  Proceedings recorded by mechanical stenography.
    Transcript produced by computer-assisted transcription.
14
```

10:34:59  15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S

 2               THE COURT:  Thank you.  Please be seated.  Good

 3 morning.

 4               MR. POWERS:  Good morning, Judge.

10:35:07  5               MR. PATE:  Good morning, Your Honor.

 6               THE COURT:  Is Mr. Meagher going to join us?

 7               MR. PATE:  Mr. Meagher cannot be here today.

 8 He resides in Dallas.

 9               THE COURT:  I'm sorry.  I hope they get care

10:35:29 10 packages to them this year.

11                    All right.  Mr. Pate, would you like to

12 explain why Mr. Meagher shouldn't pay half the cost of the

13 deposition?

14               MR. PATE:  I believe under the federal rules,

10:36:01 15 as far as an expert goes, that the Court could rule that he

16 pays 50 percent of the deposition of the expert.

17               THE COURT:  For misbehaving at a deposition, I

18 can order the entire cost of the deposition, the cost of

19 their lawyers, and anything else that would be

10:36:26 20 compensatory.

21               MR. PATE:  Your Honor, there was no misbehavior

22 at the deposition.  I have taken depositions for 20 years,

23 and done hundreds and hundreds of depositions, and this

24 deposition was not suspended.  We did not call the Court

10:36:42 25 because of any misbehavior.  They have not cited any
</pre>

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 misbehavior to me.  And, therefore, I don't believe there

2 was any misconduct whatsoever.

3           THE COURT:  Well, do you have a copy of the

4 whole thing?

10:37:01    5           MR. POWERS:  Your Honor, I'm sorry, I don't

6 have a copy of the transcript of the deposition with me.  I

7 don't know if any of my -- I am afraid we don't, Your

8 Honor.  We have submitted one to the Court, but I have not

9 brought it with me today.

10:37:11   10           THE COURT:  You can't do that.  You can't send

11 stuff to me and then pretend you don't know anything about

12 it.

13           MR. POWERS:  My apologies, Your Honor.

14           MR. PATE:  Your Honor --

10:37:18   15           THE COURT:  Otherwise, I will start sending you

16 stuff.  Other people's cases.  Want to get rid of it, send

17 it to Powers.

18           MR. PATE:  Your Honor, I would like to ask the

19 Court for five minutes just to kind of give an overview of

10:37:32   20 where we are in this case, where the case stands, and what

21 I think needs to be accomplished, if the Court would permit

22 that.

23           THE COURT:  Without abandoning the current

24 question.

10:37:45   25           MR. PATE:  Sure.  We can come back and revisit

1  that.  Thank you, Your Honor.

2          THE COURT:  Certainly.

3          MR. PATE:  Basically, what I would like to show

4  the Court, what this case is not about, it's not about

10:37:57  5  this.  This -- HEB has over 300 grocery stores in the State

6  of Texas and in Mexico, and this is not about this mark.

7  It is about this mark.

8          This is the mark in question.  They have

9  pled that we have infringed upon this mark, and abused this

10:38:19  10  mark, and they have zero evidence that we have ever used

11  this mark.  This mark pertains to not grocery stores all

12  across the State of Texas, one grocery store, Hispanic

13  grocery store in South Texas, and one Hispanic grocery

14  store on I-45.  Now, what they're -- trademark right --

10:38:40  15          THE COURT:  Now -- wait a minute.

16          MR. PATE:  Yes, sir.

17          THE COURT:  Where on 45 is it?

18          MR. PATE:  I believe it's north on 45, in the

19  area of, perhaps, the airport.

10:38:52  20          THE COURT:  From here 45 is mostly north.

21          MR. POWERS:  That is right, Your Honor.  As one

22  is north on 45, around -- north of the loop.  And there is

23  one on the Pasadena side, so the southeast side of the

24  Houston area.

10:39:07  25          MR. PATE:  So this is the trademark --

1          THE COURT:  Which one is in The Valley?

2          MR. PATE:  Pardon me?

3          MR. POWERS:  I think Mr. Pate misspoke.  There

4  is not one in The Valley, Your Honor.

10:39:14   5          THE COURT:  The one in The Valley moved to

6  Pasadena.

7          MR. PATE:  Two grocery stores is all they have

8  in the general Houston area.  One in South Houston and one

9  up by the airport.  This is the trademark we're talking

10:39:25  10  about.

11              This is their lane of traffic.  This is

12  retail grocery store services.  This is what they have

13  legitimate rights to perfect protection to under this.

14  This is why we have Delta Airlines and Delta Faucets.

10:39:40  15  They're in two different lanes of traffic.  We are in a

16  different lane of traffic altogether with social networking

17  than retail grocery services.

18          THE COURT:  Does this one include the

19  composition of the words?

10:39:58  20          MR. PATE:  Competition of the words?

21          THE COURT:  Composition.

22          MR. PATE:  Composition of the words.  Yes.

23          THE COURT:  They are written in what looks like

24  pretend woodblock cut with a Northern Aztec sun.

10:40:15  25          MR. PATE:  Right.

 1              THE COURT:  Mr. Powers --

 2              MR. PATE:  It has --

 3              THE COURT:  Mr. Powers, I just made that up

 4  about the Aztec sun.

10:40:21   5              MR. POWERS:  Your Honor managed to hit it

 6  exactly on target, as it happens.

 7              MR. PATE:  And so they use that.  You can see

 8  here that they use this Aztec sun, this design mark on

 9  their products, on their store.  There are only two of

10:40:39  10  these stores.

11              THE COURT:  I was kidding about it being Aztec.

12              MR. PATE:  I thought it was an Aztec sun, too.

13  Mr. Alonzo calls it the Northern Sun.

14              And so they have pled that we have

10:40:52  15  infringed upon their mark.  We have never used it.

16              THE COURT:  Wait a minute.

17              MR. PATE:  Yes.

18              THE COURT:  Where is a picture of what you did

19  do?

10:40:58  20              MR. PATE:  What we used?

21              THE COURT:  All right.  I hope you are not

22  marketing to old people, because would you bring it around

23  so I --

24              MR. PATE:  And this is a screenshot from our

10:41:31  25  website and Your Honor can see that we don't even use the

1 word "Mi Tienda" on here anywhere.  We don't use their

2 mark.  We never have used their mark.

3          THE COURT:  Can you read that?

4          MR. PATE:  It is hard to read.

10:41:56   5          THE COURT:  Does it say "MyStore" or something

6 on here?

7          MR. PATE:  Out here, I believe.  Let me grab my

8 glasses.  One second, Your Honor.

9          THE COURT:  I have mine if that will help.

10:42:14   10          MR. PATE:  I'll show you where it says

11 "MyStore."

12          THE COURT:  I see the word "store" up here.

13          MR. PATE:  Yeah.  "My" in a little shopping

14 bag, and "Store" next to it.  And this is their mobile app.

10:42:33   15          THE COURT:  Does it say, "MyStore"?

16          MR. PATE:  I'm sure it does.  Yes.  Right here.

17 MyStore, that little shopping bag.

18          THE COURT:  How about that telephone?

19          MR. PATE:  Down here on the telephone, I

10:42:53   20 believe -- this is blurry.  I believe it says "MyStore"

21 right there at the very first word.

22          THE COURT:  No.

23          MR. PATE:  That does not say "MyStore."

24          THE COURT:  It says -- the last two letters

10:43:14   25 appear to be "JI" or "JL."  It looks like it starts with an

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  upper case "M."  Conceivably it might be one secured by

2  this button.

3            MR. PATE:  It could be.

4            THE COURT:  But underneath it could say

10:43:47  5  "MyStore."

6            MR. PATE:  And, Your Honor, does this say

7  "MyStore"?  What we need is a young person.

8            THE COURT:  Do they learn to read these days?

9            MR. PATE:  Yes, they do.  They're incredibly

10:44:03  10  smart.

11            THE COURT:  I am willing to say with 87.4

12  percent certainty that that does not say "MyStore," the

13  blue type above the bottom two buttons.

14            MR. PATE:  Oh, okay.  It's so blurry.

10:44:17  15            THE COURT:  Yeah.  I am not sure what --

16            MR. PATE:  It is hard to tell.

17            THE COURT:  -- it says.

18            MR. PATE:  But that is what our -- our web page

19  looks like, Your Honor.  And I'll show you a little more

10:44:33  20  clearly, this is what our application looks like, and you

21  can see the font, and what MyStore looks like there.  You

22  can see our lane of traffic.

23            THE COURT:  Are you doing the words stuck

24  together?

10:44:47  25            MR. PATE:  Yes, together.

1            THE COURT:  And --

2            MR. PATE:  Yes.

3            THE COURT:  -- in Roman type --

4            MR. PATE:  Yes.

10:44:53   5            THE COURT:  -- with the "M" and the "S"

6   capitalized.

7                MR. PATE:  Right.

8            THE COURT:  Because the transcript doesn't have

9   a picture of that.

10:45:00   10            MR. PATE:  Right.  And then you can see our

11   lane of traffic is completely different than retail grocery

12   services, completely different for our description.

13                You have also seen, Your Honor, that we

14   recently filed a survey with the Court where we conducted a

10:45:21   15   survey of -- a typical survey is 500 people polled.  This

16   did 651 people polled, within a five-mile radius of these

17   two stores.  Even though they allege in their pleading that

18   their mark is famous across Texas, the Mi Tienda mark is

19   famous somehow across Texas, we didn't poll all of Texas.

10:45:42   20   We polled within a five-mile radius of the two stores, and

21   it came out with no confusion whatsoever between the two

22   distinctive presentations of MyStore and the Mi Tienda.

23                We believe that there is no likelihood of

24   confusion whatsoever, and that we are in two different

10:46:04   25   lanes of traffic.  If there is an argument, and I am sure

1  that they will argue that there is some intersection in the

2  two lanes of traffic, well, that creates a genuine issue of

3  material fact, and we think this should go to the jury.  We

4  think it is a very easy jury trial of one day, on the

10:46:24   5  record, on the public record, on the filings, and --

6              THE COURT:  Everything we have done is --

7              MR. PATE:  The presentation --

8              THE COURT:  -- in the record.

9              MR. PATE:  I'm sorry, Your Honor?

10:46:31  10              THE COURT:  Everything we have done is in the

11  record, which reminds me, I would like to remind counsel

12  that this room is wired.  And if you would like to confer

13  with each other in this room, if you'll just ask we will

14  turn it off.

10:46:54  15              MR. PATE:  Okay.  Thank you, Your Honor.

16              THE COURT:  But it --

17              MR. PATE:  But the survey showed zero

18  confusion.  And they will allege, Well, we have produced

19  this late and whatnot.  They asked us specifically if we

10:47:08  20  would produce this survey.

21              THE COURT:  They didn't ask you to do it.  They

22  asked to see what it said.

23              MR. PATE:  Right.  But, we did it.  And -- or

24  it was done.  We produced it to the other side, and

10:47:22  25  therefore, we have filed it as a supplement to our summary

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 judgment record showing that there is no likelihood of

2 confusion.

3           In this case they have sued Todd Meagher

4 and Alexis Meagher in their individual capacities, although

10:47:42  5 they have never pled alter ego or shown that they are

6 liable in their individual capacities.  Nor Alexis Meagher,

7 Todd's wife, filing a trademark application, that is not

8 trademark infringement because that is not used in

9 interstate commerce, the mere clerical act of filing this.

10:48:03  10           So we don't believe that they have a case.

11 We don't believe --

12           THE COURT:  He in -- in Mr. Meagher's earlier

13 narratives, she was in charge of the business.  She wasn't

14 in charge of it.  She did something else in the business,

10:48:18  15 and without being in charge of it.  The record has his

16 admissions that she was active in the business, and I

17 actually don't know how active she was, or the extent to

18 which she was simply using her name.

19           MR. PATE:  Sure.

10:48:36  20           THE COURT:  But that is her problem.

21           MR. PATE:  Well, the record will clearly

22 show -- the record is very clear that he set up the

23 business, MyStore, Inc., for his wife to give her this --

24 this business; however, they ended up getting sued, and so

10:48:50  25 he's dissolved the business right away without it producing

1 a single dollar of revenue.

2         THE COURT:  If you dissolve it afterwards, it

3 doesn't erase what you did in the first place.

4         MR. PATE:  Right.  But what they're --

10:49:02  5         THE COURT:  They don't have -- it's like New

6 York City --

7         MR. PATE:  Right.

8         THE COURT:  -- I guess it is, or New York

9 state, when their gun possession case got to the Supreme

10:49:12  10 Court, they changed the law and said, Never mind, this case

11 is moot.

12              It's called the Capable of Repetition

13 Doctrine.

14         MR. PATE:  But -- and Your Honor is right.

10:49:26  15 When the business was in existence for the short duration

16 it was in business, it never did a dollar's worth of

17 business, never used the trademark in interstate commerce,

18 therefore neither Alexis Meagher nor MyStore, Inc., could

19 be liable.

10:49:39  20         THE COURT:  The trademark was never used on the

21 Internet?

22         MR. PATE:  Now, that's a different matter.  On

23 a social media platform, MyStore mark was used.

24         THE COURT:  It is interstate commerce.

10:49:52  25         MR. PATE:  Right.  MyStore was used on an

1 Internet platform, but not -- that platform was not owned

2 by Alexis; that platform was not owned by MyStore, Inc.;

3 and so Alexis and MyStore should be dismissed out of this

4 action.

10:50:07  5         THE COURT:  Wait a minute.  Who used it on this

6 Internet?

7         MR. PATE:  It would have been used by a company

8 called GHER Solutions, Inc., which owned the platform which

9 used -- which used the MyStore mark.

10:50:19  10        THE COURT:  And it -- and did Mr. Meagher sue

11 them for using his mark without permission?

12        MR. PATE:  The platform would not be liable

13 based on the Consumer Decency Act because a media platform

14 such as Facebook is not liable for what users put on -- on

10:50:45  15 the platform.

16        THE COURT:  You said the platform put it up

17 there.  If Google posts -- itself posts something which

18 violates somebody's trademark, they're liable for it.  What

19 Google is not liable for is what people like you and me

10:51:06  20 post.  But if Google puts it -- if Google has some page,

21 and it makes assertions as opposed to simply being Western

22 Union -- that was a telegraph company for 150 years or so.

23 Finally last year it went out of business entirely.

24        MR. PATE:  But I think that the critical point

10:51:42  25 is that Todd Meagher, Alexis Meagher did not sell any

1  products that used their infringing mark, and therefore

2  they are not liable.

3            THE COURT:  No.

4            MR. PATE:  And if you take the two separate

10:51:58   5  marks --

6            THE COURT:  I don't think HEB has to wait until

7  a Meagher says it clouded the pool of what MyStore is

8  before they bring suit.

9                 Mr. Meagher testified at some length about

10:52:17  10  what could be sold.  We even had some discussion that you

11  would agree not to sell anything in consumer units or

12  something.  I don't think that ever came to fruition.  But

13  that was one of the proposals that you -- Mr. Meagher would

14  limit the use of MyStore to something.  And it would have

10:52:42  15  to be sufficiently distinct from the multitude of things

16  that HEB does.

17            MR. PATE:  Right.

18            THE COURT:  But if they want to start selling

19  car parts through MyStore --

10:52:54  20            MR. PATE:  Right.

21            THE COURT:  -- I think that's fine, but that's

22  not what he said they were wanting to do.  They wanted to

23  sell everything.

24            MR. PATE:  Well, I think Mr. Meagher in one of

10:53:06  25  those proposals that you have seen that we had submitted to

1    the Court has said that MyStore never intends to sell

2    grocery products on MyStore portals.

3             THE COURT:  He may have, but my recollection is

4    he had grander visions where it would do all kinds of

10:53:26   5    things.  He's talked a lot in the record.

6             MR. PATE:  And he has.  And he has sold now the

7    domain name MyStore.com and MiTienda.com to Mike Lindell of

8    Mike Lindell Products and Mike Lindell currently is using

9    that domain name MyStore.com to introduce new upstart

10:53:51  10    entrepreneurs to the market to give them kind of a leg up,

11    and an introduction into the marketplace.  Doing wonderful

12    things with that domain.

13             THE COURT:  Wait a minute.  Wait a minute.

14                  So Lindell is using it for entrepreneurs

10:54:05  15    to market what?

16             MR. PATE:  Their new inventions that they're

17    bringing to the market.  It's a fascinating website.

18             THE COURT:  And there is nothing about that

19    that doesn't mean tomorrow he won't start selling potato

10:54:29  20    chips, and canned soup, and all that stuff.

21             MR. PATE:  But if you look at that website, and

22    I looked at it as recently as yesterday --

23             THE COURT:  No.  Now, in -- does HEB have all

24    the records of that transfer?

10:54:49  25             MR. PATE:  Yes.  We have produced the --

1                    THE COURT:  Including --

2                    MR. PATE:  -- whatever records there were.

3                    THE COURT:  Including the deposit to Meagher's

4  account of the fees that the new owners paid?

10:55:02    5        MR. PATE:  I don't recall because that was

6  months and months ago.

7                    THE COURT:  It was after the suit was filed.

8                    MR. PATE:  Right.

9                    THE COURT:  And after we all talked about this

10:55:13   10  gentleman.

11                   MR. PATE:  And I believe --

12                   THE COURT:  So where is the evidence of bona

13  fide transfer for value received sort of stuff?

14                   MR. PATE:  Right.  And I believe we were here

10:55:22   15  in this courtroom, and I e-mailed them all of the

16  documentation that I had concerning that transaction.

17                   THE COURT:  I don't --

18                   MR. PATE:  Just to make sure.

19                   THE COURT:  Mr. Pate, I am not worried about

10:55:32   20  what you have.  I worry about what is out there.

21                   MR. PATE:  Right.

22                   THE COURT:  And if he sold the mark to this

23  gentleman, there is a deposit somewhere.

24                   MR. PATE:  Uh-huh.

10:55:43   25        THE COURT:  Whether it's in his or Irene's

1  account, or MyStore's account, whatever.  He's got a

2  MyStore, Inc., right?  And did -- was that sold?

3               MR. PATE:  Was the domain name sold?

4               THE COURT:  No.  MyStore, Inc. is not a domain

10:56:11  5  name.

6               MR. PATE:  No.

7               THE COURT:  MyStore, Inc. is a corporation.

8               MR. PATE:  MyStore, Inc. was dissolved with a

9  certificate -- with the Secretary of State.  But I think

10:56:20  10  the key point is you look at the MyStore website that Mike

11  Lindell currently operates, and if you look at the MyStore

12  website that we operated at the time, nobody would go to

13  that with the impression that this is where I go to buy Mi

14  Tienda groceries from one of the two grocery stores in

10:56:39  15  Houston.  There would not be that confusion.

16               And I agree with them that actual

17  confusion is not an element.  It is not required.  Although

18  it is one of the digits of confusion, whether there has

19  been actual confusion, or there has been none, but you look

10:56:55  20  at the other digits --

21               THE COURT:  But your client -- there has been

22  no actual confusion --

23               MR. PATE:  Right.

24               THE COURT:  -- with customers because your

10:57:04  25  client has variously said it's worth $100 million, and it's

1 done no business, and he has given all the -- at one time

2 he was just warming up, getting all these contacts, and

3 then he had to release them all because of security or --

4 didn't follow it all, by memory.  If I reread it, I

10:57:29  5 probably would again.

6                But, again, HEB doesn't have to wait until

7 you launch your $40 million advertising campaign for foie

8 gras and other delicacies.

9                MR. PATE:  Your Honor, if I am following your

10:57:55  10 argument, and I think I am, you -- I believe that your

11 argument is, Well, HEB doesn't have to wait around, or Mi

12 Tienda doesn't have to wait around until somebody on a

13 MyStore.com domain name or MyStore.network domain name

14 starts advertising grocery-related products of some kind.

10:58:17  15 They can sue you in anticipation of that.

16                And my answer to that is, they -- that's

17 speculative.  I mean, who knows what on Google somebody is

18 going to --

19                THE COURT:  No.

10:58:30  20                MR. PATE:  -- or YouTube somebody is going to

21 put up tomorrow.  It's not infringement until it's used in

22 interstate commerce.

23                THE COURT:  I have gotten several answers on

24 this over the last couple of years.  How many strangers,

10:58:46  25 which exclude the gentlemen in California, ever paid to use

1  MyStore?

2              MR. PATE:  How many -- how much traffic has

3  there been on MyStore?

4              THE COURT:  How many customers?  How much

10:59:04  5  customers?  Your customers are vendors.

6              MR. PATE:  Right.

7              THE COURT:  You're -- again, you're Western

8  Union.

9              MR. PATE:  And we produced to them a ream

10:59:14  10  about this thick, at least an inch of traffic.

11             THE COURT:  That's an inch-and-a-half.

12             MR. PATE:  Inch-and-a-half -- you remember the

13  documents better than I do -- of traffic on the social

14  network sites.

10:59:27  15             So my answer to that would be thousands,

16  substantial traffic.

17             THE COURT:  How much did MyStore make by

18  handling that much traffic?

19             MR. PATE:  I think the answer to that, first of

10:59:47  20  all, is not relevant to whether we infringed or not, and we

21  did not.  But the way that this business becomes productive

22  and gains value is not from the amount of money it gets

23  from the traffic but the amount -- the volume of traffic

24  itself.

11:00:08  25             THE COURT:  Yes, Counsel.  But somebody has got

1 to pay the bills.

2             MR. PATE:  Sure.

3             THE COURT:  So if you go on eBay, and there are

4 a couple of others -- when a product is sold over eBay for

11:00:21   5 $100, eBay gets to keep some percentage of it.

6             MR. PATE:  Uh-huh.

7             THE COURT:  And that's -- how else does --

8             MR. PATE:  And there is --

9             THE COURT:  You're suggesting he is running a

11:00:36  10 loss leader as his permanent plan for increasing the value

11 of his company.

12             MR. PATE:  That's the interesting thing about

13 these people who do these Internet startups.  They do

14 Internet startups for years, sometimes not making a dime,

11:00:52  15 to build the traffic, and then they --

16             THE COURT:  I have heard that and I understand

17 it.

18             MR. PATE:  Right.

19             THE COURT:  That -- there is actually a term

11:01:11  20 for it.  The condition where something -- so many people

21 are doing it, you can't not do it.  The QWERTY type

22 alignment on your keyboard.

23             MR. PATE:  Uh-huh.

24             THE COURT:  It -- that layout --

11:01:26  25             MR. PATE:  You mean building algorithms?

1          THE COURT:  No.  We're just -- the layout on

2    your keyboard was specifically done to slow down typing so

3    that the letter arms didn't hit each other.  At the rate I

4    type, there was no problem with that.  But it was so

11:01:44  5    suffused into the culture, that it still hadn't changed, so

6    we are using an 1890 type layout in -- in the modern age.

7          MR. PATE:  Right.

8          THE COURT:  Thus Millennials.

9               My point is, how does Meagher fund this

11:02:10  10   growth?  Because he has got to pay his bills.

11         MR. PATE:  He has investors, or had investors

12   at the time when he was building this, that invested a half

13   million into this to help him build this.

14         THE COURT:  The problem is Mr. Meagher in one

11:02:28  15   short conversation said, They were investors.  They were

16   creditors.  They were friends.  I think there is one more.

17              So how much of the money on the sale of Mi

18   Tienda went to the investors?

19         MR. PATE:  I don't know the answer to that, and

11:02:52  20   I don't want to guess.  But there were substantial

21   investors.  There was Julian Lennon, the son of John

22   Lennon, Beetles.  There were other investors that believed

23   heavily in MyStore concept, and brand, and invested in it,

24   and, you know, that helped lead to its success, and its

11:03:15  25   marketability.

1          THE COURT:  My point is he sold the domain name

2    and the entire operation.

3          MR. PATE:  Not the entire operation.  He

4    just -- he just sold the domain name.  That is all he sold.

11:03:28   5          THE COURT:  Okay.  And what's left of the

6    operation other than computers and servers and stuff?

7          MR. PATE:  There is the brand.

8          THE COURT:  The brand?

9          MR. PATE:  Uh-huh.

11:03:40   10          THE COURT:  I thought he sold it.

11          MR. PATE:  No.  Just the domain name.  That --

12   and he was very clear in transferring that domain name, and

13   the documents will show when they transferred it, that that

14   was the only right that they gave was to the domain name,

11:03:57   15   to Mike Lindell Products.

16              But, you know, all of that said --

17          THE COURT:  But what is the domain name?

18          MR. PATE:  The domain name is MyStore.com; and

19   the other domain name which was sold to Mike Lindell

11:04:11   20   Products was MiTienda.com, which Mike Lindell uses as a

21   redirect.  Meaning that when you type that in, it goes

22   straight to MyStore.com.

23              But I think the sum and total of this is

24   that we are in two different lanes of traffic as described

11:04:31   25   by the descriptions of goods and services.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

```
 1              THE COURT:  Okay.  I have got that.

 2              MR. PATE:  Right.

 3              THE COURT:  What I don't have is any clarity

 4   about what is really happening or would happen if HEB went
11:04:41
 5   away.

 6              MR. PATE:  What would happen if HEB went away,

 7   and they should go away.  Summary judgment --

 8              THE COURT:  And how much did he pay?

 9              MR. PATE:  -- should be granted.
11:04:50
10              THE COURT:  How much did he pay for Mi Tienda

11   versus MyStore?

12              MR. PATE:  I don't recall the exact sales

13   figures.

14              THE COURT:  Well, let's get a copy of the
11:05:01
15   documents, and --

16              MR. PATE:  And I have produced those to them.

17   They may remember the sales figures better than I remember

18   the sales figures.  I don't recall the sales figures right

19   offhand.  But the -- the end of the story, if My -- if Mi
11:05:18
20   Tienda and HEB went away, these two -- the -- MyStore.com

21   would continue doing what it's doing, and they would not be

22   in the lane of retail grocery products.  They would -- or

23   services.  They would be out of that lane altogether, as

24   they have always been out of that lane.
11:05:39
25              There is no infringement.  There is no
```

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 crossover.  To the extent that there is crossover, that's

2 an issue for a jury trial, and we are willing to do a

3 one-day jury trial over that issue.

4          THE COURT:  Please don't -- please don't repeat

11:05:54   5 something you have said not --

6          MR. PATE:  Yes, Your Honor.

7          THE COURT:  -- minutes ago, but today.

8          MR. PATE:  Sure.  I just wanted to sum up where

9 we are as we stand here today, Your Honor.

11:06:04  10          THE COURT:  All right.  I think there is

11 somebody else who wants to unsum you.

12          MR. POWERS:  Thank you, Your Honor.  Yeah.  A

13 few notes to clarify some points that Mr. Pate made there.

14              As the Court knows, HEB has grocery stores

11:06:19  15 throughout the State of Texas, and importantly a lot of the

16 food that is sold in those HEB stores are sold through

17 HEB's private labels, the Central Market stores, the HEB

18 brand products.

19              Mi Tienda is a brand name that HEB created

11:06:36  20 to brand two specifically designed grocery stores here in

21 the Houston area that cater to a Hispanic market.  The

22 people who shop in those grocery stores are people who

23 typically speak Spanish, sometimes speak both.  Those

24 stores are specifically designed to cater to the needs of

11:06:55  25 the immigrant or Hispanic population.

1           We also use that same brand because it's

2  become associated with fresh products in that particular

3  cuisine.  We sell products under the Mi Tienda label

4  throughout the HEB chain across the entire State of Texas

11:07:13  5  from The Valley to the Northern District.  And so those

6  products include tortillas, pinto beans, tamales, spices,

7  and things of that nature.  And examples of those products

8  were included in our summary judgment brief, I think

9  Exhibit 24.

11:07:28  10          Because of the breadth of services that we

11  provide under these names, we have trademarked both that

12  design mark that Mr. Pate showed you, as well as the word

13  mark.  Just the words "Mi Tienda" are also patented at the

14  Patent and Trademark Office.  Again, it is not just the

11:07:49  15  retail grocery, and we use these marks throughout the

16  business in a variety of different places.

17          Now, what Mr. Pate contended was that if

18  you were to go to the MyStore.com website, as Mr. Meagher

19  operated, you would never see the words "Mi Tienda."  And,

11:08:05  20  in fact, that is not the case.  We attached to our summary

21  judgment papers -- I think it was Exhibit 25 -- examples of

22  the MyStore website that had the label.  The top logo on

23  the website had been changed from MyStore to Mi Tienda.

24          And in this version of the website -- and

11:08:22  25  we are not sure if the website was actually producing

1  sales.  Mr. Meagher's records are quite poor on this but in

2  that version of the --

3              THE COURT:  Variable and poor.

4              MR. POWERS:  That is correct, Your Honor.

11:08:33  5  The -- we saw different examples of products that were

6  being offered that would fit the sweet spot of what a Mi

7  Tienda customer might be looking for.  They were food

8  products or food related accessories.  There was an olive

9  oil company that was offering products on the website, or

11:08:49  10  at least purported to make them available.  There was a

11  chocolates company.

12              THE COURT:  Italian or Greek olive oil?

13              MR. POWERS:  You know, Your Honor, I am not

14  sure I noticed.  But olive oil, chocolates.  There were

11:09:00  15  some products, a bread slicer device, so some food-related

16  accessories that you would typically see at a grocery

17  store, a strawberry huller, things of that nature.

18                  So one would expect that if Mr. Meagher

19  were to put this website into full operations, individuals

11:09:16  20  who were interested in catering to the same kinds of

21  customers we cater to would be interested in offering their

22  products on that website, and taking advantage of the fact

23  that Mr. Meagher had emblazoned the top of it with the

24  words "Mi Tienda."

11:09:29  25                  Now, Mr. Pate suggests that we are in

1  different lanes of traffic.  Because of that crossover of

2  the products, as it was actually implemented by

3  Mr. Meagher, we see that, in fact, they were crossing over

4  into our lane of traffic.  And to be absolutely clear, the

11:09:45   5  notion that the word mark was applied for in the retail

6  grocery store services lane, so to speak, does not limit

7  what the scope of our trademark rights are.

8              The scope of the trademark rights are, of

9  course -- the registration is one thing, but the scope of

11:10:02   10  the trademark relates to its use.  And our use is broader

11  than just that one description on the trademark.  And the

12  ability to bring a claim for infringement depends on

13  likelihood of confusion with the actual use, not just with

14  the lane of traffic, so to speak, that was strictly

11:10:20   15  indicated on the trademark application.

16              Mr. Pate has referred to a survey that he

17  and his client commissioned.  The survey that Mr. Pate is

18  referring to looks just at this version of the website.

19              Mr. Pate, may I look at your board here?

11:10:38   20          MR. PATE:  Yeah.

21          MR. POWERS:  But the survey showed apparently

22  some survey respondents this version of MyStore.network.

23  You might wonder why it says "MyStore.network" instead of

24  "MyStore.com" for the other versions.  This version of the

11:10:54   25  website was created after this lawsuit began.  In fact,

1 this version of the website was created after Mr. Meagher

2 sold his domain name to Mr. Lindell.  Our understanding

3 from Mr. Meagher's testimony is that they created a version

4 of the website for purposes of trying to pitch Mr. Lindell

5 on the idea that the Meaghers had developed some store

6 technology, some online store technology, that Mr. Lindell

7 could use for the MyStore.com domain name that he had just

8 purchased.

9           Mr. Lindell, of course, already has an

10 active commercial website, an Internet business.  And our

11 understanding from Mr. Lindell is he has no interest in

12 acquiring that technology.  But that is the version that

13 they showed to the survey respondents.

14           They did not show the survey respondents

15 the version that actually says "Mi Tienda."  They didn't

16 show the survey respondents the version that has the

17 chocolates, and the olive oil, and the food products.  They

18 didn't show them anything that has the word "Mi Tienda" on

19 it.  And, in fact, they specifically targeted people who

20 wouldn't be buying those kinds of product.

21           Apparently, according to the survey, they

22 targeted people who were online sellers, the people who

23 want to see that.  They were showing people the backstage

24 version of the website, not something that consumers would

25 see.  And, apparently, they offered the surveys only in

1  English.  Got only -- I think only 13 percent of the

2  respondents were able to speak Spanish.  So if you were

3  trying to design a survey to avoid actually targeting the

4  consumers who are relevant to this case, I don't know you

11:12:28  5  could do much better than what they did.

6                These were individuals who were not aware

7  of the use of the word mark.  There were individuals that

8  were not aware of the products that would be sold, and

9  these are not individuals who were in the target market.

11:12:42  10  And they are certainly not individuals who live throughout

11  the state and who see our Mi Tienda products in our stores.

12                Mr. Pate also, I think, indicated that

13  there is some abusiveness in the way that we have

14  approached the case.  We have tried very hard to make sure

11:12:58  15  that we do this without causing undue difficulty.  Yes, we

16  have sued Mr. Meagher and Mrs. Meagher in their individual

17  capacities and there is a very good reason for that.  It

18  appears that they are the individuals who have run the

19  business.

11:13:11  20                Mr. Meagher and Mrs. Meagher have both

21  filed patent and trademark applications at the Patent and

22  Trademark Office in which they individually had declared

23  that they had used these marks.  So this notion that this

24  is all anticipatory, or speculative, or somehow we have

11:13:26  25  targeted the wrong entities, I strongly disagree with that.

1 This notion that GHER Solutions, the entity that has filed

2 the lawsuit in the Northern District, has always been the

3 real entity involved here.  Well, we deposed Mr. Meagher.

4 We have asked him, Which entity owns these marks, owns

11:13:44  5 these brands?  Because at different times in the past he

6 has told investors the marks and the domain were owned by

7 YourStore.  He then created this MyStore, Incorporated and

8 he said that that entity was going to own it and was going

9 to raise money.

11:13:57  10          He said that the domain name registration

11 was actually originally in his son Nick's name.  His wife,

12 Alexis, filed a trademark application in which she said she

13 would be using the marks.  And I asked him:  Tell me how it

14 is that this domain name or this mark keeps going back and

11:14:15  15 forth from entities like YourStore, LLC, to MyStore, Inc.

16          And his response was:  I am supposed to

17 create some kind of document?  It's all me.  It's all me.

18 I am not going to pay myself.  I am not going to write a

19 contract with myself.

11:14:28  20          So the idea that there are some kind of

21 clear lines of demarkation between entities --

22          THE COURT:  Does that mean he doesn't trust

23 himself?  That's when you would get a contract with

24 yourself.

11:14:37  25          MR. POWERS:  Right.  I think it is very

1 difficult to keep track of what entity he's going to pay

2 attention to on any given day.  So, for that reason, of

3 course --

4          THE COURT:  Who -- I'm sorry.  Who is the

11:14:49  5 plaintiff in the Dallas suit?

6          MR. POWERS:  The plaintiff in the Dallas suit

7 is called GHER Solutions, LLC.  Mr. Meagher indicates in

8 that case that he is the -- I think he was the organizer of

9 the LLC, its principal owner, and its president, I believe,

11:15:06  10 is the office he holds in that.

11          THE COURT:  An LLC has members.

12          MR. POWERS:  Yes, Your Honor.  And I don't

13 think we have gotten a full disclosure of the members, but

14 he acknowledges that he is at least one of them.  He

11:15:17  15 contends that there are others, or at least he has

16 contended that in the Northern District case.  I believe it

17 is not entirely clear that he has contended that in this

18 case.

19              Now, with respect to Mr. Pate's statement

11:15:29  20 that the domain name has been sold to Mr. Lindell, that is

21 correct.  We have received some documents related to that.

22 We have received documents about the sale of the

23 MyStore.com domain name to Mr. Lindell.  We understand that

24 there was subsequently a sale of the MiTienda.com domain

11:15:48  25 name.  We received no documents evidencing that additional

1 sale, or we don't know what amount of money was paid for

2 that or where the money went.  But in any event, what

3 Mr. Lindell is doing, he has set up a website -- it's a bit

4 of a placeholder today -- describing how he plans to start

11:16:06   5 this, I suppose you would call it an incubator for

6 entrepreneurs, that will offer products on the website.

7 Mr. Lindell's name and personality are emblazoned all over

8 it.  It is very clearly tied to his business, and it

9 appears that he does not use the name "Mi Tienda" at all.

11:16:24  10            The business is not yet started, and our

11 understanding is that Mr. Lindell may be waiting for this

12 matter to conclude, but I can't say that for certain.

13            One thing, that once this happened, the

14 domain names were transferred to Mr. Lindell, we thought,

11:16:39  15 Well, surely that means we can all bring this to a close.

16 If Mr. Meagher is getting out of the MyStore business and

17 the Mi Tienda business, that HEB may have no beef with him

18 any longer.

19            It turns out that Mr. Meagher was not

11:16:53  20 willing to agree that he wasn't going to use MyStore or Mi

21 Tienda any longer.  And, in fact, he has created these

22 other websites.  He has created MyStore.network,

23 MiTienda.network, and not entirely sure why.  It would seem

24 that if Mr. Lindell has paid hundreds of thousands to

11:17:12  25 Mr. Meagher, he wouldn't want Mr. Meagher to then go use

1 those same names on additional websites.  So how those two

2 things are coexisting, it is not entirely clear to me, but

3 one might speculate that Mr. Meagher sees value in having

4 standing in this case because he wants to pursue

11:17:27  5 counterclaims against HEB.  So that continues to be an

6 issue.

7           THE COURT:  All right.  Paragraph 7 of

8 Meagher's Response to Management Order, Document 231, is

9 GHER Solutions, LLC, and its predecessor YourStore, LLC,

11:17:52  10 has had several investors who invested in the company, or

11 sites owned by the company, in the form of promissory or

12 convertible debt notes.

13                Have you seen any convertible debt notes?

14           MR. POWERS:  We have seen a number of documents

11:18:14  15 that are unsigned in the form of potential lending to

16 YourStore, LLC.  There was never any clarity about how any

17 of those things got transferred over to the future

18 entities.  And, in fact, one of the investors that

19 Mr. Meagher talks about frequently, a man named Michael

11:18:33  20 Burch from San Francisco --

21           THE COURT:  Would you come over?  The court

22 reporter is straining.

23           MR. POWERS:  Sure.  Would it be easier if I

24 were here?

11:18:40  25           THE COURT:  It would be easier from the

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

 1 lectern.

 2          MR. POWERS:  So, we were never entirely clear

 3 how these investors, if they were investors, how their

 4 interests continued to subsist, if at all.

11:18:53   5          Just as an example, when we took the

 6 deposition of Michael Burch, who is one of the original

 7 lenders back in 2008, and we asked him, You invested on the

 8 strength of this domain name?  And he said, Yes, that's

 9 what he was hoping to -- to invest in.  But then it turns

11:19:10  10 out that Mr. Meagher claims that that entity that he

11 invested in no longer owns the domain name.  How is that

12 possible?  And Mr. Burch didn't understand.  He thought

13 that would have been a breach of duties owed to him, if

14 that were the case.

11:19:22  15          So it is not entirely clear whether

16 Mr. Meagher has been playing fairly with these people who

17 borrowed money from him.  These investors, I should point

18 out, are all people who invested back in 2008, and it

19 appears that there was really not any effort to raise

11:19:42  20 additional financing after that.

21          The information Mr. Pate gave us about the

22 people who had signed up for the website didn't show

23 anybody having signed up after the year 2014.  My suspicion

24 is that by 2015, when the Patent and Trademark Office

11:19:56  25 canceled Mr. Meagher's marks, the website was basically

1  just inoperable, probably still sitting on a server

2  somewhere, probably still accessible, but I think the

3  reason Mr. Meagher didn't actually file an application of

4  continued use with the Patent and Trademark Office is he

11:20:15  5  had kind of forgotten about this thing.  He invested some

6  money back in 2008, and it was not really an active

7  business by 2015.

8          He has, I think, since then tried to give

9  the impression that it was more active, or that he was

11:20:26  10  actively trying to develop it because it was in a stable of

11  ideas that he continues to hold onto in hopes that some day

12  someone will come along and say, We would like to own

13  mortgage.com, or credit.com, or some of these other

14  websites that he has registered over the years.

11:20:43  15          So, you know, from our perspective, here

16  is where the case is today.  We have some motions that are

17  pending, but I think the thing that is primarily driving

18  this is Mr. Meagher's hope that he will have a live

19  counterclaim that he can pursue in front of a jury; and

11:20:59  20  that if he has that counterclaim, then he will, perhaps,

21  get someone to write him a check.

22          We believe for reasons that have been

23  explained in the briefs that these counterclaims are

24  facially deficient and can be dismissed under Rule 12.  We

11:21:14  25  believe that the merits of his counterclaims are also

1 deficient and we rule -- sorry, we have moved for those

2 under the -- under Rule 56 as well.

3           The facts related to infringement on our

4 marks, I think, are quite clear.  We have moved for summary

11:21:30   5 judgment on the merits.  Mr. Smith can address the

6 trademark law issues in detail, if you would like to hear,

7 on those subjects.  But, really, convincing Mr. Meagher

8 that this case is not going to result in a pot of gold at

9 the end of the rainbow is perhaps what's necessary to move

11:21:45   10 this thing forward and get it done.

11           THE COURT:  We may have seen that in the

12 announcement of the settlement where, after counsel had

13 described the settlement, and I asked Meagher if that was

14 the deal, and he said, Yes, plus $2 million or $10 million.

11:22:05   15           MR. POWERS:  The number keeps moving and

16 usually north.

17           THE COURT:  So does my memory.

18           MR. POWERS:  So, Your Honor, we have been

19 facing Mr. Meagher in multiplying jurisdictions.  We

11:22:17   20 obviously have been facing him here.

21           THE COURT:  What's the venue for having G-H-E-R

22 Solutions sue in Dallas?

23           MR. POWERS:  The assertion is that Mr. Meagher

24 is a resident of Tarrant County, and so sues on that basis,

11:22:39   25 that he is there located in the Northern District.  But, of

1  course, Mr. Meagher is also pursuing us in other places as

2  well.  His wife, Alexis, has filed a petition to cancel our

3  marks with the Patent and Trademark Office in Washington.

4  Mr. Meagher has a pending application.

11:22:55    5          THE COURT:  She would have no standing if she

6  doesn't have her marks.

7          MR. POWERS:  That is an issue that we have

8  brought to the PTO's attention, Your Honor.  And he has

9  also -- he has also applied for trademarks in the Patent

11:23:08   10  and Trademark Office for MyStore and Mi Tienda, even though

11  the apparent intended use of those are for Mr. Lindell's

12  benefit, not his own.  So we continue to face him in

13  multiple places.

14          THE COURT:  Is there a promissory note on that?

11:23:20   15          MR. POWERS:  Not that I'm aware of, Your Honor.

16          MR. PATE:  Your Honor, may I briefly reply to

17  what Mr. Powers said?

18          THE COURT:  No.  I want to know what G-H-E-R

19  stands for.

11:23:35   20          MR. PATE:  That's the name of the company.

21          THE COURT:  No.  What -- what do the letters

22  stand for?

23          MR. PATE:  I'm sorry?

24          THE COURT:  What is the source of the "G"?

11:23:45   25          MR. PATE:  I don't know.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          MR. POWERS:  I believe it's a pun, Your Honor.

2  I think his e-mail address is todd.me@gher.com, so that the

3  "at" symbol in his e-mail address becomes the "A" in

4  Meagher.

11:23:59  5          MR. PATE:  The basis for venue in Fort Worth --

6          THE COURT:  He shouldn't be in advertising.

7          MR. PATE:  The basis for venue was not where

8  Mr. Meagher lives.  It is based on where GHER Solutions,

9  the plaintiff, was officing.

11:24:14  10         THE COURT:  What was -- where they were

11 officing?

12         MR. PATE:  Yes.  And --

13         THE COURT:  What's the address of the GHER

14 Solutions office?

11:24:21  15         MR. PATE:  I don't know right offhand.

16         THE COURT:  Well, we are going to take a break,

17 and you can call somebody.

18         MR. PATE:  I can research that to be sure.

19 But, Your Honor, the other thing --

11:24:32  20         THE COURT:  Where does Mr. Meagher live?

21         MR. PATE:  I'm sorry?

22         THE COURT:  Where does Mr. Meagher live?

23         MR. PATE:  Outside of Dallas in -- I am not --

24         THE COURT:  Fort Worth.

11:24:42  25         MR. SMITH:  Keller, Texas, Your Honor.

1              THE COURT:  Pardon?

2              MR. SMITH:  Keller, Texas.

3              THE COURT:  Keller?  Don't know Keller.  Is it

4  in Dallas County?

11:24:50  5              MR. SMITH:  Yes, it is.

6              MR. WIMBERLY:  It is outside Fort Worth, Your

7  Honor.  Yes, north.

8              MR. PATE:  The other thing I would point out is

9  that Mr. Powers was pointing out that on this website there

11:25:02  10  was advertising olive oil.  If you look at the picture, I

11  think it is their Exhibit 24, of that olive oil on the

12  website, it says the name of the company that was selling

13  that olive oil.  It is not Mi Tienda olive oil.  It is not

14  HEB olive oil.  It was the name of some company, and it

11:25:17  15  wasn't in any way look -- giving the appearance of being

16  affiliated with Mi Tienda.

17              THE COURT:  I believe -- and I don't know this

18  from anything else but my supposition that -- I'll bet you

19  there is some Greek olive oil with nothing related to Mi

11:25:45  20  Tienda, MyStore in any language that is available for

21  purchase at both of the HEB brands, that they may have a

22  site that is all tailored for it, but I'll better you --

23  and many things don't come country or cultural --

24  culture -- cultural specific.

11:26:06  25              MR. PATE:  But none of the pictures which they

1  show in their Exhibit 24, or any of their exhibits, are

2  products.  They talk about a bread slicer.  They talk about

3  olive oil.  They talk about this, that, and the other.

4  None of it is labeled "Mi Tienda."  It is very clearly

11:26:22  5  unaffiliated with Mi Tienda altogether, and to the extent

6  that they are --

7          THE COURT:  No.

8          MR. PATE:  -- they want to use it, it is a fact

9  issue.  It is.  It's a fact issue.

11:26:33  10         THE COURT:  Counsel, you're old enough to

11  remember Foley Brothers, Foley Brothers department stores.

12         MR. PATE:  Yes.

13         THE COURT:  They got bought by Macy's, I think.

14  Is that right?

11:26:53  15         MR. POWERS:  Correct, Your Honor.

16         THE COURT:  Foley Brothers had some branded

17  products, but they sold a lot more Levi jeans than they did

18  Foley's jeans, and that you have one or the other or both,

19  if it's being sold through a medium, whether it's the

11:27:17  20  website, or the five-story building, doesn't matter.  It

21  just -- you can sell some of everything, but olive oil

22  branded with a New Jersey -- Olive Oil of New Jersey,

23  Incorporated, whose real office is in Oregon, does not make

24  any difference if it's being sold under -- from the shelf

11:27:59  25  of Mi Tienda.

1          MR. PATE:  Your Honor, what would be confusing

2     is if we went to MyStore.com, and we saw on there an

3     advertisement for some tortillas that said "Mi Tienda" on

4     them.  Then, we are creating a likelihood of confusion

11:28:18     5     that -- that consumers would think that we are somehow a

6     source, or affiliated with Mi Tienda, or HEB.  That has not

7     happened.

8          THE COURT:  Or they were counterfeit.

9          MR. PATE:  Or that we are counterfeit or

11:28:32    10     knockoff, correct.  But that has not happened.  That is not

11     an allegation in this situation.

12               Just because Foley's sells Wrangler jeans,

13     and I know you can buy Wrangler jeans at Academy, Academy

14     is not trying to create a likelihood of confusion with

11:28:48    15     Foley's, you know, if they still existed.  But none of our

16     products give a source or affiliation with Mi Tienda or HEB

17     that would create a likelihood of confusion.  And to the

18     extent they believe it does, then that's a fact issue for a

19     jury.

11:29:10    20          THE COURT:  Thank you for reminding me the

21     third time that fact issues go to the jury.  I'm sorry.  I

22     got you off track.

23          MR. POWERS:  No, Your Honor.  I think I have

24     said my piece.  If there are any questions the Court has,

11:29:26    25     I'd be happy to answer them.

1                THE COURT:  All right.  We will of move on.

2   Let's take a 15-minute break.

3                MR. POWERS:  Thank you, Your Honor.

4                THE LAW CLERK:  All rise.

11:29:52   5   (Proceedings recessed from 11:29 to 11:52.)

6                THE COURT:  Thank you.  Be seated.  The General

7   Services Administration lives in fear that you won't be

8   cold enough outside, so it's lowering the temperature in

9   here to lower than it is outside.

11:52:37  10                MR. PATE:  Your Honor, could I clarify one

11   thing?  You asked specifically for me to provide you with

12   the address, and Mr. Powers indicated that venue was based

13   on where Mr. Meagher lives.  It is not.  Venue is based --

14                THE COURT:  Wait a minute.

11:52:58  15                MR. PATE:  Yeah.

16                THE COURT:  Tell me the fact.

17                MR. PATE:  The fact is, the question is, What

18   is venue for the Fort Worth proceeding?  Venue for the Fort

19   Worth proceeding was based on plaintiff GHER Solutions, LLC

11:53:12  20   is a Delaware company having its principal place of

21   business at 550 Reserve Street, Suite 160, South Lake,

22   Texas, 76092.  That is not Mr. Meagher's address.

23                THE COURT:  Whose address is it?

24                MR. PATE:  GHER Solutions, LLC, company

11:53:33  25   address.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          THE COURT:  What kind of building is it?  How

2  long is the lease?

3          MR. PATE:  I don't know offhand.

4               Also, during the break I looked at

11:53:48   5  Exhibit 24, which is purported to be our screenshot that

6  purportedly says "Mi Tienda."  First of all, I think it's

7  questionable whether Mi Tienda is on there.  It is on the

8  printout.  But it is not the Mi Tienda mark or anything

9  that looks close to the Mi Tienda mark.

11:54:07  10          THE COURT:  Those are separate questions.

11          MR. PATE:  And it doesn't advertise grocery

12  products.  That's Exhibit 24 to plaintiff's motion.

13          THE COURT:  All right.  G-H-E-R Solutions, LLC,

14  I haven't looked this up, but I am asking you, that's a

11:54:36  15  limited liability company?

16          MR. PATE:  Yes, Your Honor.

17          THE COURT:  And who are the members?

18          MR. PATE:  I do not know the members offhand.

19          THE COURT:  I'll have my staff look it up.  Do

11:55:19  20  you know who the registered agent for it is?

21          MR. PATE:  I do not offhand, Your Honor.

22          THE COURT:  Mr. Meagher says he was born in

23  Meridian.  Is that Meridian, Mississippi?

24          MR. PATE:  I don't know.

11:55:38  25          THE COURT:  Meridian, Texas.  There are

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 probably a lot of them.

2            Doctors these days ask you to quantify

3 your pain based on a ten-unit chart with smiling faces and

4 then crying.  So, when the nurse asks me, I say, 3.207.  I

11:56:20  5 mean, you got to be precise in those things.

6            MR. PATE:  Sure.

7            THE COURT:  The problem with all of them is,

8 you don't know how other people feel when they say they

9 have a three.  So I don't know whether it's -- saying I

11:56:33  10 have a three when I feel the way I do now is worthy of a

11 three or it ought to be seven or something.

12            MR. POWERS:  Your Honor, I don't know if this

13 answers the question, or how current it is, but the paper

14 that Mr. Pate filed in Fort Worth about GHER Solutions

11:56:51  15 attaches a certificate of amendment to the limited

16 liability company agreement, and it lists the members as

17 being Nick Meagher, that is Mr. Meagher's son, at the

18 address 2101 Legacy Court, Keller, Texas, which I believe

19 is Mr. Meagher's residence.  And it is signed by

11:57:11  20 Mr. Meagher, Todd Meagher, himself, as the authorized

21 person.

22            THE COURT:  So in his reply to my request, I am

23 sure, Todd Meagher is listed as the general -- as the

24 managing member of G-H-E-R.

11:57:42  25            MS. KATHY GRANT:  Delaware and Texas.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1              THE COURT:  Curiously, the State of Texas has

2  been told the registered agent's name is Todd Meagher at

3  2101 Legacy Court, Keller.  Is that --

4              MR. POWERS:  That is the same, Your Honor.  As

11:58:11    5  I see, the pleading also states that Todd Meagher is the

6  managing member of GHER Solutions, LLC, and I'll point out

7  it also says that GHER Solutions does not claim to be the

8  owner of the trademark MyStore nor entitled to any of its

9  trademark rights, rather it had an agreement with Todd

11:58:29   10  Meagher to use his mark.

11              THE COURT:  All right.  Can you explain that?

12              MR. POWERS:  Frankly, Your Honor, it is not

13  entirely clear to me.

14              THE COURT:  Pardon?

11:58:42   15              MR. POWERS:  It is not entirely clear to me,

16  Your Honor.

17              THE COURT:  But --

18              MR. POWERS:  It seems, in fact --

19              THE COURT:  Okay.  I thought I was alone.

11:58:48   20              MR. POWERS:  No.  In fact, the paper here

21  claims that GHER Solutions is the entity that's been

22  financing the development of the website and, of course, in

23  this courtroom Mr. Meagher has said that he has financed

24  the development of the website and claims to be entitled to

11:59:03   25  damages for that finance in his own name rather than

1 through the name of this entity.

2          MR. PATE:  Your Honor, I think I can explain

3 that statement.  And the statement is, in Texas and in

4 America we recognize the legal distinctions of LLCs,

11:59:20  5 corporations, individuals, and so this is a natural

6 interplay between a managing member of a company and a LLC,

7 and they are entitled to their distinct legal recognitions.

8          Mr. Powers would like to so intermingle

9 everything that when you put it all in a blender and you

11:59:43 10 pour it out in the cup, it is Todd Meagher.  And it is

11 really not that simple.  There are legal entities.

12          THE COURT:  That is what he said once.

13          MR. PATE:  Pardon me?

14          THE COURT:  That is what Mr. Meagher said once.

11:59:55 15 It's just me.

16          MR. PATE:  He did not say he's the alter ego of

17 GHER Solutions, or MyStore, or anything else.  He may have

18 said, I am the member.

19          THE COURT:  Well, GHER Solutions probably

12:00:07 20 didn't exist at that point.

21          Mr. Pate, for Mr. Meagher to take the

22 benefits of the corporate forum, which is the essence of

23 our economic growth since the 1830s, the people claiming

24 that protection must conduct the business so it is clearly

12:01:00 25 business done in GHER Solutions.  But Meagher keeps saying,

1  Well, I have investors, but to be an investor in a limited

2  liability company, you must be a member, as I understand.

3  You can be a lender, but you can't be distinct from the

4  company -- invest without being a member.  So is -- well,

12:01:45  5  you didn't name them by who they were, as I recall.

6           Does GHER Solutions, LLC, have a balance

7  sheet or anything?

8           MR. PATE:  I am sure it does.  I know our

9  firm's interaction with that company, we have had to be

12:02:04  10  very careful about formally billing it, and so I am sure

11  that they have a formal balance sheet, and I can produce

12  that.

13           THE COURT:  Plus a list of who its creditors,

14  investors, and creditors includes lenders, obviously, but

12:02:31  15  all lenders.

16           MR. PATE:  And I would say to your issue of

17  investor versus lender, Your Honor, --

18           THE COURT:  Not mine.  It's the law's.

19           MR. PATE:  Right.  Right.  What I have seen is

12:02:46  20  that these individuals are lending the MyStore business

21  money with an expectation of being repaid that money with a

22  certain percentage rate of return.  And so they may have

23  been called investors colloquially in a deposition or

24  whatnot.  I think that legally, they probably are lenders.

12:03:14  25           THE COURT:  Well, it depends on whether they're

1  recourse or not.

2          MR. PATE:  Right.

3          THE COURT:  I would think.  But Mr. Meagher

4  cannot be casual in a lawsuit.

12:03:27  5          MR. PATE:  Oh, absolutely not.

6          THE COURT:  He needs to be brief and precise

7  and, you know, I had a conversation with him sometime

8  earlier in our lives, that went on for at least 20, 30

9  minutes and people were lenders one minute and they were

12:03:47  10  investors the second, and then it was -- then we get this

11  convertible debenture, all of a sudden.  If you have a

12  convertible debenture or a promissory note, there is a

13  tangible document signed by the parties.

14          MR. PATE:  Sure.  And I would think the

12:04:04  15  documents would speak more authoritatively whether these

16  individuals should be classified under the law as lenders

17  or investors, because if I am deposed for six hours, you're

18  deposed for six hours, Mr. Meagher is deposed for six

19  hours, and you refer to people who are lending your company

12:04:22  20  money, you may not think, Well, I got to make sure I give

21  the precise legal definition of that.  I am not even sure

22  Mr. Meagher, not being a lawyer, would know the precise

23  distinction between an investor and a lender.  So he wasn't

24  trying to be casual by any means.  I don't think --

12:04:41  25          THE COURT:  That wasn't the tone of his

1  testimony in this court.  I just was a farm boy living

2  outside of Dallas, and these people told me to sign all

3  this stuff because I just wanted to make it easy for small

4  businesses to have access to the web.  That was not his

12:04:58   5  testimony.  He was a wheeler dealer, and he knew about all

6  the transactions for domain names.

7          We get a lot of lawsuits based on things

8  like when there were videos of United Airlines security

9  people beating a passenger in the aisle of the airplane.

12:05:26   10  We probably had a bump of 75, 100 cases against every --

11  you know, whatever unpleasant experience anybody had ever

12  had, none of which meant the preceding thing.

13          On the list from the division of

14  corporations in Delaware, for some reason it lists 11 other

12:06:06   15  GHERT [sic] corporations.  Now, one of them's an LP, then

16  an Inc., an LLC, an LLC, an Inc., and an Inc., an Inc., an

17  LLC, an LLC, an LLC, and an Inc.

18          That doesn't help because he may have been

19  carefully making distinctions that he knew.

12:06:42   20  (Court confers with Judicial Assistant.)

21          THE COURT:  So either this proves he's very

22  clever about which entity is best used where or he just

23  uses them interchangeably and fills out the form and picks

24  a name.

12:07:37   25          MR. PATE:  Your Honor, you mentioned that there

1  were several, some Inc.s, and some LPs, some LLCs, are you

2  looking under G-H-E-R Solutions?

3            THE COURT:  Actually, no.  So -- you see a

4  couple of these are Gerhardt Gardini.

12:08:01   5            MR. PATE:  And G-H-E-R is all capitals.

6            THE COURT:  It doesn't -- the secretaries of

7  state of the states don't -- you can spell it however you

8  want to.

9            MR. PATE:  Oh, all right.

12:08:14  10            THE COURT:  And they are not like the copyright

11  office that let's you -- cute way you typed it.

12            MR. PATE:  I thought there was significance to

13  that.  Not --

14            THE COURT:  So there are only actually three on

12:08:29  15  this list that are GHERT Solutions, LLC, GHERT, LLC,

16  GHERT-Cand, LLC.

17            MR. PATE:  How are you spelling "GHERT," Your

18  Honor?

19            THE COURT:  G-H-E-R-T.

12:08:47  20            MR. PATE:  No.  There is no "T."

21            THE COURT:  Oh, no, G-H -- well, there is a

22  GHERT with a "T."  Okay.  We have narrowed it down.

23            MR. PATE:  It is just G-H-E-R.

24            THE COURT:  So it's GHER.

12:08:58  25            MR. PATE:  Yes.

1          THE COURT:  Not GHERT?

2          MR. PATE:  GHER Solutions, LLC.

3          THE COURT:  Where does Mr. Meagher live?

4          MR. PATE:  Keller, Texas.

12:09:28   5          THE COURT:  At 2101 Legacy Court?

6          MR. PATE:  That sounds right.

7          THE COURT:  That's the registered address, and

8  the registered agent at that address is Todd Meagher.

9          MR. PATE:  Yes.  But that's different than the

12:09:44   10 principal place of business of the company itself.

11         THE COURT:  Where is the principal place of

12 business.

13         MR. PATE:  Principal place of business is --

14 excuse me while I pull this up -- is 550 Reserve Street,

12:10:07   15 Suite 160, South Lake, Texas, 76092.  I'm sorry, it should

16 be suite 150.  I said 160.

17         THE COURT:  1-5-0?

18         MR. PATE:  1-5-0.

19         THE COURT:  So he says he has MyStore and Mi

12:11:08   20 Tienda portals, domain names.

21         MR. PATE:  Your Honor, what I think is

22 important about the domain names and the portal, you have

23 the portal which is the provider for the platform for the

24 domain names, and then you have MyStore.com.  When

12:11:52   25 Mr. Meagher was using, like, this format of MyStore.com,

1 there were people that would actually sign up and go on to

2 the portal and sell their products.  I think it's

3 critically important to note that Mr. Meagher,

4 Mrs. Meagher, MyStore, Inc., never sold a single product on

12:12:10   5 these portals claiming to be infringing the trademark of Mi

6 Tienda.

7         THE COURT:  Where did they buy them on the

8 website, then?

9         MR. PATE:  Where did --

12:12:25   10         THE COURT:  Where did anybody buy the stuff?

11 You said they were posting stuff.

12         MR. PATE:  It's kind of like an Etsy, or --

13 like an Etsy, when you would buy a product from Etsy.  Is

14 the Court familiar with that?

12:12:43   15         THE COURT:  Yes, sir.

16         MR. PATE:  Okay.  That's --

17         THE COURT:  I have grandsons.

18         MR. PATE:  Okay.  Very good.

19         THE COURT:  That's --

12:12:51   20         MR. PATE:  That is how you purchase product.

21         THE COURT:  Like Amazon, over half of Amazon

22 sales are sales through Amazon per third-party vendors.

23         MR. PATE:  Correct.

24         THE COURT:  And then there's --

12:13:07   25         MR. PATE:  There is a brand-new one out that I

1  wish I could remember its name.

2          THE COURT:  Well, there is another one.  eBay.

3          MR. PATE:  It's like eBay.

4          MR. POWERS:  Your Honor --

12:13:25  5          THE COURT:  And so your contention is that

6  these folks didn't sell anything through the website.  They

7  just allowed other people to sell them through the website?

8          MR. PATE:  Other people would sell, like,

9  guitar lessons, or recipes, or cookbooks.

12:13:42  10          THE COURT:  Mr. Meagher have a list of those

11  people?

12          MR. PATE:  Yes, and we produced that.

13          MR. POWERS:  Your Honor, if I might try to

14  explain --

12:13:52  15          THE COURT:  Yes, sir.

16          MR. POWERS:  -- a little bit about that.  The

17  listing that they produced was simply a list of people who

18  had signed up on the website.  There was no information

19  about what they listed, when they listed, how much they

12:14:02  20  listed.

21          We have over the years been to their

22  website many times, looking for information about what's

23  for sale.  One of the exhibits that was marked in

24  Mr. Meagher's deposition was a page that had various

12:14:18  25  products listed.  Some of the sellers were selling used

1 goods.  One of them, in fact, was Mr. Meagher's wife,

2 Alexis Meagher, who was selling what appears to be some

3 kind of chopping device, vegetable chopper, something like

4 that.  And this was a page that we had marked because it

12:14:35  5 has a chip-and-dip set and some other food accessories on

6 it.  So, in fact, Mrs. Meagher appears to be selling

7 food-related accessories through the website.

8              But I think the more important point is

9 this:  Mr. Meagher -- sorry, Mr. Pate wants to draw some

12:14:50  10 distinction between, say, the eBays of the world and people

11 who sell goods in their own name.  The critical fact here

12 is that Mi Tienda, our grocery store, it's a marketplace.

13 We sell some goods that we manufacture, some goods that we

14 fabricate in the stores, a lot of goods that we just buy

12:15:10  15 from vendors like Coca-Cola and General Mills.

16              So we provide a marketplace, and that is

17 exactly what Mr. Meagher wants to do.  We provide a

18 marketplace under the name Mi Tienda.  He wants to provide

19 a marketplace under the name Mi Tienda, and hence the

12:15:24  20 dispute.

21              He wants to say this is like eBay.  Well,

22 if eBay had decided to name itself memorialcitymall.com,

23 that would be a problem for the people who owned that mall.

24 Their vendor -- their vendor relationships, their customer

12:15:40  25 relationships, their credibility, their built-in goodwill,

1  all the values of the trademark that they built up over

2  years, would be what someone else is coming along and

3  saying, We also want to offer a marketplace under your

4  name.  That's the problem that we've got here, and

12:15:54   5  Mr. Meagher can't say, Well, it's all ones and zeros.  It

6  doesn't count.  He is trading in our goodwill.

7            THE COURT:  Well --

8            MR. PATE:  But the difference --

9            THE COURT:  -- to the extent that the portal,

12:16:05   10  and the website, and the address all copy Mi Tienda, eBay

11  doesn't say, We're selling this Ford car and we are Ford.

12            MR. POWERS:  Exactly, Your Honor.

13            THE COURT:  They are very careful about that.

14            MR. POWERS:  I think that is the real issue

12:16:31   15  here, is the potential that customers will be confused that

16  somehow our -- you know, Walmart.com is associated with

17  Walmart.  Kroger.com is associated with Kroger.  We think

18  customers are going to look at MiTienda.com and assume that

19  it must be associated with us in some way based on the

12:16:48   20  name, and based on what they see there.

21            MR. PATE:  And if you look at MyStore.com,

22  there is nothing that gives any appearance whatsoever that

23  your -- we are an affiliate or a source for HEB or Mi

24  Tienda.

12:17:02   25            THE COURT:  You do when you say "Mi Tienda" or

1  "MyStore."

2         MR. PATE:  We don't give that appearance of

3  MyStore.com.

4         THE COURT:  That says "MyStore" on it.

12:17:15     5         MR. PATE:  Right.

6         THE COURT:  That's the problem.  So I have had

7  cases of -- I'll just say Sony wanting to sue a flea market

8  because they didn't police what everybody was selling, and

9  I held it's a flea market.  We don't work for Sony.  They

12:17:38    10  don't check whether the blue jeans are really Levis or

11  somebody manufactured.  And that's not somebody who is

12  renting space has a duty to do.  And the question is:  Is

13  it a neutral space?

14            How did you -- your technician choose the

12:18:09    15  people to interview or question?

16         MR. PATE:  I do not know exactly other than

17  they have a whole bunch of people who are signed up to take

18  different surveys, and they targeted five-mile radius of

19  these two grocery stores, and then they seek how many

12:18:36    20  people will complete these surveys on these issues of

21  comparing --

22         THE COURT:  All right.  Wait.  No.  I know what

23  they're asked to compare.  I am asking, so you have got a

24  group of people who just volunteered to take surveys.  I am

12:18:54    25  not sure that's a random selection.

1              Yes, ma'am.

2              MS. TRIPP:  May I speak to that, Your Honor?

3 The report itself -- Your Honor, the expert report

4 specifies all the information you're asking.  Actually, I

12:19:13  5 think, it's pretty standard these days for expert reports

6 to be -- the people being surveyed, the experts hire these

7 services that compile all these people that will take

8 surveys.  And it's just standard.  I mean, it's -- the

9 actual selection like that --

12:19:33  10             THE COURT:  That doesn't -- many things that

11 are standard are not scientifically or mathematically

12 correct.

13             MS. TRIPP:  Well, they're just -- they're

14 people that are in the marketplace and --

12:19:48  15             THE COURT:  Were they asked that question?

16             MS. TRIPP:  -- it's a huge number.

17             THE COURT:  Wait.  Were they asked that

18 question?  Do you do the grocery shopping for your family?

19 Did you ask them that?

12:19:57  20             MS. TRIPP:  The questions -- and you're

21 correct, Your Honor.  Then, from this huge group of people,

22 the questions are specific, and those are set forth in the

23 report.  And you can see exactly from the report what the

24 people were asked that were ultimately in the survey.

12:20:13  25             THE COURT:  Will it be all right if I had a

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 copy of the survey?

2        MR. POWERS:  Your Honor, I believe one has been

3 filed, so I think that you have access.

4        THE COURT:  Don't get it now.

12:20:22  5        MR. PATE:  It was Exhibit B to our supplement

6 to our summary judgment.

7        MR. POWERS:  The details about who answered the

8 questions, those were all in appendices which I am told we

9 were supposed to receive, or at least they were trying to

12:20:33 10 send them to us yesterday.  You know, this report was

11 produced -- I don't know -- a couple weeks ago.  But we had

12 not gotten these attachments yet or at least in a way that

13 we could open.

14        THE COURT:  So this would identify the people

12:20:47 15 who took the survey?

16        MR. POWERS:  I'm not sure identifies them by

17 name, Your Honor, but I think it has -- well, I'm not sure

18 if it has the survey responses since I can't actually get

19 into the document.  The critical issue is that if they

12:20:59 20 wanted to have an expert report on this issue, there was a

21 deadline for that.  It was November of 2018.  And so for

22 them to try to reboot the case at this stage because they

23 don't believe that they have got the record that they need,

24 this is well out of time, and really ought to be

12:21:15 25 disregarded.

1          MR. PATE:  Well, we would --

2          THE COURT:  I am going to read the report

3    anyway.  Whether I am going to let it in is a different

4    question.

12:21:20   5          MR. PATE:  We were asked to produce it

6    recently, and so we produced it.  And then because we

7    were -- this report is just recently done and recently

8    produced, we thought we ought to supplement the summary

9    judgment record with it because it is highly relevant.

12:21:35   10          THE COURT:  Counsel.  Counsel --

11          MR. PATE:  Yes.

12          THE COURT:  -- did -- you offered none last

13   year.  Right?  By what -- I don't know what the deadlines

14   were, but I bet you he does.

12:21:47   15          So -- and none of the defendants offered

16   a -- an expert report within the time.  Right?

17          MR. PATE:  We did not produce this report

18   because this --

19          THE COURT:  No.  It didn't exist.

12:22:05   20          MR. PATE:  This did not exist.

21          THE COURT:  So, you not only didn't designate,

22   you didn't have one at the deadline.

23          MR. POWERS:  We did not have a survey.

24          THE COURT:  And you did not move to extend the

12:22:13   25   deadline for filing or getting one.

1          MR. PATE:  That is correct, Your Honor.  This

2  was done by GHER Solutions in Fort Worth.  They asked for

3  it to be produced here, and so we supplemented the record

4  with it, and we would --

12:22:24  5          THE COURT:  You can't just ignore the

6  deadlines.

7          MR. PATE:  I realize that, Your Honor.

8          THE COURT:  I'm sorry.  I have spent a whole

9  lot of time trying to get Meagher to produce data, not

12:22:37  10 press releases, although he has a lot of press releases.

11              I need to know some facts.  I went -- I

12 don't know when the hearing was, but probably six months

13 ago, I went through the investors versus lenders versus

14 birthday gifts, or whatever they all were.  Companies -- if

12:23:01  15 they have got a commitment to give somebody seven percent

16 of the company, if they lend them $200,000, that is written

17 down somewhere, or there's a secret buddy deal, or

18 something.

19          MR. PATE:  And we produced that.  We produced

12:23:17  20 their agreements to lend money to the business.

21          MR. POWERS:  Your Honor, I believe we have

22 received blank unsigned agreements in different versions.

23          THE COURT:  That is what you said earlier.

24 That is not an agreement.  That is --

12:23:33  25          MR. PATE:  Well, unfortunately, that's a lot of

1 the way that these guys do business, such as the sale of

2 MiTienda.com to Mr. Lindell, I am not even sure that

3 transaction was even papered.  They did that on a

4 handshake.

12:23:48   5          THE COURT:  That is fine when you're dealing

6 with Mr. Lindell, but when you're dealing with third

7 parties, it looks fishy.  Actually, I don't know why we use

8 that expression.  Nothing wrong with looking like a fish,

9 if -- you got to pick your fish.

12:24:06   10          MR. PATE:  Well, sometimes these businessmen,

11 they run in circles together.  They trust each other, and,

12 you know, here, I'll buy this domain name from you for a

13 half a million dollars, and that's the way these guys do

14 business on the fly.  There is a lot of trust.

12:24:20   15          THE COURT:  Well, but there is a check or

16 something; otherwise, they won't have a basis for

17 amortizing and all those other things that business people

18 are very keen at doing.

19          MR. PATE:  I don't think they have ever asked

12:24:29   20 us to produce the check, but if they would like to ask us

21 for the check, I'll produce the check.  But I think it was

22 by wire transfer.

23          THE COURT:  I said two hours ago, where is the

24 check?  When you're asked to produce the documents for a

12:24:43   25 sale, you just don't get Meagher saying, I sold it to

 1  so-and-so back in April.

 2          MR. PATE:  I am pretty confident -- I am 99

 3  percent confident this was not by a check.  It was by a

 4  wire transfer.  And I am fairly confident, equally

12:24:59  5  confident, that I produced the wire transfer information to

 6  these attorneys.

 7          THE COURT:  All right.  But you --

 8          MR. POWERS:  My recollection -- sorry, Your

 9  Honor.

12:25:05  10          THE COURT:  Pardon?

11          MR. POWERS:  I was going to say my recollection

12  is they produced evidence of the payment on MyStore.com,

13  but they did not do so with respect to MiTienda.com, but

14  it's been awhile since I have looked at it.

12:25:17  15          THE COURT:  But you can go both ways -- you can

16  see what account -- who on the account it went to, and --

17          MR. POWERS:  For the MyStore.com, I believe we

18  can -- I believe it was a wire, and I believe you can see

19  an account on both sides.

12:25:30  20          MR. PATE:  I believe that's accurate.

21          MR. POWERS:  But we have never seen any

22  evidence of payment on the MiTienda.com or have any idea

23  how much was spent for that website as well.

24          THE COURT:  Still want the balance sheet.  I

12:25:44  25  still want the balance sheet first.

1          MR. PATE:  Yes, Your Honor.  Write this.

2          THE COURT:  All right.  On who owns the stock,

3    I was not mislead by HEB.  I was independently confused by

4    what I was told.  That's different, I think.

5          And when did Irene get up -- give up her

6    rights in MyStore, Incorporated?

7          MR. PATE:  I'm sorry, Your Honor, I didn't hear

8    that question.

9          THE COURT:  Well, MyStore, I-N-C --

10         MR. PATE:  Yes.

11         THE COURT:  -- a Delaware corporation is solely

12   owned, sole director, sole president, everything, is Irene

13   Alexis Meagher.

14         MS. TRIPP:  Yes, Your Honor.

15         THE COURT:  So she is not involved in this, but

16   she owns everything MyStore, Inc. owns.

17         MS. TRIPP:  She owned MyStore, Inc., Your

18   Honor, which is the -- just to help you remember, that's

19   the company that's never -- that was formed, I guess,

20   shortly before or after this lawsuit was filed.  Never did

21   any business because of this lawsuit.  So I think it was --

22   it was formed shortly before the lawsuit was filed.

23         THE COURT:  It doesn't indicate that she was

24   not involved in the business, generally.

25         MS. TRIPP:  Well, there wasn't a business of

12:28:21
12:28:44
12:29:00
12:29:18
12:29:32

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  MyStore Inc., Your Honor.  It didn't have a business.  It

2  was planned to have a business.  Because of this lawsuit,

3  it didn't.  So her involvement with MyStore, Inc., would

4  not have made her involved in the business in suit because

12:29:45  5  MyStore, Inc., wasn't involved in the business in suit

6  either.

7           THE COURT:  The problem is has she filed for

8  trademark application, or what -- whatever it is?

9           MS. TRIPP:  She did, Your Honor, in connection

12:30:00  10  with the piece of business.

11           THE COURT:  Who would own those things?

12           MS. TRIPP:  The trademark application?

13           THE COURT:  Yes, ma'am.

14           MS. TRIPP:  I think she also abandoned that,

12:30:08  15  Your Honor.

16           THE COURT:  Ma'am, answer my question.

17           MS. TRIPP:  The person who files it sets forth

18  who owns it in the application.

19           THE COURT:  And what does it say on the

12:30:17  20  application?

21           MS. TRIPP:  I understand it was her, Your

22  Honor.

23           THE COURT:  Okay.  I mean, earlier Mr. Pate

24  reminded us that she wasn't involved in any of this.

12:30:26  25           MS. TRIPP:  She is not involved in what is in

1  suit because she -- she was -- MyStore, Inc. -- she was

2  president of MyStore, Inc., and she was owner of MyStore,

3  Inc.  The MyStore, Inc., is a very young company formed

4  just shortly before this lawsuit was filed.  Did not do any

12:30:39  5  of the -- the actions on a website that are in issue here,

6  Your Honor, so --

7          THE COURT:  And what -- what are the names of

8  the -- the names that she sought to copyright with her

9  applications?

12:31:00  10          MS. TRIPP:  I don't think she sought to

11  copyright any names, Your Honor.

12          THE COURT:  What did she seek to copyright?

13          MS. TRIPP:  I don't think she applied for any

14  copyright application.

12:31:11  15          THE COURT:  Trademark?

16          MS. TRIPP:  Yes, Your Honor.

17          THE COURT:  Well, don't do that.  There used to

18  be two things you could get:  Copyright and trademark.  And

19  now there are all kinds of funky things you can get.

12:31:24  20          MR. PATE:  It was MyStore, capital M, capital

21  S, one word, and MyStore.com.

22          THE COURT:  Okay.  And --

23          MR. POWERS:  Your Honor, it was -- MyStore and

24  Mi Tienda are the applications that Mrs. Meagher filed.

12:31:41  25          THE COURT:  I think I saw them, but --

1          MR. POWERS:  This has a couple of stray marks

2  on it, but they're not confidential.

3          THE COURT:  That's all right.  Should have

4  looked at page 2.  There is a cartoon of me.

12:31:57   5  (Laughter.)

6          THE COURT:  I ordered a major police department

7  in this area to disclose some records they made several

8  objections to, and I emphasized they were to be produced as

9  kept.  Well, they file a large banker's box with manila

12:32:18  10  folders -- I mean, envelopes -- each about three-quarters

11  of an inch thick, and the first page of every one of those

12  envelopes was a scurrilous cartoon about judges.  And I

13  thought, they don't always keep it that way, then I thought

14  maybe they do.

12:32:40  15          All right.  And so the thought that

16  Ms. Meagher was just independently casually applying to --

17  for trademarks about the names in question, you don't think

18  shows that she was participating in a whole process?

19          MS. TRIPP:  I don't see that -- filing a

12:33:17  20  trademark application is not trademark infringement.  Nor

21  is the --

22          THE COURT:  It is not -- that is not the point,

23  ma'am.  The position was taken that she didn't have

24  anything to do with it.  That -- now --

12:33:32  25          MS. TRIPP:  She -- the trademark application

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  was for her intended use of the marks she applied for, for

2  MyStore, Inc.  The MyStore, Inc., didn't have any business

3  because of the lawsuit.

4          THE COURT:  Ma'am.  Ma'am, don't -- you have

12:33:47  5  you been sitting too close to Mr. Pate.  You're repeating

6  yourself.

7              I understand that the variety of

8  artificial entities, real entities, counting the people,

9  different potential business plans, it was asserted she

12:34:17  10  didn't know anything about it, didn't have anything to do

11  with it, and that is simply not true.

12              I think Mr. Meagher in one of our hearings

13  took the position she didn't have anything to do with it,

14  and then took the position he didn't know because that was

12:34:31  15  her business at one point.

16              So this suit was filed September 19th, and

17  she filed for this mark on September 14th.  So if she

18  didn't file these in response to the lawsuit, I assume

19  there was some evidence of the controversy before the

12:35:01  20  lawsuit got filed.

21              Back to the Dallas company, who owns that

22  again?  The Dallas -- the --

23          MR. PATE:  GHER Solutions.

24          THE COURT:  GHER Solutions.

12:35:30  25          MR. PATE:  I can't remember who the members of

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 the LLC were.  I think they were read off.

2          THE COURT:  No.  All I have is the franchise

3 tax department.  It doesn't list the members.  The

4 secretary state's office should.

12:36:01   5          MR. POWERS:  All we know for certain, Your

6 Honor, is the document that was filed in the Northern

7 District case where Nick Meagher is listed as at least one

8 of the members, and Mr. Meagher is identified as being

9 someone authorized to speak on behalf of that entity.  I

12:36:19   10 suppose since the pleading indicates that Mr. Meagher is a

11 managing member, he must also be a member as well.  So I

12 suppose Todd and Nick, at least those are members.

13          THE COURT:  You filed some sort of motion in

14 Dallas?

12:36:51   15          MR. POWERS:  We have, Your Honor.  We filed a

16 motion to transfer venue or alternatively dismiss for want

17 of subject matter jurisdiction.  Judge O'Connor has not

18 advised us if he has looked at that all.

19          THE COURT:  I felt that way on your pleadings

12:37:10   20 sometimes.  Okay.  I have read it.  I need to lay down and

21 rest for a month or two.

22              The comptroller of public accounts lists

23 the president as Alexis Meagher of GHER Solutions, LLC; and

24 a director, Alexis Meagher; president, Todd Meagher;

12:37:49   25 director, Todd Meagher.

1                    Would you like to see?

2                    MR. PATE:  Sure.  Thank you, Your Honor.  I

3    think the important point is GHER Solutions, LLC is a

4    recognized limited liability company.

12:38:17    5                    THE COURT:  Who?

6                    MR. PATE:  GHER Solutions, LLC is a recognized

7    limited liability company authorized to bring its own

8    causes of action.  It brought causes of action that are

9    distinct from causes of action brought in this lawsuit,

12:38:32   10    including cancellation, which this Court says it will not

11    entertain.  The critical --

12                    THE COURT:  Not until I clear up this mess.

13                    MR. PATE:  The critical point that I want to

14    make is I filed a motion to reconsider staying this

12:38:46   15    proceeding.  Here is why.  The point is very simple.  If

16    Judge O'Connor's court cancels or determines that the mark

17    Mi Tienda is generic -- and we are not the only people

18    saying that.

19                    THE COURT:  No.  I --

12:39:04   20                    MR. PATE:  There is a cancellation proceeding

21    by C & S Wholesale Grocers, Inc., saying the same thing.

22                    THE COURT:  Wait.  Wait.  I don't care how many

23    lawsuits there are.  I only care what decisions there are.

24                    MR. PATE:  But --

12:39:15   25                    THE COURT:  And nowhere are we discussing T & S

1  Wholesale Grocers [sic].

2          MR. PATE:  Sure.  But here is the shakeout.  If

3  that proceeding determines that Mi Tienda is generic, then

4  they can't bring any trademark action against us because

12:39:32   5  they don't have a mark.  No rights, no lawsuit.

6          THE COURT:  Okay.  I understand that that is a

7  possibility.

8          MR. PATE:  Thank you, Your Honor.

9          MR. POWERS:  Your Honor, if I might respond to

12:39:49   10  that point, Your Honor.  First of all, I disagree with the

11  proposition that GHER Solutions is a recognized LLC,

12  whatever that means here.

13          THE COURT:  I was waiting to find out who

14  recognized it.

12:40:02   15          MR. POWERS:  All --

16          MR. PATE:  State of Delaware.

17          MR. POWERS:  All of the rights that Mr. Meagher

18  asserts in Dallas under the name GHER are rights that he

19  has claimed that he possesses in his individual capacity in

12:40:13   20  this case.  And so this notion that somehow there is a

21  separate entity that has separate interest and they are

22  being just separately defended --

23          THE COURT:  Absolutely not including the wife.

24          MR. POWERS:  That's excellent.

12:40:25   25          THE COURT:  That's what I was told.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          MR. POWERS:  But then to this point, what

2    Mr. Pate is saying about the relationship between the two

3    cases proves exactly why the first filed rule applies.  The

4    first filed rule doesn't require there to be an identity of

12:40:41   5    parties.  It doesn't require there to be an identity of

6    claims.  It requires there to be a likelihood of an overlap

7    between the facts or the claims in the two cases.

8          When Mr. Pate says a decision in the

9    Northern District would be dispositive of this action, he

12:40:59  10    is saying these two cases are so related that they belong

11    in one courtroom.  And that is almost black letter law in

12    the Fifth Circuit of how the first filed rule applies.  You

13    know, he is seeking the same relief in both courts.  Here

14    as a counterclaim; there as the main claim.  He is arguing

12:41:16  15    the same evidence in both courts.  He is presenting

16    attachments from our summary judgment papers up there as

17    evidence of his claims.  He is arguing the same theories,

18    the Communications Decency Act that has been discussed

19    here, this notion that there is not a likelihood of

12:41:34  20    confusion.  All the arguments from the summary judgment

21    papers he describes here, he has put in his papers in the

22    Northern District.

23          So Judge O'Connor will be required by the

24    law to either transfer that case down here or dismiss that

12:41:45  25    case.  And if that case were to be transferred here -- I

1  don't know if he will just simply dismiss it -- but if he

2  were to transfer it, that separate matter would really be

3  another attempt to plead the genericness claim one more

4  time and to amend the pleadings.

12:42:03   5        THE COURT:  Well, it would have been so easy

6  for GHER Solutions to move to be allowed to intervene as

7  another party defendant with a counterclaim.

8        MR. POWERS:  And it seems to me, Your Honor,

9  that if GHER Solutions were an actual real functioning

12:42:17   10  entity, it would have done that.

11        THE COURT:  Recognized.

12        MR. POWERS:  Recognized entity.  It probably

13  would have done that.  But really what is happening with

14  this genericness claim up in the Northern District, this is

12:42:30   15  Mr. Meagher's attempt to press the same claim in now a

16  fourth venue that he has pressed and lost before.

17        When he originally -- when HEB opposed

18  Mr. Meagher's request for marks at the Patent and Trademark

19  Office, he counterclaimed for cancellation on grounds of

12:42:46   20  genericness.  He abandoned his applications.  And the

21  Patent and Trademark Office, Trademark Trial and Appeals

22  Board dismissed his counterclaims with prejudice, including

23  the genericness counterclaim.

24        Now, he came here.  He tried to see if he

12:43:02   25  could shoehorn genericness into a counterclaim that he had

1  already been through one round of amendments on a year

2  after the case got started, and then shortly before trial

3  tries to shoehorn in a new counterclaim relitigating the

4  genericness issue that the Patent and Trademark Office had

12:43:20  5  already disposed of.  And then Mrs. Meagher filed a new

6  proceeding at the Patent and Trademark Office alleging

7  genericness, trying to kill us on that, and now he has

8  filed a lawsuit.

9            So we are now in four separate forums that

12:43:32  10  Mr. Meagher has decided to push this issue, and it has

11  already been decided.  The reason we haven't had to get

12  into these res judicata issues in this Court is because he

13  has not properly pleaded the issue in this Court.  And were

14  he to bring that case again here, I think the Court

12:43:46  15  would -- ought to deny that motion to amend his claims for

16  the same reason it's already denied that motion to amend

17  his claims.

18            THE COURT:  I just meant bring that -- just

19  take that one like -- the effect is transferring it here --

12:44:00  20            MR. POWERS:  Correct.

21            THE COURT:  -- it is like melding it with the

22  other case.

23            MR. POWERS:  And I think that what -- the Court

24  would be completely right to look at that and say, This is

12:44:10  25  essentially an attempt to amend an existing case, bring in

1 new claims, and it ought to be judged by the rules, by Rule

2 15.

3                    Is it dilatory?  Is there unfair delay?

4 Is there prejudice to the opposing party?  Is there some

12:44:23  5 bad faith in the way this case has been brought?  I think

6 the Court can find bad faith on the basis that this has

7 been brought four times in such a slapdash fashion does not

8 suggest that this case is anything other than attempt to

9 keep the ball in the air.

12:44:39 10               MR. PATE:  Your Honor, can I respond to that?

11 There are different causes of actions, different parties

12 involved in the Fort Worth --

13               THE COURT:  Counsel.  Counsel --

14               MR. PATE:  -- proceeding.

12:44:50 15               THE COURT:  -- the only thing I am worried

16 about is the common nucleus of fact, and something about

17 the three-year lead I have on Dallas.

18               MR. PATE:  Well, I think the common nucleus of

19 fact is that Mi Tienda is generic, and it doesn't cover

12:45:09 20 anyone else.

21               THE COURT:  Counsel.  Counsel, I don't want to

22 reargue.  I am telling you we are all talking about the

23 same problem.  You can file it again in El Paso, or wait

24 until spring and bring it in Jackson, Wyoming, and I'll go

12:45:23 25 up there and hear it.

1          MR. PATE:  And one other thing is, Mr. Powers

2   makes it sound like the Meaghers are litigious, filing

3   lawsuits everywhere.  The fact of the matter is, they have

4   filed multiple litigation in different forums as well, such

12:45:37  5   as before the Trademark Trial and Appeal Board.

6          THE COURT:  Wait.  Wait.  Wait.  There is a

7   concept that two wrongs don't make a right.  I think that I

8   was three when I learned that.  They won theirs, right?

9          MS. TRIPP:  No, Your Honor.  The genericness

12:46:03  10   really hasn't been decided.  The only time he was talking

11   about was by default.

12          THE COURT:  Didn't your client file some sort

13   of proceeding with the patent folks --

14          MS. TRIPP:  When he is explaining and the

12:46:15  15   client --

16          THE COURT:  Wait.  What did your client file

17   with the trademark office?

18          MS. TRIPP:  They filed a trademark application,

19   Your Honor.  But I --

12:46:26  20          THE COURT:  Wait.  Wait.

21          MS. TRIPP:  What Mr. Powers mentioned --

22          THE COURT:  Ma'am.

23          MS. TRIPP:  -- I mean, that's all you can --

24          MR. PATE:  HEB filed an opposition proceeding

12:46:36  25   in the trial trademark board prior to application.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          THE COURT:  My question -- no.  You can't talk

2    about something I didn't ask.  My question is:  What has

3    Mrs. Meagher filed in the trademark office?

4          MS. TRIPP:  She did assert --

12:46:52   5          THE COURT:  What did she file?

6          MS. TRIPP:  I think she filed a cancellation

7    proceeding based on genericness, Your Honor, and that is

8    pending, as far as I know.

9          MR. PATE:  Yes.

12:47:02   10          MR. POWERS:  That is correct, Your Honor.  She

11   currently has a pending intent to cancel our trademarks,

12   but that is in addition to what Mr. Meagher had filed in

13   his counterclaim back in 2016.  In 2016 Mr. Meagher filed a

14   petition for cancellation -- sorry, a counterclaim for

12:47:22   15   cancellation in response to our opposition for his

16   trademark application.  And that counterclaim was dismissed

17   with prejudice when Mr. Meagher abandoned his trademark

18   applications and resubmitted them under his wife's name.

19          MS. TRIPP:  He didn't -- so it wasn't really

12:47:37   20   adjudicated.

21          THE COURT:  Ma'am.

22          MS. TRIPP:  He just gave up because he didn't

23   want to fight, Your Honor.

24          THE COURT:  Ma'am.  Ma'am.

12:47:41   25          MS. TRIPP:  So that is not used against him as

1 adjudicated.

2           THE COURT:  Ma'am, I know what an adjudication

3 is.  And abandonment of a claim more than three years ago

4 is an abandonment of the claim.

12:47:52  5           MS. TRIPP:  It is done different at the

6 trademark office, Your Honor.  He is talking about what

7 happens at the trademark office.  It's not exactly the same

8 as a court hearing.

9           THE COURT:  No.  Because they are not as cute

12:48:01  10 as I am.

11           MS. TRIPP:  And when -- a party is allowed to

12 give up at the trademark office, and that's what

13 Mr. Meagher did, he just didn't want to fight that.

14           THE COURT:  All right.  Wait a minute.  Who are

12:48:13  15 you talking about?  Man or woman?

16           MS. TRIPP:  Well, what he is talking about --

17           THE COURT:  No.  I want to know what you're

18 talking about.

19           MR. PATE:  The claim --

12:48:19  20           MS. TRIPP:  I'm talking about the same thing

21 Mr. Powers is talking about, the claim where there was a

22 counterclaim that was given up on, just because Mr. Meagher

23 did not want to fight at that time.  And so, then, of

24 course, the board would -- then defaulted against him, but

12:48:36  25 that's what he's talking about, but it wasn't decided on

1  its merits at that time.

2        THE COURT:  You know, it was decided -- let's

3  leave it at that -- at that time.  But what standing would

4  Mrs. Meagher have to contest that?

12:48:59  5        MS. TRIPP:  She is a different party, Your

6  Honor, and she had an interest.

7        THE COURT:  So she has to file -- well, I mean,

8  the trouble with this case, we haven't actually established

9  some of the basics like who does, in fact, own what?  Here

12:49:14  10  we are three years into this, and we have got secret deals

11  for $400,000, and all that.

12        MS. TRIPP:  No, Your Honor.  You're --

13        THE COURT:  Ma'am, don't interrupt me.

14        MS. TRIPP:  Beg your pardon.

12:49:27  15        THE COURT:  I want hard data, business records

16  like somebody would keep who had a business for which to

17  keep them.  And I am all in favor of informality and

18  casualness, but corporate entities and their behavior has

19  to be relatively formal, and documented mainly so franchise

12:49:58  20  taxes can be collected.

21        The State of Texas probably wouldn't care

22  what you did with any name that you got from them, if there

23  weren't a franchise tax.

24        And so the floating titles -- be

12:50:17  25  interesting to know who has been paying the franchise taxes

1 on whatever they claim still to have.  But this case was

2 brought by HEB -- and we're going to litigate the claims it

3 brought unless somebody -- is there a counterclaim?

4                    MR. PATE:  Yes.

5                    THE COURT:  We got some.  But then to go almost

6 three years later and file an action making the same claims

7 about the same sites in Dallas, is transparent.

8                    MR. PATE:  Your Honor, I think that the concern

9 of the Court is, is GHER Solutions, LLC, a formal limited

10 liability company?

11                    THE COURT:  No.  We talked for an hour or two

12 today, and read a lot of these things yesterday.  Where did

13 GHER get an interest in all this stuff?

14                    MR. PATE:  GHER has owned the platform.  It

15 doesn't own the trademark.

16                    THE COURT:  Where did it get it was my

17 question.

18                    MR. PATE:  I'm sorry?

19                    THE COURT:  Where did it get its stuff?

20 Whatever assets Solutions has, whence cometh?

21                    MR. PATE:  Uh-huh.  Like any other LLC would

22 acquire assets.

23                    THE COURT:  That -- no.  I want to know -- you

24 can buy them.  You can steal them.  You can lease them.

25                    MR. PATE:  What specific assets do you want to

1  know?

2           THE COURT:  I want to know what assets it has.

3           MR. PATE:  Okay.  I can --

4           THE COURT:  And when it got them and from whom.

12:51:56   5           MR. PATE:  I can provide this Court with what

6  are the assets of GHER Solutions, LLC, when they obtained

7  them, what their balance sheets look like.

8           THE COURT:  All right.  Since we're all

9  familiar with this -- I hope Mr. Meagher is not ill.  Was

12:52:16   10 he ill?  Is that why he is not here?

11          MR. PATE:  No.  No.  He is just --

12          THE COURT:  Okay.

13          MR. PATE:  I don't usually bring clients to a

14 hearing unless --

12:52:25   15          THE COURT:  You did the previous four or five

16 times.

17          MR. PATE:  Well, he sometimes jumps on an

18 airplane and comes down if he is available.

19          THE COURT:  No.  That is not a criticism to

12:52:34   20 you.

21          MR. PATE:  So I typically --

22          THE COURT:  He may have volunteered.

23          MR. PATE:  I typically don't bring my

24 clients --

12:52:40   25          THE COURT:  No.

1          MR. PATE:  -- to hearings.  I bring them to

2     trial.  I don't even bring them to summary judgment

3     hearings.  But Mr. Meagher is very hands on with this

4     business, and he oftentimes wants to jump on an airplane

12:52:52  5     and see what is going on here.

6          THE COURT:  And it is his case.  He is welcome

7     to it.  I just -- when you said he couldn't be here today,

8     I thought perhaps I would inquire that he is --

9          MR. PATE:  I don't know the exact business that

12:53:01  10     he is conducting today, why he couldn't come.  I know he is

11     a very busy person.

12          THE COURT:  Yes.  And so I don't care whether

13     he -- he can be bass fishing someplace.  As long as he is

14     not sick.

12:53:11  15          MR. PATE:  And two other points, Your Honor.

16     GHER Solutions is not the alter ego of Todd Meagher, and I

17     think that when we produce these documents, you'll see that

18     they're not one in the same.  Although Mr. Powers would

19     like to show that he is the man behind the curtains in

12:53:28  20     everything, he is not.  It is a formal limited liability

21     company, and I think it's important to note that at the

22     deposition of Mike Lindell, I told Mr. Powers, you may want

23     to bring in GHER Solutions into this.  He said, I have

24     looked at the records.  I have made a decision not to.  So

12:53:47  25     he has left GHER Solutions out of this case, and GHER

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 Solutions has its own legal rights which it is seeking to

2 enforce.

3         THE COURT:  And did you tell him then, I was

4 going to file something in Dallas?

12:53:59 5         MR. PATE:  No.  I did not tell him that.

6         THE COURT:  He might have changed his mind

7 right then for you.

8         MR. POWERS:  Your Honor, I think at the time my

9 question was:  How does GHER Solutions own anything here?

12:54:08 10 And I don't think I ever got an answer to that question.

11 So our view has always been whatever GHER Solutions does,

12 whatever MyStore, Inc. does, whatever YourStore, LLC does,

13 whatever any of these entities do, Todd Meagher will be the

14 man who actually does the thing.  And if we can get --

12:54:24 15         THE COURT:  And he has said that here.

16         MR. POWERS:  That is right.  If we can get

17 injunctive relief against Mr. Meagher, then we are not

18 concerned that any of his entities will be doing anything

19 because they have no substance other than Mr. Meagher.

12:54:35 20         MR. PATE:  They have not pled that Todd Meagher

21 is the alter ego of anything.

22         THE COURT:  You want them to plead it as

23 opposed to state the obvious?

24         MR. PATE:  Yeah.  I actually would rather them

12:54:49 25 plead what their exact claims are because --

1              THE COURT:  Wait.  Counsel, I asked you a

2    simple question.  Do you want them to plead --

3              MR. PATE:  Yes.

4              THE COURT:  -- alter ego?  Yes or no?  Or

12:55:02   5    maybe.  Pick one.

6              MR. PATE:  Give me a second to think about it.

7                   No, I do not want them to plead it, Your

8    Honor.

9              MR. POWERS:  As a practical matter, Your Honor,

12:55:10  10    the virtue from our perspective of alleging alter ego would

11    be so that we could collect money from an alter ego.  In

12    this case -- we don't seek money in this case.  We just

13    seek for them to stop and then we will be done with it.

14                   So from our perspective, an injunction

12:55:25  15    against Mr. Meagher that he can't do wrong and he can't do

16    wrong through any other organization or name is all the

17    relief that we need.  We are not trying to reach into the

18    pocket of GHER Solutions.  I doubt that it has a pocket.

19              MR. PATE:  Your Honor --

12:55:56  20    THE COURT:  Yes, ma'am.  Yes, sir.

21              MR. PATE:  -- how long are you giving me to

22    produce the records of GHER Solutions?

23              THE COURT:  Friday.

24              MR. PATE:  Friday of this week?  Thank you,

12:56:06  25    Your Honor.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1            THE COURT:  I mean, he knows all about it.  We

2  know all about it.  Where is the list?  I thought I was

3  being neat but I -- no.  Go away.

4            All right.  You're all local, aren't you?

12:57:16  5            MR. POWERS:  Your Honor, Ms. Fuller and I are.

6  Mr. Wimberly and Mr. Smith are from Austin.

7            THE COURT:  All right.  Since the other lawsuit

8  is pending in Dallas, I am going to send them to Dallas

9  instead of Austin.  They will build character up there.

12:57:39  10  Did you drive?

11            MR. SMITH:  (Nodding.)

12            THE COURT:  Why don't you take an hour.  We

13  will come back, and see if I can do some wrapping.

14            THE LAW CLERK:  All rise.

02:00:31  15  (Proceedings recessed from 12:57 to 2:07.)

16            THE COURT:  Thank you.  Please be seated.  Do

17  we have a related litigation list?

18            MR. POWERS:  Your Honor, we have prepared

19  different chronologies over time that have listed the

02:07:42  20  various matters.  I don't know that we have got one that's

21  been updated recently.

22            THE COURT:  Apparently the Meaghers were

23  discharged in bankruptcy on February 26, 2008, in Fort

24  Worth.  Did you know that?

02:08:01  25            MR. POWERS:  That sounds familiar, Your Honor.

1 I seem to recall asking Mr. Meagher about that in his

2 deposition.

3        THE COURT:  So in the case HEB, LP vs. Todd

4 Meagher, the opposer's motion to suspend this proceeding

02:08:48  5 pending final determination of what I think is us, is

6 granted as conceded.

7        MR. POWERS:  Yes, Your Honor.  This is the

8 suspension of the proceeding that followed Mr. Meagher's

9 2018 application.

02:09:08  10        THE COURT:  Right.

11        MR. POWERS:  After Mr. Meagher sold his domain

12 names to Mike Lindell, Mr. Lindell sought a trademark with

13 the Patent and Trademark Office.  The Patent and Trademark

14 Office denied his application on the grounds that MyStore

02:09:26  15 was too similar to Mi Tienda.  At that point, Mr. Lindell

16 withdrew his application, and then Mr. Meagher, all of a

17 sudden, applied for MyStore again, this time in his own

18 name.  And HE- -- that mark was published for opposition.

19 HEB opposed the mark, and that matter is now currently on

02:09:47  20 suspension in light of your pending case.

21        THE COURT:  Okay.

22        MS. TRIPP:  Your Honor, may I reply to that

23 briefly?

24        THE COURT:  Yes, ma'am.  I looked it up to see

02:09:56  25 what it said.

1          MS. TRIPP:  Right.  Well, the -- Mr. Lindell's

2  application was rejected based on a lot of applications.

3  It wasn't on -- it was not a focus by the trademark office

4  on Mi Tienda.

02:10:08    5          THE COURT:  Wait a minute.  I don't have that.

6          MS. TRIPP:  I was just replying to what he

7  said.  I just didn't know what he was representing.

8          THE COURT:  No.  All I care about is there was

9  an action.  And the answer is, it was stayed or withdrawn.

02:10:21   10          MS. TRIPP:  Okay.

11          THE COURT:  But I would be happy to read the

12  order if there is any reason to.

13          MR. POWERS:  We would be happy to compile those

14  for Your Honor.  I don't think it is necessary to decide

02:10:37   15  the pending motions to dismiss --

16          THE COURT:  It doesn't strike me -- for the

17  poor old court reporter's sake, would you spell Lindell?

18          MR. PATE:  L-I-N-D-E-L-L.

19          THE COURT:  Does he have a first name?

02:10:56   20          MR. PATE:  Michael.

21          THE COURT:  Okay.  Spelled the traditional way?

22          MR. PATE:  Correct.

23          THE COURT:  Why did Mr. Meagher file for

24  bankruptcy in the Fort Worth Division of the Northern

02:11:33   25  District of Texas?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1        MR. PATE:  I am not privy to any of that

2   information, the facts or circumstances of that.

3        THE COURT:  Do I understand correctly that

4   Mrs. Lindell filed for MyStore, or Mi Tienda, withdrew it.

02:12:19   5   He filed one, and it was stayed.  Mr. Lindell filed -- this

6   is out of chronology I am sure.  Mr. Lindell filed one and

7   dismissed it.  It actually comes her, Lindell, and

8   Mister --

9        MR. PATE:  The actual application that was

02:12:38   10   filed was filed by Mike Lindell Products, LLC, I think it

11   is.  And the reason that was rejected was because the

12   description of use was all messed up.  Made it sound like

13   it could be retail business.  And so they rejected it, and

14   they scrapped it.  And then Todd Meagher decided what he

02:13:05   15   would do is he would reapply for his trademark application

16   using the identical description of use that he used before,

17   and because of that, the trademark office published it for

18   opposition.  And they allowed it.

19            And then HEB opposed it, and so --

02:13:26   20        THE COURT:  That is why they do the publish for

21   opposition.

22        MR. PATE:  That's where we are now.  Yes.

23        THE COURT:  They want to see who disagrees.

24        MR. PATE:  I think that the interesting thing

02:13:37   25   there is, when Mr. Meagher reapplied for his original

1 trademark application, used the identical use and

2 description of goods and services, HEB didn't oppose that

3 for seven years, but now they opposed it for no reason

4 whatsoever.

02:14:08   5          THE COURT:  They didn't oppose Mr. Meagher's

6 revision of what he had sold to Lindell?

7                 Lindell moved to have a copyright on what

8 he had bought.

9                 MR. PATE:  True.  Trademark on his --

02:14:26  10          THE COURT:  And so when they said no, then

11 Mr. Meagher applied.

12          MR. PATE:  Right.  Mr. Meagher said, I'll get

13 this right for you, Mr. Lindell.  Let me apply using my

14 original language that the United States Patent and

02:14:45  15 Trademark Office has already approved before.  And he

16 contacted the chief examiner and they said, If you reapply

17 using the same language as before, we'll publish it for

18 opposition, and they did.

19                 Basically, Mr. Meagher's assisting

02:14:58  20 Mr. Lindell to get it published correctly.

21          THE COURT:  But he got it in his name.

22          MR. PATE:  Yes.  And then he will transfer the

23 rights over to Mr. Lindell.

24          THE COURT:  Since he had already transferred

02:15:12  25 the rights -- well, the title on the Buick needed to be

1 countersigned by the previous owner's grandmother or

2 something.  And so he went to fix that, but he doesn't have

3 any standing to sue anybody because he's transferred the

4 Buick defectively.

02:15:37 5          MR. PATE:  No.  He has transferred the domain

6 name, not the trademark rights --

7          THE COURT:  They count.

8          MR. PATE:  -- or any of that.  So --

9          THE COURT:  Whatever it is --

02:15:48 10          MR. PATE:  Mr. Lindell was wanting to get --

11          THE COURT:  He applied -- he applied for a

12 copyright on a domain name he no longer owned.

13          MR. PATE:  Right.  And he did this on behalf of

14 Mike Lindell.

02:16:01 15          THE COURT:  No.  He didn't say that in the

16 papers, did he?

17          MR. PATE:  There was no requirement to.

18          THE COURT:  Counsel, the answer to my question

19 is "no, sir."

02:16:10 20          MR. PATE:  He did not in the application

21 papers.  Basically, told Mike Lindell, I'll get the

22 application using my original application language.

23          THE COURT:  To something he didn't own.  "He"

24 being Meagher.  Because once you convey it to him, he is

02:16:32 25 saying, Come patch the Buick so I can use it, because you

1  told me it was in running shape.

2           MR. PATE:  Well, there is a distinction.

3           THE COURT:  The title doesn't revert.

4           MR. PATE:  He still owned the common law

02:16:44  5  rights.

6           THE COURT:  He didn't.  He sold all his rights.

7           MR. PATE:  No, no, no.  He sold the domain

8  name.  He did not sell his common law rights in the brand,

9  and in MyStore, or MyStore.com.  He just sold the domain

02:16:59  10  name.  That's one component.  That is one key aspect of the

11  business, but he did not sell tax, title, and license,

12  everything.  He did not sell the trademark rights.  He has

13  subsisted.  He has continued to own common law rights in

14  the trademark.

02:17:20  15           THE COURT:  He has nothing from the national

16  government to give him a temporary monopoly.

17           MR. PATE:  No.

18           THE COURT:  That's the important question.

19           MR. PATE:  But he still has subsisting common

02:17:35  20  law rights.

21           THE COURT:  Absolutely.  And probably under the

22  Wausau Treaty.

23           MR. POWERS:  And, Your Honor, I would simply

24  point out I don't know what those subsisting common law

02:17:45  25  rights would be.  Common law trademark, of course, comes

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 out of use; and presumably, if Mr. Meagher has conveyed the

2 only website that could be called MyStore.com, he has

3 conveyed the ability to use this mark.  And I presume

4 Mr. Lindell would not want Mr. Meagher to be running a

02:18:05  5 business called "MyStore" while Mr. Lindell is attempting

6 to do that.

7            I understand that Mr. Meagher thinks that

8 he has some kind of ability to influence the process with

9 the Patent and Trademark Office.  I don't know if that is

02:18:16  10 something that is valid.  But in any event, it's been

11 opposed, and so I -- the relative --

12            THE COURT:  Somebody needs to explain that to

13 the trademark office.  He can't just say, I own it.

14 They're yours, Mike.  It's mine, trademark office.  No,

02:18:32  15 it's not Mike's.  They're mine.

16            MR. PATE:  No.  He has only sold the domain

17 name.

18            THE COURT:  I got that.

19            MR. PATE:  Right.  He still --

02:18:42  20            THE COURT:  But he didn't tell -- when he

21 applied, he didn't say, Now, I sold this to Lindell.

22            MS. TRIPP:  I don't think the application was

23 for MyStore.com.  I think the application is MyStore.

24 There is a difference in MyStore.com as a domain name and

02:18:59  25 MyStore as a trade name.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          THE COURT:  Ma'am, I understand the difference

2  between the name and a website --

3          MS. TRIPP:  Correct.

4          THE COURT:  -- address.  I understand.  And so

02:19:09   5  it's Mr. Meagher's position that he only sold the domain

6  name.  That's fine.

7          MS. TRIPP:  (Nodding.)

8          THE COURT:  I want to see where in writing he

9  told Lindell, But you can't use MyStore as a label if you

02:19:27   10  produce something.  You can't use it.  He couldn't --

11  Lindell could not open a MyStore classical movies, right?

12  Because --

13          MS. TRIPP:  They don't have to.  I mean, they

14  can agree on usage of the trademark totally separate from

02:19:51   15  selling the domain name.

16          THE COURT:  You have a license you want to show

17  me?

18          MS. TRIPP:  They can agree.

19          THE COURT:  That is called --

02:19:59   20          MS. TRIPP:  Selling the domain name doesn't

21  control the trademark usage.

22          THE COURT:  I do not believe Lindell thought he

23  was buying a domain name, but not the name doing business

24  under, with, or through that domain name.  And this is a

02:20:30   25  microcosm of our problems here.  What it is, whose it is,

1 when it was, who's in, who's out morphs.

2          MR. PATE:  I think Your Honor is pointing out

3 the fact that this thing, this whole case, is laden with

4 fact issues that need to go --

02:21:01  5          THE COURT:  Stop it.  It is now 2:30.  I asked

6 you not to do that because you keep repeating yourself.  I

7 know what happens if they don't win on summary judgment.

8 It's the same thing that happens if you don't win on

9 summary judgment.  If both of you don't win, we will have

02:21:22  10 two trials at once.

11          All right.  The answer to the order to

12 show cause is that Todd Meagher will pay one-half of the

13 expenses for the deposition of Jeffrey Andrien,

14 A-N-D-R-I-E-N -- today is Wednesday -- by 2:00 Monday

02:22:16  15 afternoon.

16          Docket Number 226, Meagher's motion for

17 reconsideration is denied.

18          Meagher's motion for reconsideration of

19 his denial of his motion for the Court to stay this case in

02:22:56  20 favor of his newly filed one three years later is denied.

21 He wants to stay this one because that one is completely

22 different, according to Mr. Meagher's position, and it

23 therefore shouldn't be consolidated here, but this one

24 should not happen until that one happens.  Unless they are

02:23:27  25 parallel in some significant way, they shouldn't be

1  consolidated.  If they are, the other one shouldn't be

2  filed; but having been filed, it should be with the

3  oldest -- older case.

4                    The counterclaim for malicious prosecution

02:26:43   5  has no basis in fact.  Somebody else connected to this case

6  is practicing litigation, bullying.  The only difference

7  between malicious civil prosecution and trademark bullying

8  is you have to have a trademark in the first one.  There is

9  simply nothing in the pleadings, nothing I have heard in

02:27:33  10  probably fourteen hours of talk, all told, that Meagher has

11  been bullied.  Malicious civil prosecution -- the reason it

12  hasn't been bullying is all it has done is what it intended

13  to do is open a couple of stores, and put the marks on it,

14  and advertise them, which they seem to be doing, and that's

02:28:11  15  all they have done.  That they don't want Meagher to revive

16  some interest he once had but let go, and they don't want

17  to agree to that, does not make them bullies.

18                    Malicious civil prosecution, the only

19  evidence in this case of unprincipled litigation is

02:28:48  20  Mr. Meagher's -- Meagher's changing who owns what, where,

21  and filing multiple lawsuits over the same problem.

22                    So the summary judgment is granted on

23  those two.

24                    MS. TRIPP:  What are those two, Your Honor?

02:29:10  25                    THE COURT:  Pardon?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          MS. TRIPP:  What is the second one summary

2  judgment is granted on?

3          THE COURT:  Trademark bullying and malicious

4  civil prosecution.  And because of those two things, the

02:29:36   5  claim for prosecution has -- cancellation, the evidence

6  shows, that HEB has done nothing that would support

7  eviscerating its rights in all the registrations it has.

8          The rights that Meagher had earlier was

9  not impeded or otherwise affected by HEB because they --

02:31:46  10  the trademark office and HEB agreed that they were

11  cancelled because Mr. Meagher did not meet his

12  responsibility to maintain them.

13          Whatever the examining attorneys say in

14  the process, the Court's only concerned with decisions.

02:33:10  15  There's still no evidence that the defendants are using the

16  marks in commerce.  That they are "fixing to," as we say in

17  the country, may be true.  I rather wish they wouldn't

18  because they don't have any right to do it, but...

19          Mr. Meagher's deletion of the customers

02:34:23  20  for MyStore after the suit was filed pretty well answers

21  the question that it would have been against him.

22          Since the MyStore, expanded sometimes to

23  Mi Tienda, combination under the Meaghers have -- for

24  everything in the record had no business, and therefore

02:35:18  25  nothing HEB did could have interfered with it.  I

1 understand the argument that, Well, what makes a website,

2 web domain name valuable is not sales, but the number of

3 customers.  That only works for a little while.  Yes,

4 Mr. Bezos ran Amazon for six or seven years before showing

02:35:53    5 a profit, but I know from at least the second year he had a

6 loyal following of one customer in Texas.  Anybody who will

7 bring you books to your door has got to be pretty good.

8                HEB has two stores that are real, live

9 operating things with inventory, customers, cost sheets,

02:36:27   10 personnel departments.  And, no, it doesn't have to be big.

11 It doesn't have to have a lot of employees.  It has to do

12 something that's marketable.  And the only thing that

13 Mr. Meagher had to sell to his good friend, which is

14 clearly not an arm's-length transaction, was the domain

02:37:08   15 name.  It has been mentioned that maybe Mr. Lindell was

16 upset when he found out he didn't get the whole package,

17 but we don't really have a record on that.

18                The suit was filed in September, is that

19 right, of '17?

02:37:44   20           MR. POWERS:  I believe that's correct, Your

21 Honor.

22           THE COURT:  Your help says yes.

23           MR. POWERS:  The original complaint was

24 September 19th of 2017, Your Honor.

02:38:02   25           THE COURT:  All right.  So it was incorporated

1 May and June, July, August, three-and-a-half months later,

2 HEB sought redress.  There was no delay to entice him to

3 bankrupt himself in order to promote the marks because

4 that's not what was happening.

02:39:14    5                 So how did it happen that Meagher filed

6 two applications for MyStore in May of 2017?  Are they just

7 an expansion of the earlier ones?

8                 MR. PATE:  I'm not sure, unless I can see those

9 applications.

02:39:38    10                THE COURT:  Well, I just have the textual data.

11 I can tell you --

12                MR. PATE:  One may have been for MyStore.  The

13 other may have been for MyStore.com.

14                THE COURT:  It's not the way they're listed,

02:39:57    15 but it's action 87 -- I mean -- I'm sorry.  Yeah.

16 87/462,085 and 87/462,127.

17                MR. POWERS:  It appears, Your Honor, that one

18 of those two applications was for MyStore, and the other

19 one was for MyStore with a stylized script that was filed

02:40:33    20 on May 24th, and then abandoned on September 14th of the

21 same year.

22                MS. TRIPP:  Your Honor, I believe

23 Mr. Meagher's -- after he realized that he -- he had failed

24 to timely renew his application -- his registration, he

02:40:51    25 refiled.  And as I understood, he filed -- I think HEB,

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 | then, protested.  Right?  And so he -- because he -- when

2 | he refiled, he decided to file with a more modern

3 | description, and that's when HEB protested.  And so then he

4 | later -- and I think the 2017 application, I think, was

02:41:16  5 | when he went back and refiled under his original

6 | description, thinking, Okay, well, if that doesn't -- you

7 | don't like my new description, let me just go back to where

8 | I was in the beginning and describe it.  And I think that's

9 | the 2017 ones you're talking about is when he was going,

02:41:30  10 | Okay, let me try this again.

11 |       THE COURT:  So one of them had topography that

12 | was artistic and the other was just a name?

13 |       MS. TRIPP:  Oh, well, the two different ones,

14 | yeah.  I thought you were asking why they were filed in

02:41:45  15 | 2017, right.  Yes.

16 |       MR. POWERS:  Looks like one is just the

17 | ordinary word and then one is this --

18 |       THE COURT:  An elegant.

19 |       MR. POWERS:  A proprietary font, perhaps.

02:42:01  20 |       THE COURT:  So he forfeited his title first.

21 | Then he made these two applications, which he then

22 | abandoned.

23 |       MS. TRIPP:  He made two that -- I thought that

24 | HEB objected to, and then he was trying to just get it --

02:42:17  25 | he was just trying to get a registration back, and so I

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 think he went back to his original description.  That's the
2 way I remember it.

3         MR. POWERS:  It appears that the May 2017
4 application was never published for opposition, so HEB
02:42:29 5 wouldn't have had an opportunity to oppose that.  But there
6 was at that time the earlier application from 2015 which
7 was in an opposition proceeding.

8         MS. TRIPP:  Yeah.  I think he -- after they --
9 after HEB filed the lawsuit when the 2017 applications were
02:42:44 10 going, I mean, he decided, well, this isn't working either
11 so he didn't pursue those anymore either.  But, I mean,
12 that was when the lawsuit was underway then, when those
13 last applications were filed.  So...

14         THE COURT:  All right.  Apparently, the record
02:43:01 15 shows he abandoned the two applications that were made
16 post-forfeiture, post-issuance to HEB, and he abandoned
17 those September 14th, 2017.

18         MS. TRIPP:  Right.  Wasn't the lawsuit already
19 filed then?

02:43:21 20         THE COURT:  I think it was filed on the 9th or
21 something.

22         MR. POWERS:  The lawsuit was already filed.  He
23 withdrew those new applications on September 14th, 2017.
24 The same day he submitted the applications again in the
02:43:32 25 name of Alexis Meagher.

1          THE COURT:  What was the last one?  And then?

2          MR. POWERS:  That he submitted the applications

3 again.  He withdrew them in his own name and then submitted

4 new applications in the name of his wife on that same day.

02:43:46  5 The lawsuit was already pending.  Sorry, the lawsuit was

6 pending five days later.  I apologize.

7          THE COURT:  That's all right.  So where is the

8 December 4th, 2018 application for MyStore?

9          MR. POWERS:  The December 4th, 2018 application

02:44:38  10 is the one that HEB has opposed and is on suspension at

11 this time.

12          THE COURT:  Okay.  So that's the last one so

13 far.

14          MR. PATE:  That's correct.

02:44:47  15         MR. POWERS:  I believe that's right, Your

16 Honor.

17          THE COURT:  So the litigation was a year and a

18 month or so old at that point.

19          All right.  There is no contest to HEB's

02:45:13  20 title to the MyStore and Mi Tienda; and Mi Tienda comes in

21 two versions, the plain and the woodblock cut.  Would you

22 agree?

23          MR. POWERS:  Correct, Your Honor.

24          THE COURT:  Your nod was fine, but --

02:45:39  25        MS. TRIPP:  Except for the genericness.  I

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 mean, I think in a sense that's contesting it, the

2 ownership, because generic marks belong to the public.

3              THE COURT:  The original ones, right?

4              MS. TRIPP:  The --

02:45:52  5          THE COURT:  The original ones that HEB got.

6              MS. TRIPP:  Yeah, when -- they're being

7 challenged as generic.

8              THE COURT:  Ma'am, I know that.

9              MS. TRIPP:  Okay.

02:46:01 10          THE COURT:  I just want to make sure we're just

11 talking about those two as being generic.

12              MS. TRIPP:  Yes, Your Honor.

13              THE COURT:  Don't sit down.  I have a question

14 for you.  If HEB's are generic, so are Meagher's.

02:46:12 15          MS. TRIPP:  It didn't -- it depends on what it

16 is for, Your Honor.

17              THE COURT:  No.

18              MS. TRIPP:  Marks aren't -- yes, it does.

19              MR. PATE:  Your Honor, the reason why

02:46:23 20 Mr. Meagher's are not generic is because MyStore, if he

21 owned a brick-and-mortar store, yes, it would be generic,

22 but it is fanciful because he doesn't own a

23 brick-and-mortar store.  It is fanciful -- fanciful because

24 he has an Internet social platform for sales that works as

02:46:44 25 kind of a proxy store.  And so it's the fancifulness that

1  it is --

2             THE COURT:  How is it different from eBay?

3             MR. PATE:  Pardon me?

4             THE COURT:  How is his plan different from

02:46:53  5  eBay?

6             MR. PATE:  It's not all that different.

7             THE COURT:  All right.  So we worked that out

8  earlier so we all know what we're talking about, more or

9  less.

02:47:04  10            MR. PATE:  He could call his website -- instead

11 of eBay, could call it eStore or MyStore.

12            THE COURT:  Okay.

13            MR. PATE:  And it's --

14            THE COURT:  Wait.  Wait.  Wait.  No.  Don't

02:47:14  15 change the subject.

16            MR. PATE:  Okay.

17            THE COURT:  If MyStore, Mi Tienda, are generic

18 when HEB does them, it's generic when Meagher does them.

19            MR. PATE:  No, because they own a store.  It's

02:47:27  20 like if they own --

21            THE COURT:  They also own a website.

22            MR. PATE:  If they --

23            THE COURT:  Wait.  They own a website.

24            MR. PATE:  They have a website, but that's

02:47:33  25 still -- they have it for retail grocery store services.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          THE COURT:  And you -- your client has promoted

2   grocery sales -- I don't know what I did with the picture.

3   None of that which is produced somehow, for some -- for the

4   survey, I guess, but the one that has all the pictures that

02:48:02    5   was actually posted.  We actually may not have one.

6          MS. TRIPP:  Your Honor, I don't think HEB sells

7   groceries off their website.  I think it's just an

8   advertisement for the grocery stores.

9          THE COURT:  Shh.

02:48:19   10          MR. POWERS:  I don't know if Your Honor has the

11   HEB app on your phone, but you can buy groceries online.

12   You can buy groceries online, have them delivered to your

13   home or to your office.

14          MS. TRIPP:  That is HEB, right, but not Mi

02:48:32   15   Tienda?

16          MR. POWERS:  Including Mi Tienda products.

17          THE COURT:  I need some --

18          MR. PATE:  That is a recent development, by the

19   way.

02:48:39   20          MS. TRIPP:  That's what I thought.  I thought

21   in the record it shows you didn't.

22          THE COURT:  Wait.  It is.  Unlike assertions

23   your client has made in a great variety of forums about

24   what he has been and is doing, which have turned out not to

02:48:54   25   exist.  HEB's statement was currently, it does.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1                All right.  So the record is clear, we

2  have HEB 1198 being a fuzzy representation of their

3  website, right?

4                MR. POWERS:  Yes, Your Honor.

02:49:46    5                MR. PATE:  Whose website is that?

6                THE COURT:  Pardon?

7                MR. PATE:  Whose website is that, Your Honor?

8                THE COURT:  Theirs.

9                MR. PATE:  Their website?  Okay.

02:49:53   10                THE COURT:  So we will make that Hearing 001.

11                MR. PATE:  But the fact that they have a

12  website, that they advertise grocery products on their

13  website, they have curbside service, and they have a

14  brick-and-mortar store, if they were to call their store

02:50:17   15  MyStore, or this case Mi Tienda, it's generic because

16  it's -- they are trying to get a trademark on what their

17  entity, or their -- their thing is, and it's a store.  It's

18  a brick-and-mortar store, but we're a website only.

19                THE COURT:  Counsel --

02:50:34   20                MR. PATE:  But we sell through that website.

21                THE COURT:  They sell through that website.

22                MR. PATE:  Pardon me?  It's not us selling

23  through the website.  It is other people social networking

24  and selling through the portal.

02:50:46   25                THE COURT:  It's commercial networking.

1          MR. PATE:  Right.  Commercial networking.

2          THE COURT:  If I go on eBay and buy a rocking

3  chair, that is no different than going into a store with

4  rocking chairs where the store is owned by somebody else,

02:51:08  5  and the operator is a tenant, and he has goods on

6  consignment.  So that's got about four layers.  The essence

7  of it is, a rocking chair leaves the building, and money

8  comes in.  And if they deliver it, it leaves the building

9  under the control of the vendor.

02:51:31  10          Now, in the Mudville Flats Ooh Lala web

11  page, is this one, so we will make this H002.  And it has

12  olive oil.  I don't think HEB has a hotel, but I haven't

13  checked lately.  They have flowers.  City Florist Flowers

14  and Gifts, pet wellness store probably sells a lot of pet

02:52:38  15  grooming supplies.  It says that down at the bottom in the

16  fine print.  I don't know what Betabrand does.  Do you?

17          MR. PATE:  I'm sorry?

18          THE COURT:  Betabrand.

19          MR. PATE:  I don't know what Betabrand is.

02:52:52  20          THE COURT:  It's in San Francisco, so we

21  probably don't want to know.  The Kiss It Good Buy

22  furniture consignment is pretty funny.  They sell clothes

23  at HEB?

24          MR. POWERS:  At the Mi Tienda stores, there are

02:53:17  25  tenants who lease space within the store that have

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 entrances into the store.

2          THE COURT:  You're a website, a

3 brick-and-mortar website.

4          MR. POWERS:  No.  But we --

02:53:27   5          THE COURT:  Same idea.

6          MR. POWERS:  That is right.  We have tenants.

7 There is a western wear that is there.  I believe there is

8 a jewelry and watch boutique that is there, and what other

9 tenants I'm not entirely sure, but there would be clothing

02:53:41   10 available.

11          MR. PATE:  I think the distinction, though,

12 between the two websites is HEB is advertising HEB products

13 on HEB's website.

14              On this website, on MyStore.com, other

02:53:54   15 people are advertising their consigned products on that web

16 page, and so I think it makes the two very different.  And

17 they don't even appear the same.

18          MR. POWERS:  Your Honor, I believe it turns out

19 to be a distinction without a difference that we, in fact,

02:54:09   20 lease space to other vendors who sell within the Mi Tienda

21 facility.  In both cases, we are talking about marketplaces

22 where people can make purchases.  In both places, we are

23 talking about people who are trying to use this name to

24 convey to the consumer that this is a place where they can

02:54:28   25 acquire goods and services.

          KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1             MR. PATE:  But the distinction there is we're

2    an Internet marketplace just like our description of goods

3    and services says.  They are a brick-and-mortar store,

4    where they sub- -- they rent out spaces to people who want

02:54:41    5    to sell cowboy boots, and belt buckles, and things like

6    that.  But it is not Mi Tienda products being sold.  It is

7    subleasing their space.

8             But what makes us unique --

9             THE COURT:  Wait a minute.  Mi Tienda sells

02:54:56    10    three or four different ways.  You go in and buy it and

11    take it to your car and go home.  You see it on the website

12    and call them.  Probably has to be done on a computer.

13             MR. POWERS:  I believe that's right.

14             THE COURT:  Even people who don't have home

02:55:19    15    delivery and stuff now, they don't want you to call them on

16    the phone and order something.  They want you to get on

17    their website and e-mail it.  And, you know, people like

18    Macy's still have brick-and-mortar stores, none of which

19    they probably own in this day and age.  It is cheaper to

02:55:36    20    lease them from somebody.

21             MS. TRIPP:  Your Honor, the HEB markets for

22    retail grocery store services is not for clothes or --

23             THE COURT:  Grocery stores in America sell lots

24    of stuff.  It's like drugstores.  You go in a drugstore,

02:55:54    25    you're still shopping in a drugstore, but you can get all

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1    kinds of beauty products, which I obviously don't use.  And

2    then there are toys, there are gift cards, pet supplies,

3    all wound through rows that you go through with delicious

4    candies and things when you get to the prescription

02:56:19    5    section.  And I probably missed several things.

6                    The fact that they do other things, too,

7    doesn't keep it from being --

8                    MS. TRIPP:  Well, the registration says

9    "grocery store services."

02:56:33    10                    THE COURT:  I just answered that one, I think,

11    as best as I can.

12                    MS. TRIPP:  Okay.

13                    THE COURT:  So what is the gross number of

14    tenants, or whatever you call people who use your web --

02:56:52    15    website, but it's not their -- the people like the Kiss It

16    Good Buy furniture company, when you click on that, do you

17    get pictures of the available furniture?

18                    MR. PATE:  Uh-huh.  Yes.

19                    THE COURT:  And do they have all kinds of

02:57:12    20    furniture?

21                    MR. PATE:  Yes.

22                    THE COURT:  Have anything besides furniture

23    like vases and pillows?

24                    MR. PATE:  No.  I think furniture is their

02:57:21    25    specialty.  I don't think you will find pet supplies.

1           THE COURT:  I don't know.  Throw rugs and

2    something else I don't know anything about.

3                So the 36 results that got printed here

4    seem all to be Mi Tienda branded products.  We are assured

02:58:02  5    that there are additional products which are not Mi Tienda.

6           MR. POWERS:  Yes.  That is right, Your Honor.

7    What you see there are Mi Tienda brand products available

8    on various HEB websites.  There is also --

9           THE COURT:  That is because the search term was

02:58:22  10   Mi Tienda.

11          MR. POWERS:  Yes.  There is also, for example,

12   the Mi Tienda web pages where they describe the bakery

13   products, or Mi Tienda products, things of that nature,

14   that are offered in the physical store.

02:58:49  15          MR. PATE:  And, Your Honor, on our website,

16   MyStore.com, or MyStore.network, you will not see a list of

17   Mi Tienda products such as tortillas and tamales for sale

18   because we don't --

19          THE COURT:  So you're telling me if the Sonoran

02:59:07  20   League for Better Cuisine wants to work through your

21   website, you wouldn't work with them and advertise their

22   tamales and --

23          MR. PATE:  If it was a company other than Mi

24   Tienda, some person want -- has a start-up company of food

02:59:25  25   that they want to sell, as long as they're not representing

1  it to be Mi Tienda, or HEB products, you know, they could

2  get space on the website to market their product.

3          MR. POWERS:  Your Honor, I would say that there

4  is absolutely no evidence whatsoever that anybody

02:59:43  5  associated with MyStore ever attempted to screen what was

6  being offered on their website, or somehow prevent people

7  from selling things that would violate the intellectual

8  property rights of other parties.

9          MR. PATE:  But I don't think you know that.

02:59:56  10          THE COURT:  Wait.  He said there is no

11  evidence.

12          MR. POWERS:  Exactly, Your Honor.  There simply

13  hasn't been any explanation of any system like that in

14  their possession.  Apparently, Mr. and Mrs. Meagher, as far

03:00:09  15  as we know, were the only people involved in administering

16  the site.  I understand Mr. Meagher's son, Nick, did some

17  coding for the site as well.  But they haven't described

18  any activity associated with screening products, or

19  protecting intellectual property rights at all.

03:00:27  20          MR. PATE:  But I don't think you see any

21  rampant violations that are on that website.  Like we're

22  trying to sell knockoff, you know, Louis Vuitton purses or

23  something like that.

24          THE COURT:  You would have a lot of competition

03:00:43  25  in that.  Friend of mine said he was having a hard time

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 getting his passport renewed, and I said, Why don't you

2 just go out on Harwin?  You can get a new American passport

3 and a Harvard degree, and --

4          MR. PATE:  In 30 minutes.

03:00:59  5          THE COURT:  -- anything else you wanted.

6          MR. POWERS:  I think Your Honor's beginning

7 proposition here was quite right that if the phrase

8 "MyStore" by itself is generic, then it is generic whoever

9 uses it.  It would be an argument that the consuming public

03:01:15  10 regards that word as being something that describes a

11 category of goods rather than a particular vendor.

12          THE COURT:  And it would vitiate Meagher's

13 claim, too.

14          MR. PATE:  Well --

03:01:28  15          THE COURT:  If MyStore is generic, it's

16 generic.  And it doesn't matter whether you're selling

17 gasoline, you know, there are all these stores that --

18 service stations now.  Timewise, I think was with Shell or

19 Exxon.  Their stores are all run by Timewise.

03:01:49  20          MR. PATE:  We have never been challenged as

21 being generic, not even by the trademark examiner.

22          THE COURT:  But you're stayed.  You're stayed.

23          MR. PATE:  Pardon me?

24          THE COURT:  You're stayed now.

03:01:57  25          MR. PATE:  Well, what makes us nongeneric is

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 because we don't have a brick-and-mortar store.  So we are

2 not describing anything more fanciful and arbitrary, which

3 is the requirement when you file a trademark.

4          THE COURT:  No.  The consumer doesn't care

03:02:09  5 whether it comes from a website in some basement in

6 Baltimore, but the people -- you could actually run one of

7 these things by -- be camping in Wyoming, and if you

8 brought your laptop, you could run a -- an only Internet

9 store while there was no headquarters.  But that doesn't

03:02:41 10 have anything to do with the mark because what we're trying

11 to do with the mark, it's what the consumer sees, hears,

12 reads.  Not whether Mr. Butt put his socks on today.

13          MS. TRIPP:  But, Your Honor, isn't it then how

14 a consumer views the word "Store"?  Because to me,

03:03:12 15 consumers think a store is like brick and mortar, and they

16 refer to online shopping as sites, or something similar, so

17 I'm not sure.  That's -- but I mean that is a question of

18 fact.

19          THE COURT:  Well, I am not prepared on the

03:03:28 20 genericness.  We have got too many problems before we get

21 there this morning.

22          MR. POWERS:  And as Your Honor has pointed out,

23 there is no genericness claim in this case.  It has not

24 been pleaded in this case.  That is something the Court has

03:03:45 25 already disposed of, and so, you know, their pitch that

1  they want to try to make a late amendment, I think we have

2  explained why that would be inappropriate, but there is not

3  a genericness claim before the Court to be decided.

4              MR. PATE:  There is in Fort Worth by a separate

03:04:01   5  legal entity called GHER Solutions, LLC.

6              THE COURT:  Who is nothing but another

7  appendage of Mr. Meagher.

8              MR. PATE:  Your Honor, are you making a --

9              THE COURT:  Yes.

03:04:10   10             MR. PATE:  -- judicial determination --

11             THE COURT:  Yes.

12             MR. PATE:  -- that company is not a valid

13  company, just because it was founded by Mr. Meagher?

14             THE COURT:  Counsel, today we have gone through

03:04:23   15  the inventory of file it in one name, withdraw it and file

16  it in another name, file it after the lawsuit is filed.

17  Other law- -- him adopting a new name, when the data of its

18  existence is it was created -- how long elapsed between the

19  issuance of the certificate for the LLC, and the filing of

03:04:54   20  the suit in Fort Worth or Dallas, wherever it was?

21  Bankruptcy was in Fort Worth.

22             MS. TRIPP:  It was a long time.  Years.

23             MR. PATE:  Your Honor, I have, and I can show

24  the Court here today, tax returns filed on behalf of GHER

03:05:17   25  Solutions, LLC, back in 2015.  I have them right here on my

1  phone going back to 2015, even further back, where Todd

2  Meagher was not even a member of GHER Solutions, LLC.  Nick

3  Meagher was the managing member of the company.  And so

4  Todd Meagher had nothing to do with it.  And this whole

03:05:40  5  finding that GHER Solutions, LLC is not based on any

6  evidence.  We have tax returns.  We can get an affidavit

7  from the accountant, that showed that --

8                THE COURT:  Show me a tax return.

9                MR. PATE:  Okay.  I will have to fire up my

03:05:55  10  phone.  I'll show you in one minute.

11                MR. POWERS:  If I could respond to this point

12  Your Honor, this claim that somehow Mr. Meagher didn't have

13  anything to do with it.  In this declaration that he filed

14  in the Northern District, it says, "I was the initial

03:06:18  15  founder of GHER Solutions, LLC.  I incorporated the company

16  as a Delaware limited liability company and listed myself

17  as its managing member on January 3rd, 2011."

18                MR. PATE:  That was in 2011.  I am not talking

19  about 2011.  I am talking about 2015.  Here is a tax

03:06:35  20  return.  Let me pull it up.  May I approach, Your Honor?

21                THE COURT:  Yes, sir.

22                MR. PATE:  Sorry.  I have to --

23                THE COURT:  That's all right.

24                MR. PATE:  Your Honor, I apologize.  It is so

03:07:11  25  small.  This is -- I'll let you scroll.  You will see it is

1   filed by Nick Meagher as the president.

2          MR. POWERS:  What year did he file for

3   bankruptcy?  I have it up here.

4          MR. PATE:  I don't think GHER Solutions filed

03:07:59   5   for bankruptcy.

6          MR. POWERS:  Meagher did.

7          MR. PATE:  I think Todd Meagher did.  And, Your

8   Honor, I can show you other tax returns.  Would you like to

9   see other years?

03:08:34   10          THE COURT:  Sure.  Yeah, I want a current year.

11          MR. PATE:  Okay.  He hasn't filed yet.

12          THE COURT:  Not this year.  I mean a current

13   year.

14          MR. PATE:  I'll see if I can find you more

03:09:07   15   years.  I asked him to send me a bunch of tax returns, and

16   I am not sure.

17          THE COURT:  Just some indication.  And what

18   does GHER Solutions own that is an office building,

19   royalties on songs?

03:09:35   20          MR. PATE:  I don't know offhand.  I would be

21   guessing.  I will find that information and report that to

22   the Court, what the assets are.

23          MR. POWERS:  Your Honor, according --

24          THE COURT:  Well, sources of income.

03:09:48   25          MR. PATE:  Sources of income.

1          THE COURT:  I mean, that should be an asset --

2          MR. PATE:  Yes.

3          THE COURT:  -- normally.  But sometimes you --

4    your income is from selling stuff to people.

03:09:57   5          MR. PATE:  Yes.

6          MR. POWERS:  Your Honor, I would simply point

7    out that in the paper he filed in the Northern District,

8    Mr. Meagher said that GHER Solutions does not own the

9    trademark MyStore.  It is not entitled to any of its

03:10:09   10   trademark rights, but it has some kind of agreement with

11   Todd Meagher to use the mark.

12          Then later Mr. Meagher declares that he

13   has reacquired the company from his son, Nicholas, that he

14   serves as the -- a member and managing member of GHER

03:10:26   15   Solutions, and then describes the process by which he chose

16   to file this lawsuit, which he claimed he needed to do out

17   of some fiduciary obligation to the entity.

18          So the question about whether GHER

19   Solutions is an entity that has been formed and has an

03:10:45   20   asset to its name -- I don't know what it is -- but that is

21   separate from the question of, Can it file a lawsuit in the

22   Northern District that would not be consolidated with this

23   one?  And clearly, we have an overlap of the substantive

24   issues.  Clearly, the same trademark rights in question.

03:11:02   25          THE COURT:  Same arguments.

1          MR. POWERS:  Exactly.  Same arguments.

2          MR. PATE:  Your Honor, can I respond to that

3  real briefly?

4          THE COURT:  Sure.

03:11:09   5          MR. PATE:  Okay.  We -- we have GHER Solutions

6  in that lawsuit.  We do not have GHER Solutions here.  I

7  offered that at one point.  We have Mike Lindell Products,

8  LP intervening in that lawsuit in -- there.  We have filed

9  a motion --

03:11:23  10          THE COURT:  Have you read the intervention?

11          MR. POWERS:  Pardon, Your Honor?

12          THE COURT:  Have you read the intervention?

13          MR. POWERS:  We have seen the intervention,

14  Your Honor.  It has not been granted.  And I mean there has

03:11:33  15  simply been a motion to intervene.  It has not been heard.

16          MR. PATE:  It has not been opposed either.  And

17  then also, GHER Solutions is moving for declaratory

18  judgment and for cancellation.

19          THE COURT:  Wait.

03:11:46  20          MR. PATE:  And this Court has said it will not

21  entertain cancellation for genericness down here, and has

22  said, I'm not sure I would like Mike Lindell to intervene

23  in this lawsuit.

24          THE COURT:  I said there were questions about

03:12:03  25  what I ought to do, to the trademark office.  And that

1  wasn't a ruling that I will never cancel the trademarks.  I

2  started.  I tried to pare it down.  It didn't work.  And so

3  I still don't see how baking his language from Fort Worth,

4  and while it is in the Northern District of Texas, earlier

03:12:41   5  references were to the suit was in Dallas, and for that I

6  apologize.  It's in Fort Worth.

7                    But the evidence I have is GHER Solutions

8  is operated at the discretion of Todd Meagher.  He

9  reacquired it from his son.  How did his son acquire it?

03:13:15  10  And then he has a mystical duty to the company, which is

11  him, or maybe another owner.  We don't know that.  But he

12  filed the complaint, right?  Todd --

13                    MR. PATE:  GHER solutions filed the complaint.

14                    THE COURT:  Who?

03:13:41  15                    MR. PATE:  GHER Solutions filed the complaint.

16                    THE COURT:  It takes a live person.  Who signed

17  it?

18                    MR. PATE:  I signed the complaint.

19                    THE COURT:  You can't sign a complaint.

03:13:50  20                    MR. PATE:  Are you talking about in Fort Worth?

21                    THE COURT:  Yes.

22                    MR. PATE:  Yeah.  I filed the complaint and I

23  signed the complaint, as a lawyer for GHER Solutions.

24                    THE COURT:  And who told you to do that?

03:14:05  25                    MR. PATE:  Todd Meagher.

1          THE COURT:  You -- no matter what soulless

2  entity we create, it still takes a human being to operate

3  it.

4          MR. PATE:  Sure.  But, is the Court saying that

03:14:20    5  if Todd Meagher tomorrow were to start a new company --

6  let's say form a Texas corporation.  GHER Solutions is a

7  Delaware, LLC.  Let's say he files with the Secretary of

8  State an Inc., and he uses that in order to sell -- do pet

9  grooming.  Are you saying that Inc. that he just formed, if

03:14:43   10  he files taxes, and maintains corporate formalities, is

11  nothing but a sham, it is just Todd Meagher?  That is --

12          THE COURT:  It may be.

13          MR. PATE:  We --

14          THE COURT:  What I have known about all of his

03:14:56   15  businesses are they came and went.  They were used for one

16  thing, then another, but it was all because they had a

17  plan.  His press releases say that he has a bunch of, I

18  think, residual music deals where he is getting royalties

19  on songs, or something like that.

03:15:18   20          So where does the music -- which entity

21  gets the music royalties or whatever it is that he was

22  talking about?

23          MR. PATE:  Right.  And I'm not sure what entity

24  he has set up that receives his music royalties.  Or they

03:15:38   25  go to him personally in his name.  But people all the time

1 start small businesses by themselves, and they incorporate

2 or form an LLC and they become the sole managing member.

3 There is nothing illegal about doing that.  It is not a

4 sham to do that.  I have clients all the time that want to

03:16:01   5 form LLCs for their small little consulting business.

6            THE COURT:  How many of them have formed six, I

7 think, in a relatively short time period, from my

8 perspective?  Maybe not from normal people, but --

9            MR. PATE:  I don't think that would be

03:16:21  10 necessarily uncommon if you are a businessman and you do

11 different kinds of businesses.

12            THE COURT:  And you file it yourself and that

13 doesn't work so you have your wife sign it this time, and

14 all the same companies, all the same assets, and it just --

03:16:37  15 they get assigned to an entity depending on what he thinks

16 is best at the time.

17            MR. PATE:  I will say in this case, there is

18 clear deposition testimony, under oath, that Plaintiff

19 Meagher set up MyStore, Inc. for his wife.  He wanted his

03:16:54  20 wife to own this business, and run this business.  And so

21 he is setting up a lot of stuff to bless his wife, and to

22 benefit his wife.  They have a very good marriage, very

23 good family.  If you see the whole Meagher family, they're

24 an amazing family.  And, you know, they try to bless and

03:17:12  25 benefit one another.  And there is nothing wrong with

1 Mr. Meagher setting up MyStore, Inc. for his wife, and

2 having her, you know, secretarially complete the trademark

3 applications.  And he decided to benefit her.

4           THE COURT:  Wait.  Secretarially, no.  It's got

03:17:29  5 to be -- she signs the thing as the owner of it.

6           MR. PATE:  Uh-huh.  Yes.  He set her up for

7 that business.

8           THE COURT:  Well, but he owned it.  That is

9 what he told them, what, two years earlier?

03:17:42  10           MR. PATE:  He did.  He did.  He owned it, and

11 then he is going to give it to his wife, transfer it to his

12 wife.

13           THE COURT:  And what did he say it was worth

14 when he transferred it to her?

03:17:53  15           MR. PATE:  I don't -- I don't recall.  I don't

16 recall at that time what the value of the company was.

17           THE COURT:  Of course, it is only half his.

18           MR. PATE:  True.

19           THE COURT:  It is half hers to start with.

03:18:04  20           MR. PATE:  True.  Absolutely.

21           MR. POWERS:  If I may, Your Honor, where we got

22 on this path was the question of whether genericness could

23 be alleged.  And I agree that Mr. Meagher can set up as

24 many different entities as he would like to set up.  What

03:18:16  25 he can't do is miss a pleading deadline in this case, miss

1  an expert deadline in this case, miss the discovery

2  deadline in this case, and then think I have got a new

3  argument.  And then transfer to a new entity rights

4  associated with this case, so that that new entity can go

03:18:34   5  file a separate lawsuit and say, Well --

6          THE COURT:  It wasn't, it turns out, brand-new.

7          MR. POWERS:  It was not.

8          THE COURT:  It was of -- there but unused

9  apparently, so we found out about it later.

03:18:46   10          MR. POWERS:  Right.  And this entity may

11  have -- I believe this entity may have held other web

12  businesses he was thinking of, like his -- his -- his

13  lockers for professional credentials and things like that.

14          So he has had different Internet

03:19:01   15  businesses that probably trafficked in and out of GHER

16  Solutions.  But, he can't go then use that entity to

17  introduce new issues into a lawsuit well after all the

18  deadlines, well after all the facts have been established,

19  all the discovery has been completed.  That is what is

03:19:18   20  going on here.

21          Genericness came too late to be litigated.

22  It will still be res judicata by this decision.  It will

23  still be estopped by this decision.  But they would like to

24  separate it out, create a new entity or create new rights

03:19:33   25  in some entity to bring that as a separate lawsuit.  If

1 they have some right to bring that claim, then that needs

2 to come back to this Court in a Rule 15 motion saying, We

3 want to amend and add genericness and explain why it wasn't

4 bad faith, or dilatory, or undue delay, or anything else

03:19:52   5 like this.  That's the standard for this.

6           MR. PATE:  Your Honor --

7           THE COURT:  I want to be perfectly clear that

8 this Court is legally obligated but intellectually

9 committed to the vitality of limited liability companies.

03:20:05   10 That includes incorporateds and all that.  It is an engine

11 of our success.

12                 It's not the entities that are the

13 problem.  It's how the entities, and who is in charge of

14 them, and who owns them, is infinitely variable in an oral

03:20:29   15 tradition within the family.  He stood right there and

16 said, It's all me, at one of our sessions.  And he's

17 calling all the shots.  And to run up and have one more of

18 his entities pulled out of his desk drawer so he can file

19 it in a different name, this lawsuit in a different name,

03:20:57   20 in Fort Worth --

21           MR. PATE:  Your Honor --

22           THE COURT:  -- suggests that they are

23 insubstantial in their operation.  And part of the reason

24 for them being corporations and being vulnerable is they're

03:21:12   25 not supposed to be used as booby traps, or smoke screens to

1 keep people from knowing with whom they're dealing, or what

2 they're dealing with.

3              And do you have a document where GHER

4 Solutions gave its rights in all this stuff to -- I mean

03:21:41  5 all these other people gave GHER Solutions its right to all

6 these trademarks and things, and has Mrs. Meagher moved to

7 change the proponent on the trademark application to GHER

8 Solutions?

9              MR. PATE:  I don't think GHER Solutions has

03:22:06  10 ever had ownership of the trademarks.  As a matter of fact,

11 I am very confident of that.  There has never been a

12 decision made, that I'm aware of, to transfer the ownership

13 of the trademarks to GHER Solutions.

14              THE COURT:  How does it have standing?  If it

03:22:28  15 doesn't own them, it has no interest in them.  It can't

16 sue.

17              MS. TRIPP:  It's a licensee, Your Honor.

18              THE COURT:  Pardon?

19              MS. TRIPP:  GHER Solutions has an interest as

03:22:38  20 the exclusive licensee.

21              THE COURT:  Speak up.

22              MS. TRIPP:  GHER Solutions has an interest as a

23 licensee, Your Honor.

24              THE COURT:  Well, he just said -- where is the

03:22:48  25 license?

1          MS. TRIPP:  I don't have it with me, Your

2    Honor, but I am sure they have it.  They said they had a

3    license in the papers.

4          THE COURT:  Have you seen the license?

03:22:59    5          MS. TRIPP:  No, Your Honor.  I don't represent

6    GHER Solutions.

7          THE COURT:  No, but you represent people who

8    are litigating and the subject of this case.  Have you seen

9    an assignment?

03:23:09    10          MS. TRIPP:  The genericness, Your Honor, I even

11   did a motion in this case about genericness and you told me

12   it was not to be considered here, months ago.  So, I mean,

13   I didn't consider genericness an issue you in this case.

14          THE COURT:  I am not going to talk about that

03:23:25    15   now and that is what I told you before.  However you may

16   have interpreted it, I'm sorry if I wasn't clear.  But

17   after I get all of this clear, as clear as I can, I don't

18   know what I'll do next among the parties.  I'll see what

19   the problem is.  But, I can't keep going to genericness

03:23:44    20   when I am trying to figure out who owns something.

21          MS. TRIPP:  I thought that was what the GHER

22   Solutions lawsuit was about.  So I didn't -- I thought that

23   was the issue in the case.

24          THE COURT:  No.  It's about -- it's about --

03:23:54    25   it's the whole thing.  It is a shade on this.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1              Look --

2              MR. PATE:  Your Honor --

3              THE COURT:  Mr. Meagher is not the first person

4    to figure out, Well, if things are not going well on the

03:24:06  5    bayou, we will go up on the upper forks of the Trinity and

6    see if we can get some stuff.

7              It is a common technique for some folks.

8    Other folks understand it's about as transparent as

9    possible, and a new entity reurging things that have been

03:24:37  10   urged here.

11             MR. PATE:  The issue with GHER Solutions is

12   GHER Solutions owns the platform whereby MyStore has been

13   alleged to be infringing upon HEB, and so they have sought

14   a declaration that as an Internet platform they're not

03:25:00  15   infringing by using MyStore.com.  And so that gives them

16   standing to assert that claim for declaratory judgment.

17             THE COURT:  That will be an interesting

18   question which somebody apparently will have to decide.

19             MS. TRIPP:  As I understand it, Your Honor,

03:25:16  20   that's the way it has been the whole time.  I mean, that

21   GHER Solutions isn't new on this, that they have had that

22   role the whole time.

23             THE COURT:  That is not what anybody told me

24   the first half of today.

03:25:27  25             MR. PATE:  Your Honor, I want to clarify

1  something that Mr. Powers brought up.  He is saying that

2  this is some late attempt to smuggle in some expert report

3  because we somehow missed the deadline in this underlying

4  proceeding, or in this proceeding, or whatnot.  That is not

03:25:41   5  how this trans -- went down at all.

6              Typically, in a trademark proceeding like

7  this, you will see the plaintiff, like HEB, do a survey.

8  They never did a survey.  Well, GHER Solutions is the

9  plaintiff in Fort Worth and they decided, We are going to

03:25:56   10  do the survey and set the record straight and so we got the

11  survey.

12              THE COURT:  Okay.  Three years.

13              MR. PATE:  And then they --

14              THE COURT:  Three years later.  And you can get

03:26:04   15  your survey anytime you want to, and they can get theirs

16  anytime they want to up until the deadline.  But all you

17  did was sell the interest to GHER Solutions, which is

18  selling it from the Meaghers to the Meaghers.

19              MR. PATE:  I am not sure what interest you're

03:26:24   20  referring to, Your Honor.

21              THE COURT:  The interest in Mi Tienda and

22  MyStore.  And what are you referring to when you say, Oh,

23  well, they just have a platform?

24              MR. PATE:  GHER Solutions owns the Internet

03:26:37   25  platform on which MyStore.com or MyStore.net were --

1                    THE COURT:  You mean the servers?

2                    MR. PATE:  That would be part of the platform.

3                    THE COURT:  Couple of desktops?  I hope you

4    have --

03:26:51   5                    MR. PATE:  That would be part of the platform.

6                    THE COURT:  -- uninterrupted power.

7                    MR. PATE:  Like Facebook has a platform.  What

8    is that?  That is a whole bunch of really big servers and

9    all of that.

03:27:04   10                    MR. POWERS:  Your Honor, I think that this

11   notion that there was some kind of separation between a

12   platform, and a mark, and a domain name is all after the

13   fact, all artificial.  When I took Todd Meagher's

14   deposition, there wasn't any claim that he had some kind of

03:27:19   15   interest held by a platform.

16                         He has claimed all the damages associated

17   with the loss of this so-called business, he has claimed he

18   is entitled to those in this case, in his own name.  I

19   don't know what possible interest GHER could have in it.

03:27:34   20   If he thinks he had some obligation to protect GHER's

21   interests, why wasn't GHER trying to intervene?  Why wasn't

22   GHER trying to claim the damages that Mr. Meagher himself

23   has claimed?

24                    THE COURT:  And who owns GHER?

03:27:47   25                    MR. PATE:  I think it's --

1          THE COURT:  If it turns out to be Mrs. Meagher,

2  or what's his name?  Vick?

3          MR. POWERS:  Nicholas.

4          THE COURT:  Nicholas.  That's the same folks.

03:28:01   5  And, actually, Mrs. Meagher would have a half interest in

6  all this stuff.

7          MR. PATE:  And I think that the argument, Well,

8  why didn't GHER Solutions intervene in this lawsuit, it

9  doesn't hold water because why would GHER Solutions want to

03:28:17  10  intervene in this lawsuit and become another defendant when

11  they have sued half the Meagher family in the first place?

12  Sue another business.  GHER Solutions doesn't want to be

13  added to this as a defendant.

14          THE COURT:  That's fine.  But it doesn't get

03:28:35  15  to -- so the right hand can't pick a fight, and it's in the

16  middle of it for three years in Houston and decide that,

17  Well, the left hand needs to go to Fort Worth, and have

18  the -- all the same arguments, all the same stuff, whether

19  it's genericness, or Mi Tienda is misspelled, or whatever

03:29:04  20  the arguments are, they are going to be the same both

21  places.

22          MR. PATE:  Your Honor, how this kind of morphed

23  into this monster started with HEB picking a fight and

24  saying that this company that just does social networking

03:29:19  25  in behalf of this platform is infringing upon their

1  trademark when there is no actual confusion whatsoever.

2          THE COURT:  When --

3          MR. PATE:  No one is confused.  So they sued

4  us.

03:29:31  5          THE COURT:  When was that first prepared?

6          MR. PATE:  I'm sorry?

7          THE COURT:  When was that exhibit first

8  prepared?

9          MR. PATE:  Oh, I prepared that yesterday just

03:29:41  10 to show you, blow it up so you could see visually what I am

11 talking about.

12         THE COURT:  What did it look like three years

13 ago?

14         MR. PATE:  This is from a screenshot.

03:29:49  15         THE COURT:  What did it look like three years

16 ago?

17         MR. PATE:  I am sure that has been produced in

18 our motion for summary judgment as a picture of some of our

19 former websites.  Screenshots.

03:30:06  20         THE COURT:  That other one, when did you start

21 using -- if it is what I think it is.  No, the next diagram

22 thing.

23         MR. PATE:  This is --

24         THE COURT:  No.  That is theirs.

03:30:18  25         MR. POWERS:  That is ours, Your Honor.  But the

1 page that you had earlier at the bench, Your Honor, I think

2 designated as Hearing Exhibit 1 is a printout of one of

3 their web pages from 2016 or '17.

4          THE COURT:  2016.  So --

03:30:39    5          MR. PATE:  Of course, they get updated,

6 modified every year.

7          THE COURT:  I know that.  But --

8          MR. PATE:  They have never looked anything

9 like Mi Tienda's web page, or HEB's web page.  There is

03:30:53   10 nobody that is confused.

11          So they picked this fight.  They sued us,

12 and then Tom Meagher got into the fray by asserting

13 counterclaims against HEB.  And, you know, my dad, who

14 retired as president of Pennzoil, always said:  I don't

03:31:05   15 start a fight, but if somebody starts a fight, I am going

16 to end it.  And that is the same attitude Mr. Meagher has.

17 They picked a fight.  They are the big bully, and saying

18 that we are -- are infringing upon their mark when nobody

19 is confused.  Mr. Meagher has said, I am going to fight

03:31:23   20 them down.  I am not going to stand here and take this.

21          And the fact of the matter is we have had

22 six or seven hearings and Mr. Meagher has taken all the

23 beating, all of the accuse -- accusing he is some alter

24 ego, and some, you know, lying lunatic.  And it's been

03:31:40   25 very, very painful.  Mr. Meagher's tried to run his

1  business correctly.

2           THE COURT:  Then maybe he should not take the

3  primitive eye for an eye.  If they're picking on me, I am

4  going to pick on them.  If HEB is bullying him, he had

03:32:02    5  responses.  He could have produced documents.  But

6  virtually everything has had to be asked for several times,

7  and I think there's a couple of things that were never

8  done.  He has testified, whether you wanted him to testify

9  or not, on several occasions with great loquacity, and with

03:32:29   10  a description of the ownership, and who was who, and what

11  was what that varied a great deal, and had lots of

12  sidetracks about Mr. Lindell's son, and whoever the other

13  person was.

14           MR. POWERS:  Mr. Lindell, Your Honor.

03:32:54   15           THE COURT:  Is he a bazillionaire?

16           MR. PATE:  I would say pretty close to that.

17           THE COURT:  I mean, you and --

18           MR. PATE:  I think --

19           THE COURT:  -- Mr. Meagher kept referring to

03:33:04   20  people as bazillionaires.

21           MR. PATE:  I think Mike Lindell has probably

22  sold over 60 million pillows by now.

23           THE COURT:  I had a copyright case on the bent

24  shower rods --

03:33:24   25           MR. PATE:  Uh-huh.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1              THE COURT:  -- for motels and things --

2  although, I don't know why you wouldn't sell them to

3  houses -- and so I ruled, as you often do in a patent case,

4  to a minor alteration that somebody had done and said that

03:33:39    5  he didn't have a monopoly.  He was furious at me.  He left

6  and he just sold his company for $10 or $12 million.  And

7  about a month after he sold it, the market fell out of it,

8  because there are only so many motel rooms in America.

9  There are a lot, but once you fill them up, and just, you

03:33:58   10  know, the replacements was apparently not a big business,

11  and so he switched from hating me to loving me.

12              MR. PATE:  Your Honor, I would ask you to

13  reserve any determination that Todd Meagher is an alter ego

14  of GHER Solutions, or GHER Solutions is an alter ego of

03:34:31   15  Todd Meagher, until we produce the documents that we will

16  produce and show you that we have observed the corporate

17  formalities.

18              THE COURT:  Well, and the substance of the

19  transfers.  Exactly what -- when he says, Oh, I have a

03:34:43   20  fiduciary duty to somebody.  To whom and how did it arise?

21  Because --

22              MR. PATE:  But, Your Honor, one thing I would

23  ask --

24              THE COURT:  There are walnut shells and peas.

03:34:53   25              MR. PATE:  What I would ask for, instead of

1 having to produce these documents by this Friday because

2 Mr. Meagher is going to be out of town, to give me ten days

3 to produce these documents so we do it right.

4             THE COURT:  All right.  Friday the 13th.

03:35:12   5             MR. PATE:  That is not a good day, but that is

6 fine.  Thank you, Your Honor.

7             THE COURT:  It's got to be a good day for

8 somebody because it's a bad day for everybody else.

9             MR. PATE:  Thank you, Your Honor.

03:35:30  10            THE COURT:  Yes, sir.

11             MR. PATE:  Your Honor, one more question.  When

12 I produce those documents on the 13th, can I produce them

13 to the Court sealed due to the fact that they will have

14 social security numbers and the like in them?  I would

03:38:25  15 rather not make them public records.

16             THE COURT:  No.  Just send me a copy, to my --

17 address it to my case manager, and stamp "confidential" all

18 over it or something.

19             MR. PATE:  Very good.

03:38:38  20            THE COURT:  And then --

21             MR. PATE:  And a copy to opposing counsel.

22             THE COURT:  Yes.  And haven't I signed the

23 confidentiality order here?

24             MR. POWERS:  I believe there is a protective

03:38:48  25 order in this case, Your Honor.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1               And I certainly wouldn't have any

2  objection to redactions of social security numbers.

3               THE COURT:  Yes.  We're not interested in

4  that.

03:38:56     5               MR. PATE:  Okay.

6               THE COURT:  And so he can blank them out.  So I

7  don't know why I wouldn't have done one.

8               MR. PATE:  Thank you.  I'll redact social

9  security numbers.  I just want to make sure that --

03:39:13    10               THE COURT:  I'll check.  And if there is not

11  one in place, I'll sign one.  But generally, Mr. Powers,

12  don't -- don't --

13               MR. POWERS:  Your Honor signed one in

14  October -- sorry, August 31st of 2018.

03:39:28    15               THE COURT:  Okay.  But just be careful.

16  That's all I can say, that -- you know, I want to tell the

17  people that encountered medical providers, Look, if you get

18  an opportunity to sell my medical records, have at it.  My

19  worst enemy wouldn't look at my medical records.  I have

03:39:52    20  looked at them and they're certainly not interesting.

21               All right.  I am going to take care of

22  what I think I took care of, but would you do a draft of

23  the -- of what I just said?

24               MR. POWERS:  Yes.  A proposed order for Your

03:40:23    25  Honor?

1                THE COURT:  Yes, sir.

2                MR. POWERS:  Yes, we will, Your Honor.

3                THE COURT:  Really it should be an opinion, and

4  the order should then be separate, two-pager.

03:40:45   5                Would anybody object if I called Judge

6  O'Connor, and just asked him what he -- does he have an

7  idea when he might do something?

8                MR. POWERS:  No objection here, Your Honor.

9                MR. PATE:  I would object, Your Honor.

03:40:59   10                THE COURT:  Okay.  Now is that H-E -- is that

11  Meagher Solutions, or Meagher 1, 2, 3, 4, 5, 7, or 12?

12                MR. PATE:  That is GHER Solutions speaking,

13  Your Honor.

14                THE COURT:  All right.  I'm just going to take

03:41:17   15  that for all your clients.

16                MR. PATE:  Thank you, Your Honor.

17                THE COURT:  Ma'am, just for the record, do you

18  object?

19                MS. TRIPP:  I object, Your Honor.

03:41:28   20                THE COURT:  Okay.  It is his lucky day.  He

21  doesn't have to talk to me.

22                MR. POWERS:  I'm sorry, Your Honor?

23                THE COURT:  It's his lucky day.  He doesn't

24  have to talk to me.  Judge O'Connor.

03:41:41   25                MR. POWERS:  Certainly have no objection to you

1 speaking with Judge O'Connor, Your Honor.

2              THE COURT:  All right.  Are you going to be in

3 town next week or so?

4              MR. PATE:  I am going to be in trial the 16th,

03:42:01   5 17th.  I think the 16th, 17th, and 18th.

6              MR. POWERS:  I think the 13th I may be out of

7 town, but other than that, I should be available.

8              THE COURT:  You got four lawyers.

9              MR. POWERS:  We will be able to serve the Court

03:42:15  10 as needed.

11             THE COURT:  All right.  Well, I will try not to

12 call you on short notice, but when I start putting it all

13 together, I may want to have a mini hearing to clear

14 something up because there is a lot of stuff here.

03:42:27  15             MR. PATE:  Just to be clear, I'm not sure of

16 the dates I just whistled off, but I believe that they

17 are --

18             THE COURT:  It doesn't matter.  If you can't

19 come, we won't do it.

03:42:38  20             MR. PATE:  Okay.  Thank you.

21             THE COURT:  I mean, no --

22             MR. PATE:  I personally would like to be

23 involved.

24             THE COURT:  Yes.  No.  If everybody is

03:42:47  25 available, then, I might want to do it.  But I am not --

1    Even if you were, say, going to hunt deer

2  or something.  I don't want to hunt deer.  We were invited

3  on a deer hunt, and my youngest grandson, who is 13, which

4  is kind of scary, he and I are going to target shoot while

03:43:09   5  everybody -- I don't have anything against hunting.  It

6  just involves getting up really early in the morning on a

7  cold day, having five minutes of fun, and spending the rest

8  of the day cleaning up the mess you made.  So I would just

9  as soon shoot targets.  They don't talk back or bleed on

03:43:25   10  you or anything.

11    Now, you all need to take breaks every

12  once in a while, you know.  If your families will have you,

13  have some fun with them.  If not, go do something

14  interesting, that you think is interesting, not what I

03:43:45   15  think is interesting.  And that includes young people to 12

16  percent as much as the old people.  See, if I start

17  treating you nice, then it will make them look bad.

18    All right.  Thank you, Counsel.

19    MR. PATE:  Thank you, Your Honor.

03:44:04   20    MR. POWERS:  Thank you, Your Honor.

21    THE LAW CLERK:  All rise.

22  (Proceedings concluded at 3:44 p.m.)

23

24

25

1          COURT REPORTER'S CERTIFICATE

2

3      I, Kathleen K. Miller, certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-entitled matter.

6

7  DATE: Dec. 9, 2019        /s/    _Kathleen K Miller

8                            Kathleen K. Miller, RPR, RMR, CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25